**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| G&A STRATEGIC INVESTMENTS I LLC, *et al.*, | |
| Plaintiffs, | Case No. 1:23-cv-10766-JSR |
| v. | |
| PETRÓLEOS DE VENEZUELA, S.A., *et al.*, | |
| Defendants. | |
| GIRARD STREET INVESTMENT HOLDINGS LLC, | |
| Plaintiff, | Case No. 1:23-cv-10772-JSR |
| v. | |
| PETRÓLEOS DE VENEZUELA, S.A., *et al.*, | |
| Defendants. | |
| GIRARD STREET INVESTMENT HOLDINGS LLC, | |
| Plaintiff, | Case No. 1:24-cv-04448-JSR |
| v. | |
| PDV HOLDING, INC., | |
| Defendant. | |

**DEFENDANTS PDV HOLDING, INC. AND PETRÓLEOS DE VENEZUELA, S.A.'S**
**MOTION FOR SUMMARY JUDGMENT**
**ON COUNTS III AND IV OF THE CONSOLIDATED COMPLAINTS**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS ............................................................................. 4

ARGUMENT ................................................................................................ 7

    I.    Plaintiffs Fail to Rebut the *Bancec* Presumption as a Matter of Law ............... 8

        A.    Plaintiffs Cannot Establish Extensive Control as a Matter of Law. ...... 9

            1.    PDVSA did not use PDVH's property as its own (Factor 1). .................................................................... 10

            2.    PDVSA does not ignore PDVH's separate status or ordinary corporate formalities (Factor 2). ............................................... 18

            3.    PDVSA does not deprive PDVH of independence from close political control or require PDVH to obtain political approvals for ordinary business decisions (Factors 3 and 4).................... 23

            4.    PDVSA has not issued policies or directives that cause PDVH to act directly on its behalf (Factor 5). ..................................... 24

        B.    It Would Be Inequitable to Hold PDVH Liable for PDVSA's Obligations to These Plaintiffs............................................................. 28

            1.    Plaintiffs and the Original Noteholders Had Full Knowledge of the Circumstances Surrounding the Note Agreements and PDVH..................................................................................... 28

            2.    Plaintiffs Deliberately Chose Not to Pursue an Available Remedy at Law Against PDVSA............................................. 31

            3.    Veil-Piercing Would Harm PDVH, Which Had No Role in the Underlying Transaction and Has Devoted Substantial Resources to Strengthening Its Post-Maduro Corporate Governance. ............................................................................ 32

            4.    Granting Plaintiffs' Requested Relief Would Harm Third Parties in the *Crystallex* Action, Undermine the Delaware Court, and Harm Judicial Efficiency. ...................................... 35

        C.    Plaintiffs Cannot Show Fraud or Injustice as a Matter of Law............ 36

    II.    Defendants Are Entitled to Summary Judgment Under Delaware Law ......... 37

CONCLUSION............................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Ala. By-Prods. Corp. v. Cede & Co. on Behalf of Shearson Lehman Bros., Inc.*,
657 A.2d 254 (Del. 1995) ................................................................ 24

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
545 A.2d 1171 (Del. 1988) ................................................................ 5

*Arch Trading Corp. v. Republic of Ecuador*,
839 F.3d 193 (2d Cir. 2016) ................................................ 10, 17, 21

*Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*,
No. 20-14058, 2023 WL 8946765 (11th Cir. 2023) ........................... 11

*Att'y Gen. of U.S. v. Irish N. Aid Comm*,
668 F.2d 159 (2d Cir. 1982) ........................................................ 25, 26

*Badilla v. Midwest Air Traffic Control Serv., Inc.*,
8 F.4th 105 (2d Cir. 2021) ................................................................ 38

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.*,
665 F. Supp. 289 (S.D.N.Y. 1987) ................................................... 12

*Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.*,
782 F.2d 377 (2d Cir. 1986) ........................................................ 8, 28

*Brunswick Corp. v. Waxman*,
599 F.2d 34 (2d Cir. 1979) ............................................................... 29

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
117 F.3d 655 (2d Cir. 1997) ............................................................. 31

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
596 U.S. 107 (2022) .................................................................... 38, 39

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................... 7

*Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*,
153 F. App'x 749 (2d Cir. 2005) ....................................................... 21

*Crosse v. BCBSD, Inc.*,
836 A.2d 492 (Del. 2003) .................................................................. 40

*Darnell v. Pineiro*,
849 F.3d 17 (2d Cir. 2017) ................................................................ 37

*De Letelier v. Republic of Chile*,
748 F.2d 790 (2d Cir. 1984) ........................................................................... 9, 36

*EM Ltd. v. Banco Cent. de la Republica Argentina*,
800 F.3d 78 (2d Cir. 2015) ........................................................................... passim

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
40 F.4th 56 (2d Cir. 2022) ........................................................................... 10

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)..................................................................................... passim

*Flatow v. Alavi Found.*,
225 F.3d 653, 2000 WL 1012956 (4th Cir. 2000) .................................... 38

*Flatow v. Islamic Republic of Iran*,
308 F.3d 1065 (9th Cir. 2002) ................................................................... 19

*Fusion Cap. Fund II, LLC v. Ham*,
614 F.3d 698 (7th Cir. 2010) ..................................................................... 29

*Gater Assets Ltd. v. AO Moldovagaz*,
2 F.4th 42 (2d Cir. 2021) ........................................................................... passim

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*,
713 F. Supp. 2d 267 (S.D.N.Y. 2010) ...................................................... 12, 33

*Greene v. Long Island R.R. Co.*,
280 F.3d 224 (2d Cir. 2002) ....................................................................... 21

*Greiling v. Zahoudanis*,
No. 08-cv-6467, 2009 WL 700049 (C.D. Cal. Mar. 13, 2009) ................ 18

*Grumman Corp. v. LTV Corp.*,
665 F.2d 10 (2d Cir. 1981) ......................................................................... 28

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)..................................................................................... 28

*Hercaire Int'l Inc. v. Argentina*,
821 F.2d 559 (11th Cir. 1987) ................................................................... 33

*Hester Int'l Corp. v. Fed. Republic of Nigeria*,
879 F.2d 170 (5th Cir. 1989) ................................................................. 26, 27

*Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*,
934 F. Supp. 570 (S.D.N.Y. 1996) ............................................................ 29

*In re Big Foot Props., Inc.*,
    No. 3:11-bk-6868, 2012 WL 6892645 (Bankr. M.D. Fla. May 25, 2012) ............................. 18

*In re Schwarzkopf*,
    626 F.3d 1032 (9th Cir. 2010) ........................................................................................ 18

*In re Vlasek*,
    325 F.3d 955 (7th Cir. 2003) .......................................................................................... 28

*Int'l B'hood of Teamsters v. U.S.*,
    431 U.S. 324 (1977)........................................................................................................ 28

*Kensington Int'l Ltd. v. Republic of Congo*,
    No. 03-CV-4578, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007)........................................ 33

*Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*,
    31 F.2d 265 (2d Cir. 1929) ............................................................................................ 29

*Manichaean Cap., LLC v. Exela Techs., Inc.*,
    251 A.3d 694 (Del. Ch. 2021) ................................................................................... 31, 40

*Marsh v. Rosenbloom*,
    499 F.3d 165 (2d Cir. 2007) ...................................................................................... 38, 39

*McKesson Corp. v. Islamic Republic of Iran*,
    52 F.3d 346 (D.C. Cir. 1995)............................................................................ 15, 16, 25, 27

*Minpeco, S.A. v. Hunt*,
    686 F. Supp. 427 (S.D.N.Y. 1988) ................................................................... 12, 16, 20, 27

*MWH Int'l, Inc. v. Inversora Murten, S.A.*,
    No. 1:11-cv-2444, 2015 WL 728097 (S.D.N.Y. Feb. 11, 2015) ............................................ 21

*Network Enters., Inc. v. Reality Racing, Inc.*,
    No. 09-cv-4664, 2010 WL 3529237 (S.D.N.Y. Aug. 24, 2010) ............................................ 37

*NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*,
    652 F.3d 172 (2d Cir. 2011) ........................................................................................... 14

*O'Melveny & Myers v. Fed. Deposit Ins. Corp.*,
    512 U.S. 79 (1994)........................................................................................................ 38

*Postal Instant Press, Inc. v. Kaswa Corp.*,
    162 Cal. App. 4th 1510 (2008) ...................................................................................... 18

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
    9 F. Supp. 2d 300 (S.D.N.Y. 1998) ................................................................................. 16

*RAI Care Ctrs. of Md. I, LLC v. Off. of Pers. Mgmt.*,
   459 F. Supp. 3d 124 (D.D.C. 2020) ........................................................ 29

*Rodriguez v. Fed. Deposit Ins. Corp.*,
   589 U.S. 132 (2020) ................................................................... 38, 39

*Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*,
   401 F. Supp. 3d 433 (S.D.N.Y. 2018) ..................................................... 19

*Tr. v. Kummerfeld*,
   153 F. App'x 761 (2d Cir. 2005) ........................................................ 37

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
   200 F.3d 843 (D.C. Cir. 2000) ................................................. 12, 16, 22, 25

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ..................................................................... 20

*Unkechaug Indian Nation v. Seggos*,
   126 F.4th 822 (2d Cir. 2025) ............................................................ 7

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
   871 A.2d 1108 (Del. 2005) .............................................................. 24

*VR Optics, LLC v. Peloton Interactive, Inc.*,
   Nos. 2021-1900, 2023 WL 2031213 (Fed. Cir. Feb. 16, 2023) ............................. 37

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999) .......................................................... 40

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
   933 F.2d 131 (2d Cir. 1991) ............................................................ 19

*Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*,
   215 F.3d 247 (2d Cir. 2000) ............................................................. 8

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ..................................................................... 18

**Statutes**

22 U.S.C. § 611 .......................................................................... 26

28 U.S.C. § 1603(b) ...................................................................... 39

**Rules**

Fed. R. Civ. P.  69 ...................................................................... 37

Fed. R. Civ. P. 56(a) ................................................................................................ 7

**Other Authorities**

1 Fletcher Cyc. Corp. § 41.70 (Sept. 2024) ............................................. 36

1 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* (4th ed.)............. 19

**INTRODUCTION**

Plaintiffs in these consolidated actions[1] are paper investment vehicles created and managed by Gramercy Funds Management LLC ("Gramercy"), a sophisticated speculator in emerging-market distressed debt. In 2018 and 2021—well after the events they complain of—Plaintiffs paid pennies on the dollar for promissory notes originally issued to third parties by Petróleos de Venezuela, S.A. ("PDVSA"), the state oil company of the Bolivarian Republic of Venezuela ("Venezuela" or the "Republic"), and guaranteed by PDVSA's wholly owned Venezuelan affiliate PDVSA Petróleo, S.A. ("PPSA"). In Counts I and II of the operative complaints, Plaintiffs allege that PDVSA and PPSA breached the terms of the notes. In Counts III and IV, Plaintiffs allege that PDV Holding, Inc. ("PDVH"), PDVSA's wholly owned American subsidiary, should be liable for the notes as PDVSA's alter ego, and they seek a turnover order of PDVH's assets under the same theory.

PDVH, joined by PDVSA, is now entitled to summary judgment in its favor on Counts III and IV.[2] There is no genuine dispute as to the facts of the relationship between PDVSA and PDVH, and as a matter of law, PDVH is not PDVSA's alter ego under the federal common law standard for veil-piercing claims against foreign states set forth in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). The Court has already determined that even after discovery, Plaintiffs could not plausibly allege facts to satisfy *Bancec*'s "fraud or injustice" prong. 1:24-cv-04448 Dkt. 130 (March 14 Order). Summary judgment in PDVH's favor

---

[1] Girard Street Investment Holdings LLC ("Girard Street") is the plaintiff in Nos. 23-cv-10772 and 24-cv-4448. The seven entities enumerated G&A Strategic Investments I–VII, LLC (collectively, "G&A") are the plaintiffs in No. 23-cv-10766.

[2] Consistent with their common interest in defending against a claim that PDVSA and PDVH are alter egos, Defendants submit this joint brief—as discussed with the Court on March 14, 2025—to promote efficiency in the briefing and resolution of this case. PDVH is represented by separate counsel from PDVSA and PPSA; at no time in the preparation of this motion has PDVSA instructed PDVH regarding its legal arguments.

is now proper because (1) Plaintiffs also cannot overcome *Bancec*'s "strong" presumption of corporate separateness through a showing that PDVSA "extensively controlled" PDVH's day-to-day operations and (2) because the equities overwhelmingly disfavor Plaintiffs' attempt to use veil-piercing to rescue themselves from the consequences of their knowing and voluntary undertaking of investment risk—particularly where, as here, Plaintiffs strategically declined an adequate remedy at law, and where their recovery would harm third-party creditors and undermine the federal judicial system.

Extensive Control. To prove extensive control, Plaintiffs rely primarily on three transactions undertaken during a time of financial crisis for PDVSA (and well before Plaintiffs invested in the notes): a one-time dividend recapitalization in 2015 and two 2016 equity pledges. These transactions were properly authorized and executed by PDVH, not PDVSA, and were on par with other industry distributions by corporations to shareholders. More fundamentally, the decade-old transactions do not show anything close to the total domination of PDVH's day-to-day activities required by the Second Circuit, which has, among other things, rejected a claim that an instrumentality's financial assistance to its foreign-state parent demonstrates extensive control under *Bancec*. *EM Ltd. v. Banco Cent. de la Republica Argentina*, 800 F.3d 78, 95 (2d Cir. 2015) ("*EM Ltd. II*").

Plaintiffs also allege other purported irregularities of corporate form and influence, but these do not establish control either: they were not irregularities at all, were not related to PDVH's day-to-day operations, or were at most minor foot faults. The Court is no longer bound to assume the truth of Plaintiffs' characterizations about these transactions, as it was at the motion to dismiss stage. With the evidence in hand, no trier of fact could overcome *Bancec*'s strong presumption to find that PDVSA exerted the extensive control required to pierce the corporate veil here.

<u>Equitable Considerations</u>.  Even if Plaintiffs could prove extensive control, *Bancec* is an equitable test, and the equities weigh strongly against this Court exercising its equitable powers to pierce PDVH's corporate veil. Plaintiffs are not innocent victims without other recourse, but rather sophisticated entities trying to game the system to the detriment of others. Absent any unfairness to them, equity should not come to Plaintiffs' aid.

*First*, courts do not countenance veil-piercing against the affiliate of a contractual counterparty where, as here, a party enters a contract with full knowledge of its counterparty's financial distress but fails to obtain a guaranty or other protection from that affiliate. The original noteholders were sophisticated companies that knew of PDVH's separate corporate existence—which is expressly set forth in the Note Agreements themselves—and executed those agreements knowing that PDVH was not a guarantor or other source of security in the event of default. And the Gramercy personnel who managed Plaintiffs bought the Notes with knowledge of these explicit contractual terms, as well as the 2015 dividend, 2016 equity pledges, and other transactions they now complain of.

*Second*, Plaintiffs had a legal remedy that would not require piercing the veil: the near decade-long process in Delaware by creditors seeking to execute on PDVSA's stock in PDVH. Indeed, the existence of the Delaware sale process shows why the Supreme Court's public policy and international law concerns in *Bancec* do not apply here. The *Bancec* framework was designed to prevent foreign sovereigns from using their special status in U.S. courts to shield their assets from creditors. *See* 462 U.S. at 632. The Delaware proceedings have already created a mechanism for creditors of PDVSA (and the Republic) to satisfy their claims against PDVSA's U.S. assets: attaching the shares of PDVH—the value of which derives from all PDVH subsidiaries, including CITGO—and participating in the sale process. Plaintiffs are simply trying to outmaneuver other

creditors. Where, as here, Plaintiffs have an adequate remedy at law (the attachment proceedings) but willingly chose not to take advantage of that route for strategic purposes, *Bancec*'s motivating purposes are entirely absent, leaving no equitable reason to disregard the "strong" presumption of separateness between PDVSA and PDVH.

*Third*, PDVH played no role in the underlying Note Agreements or the alleged defaults, and Plaintiffs have conceded that PDVH has not harmed them in any fashion. Piercing PDVH's corporate veil now—especially a decade after the transactions Plaintiffs complain of, and following a half-decade of PDVH operating under new leadership that has reinforced PDVH's separate existence through enhancements to its governance procedures—is inequitable.

*Finally*, granting the relief Plaintiffs seek would harm diligent third-party creditors who have spent years pursuing recovery in the Delaware proceeding by enabling Plaintiffs to jump to the front of a line from which Plaintiffs have been excluded due entirely to their own calculated delay, likely inviting a slew of new claims in this Court. Such gamesmanship is contrary to the public interest.

## STATEMENT OF FACTS

PDVH, a Delaware corporation established in 1997, is the indirect parent of the thriving, major refining company CITGO Petroleum Corporation ("CITGO"). SUMF ¶¶ 27, 29, 30–31.[3] PDVH is wholly owned by PDVSA. SUMF ¶¶ 20–22, 28. At all times, PDVH has held itself out as having its own separate corporate existence. SUMF ¶¶ 78–80. On a day-to-day basis, PDVH evaluates and decides on the strategic goals of the assets it owns, such as by identifying risks and opportunities for its subsidiary companies as well as ensuring proper financial management and

---

[3] A full recitation of the facts pertinent to Defendants' entitlement to summary judgment is contained in Defendants' Rule 56.1 Statement of Undisputed Material Facts ("SUMF"), which, for the sake of economy, is not reproduced here.

legal compliance. SUMF ¶ 135. Although PDVH is obligated under Delaware law to operate in the interests of its shareholder, *e.g.*, *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988), it makes independent assessments and decisions for the company on a day-to-day basis. SUMF ¶ 139.

In 2015 and 2016, during a time of financial turmoil affecting Venezuela and PDVSA, the Board of Directors of PDVH considered and approved three transactions at issue in this litigation. SUMF ¶¶ 41–46, 57–60. First, in 2015, PDVH and its wholly owned subsidiary, CITGO Holding, participated in a dividend recapitalization funded through debt financing, which resulted in the declaration and payment of a $2.2 billion dividend to PDVSA (the "2015 Dividend"). SUMF ¶¶ 42–43, 48. In the fall of 2016, the PDVH Board authorized two additional transactions: a pledge of 50.1% of its shares of stock of CITGO Holding, Inc. ("CITGO Holding") to secure notes issued by PDVSA in exchange for existing debt (the "October 2016 Pledge")[4] and a pledge of 49.9% of its stock in CITGO Holding as collateral for a prepaid crude oil export contract between PPSA and Rosneft Trading that was guaranteed by PDVSA (the "November 2016 Pledge" and together the "2016 Pledges"). SUMF ¶¶ 57, 59. In all three instances—consistent with all corporate formalities—the Board of PDVH voted to approve the transactions. SUMF ¶¶ 46(a)–(e), 58(a)–(c), 60(a).The November 2016 pledge was released by Rosneft Trading in 2023. SUMF ¶ 61.

In August 2017, the United States imposed a sanctions regime on the Government of Venezuela, then led by President Nicolás Maduro. Among other things, these sanctions prohibited PDVH from issuing dividends to PDVSA. SUMF ¶ 65. In August 2018, a federal court in Delaware overseeing a judgment enforcement proceeding by a creditor of the Republic issued a

---

[4] The validity of the October 2016 Pledge is disputed and subject to separate litigation. *See generally Petroleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et al.*, 19-cv-10023 (S.D.N.Y.).

writ of attachment on the PDVH shares, which likewise prohibits PDVH from issuing dividends. SUMF ¶¶ 305–08; *infra* n.16; *see generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 1:17-mc-151 ("*Crystallex*"), Writ of Attachment *Fieri Facias*, Dkt. 95 at 7 (D. Del. Aug. 23, 2018). In 2018, the then-president of the Republic, Nicolás Maduro, declared victory in a presidential election widely viewed as fraudulent. SUMF ¶¶ 6–7, 10. The United States derecognized Maduro in January 2019 and instead recognized Juan Guaidó, the president of the duly elected National Assembly of Venezuela, as Interim President. SUMF ¶¶ 8–9, 69. In February 2019, the National Assembly established the Ad Hoc Board of PDVSA to govern PDVSA's assets outside Venezuela, such as its shares of stock in PDVH. The United States recognizes the Ad Hoc Board of PDVSA as the only legitimate governing body of PDVSA. SUMF ¶¶ 23–25. President Guaidó appointed new directors to the Ad Hoc Board, which in turn independently appointed new directors of PDVH. SUMF ¶¶ 24, 26.

In 2016, Servicios Halliburton de Venezuela, S.A. ("Halliburton") entered a note agreement with PDVSA and PPSA for a principal amount of $200,000,123.50 to satisfy unpaid accounts receivable. SUMF ¶¶ 168, 170, 173. In 2017, Schlumberger Venezuela, S.A. ("Schlumberger") entered a series of note agreements with PDVSA and PPSA with a combined value of $700,000,007.16 to satisfy unpaid accounts receivable. SUMF ¶¶ 207, 209, 211. In both cases, the Note Agreements named PPSA as guarantor on the Notes, SUMF ¶¶ 177, 181, 217, 220; identified PDVH as a separate subsidiary of PDVSA, SUMF ¶¶ 178, 218; and did not include recourse against PDVH in the event of breach, SUMF ¶¶ 181, 220. Plaintiffs assert that, in late 2017, PDVSA breached the Note Agreements. SUMF ¶¶ 192, 230, 231. In 2018, the Schlumberger Notes were purchased by G&A. SUMF ¶¶ 232–33. In 2021, the Halliburton Note was purchased

by Girard Street. SUMF ¶¶ 193–95.[5] Both Plaintiffs were and are sophisticated entities with

expertise in investing in distressed sovereign debt, SUMF ¶¶ 196, 234; were aware of the 2015

Dividend and 2016 Pledges SUMF ¶¶ 267, 268; knew that PDVH was not a guarantor on the Notes,

SUMF ¶¶ 201, 243; and were aware of the unfolding litigation in Delaware in which, since 2018,

multiple creditors of the Republic and PDVSA have obtained attachments on the shares of PDVH,

SUMF ¶¶ 272, 275–76, 307, 319–20. At present, a court-appointed Special Master is seeking to

sell the PDVH shares as part of the Delaware proceedings to satisfy debts of PDSVA and the

Republic, with the deadline for a final recommendation currently set for May 16, 2025. SUMF

¶¶ 313, 341. Plaintiffs chose not to participate in the Delaware proceedings. SUMF ¶¶ 355, 363–

65, 372–74. In late 2023, Plaintiffs filed suit in this Court seeking to enforce their judgments

against PDVSA. In June 2024, Plaintiffs filed actions seeking to hold PDVH liable on the

Halliburton and Schlumberger Notes on an alter ego theory and for a turnover of PDVH's shares

of stock in CITGO Holding. SUMF ¶¶ 206, 247–48, 294, 326.

## ARGUMENT

Under the familiar standards of Federal Rule of Civil Procedure 56(a),[6] PDVH is entitled

to summary judgment on Counts III and IV because Plaintiffs are not entitled to the equitable

remedy of veil-piercing as a matter of law.

---

[5] For the avoidance of doubt, PDVSA and PPSA continue to assert their defenses to Plaintiffs' purported acquisition of the Note Agreements and do not in any way waive or concede the validity of Plaintiffs' claims arising from alleged breach of the Note Agreements. But the Court need not reach that issue to grant summary judgment to Defendants, as, even if the assignments were valid, no trier of fact could reasonably find extensive control.

[6] Summary judgment is "required" if the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 828 (2d Cir. 2025). If the opposing party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## I.    Plaintiffs Fail to Rebut the *Bancec* Presumption as a Matter of Law

In *Bancec*, the Supreme Court emphasized that "[l]imited liability is the rule, not the exception" and that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Bancec*, 462 U.S. at 626–27. *Bancec* thus establishes a "strong" presumption of separateness between the foreign sovereigns and their instrumentalities. *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021) (quoting *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 252 (2d Cir. 2000)).[7] Under Second Circuit precedent, this presumption *cannot* be overcome unless, at minimum, either (1) "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) "recognizing the instrumentality's separate juridical status 'would work fraud or injustice.'" *Id*. at 55 (quoting *Bancec*, 462 U.S. at 628–29). "An alter ego relationship is not easily established," and Plaintiffs bear the burden of proof to overcome the presumption. *Id.* at 55–56.

Even if one of those prerequisites is satisfied, *Bancec* and the Second Circuit make clear that such a finding alone is insufficient to hold PDVH liable for the debts of PDVSA, as the Court's task ultimately is to determine whether the equities warrant veil-piercing "in the light of the circumstances of the case." *Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.*, 782 F.2d 377, 379 (2d Cir. 1986); *see also, e.g.*, *Moldovagaz*, 2 F.4th at 55 (stating that proving either prong of the *Bancec* test "may" warrant piercing (quoting *Bancec*, 28 U.S. at 628–29)). In particular, *Bancec* emphasized that it was announcing "no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded." 462 U.S. at 633. Instead, as this Court previously has recognized, *see* 1:24-cv-04448

---

[7] Consistent with Second Circuit law, Defendants respectfully renew their argument that Delaware law should govern the veil-piercing inquiry in this case. *See infra* Part II.

Dkt. 116 ("MTD Op.") at 7, the Supreme Court grounded its decision in "principles of equity common to international law and federal common law," *Bancec*, 462 U.S. at 613. Thus, even if Plaintiffs "make the difficult showing necessary" to prove extensive control, this Court still must "assess the propriety of veil piercing" as an equitable matter in light of all relevant circumstances. MTD Op. at 24; *accord De Letelier v. Republic of Chile*, 748 F.2d 790, 795 n.1 (2d Cir. 1984) (holding that the *Bancec* analysis should consider whether "an 'injustice' might be inflicted on third parties," such as non-party creditors, by ignoring an instrumentality's separate status). Here, the undisputed facts are insufficient as a matter of law to rebut the strong presumption in favor of recognizing PDVH's independent status or to justify the Court exercising its "equitable powers," MTD Op. at 25, to hold PDVH liable for PDVSA's debts. This is particularly true in light of the concerns that motivated the Supreme Court in *Bancec*—namely, the risk that foreign governments would seek "to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity" or "avoid the requirements of international law simply by creating juridical entities whenever the need arises" to avoid paying creditors. 462 U.S. at 632–33. Those concerns are not at issue given the *Crystallex* proceedings. This is simply a case of two creditors of PDVSA trying to race ahead of many others.

### A.      Plaintiffs Cannot Establish Extensive Control as a Matter of Law.

"In applying *Bancec's* 'extensive control' prong, the touchstone inquiry is whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *Moldovagaz*, 2 F.4th at 55. It is not enough to show a level of control "that corporations would normally tolerate from significant shareholders or expect from government regulators." *Id.* at 56. Instead, Plaintiffs must present evidence "of activities that illustrate a complete takeover of [PDVH]'s day-to-day operations by [PDVSA]." *EM Ltd. II*, 800 F.3d at 95.

In conducting this inquiry, relevant factors include whether the sovereign entity "(1) uses

the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 202 (2d Cir. 2016) (quoting *EM Ltd. II*, 800 F.3d at 91); *see also* MTD Op. at 13. Consistent with the Supreme Court's admonition in *Bancec* that "no mechanical formula" governs the analysis, 462 U.S. at 633, the Second Circuit considers these factors as part of a holistic inquiry, and always through the lens of whether "whatever control [the sovereign entity] exerted" is "significant," "repeated," and "tied to [the instrumentality's] *day-to-day* operations." *EM Ltd. II*, 800 F.3d at 91–92 (emphasis original); *see also, e.g.*, *Moldovagaz*, 2 F.4th at 55 n.7, 56–61 (same); *Arch Trading Corp.*, 839 F.3d at 202–05 (similar). Plaintiffs' evidence does not come close to exceeding the high bar set by the Second Circuit for showing a complete takeover of PDVH's day-to-day operations.

### 1.    PDVSA did not use PDVH's property as its own (Factor 1).

The undisputed evidence shows that PDVSA has not used PDVH's property as its own. Examples of a state using an instrumentality's property as its own include the state's maintenance of "offices on property belonging to" the instrumentality without paying rent, the instrumentality donating highly valuable property to the government that the instrumentality's board had "recommended selling for a financial benefit," and the state and instrumentality sharing bank accounts. *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 70 (2d Cir. 2022); *see also Arch Trading Corp.*, 839 F.3d at 204, 207 (describing a case in which "sovereign instrumentality deposited funds in [its indirect subsidiary's] bank account … and made millions of dollars of … payments from that account … without seeking approval from [the

10

indirect subsidiary]" and a case in which "audits revealed the absence of any clear demarcation between [the sovereign's] finances and those of [the instrumentality]"(cleaned up)).

There is no evidence of such use or commingling of PDVH's property by PDVSA. PDVH and PDVSA maintain separate bank accounts; have separate offices; issue separate financial and accounting statements; and conduct (and document) intercompany and commercial transactions pursuant to written goods, services, and payment agreements. SUMF ¶¶ 85, 111–14. These indisputable facts show that PDVSA does not exercise day-to-day control over PDVH. *See, e.g.*, *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, No. 20-14058, 2023 WL 8946765, at *7 (11th Cir. 2023) (maintenance of separate bank accounts and separate accounting system supported conclusion that instrumentality was "not under the Dominican Republic's operational control").

Contrary to Plaintiffs' contentions, PDVH's payment of dividends and pledges of its property in 2015 and 2016 do not show that PDVSA used PDVH's property as its own. At the threshold, harkening back to isolated and decade-old transactions to demonstrate extensive control today is the wrong lens through which to view the *Bancec* inquiry. Plaintiffs have conceded that neither they nor the original noteholders were harmed by these transactions and that when they purchased the Notes from the original noteholders, they were aware of the very transactions that are now the centerpiece of their complaints. SUMF ¶¶ 62, 267–68, 271, 277, 286–87; *see also* MTD Op. at 13–14 (identifying the 2015 Dividend and 2016 Pledges as Plaintiffs' "chief allegation"). Indeed, the 2015 Dividend predated issuance of both Notes to the *original* noteholders, and the 2016 Pledges predated issuance of the Schlumberger Notes. Moreover, U.S. sanctions have prohibited the payment of dividends from PDVH to PDVSA since 2017, SUMF ¶ 65, and the pledging of equity to secure PDVSA's debts since 2018, SUMF ¶ 66, before the Ad

Hoc Board was created, SUMF ¶¶ 23–24, and in February 2019, the boards of both PDVSA and PDVH were reconstituted after the U.S. de-recognized Maduro's government in favor of Interim President Guaidó, SUMF ¶¶ 7–9, 23–26. Tellingly, *none* of Plaintiffs' primary arguments turn on post-2019 conduct (nor could they). *See Moldovagaz*, 2 F.4th at 60 (giving more relevance to recent facts than more distant ones in assessing alter ego); *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 276 (S.D.N.Y. 2010) (same).

Even if transactions from a decade ago were relevant to the extensive control inquiry, they still would not support Plaintiffs' claims. It is not unusual or indicative of extensive control for a parent and subsidiary "to provide capital to cover losses" or to assist with one another's debts, particularly where one is in distress. *Bancec*, 462 U.S. at 624; *see also EM Ltd. II*, 800 F.3d at 94 (Central Bank provided funds to sovereign to assist "in responding to an extremely severe debt crisis"); *Moldovagaz*, 2 F.4th at 62 (sovereign provided funds to instrumentality to help pay its debts); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 852 (D.C. Cir. 2000) (Venezuela's provision of funds to instrumentality "in order to reorganize the ailing company and to bail it out of debt" did not suggest alter ego); *Minpeco, S.A. v. Hunt*, 686 F. Supp. 427, 437 (S.D.N.Y. 1988) (loans by Peruvian central bank to another Peruvian instrumentality to cover instrumentality's losses did not show that Peru extensively controlled the central bank); *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 297 (S.D.N.Y. 1987) (extensive control not shown by Bank of England's guarantee of subsidiary's obligations to stave off subsidiary's potential collapse).

Here, as was public knowledge, the Republic of Venezuela and PDVSA were in financial turmoil in 2014 and 2015 after global oil prices collapsed. SUMF ¶ 41. The 2015 Dividend and 2016 Pledges were all executed to help provide much-needed liquidity to PDVSA or the

refinancing of maturing debt in this period of emergency. Contrary to Plaintiffs' allegations, PDVSA paid down considerable debt to existing creditors contemporaneously with receipt of the 2015 Dividend. SUMF ¶¶ 49(a)–(b) (PDVSA reduced its total financial debt by approximately $4.1 billion, its total current liabilities by approximately $3.4 billion, and its total non-financial liabilities by approximately $23.6 billion). It is both commonplace and proper for a wholly owned subsidiary to borrow against its future earnings in order to fund dividends to its parent; this is called a dividend recapitalization.[8] Moreover, contrary to Plaintiffs' allegations (MTD Op. at 16; 1:24-cv-04448 Dkt. 47 (Girard Street Consol. Am. Compl. (*hereafter* "CAC") ¶¶ 114–117)), the amount of the 2015 Dividend was comparable in size to transfers to shareholders of peer companies when compared to the full complement of cash transfers that such companies made to their shareholders at the time. SUMF ¶¶ 48(a)–(b). For example, between dividends and share buybacks, Marathon returned an average of 125% of its earnings to its shareholders between 2015 and 2023, compared with just 48% for PDVH during the same period.[9] And there also is nothing unusual about a subsidiary pledging assets to support its parent in a corporate group, particularly, as here, to help the parent avoid defaulting on its existing obligations. Ex. 3 (Expert Report of T.

---

[8] Dividend recapitalizations are widely used by businesses to increase their level of debt while returning capital to shareholders. The trade off in current liquidity in exchange for a reduction in future cash flows available to equity owners is within the normal purview of a business to determine its capital structure and the timing of distributions. SUMF ¶¶ 48, 48(a). *See also*, Ex. 3 (Expert Report of T. Henderson (Jan. 29, 2025)) at ¶¶ 71, 77–83, 155–167; Ex. 4 (Supplemental Expert Report of T. Henderson (Feb. 19, 2025)) at ¶¶ 20, 32.

[9] *See* Ex. 5 (Expert Report of Jack Schwager (Jan. 29, 2015)) at 109, Table 21. U.S. sanctions barred CITGO Holding from paying dividends for part of this period, but even if sanctions had not been imposed, the total amount of dividends paid would not have materially changed. The debt covenants that CITGO Holding entered into as part of the recapitalization transaction would have prevented CITGO Holding from making any dividends until at least mid-2022. Ex. 6 (Supplemental Expert Report of Jack Schwager (Feb. 19, 2025)) ¶¶ 27–29. Effectively, through the transaction, PDVSA traded away its access to dividends in 2016–2022 for the one-time payment in 2015.

Henderson (Jan. 29, 2025)) at ¶ 167.

One Second Circuit case, in particular, forecloses Plaintiffs' theory that the 2015 and 2016 transactions exhibit extensive control. In *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 95 (2d Cir. 2015), the district court found that Argentina caused the Argentine Central Bank to make billions of dollars of "purchases of U.S. dollars in order to use those dollars to repay a debt of the Republic [of Argentina]." *EM Ltd. v. The Republic of Argentina*, 720 F. Supp. 2d 273, 285 (S.D.N.Y. 2010), *vacated sub nom. NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011).[10] Argentina and the Bank repeated this "pattern" in subsequent years, with the Bank paying $6.7 billion of Argentina's debts in 2006 and $6.6 billion of its debts in 2008. *Id.* at 300. These facts, the district court initially found, "demonstrated that the Republic [of Argentina] could draw on the resources of [the Bank] at will" and, based on this and other findings, determined that the Bank was the alter ego of Argentina. *Id.* On subsequent appeal after remand on a different issue, the Second Circuit reversed, reasoning that Argentina's "decision to use [its central bank] to repay its debt to the [International Monetary Fund] and other creditors [was] not indicative of the extensive control that concerned the Supreme Court in *Bancec*." 800 F.3d at 94. Moreover, Argentina's "plan to borrow money" from the Bank to pay its creditors "was not executed by the Argentine government alone," but instead "received the necessary review and approval by [the Bank's] legal advisers and [its] Board of Directors." *Id.*

Here, as in *EM Ltd.*, the financings, dividend payments, and pledges to which Plaintiffs

---

[10] As the district court described it, "more than $8 billion, constituting almost a third of the U.S. dollar reserves held by [the Bank], was used to pay an indebtedness of the Republic (not, of course, an indebtedness of [the Bank])," and all the Bank received in return was a zero-interest, unenforceable 10-year note that the Republic did not start to pay back until "urged to do so by the Republic's New York attorneys." *Id.* at 285–86, 300; *see also id.* at 286 ("It would appear that the 10-year note is more appearance than substance.").

point were not "executed by [PDVSA] alone." *See id*. Instead, these decisions were made by PDVH's Board of Directors, through duly authorized written consents. The 2015 Dividend was authorized separately by each subsidiary's board after issuance of a solvency opinion by PDVH's financial advisor, Houlihan Lokey, and a finding that the transaction was in the "best interests" of both PDVH and its shareholder.[11] SUMF ¶¶ 46(a)–(c). And the PDVH Board likewise properly authorized the 2016 Pledges. SUMF ¶¶ 57–58(b), 59–60(a).

These are not instances of *PDVSA* using PDVH's property as its own, but rather PDVH using its property to aid its parent, just as the Central Bank did for Argentina. And even if the 2015 Dividend or 2016 Pledges could support a finding of extensive control (they cannot), PDVH has neither paid dividends to PDVSA nor guaranteed obligations of PDVSA since U.S. sanctions were imposed in 2017, SUMF ¶¶ 87–88, much less since the Ad Hoc Board was formed in February 2019. SUMF ¶ 89.

PDVH's payment of dividends to its sole shareholder is also materially distinguishable from *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351–52 (D.C. Cir. 1995), to which the Second Circuit has sometimes pointed as standing for the proposition that a state dictating an instrumentality's decisions regarding the declaration and payment of dividends can help to show extensive control, *see EM Ltd. II*, 800 F.3d at 95 n.77. In *McKesson*, Iran was the 52% shareholder of an Iranian dairy operation, and political officials directly exercised their control over the dairy's board of directors to require them to stop paying dividends to the minority American shareholder purely for political instead of commercial reasons. 52 F.3d at 351–52. Notably, unlike PDVH, the

---

[11] Plaintiffs are wrong that the 2015 Dividend was "negotiated and orchestrated by PDVSA employees, not employees of PDVH or Citgo Holding." CAC ¶ 114. The financing to facilitate the 2015 Dividend was negotiated by CITGO personnel and their counsel; PDVH has maintained a services agreement with CITGO since 2002 by which CITGO provides legal and financial services for a fee. SUMF ¶¶ 44, 98.

directors in *McKesson* turned dividend decisions over to Iran's cabinet ministers and officials. *Id.* By contrast, here, these decisions were made by PDVH's Board, in the exercise of its duly authorized powers, after engaging an outside advisor to conduct a solvency review, and after finding that the dividends were "advisable and in the best interests of the Company and its sole stockholder." SUMF ¶¶ 46(a)–(c).

Nor would it matter if PDVSA requested the dividends or pledges or if it had a role in investigating and approving the financing transaction for the dividends, as neither fact would show that PDVSA dominated PDVH's day-to-day operations. A request for a dividend by a sole shareholder—and the corporation paying a dividend consistent with that request—does not come close to "ris[ing] above the level that corporations would normally tolerate from significant shareholders." *Moldovagaz*, 2 F.4th at 56. (Indeed, the Second Circuit saw no control in the fact that Argentina conceived the loan plan at issue in *EM Ltd.*) It also is not surprising that a parent corporation would play a role in evaluating and approving the borrowing of billions of dollars by one of its subsidiaries or the pledging of its largest asset, which "hardly qualif[y] as [the subsidiary's] 'day-to-day' business." *Transamerica Leasing, Inc.*, 200 F.3d at 851; *see also Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 9 F. Supp. 2d 300, 306 (S.D.N.Y. 1998) (holding that sovereign involvement in privatization of state telecommunications company did not show extensive control over day-to-day operations, as it was "unlikely" that any similar privatization "could move forward without the active participation, if not control, of the sovereign," and that such involvement was "similar to the conduct of a majority shareholder, [was] not unusual, and cannot be the basis for ignoring the corporate form"); *Minpeco, S.A.*, 686 F. Supp. at 435 ("Clearly, any sole shareholder has a strong legitimate interest in the major decisions of a wholly-owned corporation.").

Plaintiffs' assertions that PDVH subsidiaries paid expenses of PDVSA or its Ad Hoc Board, *e.g.*, Ex. 7 (Expert Report of F. Rodríguez (Dec. 12, 2024)) ¶ 129, are incorrect as a matter of fact and otherwise irrelevant and immaterial to their claim, given that Plaintiffs do not seek to hold these separate PDVH subsidiaries liable for PDVSA's debt, much less pierce their corporate veils. *See Arch Trading Corp.*, 839 F.3d at 203 (direct subsidiary is "an entity distinct from" indirect subsidiary). Indeed, throughout their complaints, Plaintiffs refer to CITGO (PDVH's indirect subsidiary) and other direct or indirect PDVH subsidiaries. *E.g.*, CAC ¶¶ 98–102 (PDVH subsidiary PDV USA); *id.* ¶ 103 (PDVH subsidiary PDV Chalmette); ¶¶ 73, 144 (appointments at CITGO). But they seek to pierce *PDVH*'s veil. Plaintiffs' imprecision is intentional, as they lack sufficient evidence to show that PDVH is an alter ego. In any event, even if relevant, the evidence shows that the expenditures identified by Plaintiffs were **funded by PDVSA, not PDVH or its subsidiaries**. Most were either prepaid by PDVSA or paid with monies owed to PDVSA or PPSA; and all were properly authorized, recorded, accounted for, independently audited and, after the imposition of sanctions, specifically *approved by OFAC*. SUMF ¶¶ 164–65 (including all subparagraphs).[12] These transactions do not show that PDVSA used PDVH's property as its own, but rather that PDVSA directed the use of its own money to its own business purposes as authorized under U.S. law.

Finally, the remaining allegations cited by the Court as potentially supporting this factor (MTD Op. at 13–16) are, upon review of the evidence, demonstrably false. First, Plaintiffs mistakenly allege that PDVH president/CITGO Board chair Dr. Luisa Palacios said in an interview

---

[12] PDV USA, Inc. provided services to PDVSA, including primarily procurement and logistical support services for PDVSA in the United States. These services were paid for, either directly or indirectly, by PDVSA, and the transactions were properly recorded, accounted for, and reviewed by the PDVH's outside auditors. SUMF ¶ 166.

that dividends of CITGO were intended to pay down the Republic's debt (MTD Op. at 15; Girard Street Compl. ¶ 123); as explained at Dr. Palacios' deposition and as apparent on the face of the interview transcript, Dr. Palacios stated that, during her tenure (which began in 2019), dividends declared by CITGO to CITGO Holding (CITGO's direct parent) would be used to pay down *CITGO Holding's* debts.[13] SUMF ¶ 64. Second, as demonstrated by PDVH's balance sheets and solvency opinions, PDVH was not undercapitalized or insolvent at the time of the 2015 Dividend or 2016 Pledges, nor any time thereafter. SUMF ¶¶ 50–53; (*see* MTD Op. at 14–15; CAC ¶ 5). Finally, one is not "siphoning" funds (MTD Op. at 13; CAC ¶ 5) if one enhances the debtor's financial standing. SUMF ¶¶ 49(a)–(c).[14]

    2.    <u>PDVSA does not ignore PDVH's separate status or ordinary corporate formalities (Factor 2).</u>

The undisputed facts also show that PDVSA respects PDVH's separate status and that

---

[13] Plaintiffs' allegations regarding statements of Mr. Maduro in 2022 (CAC ¶ 125; MTD Op. at 15) are of no moment for two reasons. First, the United States derecognized Mr. Maduro as the legitimate president of the Republic in 2019; this Court is bound to honor that decision by the Executive Branch and thus cannot ascribe presidential weight to any statement by Mr. Maduro in 2022. *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015). Even if Mr. Maduro had been the legitimate president in 2022, the Second Circuit discounts political commentary when conducting a *Bancec* analysis. *Moldovagaz*, 2 F.4th at 56 n.9 ("A politician's statement in favor of a position … does not indicate alter ego status for an entity that later acts in accordance with that view.").

[14] As a legal or equitable matter, "siphoning" of funds should have little relevance in the reverse-piercing context. Reverse-piercing cases, as a number of courts have noted, typically involve funds going from the shareholder to the corporate entity, *i.e.*, in the opposite direction than dividends or other "siphoning" from the subsidiary to the parent. *See, e.g.*, *In re Big Foot Props., Inc.*, No. 3:11-bk-6868, 2012 WL 6892645, at *4 (Bankr. M.D. Fla. May 25, 2012) (reverse-piercing cases involve instances "when the shareholders have formed or used the corporation to secrete assets and thereby avoid pre-existing personal liability" (applying Florida law)); *see also Greiling v. Zahoudanis*, No. 08-cv-6467, 2009 WL 700049, at *3 (C.D. Cal. Mar. 13, 2009) ("[T]he issue addressed by outside reverse piercing is the shareholder's transfer of personal assets to the corporation to shield the assets from collection by a creditor of the shareholder. In other words, outside reverse piercing seeks to protect the judgment creditor from the shareholder's fraudulent transfer of assets to the corporation." (applying California law) (quoting *Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal. App. 4th 1510, 1523 (2008))); *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) (applying *Postal Instant Press*).

PDVSA and PDVH observe ordinary corporate formalities. Corporate formalities include such activities as issuing stock certificates, the keeping of articles of incorporation and bylaws, the payment of dividends, the election of directors, the filing of annual reports and tax returns, and the "keeping of books and records" "that would evidence the workings of an actual corporation," such as "resolutions, minutes, or the like." *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991); *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018); 1 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 7:9 (4th ed.).

PDVH maintains all these formalities and more. It has its own board of directors and its own officers. SUMF ¶¶ 78, 93, 111, 115–17. It issues stock certificates, operates pursuant to a certificate of incorporation filed with the Delaware Secretary of State and its own bylaws, files annual reports with the State, pays federal and state taxes and files its own tax returns, maintains separate finances from PDVSA, keeps regular financial statements, delivers quarterly reports to its shareholder, declares regular dividends approved by its board of directors (until 2017, when OFAC prohibited the payment of dividends to PDVSA), and documents its formal decisions in regularly maintained resolutions, meeting minutes, and written consents in conformance with Delaware law. *See Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1072 (9th Cir. 2002) (Iranian bank held not to be agent of Iran where, among other things, the bank had "its own Articles of Association," "operate[d] under its own charter as a separate banking entity," and was "supervised by a Board of Directors" that appointed the bank's officers); SUMF ¶¶ 65, 79–87, 131. Though Plaintiffs may point to evidence purportedly showing that PDVH's recordkeeping or adherence to formalities over the nearly thirty-year period of its existence may not have been perfect at some points or in some respects, such "evidence … is simply not relevant to the alter ego issue" given

that "it is undisputed that [PDVH] was and is an active, real business entity which keeps extensive corporate records of various activities, even if they may be inadequate in some respects." *See Minpeco, S.A.*, 686 F. Supp. at 435.

Likewise, PDVSA exercises its powers of appointment and removal of PDVH's directors through duly executed meeting resolutions or stockholder's written consents, and in accordance with Delaware law. SUMF ¶¶ 95–96. The Ad Hoc Board does not assert that it has the power to direct the day-to-day business of PDVH, SUMF ¶¶ 105, 387, does not do so, SUMF ¶¶ 141–42, and, indeed, does not even regularly discuss PDVH's day-to-day business activities with PDVH, SUMF ¶¶ 146. With respect to PDVH's subsidiaries—CITGO Holding and CITGO Petroleum— the Ad Hoc Board has never appointed a director to their boards, SUMF ¶¶ 120, 121, 124, instructed PDVH to remove a director from the CITGO Holding or CITGO Petroleum boards, SUMF ¶¶ 122, 124, or discussed the day-to-day business activities of these subsidiaries with PDVH. SUMF ¶ 146. This is because, as described by Ad Hoc Board member Julián Cárdenas, the Ad Hoc Board considers it important to "safeguard the independence of PDVH" and of all the entities in the corporate chain so that "each one of them is able to make their own separate decisions and . . . comply with [their] fiduciary commitment[s]." SUMF ¶¶ 387, 105; Cárdenas Decl. (Mar. 19, 2025) ¶ 3.

Plaintiffs allege some historical overlap between PDVSA's and PDVH's directors or the appointment of PDVSA employees as PDVH directors (though that has not occurred since at least 2019, SUMF ¶ 93) and that the President of Venezuela at some point supposedly "directly" appointed the President of CITGO. The former allegation is typical for corporate families and has been repeatedly rejected as a basis to pierce the corporate veil. MTD Op. at 17; *see, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998) ("[I]t is hornbook law that the exercise of the

'control' which stock ownership gives to the stockholders … will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws … and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal."); *see also MWH Int'l, Inc. v. Inversora Murten, S.A.*, No. 1:11-cv-2444, 2015 WL 728097, at \*13 (S.D.N.Y. Feb. 11, 2015) ("[O]wnership and shared management is a defining feature of the parent-subsidiary relationship that, without more, does not establish alter ego liability or warrant disregarding the corporate form[.]") (citing *Greene v. Long Island R.R. Co.*, 280 F.3d 224, 235 (2d Cir. 2002)); *cf. Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 153 F. App'x 749, 752 (2d Cir. 2005) (acknowledging "the presumption that dual officers and directors can faithfully serve both parent and subsidiary"). The latter allegation regarding appointment of CITGO's president is false and not relevant: CITGO's officers have always been appointed by direct corporate action of the CITGO Board of Directors. *See* SUMF ¶ 128.[15]

While the Republic or PDVSA may have proposed, from time to time, officers at PDVH and board members or officers at PDVH's subsidiaries, the actual decision on whether to appoint the proposed persons always remained with the PDVH Board or the board of the relevant subsidiary (*i.e.*, CITGO Holding or CITGO). SUMF ¶¶ 123, 126–27; *see also* SUMF ¶¶ 119–20. *See Moldovagaz*, 2 F.4th at 59 (no evidence of day-to-day control where sovereign could nominate chief officer of instrumentality, but the nomination had to be approved by the instrumentality's governing council, particularly where the council had previously blocked the sovereign's

---

[15] Even if this allegation were true, "[CITGO] is an entity distinct from [PDVH], and even as to [PDVSA's] relationship with [CITGO]," the "appoint[ment of] board members or managerial employees" establishes only that [the parent] exercises powers incidental to ownership of these separate entities—not that [it] ignores corporate formalities or directs the entities' day-to-day operations." *Arch Trading Corp.*, 839 F.3d at 207.

nomination). Moreover, the evidence establishes that the boards of PDVH and its subsidiaries did not always follow the recommendations. For example, Plaintiffs incorrectly claim that in February 2019, the Venezuelan Government instructed PDVH, CITGO Holding, and CITGO to install certain slates of directors and that such individuals were, in fact, appointed. SUMF ¶ 124(a); CAC ¶ 146. Among the individuals recommended for board membership at PDVH and CITGO Holding was an individual named Oswaldo Nuñez. SUMF ¶ 124(a). Mr. Nuñez was never appointed to those boards; his candidacy for the PDVH Board was rejected by the Ad Hoc Board, and his candidacy for the CITGO Holding Board was rejected by PDVH. SUMF ¶¶ 124(a), 390. Even if PDVSA had, from time to time, appointed PDVH officers or the board members of PDVH's subsidiaries, that would be insufficient to establish extensive control under *Bancec*. *E.g.*, *Moldovagaz*, 2 F.4th at 58–59 (finding no indication of control in sovereign's appointment of civil servants to governing council of instrumentality and stating that "[a]ppointing loyal board members is a due exercise of power incidental to ownership" (internal quotation marks omitted)); *Transamerica Leasing, Inc.*, 200 F.3d at 851 (evidence "describe[d] nothing more than the sole shareholder exercising its influence, through the Board of Directors, to put its own chosen manager in charge of a corporation that was suffering severe operational problems—and leaving to him the task of running 'day-to-day' operations"); *EM Ltd. II*, 800 F.3d at 92 ("Courts have consistently rejected the argument that the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the *Bancec* presumption.").

Finally, even if Plaintiffs could identify instances of PDVSA exercising occasional, atypical influence over the past decades, that is not *day-to-day* control. *Moldovagaz*, 2 F.4th at 59 ("Gater identifies some instances in which the Republic arguably intruded into Moldovagaz's affairs to a degree atypical of a shareholder or government regulator. Yet this evidence still falls

short of establishing that the Republic 'exercise[d] significant and repeated control over the instrumentality's day-to-day operations,' such that Gater can 'overcome' the strong 'presumption' in favor of Moldovagaz's 'independent status.'" (quoting *EM Ltd. II*, 800 F.3d at 91; *Bancec*, 462 U.S. at 627–29)). PDVH evaluates and decides on the strategic goals of the assets it owns, including by identifying risks and opportunities for subsidiary companies and ensuring proper financial management and compliance with law. SUMF ¶ 135. Plaintiffs have not and cannot establish that PDVSA influences—much less controls—these activities.

3.    PDVSA does not deprive PDVH of independence from close political control or require PDVH to obtain political approvals for ordinary business decisions (Factors 3 and 4).

Plaintiffs have no evidence to support the two *Bancec* factors addressing political interference, namely whether PDVSA deprived PDVH of independence from close political control or required PDVH to obtain political approvals for its ordinary business decisions. In its recent order (MTD Op. at 17), this Court noted that Plaintiffs allege that Venezuelan law requires PDVSA to approve every contract entered into by PDVH or its subsidiaries (CAC ¶ 141) and empowers the Venezuelan Minister of Petroleum to interfere directly with the management structure and bylaws of PDVH and its subsidiaries (CAC ¶ 142). However, the laws cited by Plaintiffs (which were issued in late 2017 and early 2018, shortly before the U.S. de-recognized the Maduro regime) do not purport to apply to U.S. subsidiaries of PDVSA, Ex. 1 (Expert Report of H. Briceño León (Jan. 29, 2025)) at Section V, a fact that Plaintiffs' proffered expert did not and cannot dispute, Ex. 8 (Supplemental Expert Report of F. Rodríguez (Feb. 12, 2025)) at ¶ 108. And even if these laws did purport to apply to PDVH (rather than just to PDVSA's Venezuelan subsidiaries like PPSA), Venezuelan law does not govern PDVH's business activities in the United States or apply to PDVH's management structure or bylaws, which is governed by Delaware law. Ex. 1 (Briceño Report), Section V; *see, e.g., VantagePoint Venture Partners 1996 v. Examen, Inc.*,

871 A.2d 1108, 1113 (Del. 2005). The consistent testimony of the directors and officers of PDVH is that they did not consider PDVH bound by these or any other Venezuelan laws. SUMF ¶¶ 100, 102. Plaintiffs can present no evidence that PDVH sought PDVSA's approval of all of its contracts, that the Ad Hoc Board claimed to require the same, or that the Venezuelan Minister of Petroleum attempted to exercise the purported authority Plaintiffs identify. SUMF ¶¶ 106–09, 145.

Plaintiffs have also signaled their intent to suggest that more recent Venezuelan law, enacted by the U.S.-recognized Venezuelan government, prohibits PDVH from issuing dividends to PDVSA. 1:24-cv-04448 Dkt. 123 at 2. Again, Venezuelan law does not apply to, or bind, PDVH's dividend decisions. Ex. 1 (Briceño Report) at 31; Ex. 2 (Supplemental Expert Report of H. Briceño León (Feb. 19, 2025)) at 11; SUMF ¶¶ 100, 102; *VantagePoint Venture Partners 1996*, 871 A.2d at 1113. Indeed, PDVH has been barred from issuing dividends to PDVSA since August 2017 under U.S. sanctions, SUMF ¶ 65; 1:24-cv-04448 Dkt. 126 at 3, and since August 2018 by the attachment order in *Crystallex*.[16] 1:24-cv-04448 Dkt. 126 at 3 & n.7.

4.    PDVSA has not issued policies or directives that cause PDVH to act directly on its behalf (Factor 5).

Plaintiffs cannot present evidence that PDVSA has issued policies or directives that cause PDVH to act directly on PDVSA's behalf. Mere alignment of interests is not enough: a sovereign parent, like any shareholder, may establish a separate entity to pursue its own goals. "That entity retains its separate juridical status even if it 'assist[s]' the sovereign in achieving the sovereign's 'policies and goals.'" *Moldovagaz*, 2 F.4th at 64 (quoting *EM Ltd II*, 800 F.3d at 64). Instead, a

---

[16] The writ issued in *Crystallex* applies to any "rights incident to [] stock ownership" of the shares, such as dividends. *Crystallex*, Dkt. 95 at 7 (D. Del. Aug. 23, 2018) (attaching "all shares of [PDVH] stock and any other assets or rights incident to that stock ownership belonging or owing to [PDVSA]"); *see also Ala. By-Prods. Corp. v. Cede & Co. on Behalf of Shearson Lehman Bros., Inc.*, 657 A.2d 254, 259 (Del. 1995) ("the traditional benefits of stock ownership" include "the right to vote stock and to receive payment of dividends or other distribution upon the shares").

plaintiff must show something akin to the egregious facts present in *McKesson*, the case from which the Second Circuit derived this factor. *See EM Ltd. II*, 800 F.3d at 91 n.58. In *McKesson*, Iran behaved inconsistently with its role as majority shareholder and "forced the dairy to disregard its commercial mission and its [fiduciary] duties to [its minority American] shareholder" and instead to pursue a governmental policy "designed to injure some of the corporation's own shareholders and to do so through a corporate policy guided by government representatives." 52 F.3d at 351–52. This policy, which was manifested "through Iran's control over the management of" the dairy and other instrumentalities "and through a pattern of conduct and policy statements" that "included rampant anti-American propaganda, expulsions of Americans and takings of American interests, … caused the government representatives on Pak Dairy's board to believe that Iran desired them to" act on Iran's behalf. *Id.* at 352.

Plaintiffs cannot show facts even remotely close to those in *McKesson*. Their primary focus appears to be PDVH's registration under the Foreign Agents Registration Act ("FARA"). This is entirely misguided. As an initial matter, Plaintiffs' insinuation that some significance can be derived from FARA's use of the terms "agent" and "foreign principal" is wrong. Courts have rejected the false equivalence between the term "agent" as used in various federal statutes, including FARA, and the "principal and agent" relationship described in *Bancec*. *See, e.g.*, *Att'y Gen. of U.S. v. Irish N. Aid Comm,* 668 F.2d 159, 161 (2d Cir. 1982) ("In determining agency for the purposes of the [FARA] . . . our concern is not whether the relationship can impose liability on [the] principal but whether the relationship warrants registration by the agent to carry out the informative purposes of the Act."); *Transamerica Leasing, Inc.*, 200 F.3d at 852 (instrumentality of Venezuela was required by U.S. government agency to state that its assets were owned and controlled by Venezuela if majority interest in asset was owned or controlled by the government

or a government-controlled entity, which the D.C. Circuit stated did "not imply control of the sort that could render the Government amenable to suit based upon the acts of the corporation"); *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 176 (5th Cir. 1989) (noting that majority ownership may establish "agency" status under FSIA but is not enough to establish alter ego).

Here, as is evident on the face of PDVH's FARA filings, PDVH registered under FARA because of the risk that the Department of Justice would hold that mere ownership—even *indirect* ownership—by PDVSA was sufficient to trigger FARA's definition of an "agent." SUMF ¶¶ 151–52 (noting in its registration statement that PDVH registered solely because "PDVH understands that under the Department of Justice's interpretation of . . . [FARA], PDVSA's ownership of PDVH may, under certain circumstances, render PDVH an agent of the PDVSA Ad Hoc Board"). FARA defines agency broadly, requiring that a person be considered an agent if they act "in *any* [ ] capacity" at the "request" of "a person any of whose activities are *directly or indirectly supervised* . . . in whole or in major part by a foreign principal[.]" 22 U.S.C. § 611 (emphasis added); *INAC*, 668 F.2d at 161 ("We agree that the agency relationship sufficient to require registration [under FARA] need not . . . meet the standard of the Restatement (Second) of Agency with its focus on 'control' of the agent by the principal."). Under *Bancec*, in contrast, ownership alone cannot justify piercing the veil. *See Bancec*, at 628–33 (applying presumption of separateness to wholly owned instrumentality and ultimately piercing the veil based on injustice, not control).

Nor, as the Court has suggested (MTD Op. at 18), is this factor satisfied by the instrumentality merely acting or advocating on the parent's behalf. *See Moldovagaz*, 2 F.4th at 55 ("An entity does not become a sovereign's alter ego merely because it assist[s] the sovereign in carrying out the sovereign's policies and goals." (alteration in original) (internal quotation marks omitted)); *EM Ltd. II*, 800 F.3d at 92 (noting that the Argentine Central Bank was charged by

statute "with acting as Argentina's agent and depository before international monetary, banking, and financial entities" and that Argentina "sought the assistance of [the Central Bank] in responding to an extremely severe debt crisis" but concluding that such facts did not show extensive control); *Hester Int'l Corp.*, 879 F.2d at 180 ("All corporations to some degree represent their owners."). Much more, such as the extreme facts in *McKesson*, is required.

In any event, the undisputed facts show that PDVH pursued its own distinct interests in meeting with and advocating before the U.S. government. For example, PDVH's initial FARA filing pertained to its efforts to *maintain* sanctions restrictions that protected *PDVH's property*: the shares of CITGO Holding purportedly pledged to the 2020 bondholders. SUMF ¶ 153. In its second registration, PDVH sought to more broadly discuss ongoing efforts by creditors of the Republic and PDVSA to attach and execute upon the PDVH shares, advocating in support of its independent interest in not being subjected to a lengthy, intrusive, and value-destroying forced sale that is harming CITGO's business operations and interests. SUMF ¶¶ 158–59, 161.

There is no evidence that Venezuela or PDVSA required, or even requested, PDVH to meet with the U.S. government on their behalf. Quite the contrary: many of the meetings included representatives of the Venezuelan government, PDVSA, and PDVH, *each* representing different entities and their own interests. While PDVH sometimes met with the Venezuelan government and PDVSA to coordinate their efforts, that is because they are each parties in multiple pending lawsuits with aligned interests. *See, e.g.*, *EM Ltd. II*, 800 F.3d at 94 (finding no indicia of control based on fact that Argentina and its Central Bank "coordinated their activities"); *Minpeco, S.A.*, 686 F. Supp. at 437 (day-to-day control not shown where entities had "close relationship" and "aligned" interests, which were typical features of a parent and its subsidiary). A subsidiary's alignment with positions advocated by its parent is not indicative of "extensive control" (*cf.* MTD

Op. at 18); otherwise, affiliates in nearly every corporate group would be deemed alter egos.

### B.    It Would Be Inequitable to Hold PDVH Liable for PDVSA's Obligations to These Plaintiffs.

Even if Plaintiffs could establish that PDVSA dominated PDVH's day-to-day operations (which they cannot), this Court should refuse to exercise its equitable powers to pierce PDVH's veil , given the stark inequity of doing so "in the light of the circumstances of the case," *Banco Nacional de Cuba*, 782 F.2d at 378–79; *see* MTD Op. at 24. Balancing the equities is a time-tested jurisprudential exercise that requires weighing whether equitable relief is just and appropriate—considering plaintiffs' own conduct, undue harm to the defendant(s), and the impact on third parties and the public. *See, e.g.*, *Grumman Corp. v. LTV Corp.*, 665 F.2d 10, 16 n.4 (2d Cir. 1981) ("The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944)); *see also, e.g.*, *Int'l B'hood of Teamsters v. U.S.*, 431 U.S. 324, 375 (1977) (considering effect upon "the expectations of innocent parties" in deciding whether to award equitable relief); *In re Vlasek*, 325 F.3d 955, 963 (7th Cir. 2003) ("[I]n formulating equitable relief a court must consider the effects of the relief on innocent third parties."). Here, *none* of these factors weighs in Plaintiffs' favor.

#### 1.    Plaintiffs and the Original Noteholders Had Full Knowledge of the Circumstances Surrounding the Note Agreements and PDVH.

*First*, both the original noteholders and Plaintiffs are sophisticated entities with extensive contracting experience. They knew about PDVSA and PDVH's relationship and PDVSA's difficult financial circumstances when they executed or purchased the Notes, respectively. They represented that they conducted due diligence and were not misled about the terms and limitations of the Notes. It is undisputed that the Note Agreements provide no guaranty or other right or remedy against PDVH in the event of PDVSA's default. SUMF ¶¶ 181–83, 201, 220–21, 243.

Now, disappointed in these contractual terms, Plaintiffs invoke equity to effectively write in a guaranty from PDVH. But piercing the corporate veil to reach an affiliate is inequitable where the plaintiff is a sophisticated party that negotiated a contract, had knowledge of its counterparty's corporate structure and finances, and failed to obtain a guaranty or other form of security from that affiliate. *See, e.g.*, *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979); *see also Fusion Cap. Fund II, LLC v. Ham*, 614 F.3d 698, 702 (7th Cir. 2010) ("We do not know of any statute or decision, in any American jurisdiction, holding that investors in a thinly capitalized corporation are personally liable for its debts to a contracting partner when that partner, with knowledge of the corporation's insolvency, signs without getting a guaranty from the investors.").[17]

As purported assignees[18] to the original Note Agreements, Plaintiffs "stand[] in the shoes of [their] assignor[s], deriving the same rights and remedies." *RAI Care Ctrs. of Md. I, LLC v. Off. of Pers. Mgmt.*, 459 F. Supp. 3d 124, 131 (D.D.C. 2020) (applying federal common law), and the original noteholders' knowledge is imputed to them as a matter of law. *Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*, 934 F. Supp. 570, 576 (S.D.N.Y. 1996). The original noteholders— Halliburton (for Girard Street) and Schlumberger (for G&A)—were Venezuelan subsidiaries of sophisticated, multinational corporations. SUMF ¶¶ 168–69, 172, 207–08, 215–16. When they executed their respective Note Agreements, Halliburton and Schlumberger knew about the 2015

---

[17] Courts have recognized this principle at least since Judge Learned Hand rejected a reverse veil-piercing claim where "[a]ll that has really happened is that the libelant, being dissatisfied with the credit of the company with which it dealt now seeks to involve its creature, on the notion that the whole enterprise was single in all its aspects. So long as the law allows associated groups to maintain an independent unity, its sanction is not so easily evaded, and persons dealing with either do so upon the faith of the undertaking of that one which they may select." *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929).

[18] PDVH takes no position on whether the Note Agreements were validly assigned. For purposes of this motion only, PDVH and PDVSA assume that they were. The Court need not reach the validity of the assignments to conclude that, whether valid or invalid, Defendants are entitled to summary judgment on Plaintiffs' veil-piercing claims.

Dividend from PDVH to PDVSA, knew about PDVSA and Venezuela's financial turmoil and difficulty paying debts;[19] knew that PDVH was a *separately incorporated, American* company (which was disclosed *in* the Note Agreements themselves, alongside PDVH's corporate relationship with CITGO Holding and CITGO) that was wholly owned by PDVSA (and not owned by PPSA); and affirmed in the Note Agreements that they had conducted due diligence and had all necessary information (including about PDVSA and PPSA's financial conditions) to make an informed decision to enter the agreements. SUMF ¶¶ 178–80, 186–90, 218–19, 221, 224–28. With all this knowledge in hand, they agreed to Note Agreements that provided no recourse against PDVH in the event of breach: the Notes provide no guaranty from PDVH (only from PPSA),[20] SUMF ¶¶ 181, 220, do not identify PDVH as an asset securing the Notes, *id.* ¶¶ 183, 221, and do not contain any capital guarantees or financial covenants that might have otherwise rendered a guaranty less prudent, *id.* ¶¶ 184, 222.

Plaintiffs are also sophisticated financiers whose very business is investing in emerging market, sovereign, and distressed debt (including material experience with distressed and defaulted debt in Latin America). SUMF ¶¶ 196, 234, 250. When they purchased the Note Agreements, the Notes were already declared in default. SUMF ¶¶ 192–93, 230, 232. Plaintiffs do not dispute that

---

[19] Halliburton's corporate parent knew that Venezuela was experiencing "economic turmoil" in 2016 and knew that PPSA (guarantor on the Halliburton Note) was struggling to pay its debts *to Halliburton*, which was a reason it supported the Halliburton Note Agreement. SUMF ¶ 190. In 2017, Schlumberger's corporate parent reduced its activity in Venezuela due to insufficient payments on outstanding receivables, recognizing that collectability of receivables and promissory notes in Venezuela was sensitive to economic conditions in the country. SUMF ¶ 228. The principal purpose of the Note Agreements was therefore to novate receivables owed to both companies. SUMF ¶¶ 173, 190, 211.

[20] Halliburton acknowledges that it did not seek a guaranty from PDVH. SUMF ¶ 182. The court in *Fusion Capital* concluded that failure to even try to obtain a guaranty makes it all the more inappropriate to pierce the veil later. 614 F.3d at 701 ("Fusion not only did not get a guaranty but also did not even *ask* for one.") (emphasis in original).

they: read and understood the terms and limitations of those agreements (including PDVH's separate incorporation and lack of status as a guarantor), SUMF ¶¶ 199, 239; conducted due diligence regarding both the economic circumstances of Venezuela and PDVSA *and* the particulars of the Note Agreements themselves, *id.* ¶¶ 197–98, 237–38, 240–41, 243; knew about the 2015 and 2016 transactions upon which they base much of their veil-piercing theory now (and even considered participating in the 2016 Pledges), *id.* ¶¶ 62, 267–68, 271; trusted the representations and warranties made by Halliburton and Schlumberger, *id.* ¶¶ 202, 244; and were not misled, confused, or bamboozled in any fashion, *id.* ¶¶ 203, 245.[21] Plaintiffs' own corporate structure makes plain that they understand the concepts of limited liability and holding companies, *see* SUMF ¶¶ 252–53, 257, 259, 264, and thus were fully cognizant that PDVH was not in any way intended to be responsible for the Notes. *See Fusion Cap.*, 614 F.3d at 701 (holding that veil piercing between contractual counterparties requires evidence that the plaintiff was somehow "deceived, hornswoggled, misled, duped, hoodwinked, bamboozled, or snookered").[22]

### 2. Plaintiffs Deliberately Chose Not to Pursue an Available Remedy at Law Against PDVSA.

*Second,* veil piercing is not appropriate where the plaintiff has a remedy available at law. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 662 (2d Cir. 1997) ("[I]t is fundamental that equity will not grant relief if the complaining party has, or by exercising proper diligence would have had, an adequate remedy at law." (internal quotation marks and citation omitted)); *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 720–21 (Del. Ch. 2021). Plaintiffs had such a remedy here: attaching PDVSA's stock in PDVH. They are only here because

---

[21] Moreover, in 2021, when Girard Street asserts it acquired the Halliburton Note, the PDVSA AD Hoc Board had been in existence, and PDVH already had been undertaking the below-described actions to strengthen its corporate governance, for two years. *See* Part I.B.3.

[22] The original noteholders likewise attest that they were not misled. SUMF ¶¶ 191, 229.

they knowingly chose not to pursue that remedy. This alone forecloses their alter ego claim.

As the Court knows, *Crystallex*—an attachment action involving creditors of PDVSA and the Republic—has been pending in the District of Delaware since 2017. *See* MTD Op. at 23; SUMF ¶¶ 193, 305. At present, a court-appointed Special Master has spent over four years designing and conducting a judicial sale of PDVH shares on behalf of 18 creditors of Venezuela or PDVSA that hold judgments collectively exceeding $21 billion. MTD Op. at 23; SUMF ¶¶ 313, 319–20, 368–69. The Delaware creditors are subject to a Priority Order entered by the Delaware District Court that entitles them to sale proceeds in the order of their diligence in pursuing their claims. *Crystallex*, Dkt. No. 646 at 19–25; SUMF ¶¶ 321–22. Plaintiffs here are no different than the *Crystallex* creditors except that they deliberately chose not to timely participate in those proceedings and were therefore shut out of the Priority Order. SUMF ¶¶ 355–68.

Plaintiffs admit that they have long known about the *Crystallex* proceedings, SUMF ¶¶ 272, 275–76, 342–52, 360–62, but devised different strategies to monetize the Notes, *id.* ¶¶ 289–90, 292–93. Had Plaintiffs opted to participate in *Crystallex*, they too could have sought an attachment against the shares of PDVH. Instead, Plaintiffs tried to monetize the Notes by selling them to third parties or restructuring them after hoped-for regime change in Venezuela. SUMF ¶¶ 270, 289, 355–56, 372. After those strategies failed to bear fruit, Plaintiffs filed these claims as a last-ditch effort to circumvent the already closed *Crystallex* sale proceedings. Equitable relief is not a mulligan for sophisticated Plaintiffs who consciously decline an available remedy at law. The Court should not rescue these professional gamblers from their poor bet.

3.  Veil-Piercing Would Harm PDVH, Which Had No Role in the Underlying Transaction and Has Devoted Substantial Resources to Strengthening Its Post-Maduro Corporate Governance.

*Third,* there is no dispute that PDVH had no role in the Note Agreements or their alleged breach. This is further reason to leave its corporate veil intact. Plaintiffs do not allege that the 2015

Dividend or 2016 Pledges harmed them and do not identify any activity of PDVH that caused them (or the original noteholders) harm. SUMF ¶¶ 277, 286–87. It is also relevant to equity whether "the [subsidiary] was involved in the underlying act for which the sovereign is liable." *See Kensington Int'l Ltd. v. Republic of Congo*, No. 03-CV-4578, 2007 WL 1 F, at *15 (S.D.N.Y. Mar. 30, 2007). For example, in *General Star National Insurance Co. v. Administratia Asigurarilor de Stat*, the court found it inequitable to hold a Romanian bank liable as an alter ego of the Romanian government on an extensive control theory in part because the bank had not been involved in the underlying contract between the creditor plaintiff and the former state-owned Romanian insurance company. 713 F. Supp. 2d 267, 283–84 (S.D.N.Y. 2010). Here, because PDVH "had no connection whatsoever with the underlying transaction which gives rise to [PDVSA's] liability," it would be "manifestly unfair" to hold PDVH primarily liable or subject its assets to attachment. *Id.* at 284 (quoting *Hercaire Int'l Inc. v. Argentina*, 821 F.2d 559, 561 (11th Cir. 1987)); *see also* SUMF ¶¶ 218–21; 311–14.

It would be particularly unfair to treat PDVH as PDVSA's alter ego given PDVH's substantial efforts since 2019 to enhance its corporate governance. That is when the United States Government derecognized the Maduro government and recognized President Guaidó and his Interim Government. That new government appointed new directors for PDVSA, the Ad Hoc Board, which in turn replaced the PDVH Board. SUMF ¶¶ 8–9, 25, 36–38, 40. As described in the Declaration of Fernando Vera, PDVH's Corporate Secretary, the new PDVH Board, consisting entirely of seasoned and independent professionals, strengthened its corporate governance processes, instituted protocols for maintaining independence from the Ad Hoc Board, and began investigating and rooting out corruption that occurred previously. Vera Decl. (Mar. 19, 2025) ¶¶ 18–22.

Among other things, after the appointment of Dr. Luisa Palacios as president of PDVH in February 2019, PDVH undertook specific actions to improve corporate governance of PDVH and its subsidiaries, including by providing training to all directors and retaining counsel specializing in corporate governance issues. SUMF ¶ 130. As Mr. Vera explains, the new PDVH Board took immediate steps to bolster corporate separateness and legal compliance, including issuing updated codes of conduct and policies related to board appointments, board investigations, and communications with political figures; hiring ethics and compliance professionals; investigating past policy violations and taking enforcement actions in response, including litigation; establishing whistleblower programs and investigation committees; implementing revised screening programs to ensure a risk-based compliance program; and many other measures. Vera Decl. (Mar. 19, 2025) ¶¶ 18–22. To pierce PDVH's corporate veil now would be to disregard all of that good work in favor of dilatory PDVSA creditors who, as described above, are simply trying to obtain insurance for their bad gamble on distressed debt.

Like PDVH, the Ad Hoc Board—which has been the only legitimate representative of PDVSA recognized by the United States since 2019—has ensured its adherence to corporate formalities in furtherance of its mission to preserve PDVSA's assets located abroad. The members of the Ad Hoc Board are industry professionals, many of whom have full-time careers outside their work on the Ad Hoc Board, and who serve at considerable risk of retribution from the Maduro regime. SUMF ¶¶ 381–83. The Ad Hoc Board's limited resources are devoted entirely to protecting PDVSA's assets, in large part by managing litigation in the United States, including lawsuits brought by U.S. creditors seeking to attach PDVSA's assets. SUMF ¶ 385. The illegitimate Maduro regime does not exercise control over or communicate with the Ad Hoc Board. SUMF ¶ 383. Rather, the Ad Hoc Board conducts its activities as a shareholder of PDVH

independently, just as PDVH operates independently from day-to-day control by the Ad Hoc Board.[23] *E.g.*, SUMF ¶¶ 101, 105, 137, 139–40, 144, 385–86, 388–89, 391.

        4.    <u>Granting Plaintiffs' Requested Relief Would Harm Third Parties in the *Crystallex* Action, Undermine the Delaware Court, and Harm Judicial Efficiency.</u>

Finally, if successful, Plaintiffs' alter ego claims would allow them to effectively bypass the *Crystallex* creditor priority line in an effort to start a new sale proceeding in this Court. This would be detrimental to the third-party creditors and to the federal judicial system. Relief is not equitable where it would harm third parties or the public.

In September 2024, the *Crystallex* Special Master filed a motion for an injunction, stating that the proceedings in this Court "threaten to render the PDVH Shares worthless" and agreeing that enjoining these proceedings was critical to effectuating his mandate. SUMF ¶¶ 329–31, 375–78. Though, the Delaware court denied the Special Master's motion for an injunction, and the bidder recommended by the Special Master withdrew its bid, SUMF ¶¶ 338–40, the risk that Plaintiffs and other copycat creditors of PDVSA or the Republic will succeed in jumping the priority line continues to hang over the *Crystallex* sale process. Plaintiffs are well aware of the harm they are causing to these creditors, and in fact intend to—at best—have their own turnover proceeding here supplant the Delaware process (with Plaintiffs first in a new priority line) or—at worst—pull the rug out from under the winning bidder for the PDVH shares. Yet Plaintiffs can cite no authority that equity entitles them to preference over other creditors, much less to justify the extraordinary remedy of reverse-veil piercing when they could have enforced their judgments against the PDVH shares directly, just like the other attached judgment creditors. *See, e.g.*, *Phillips Petroleum Co. v. Petróleos de Venezuela*, No. 1:19-mc-342, Opening Br. in Support of Mot. for

---

[23] The Ad Hoc Board's activities since 2019 are explained in greater detail in the Declaration of Julian Cárdenas (member of the Ad Hoc Board).

an Order Authorizing the Issuance of a Writ of *Fieri Facias*, Dkt. 3 (D. Del. Nov. 26, 2019); SUMF ¶ 321. For example, the enforcement efforts of ConocoPhillips, which also holds a judgment directly against PDVSA, did not require piercing the veil between PDVSA and PDVH. *See id.* ConocoPhillips is now third in line in the Delaware Priority Order, having initiated its efforts to attach the PDVH shares in November 2019—over a year after G&A purchased the Schlumberger Notes. SUMF ¶¶ 232, 319, 321.

The Delaware court has spent over four years and tens of millions of dollars devising and implementing a sale process to pay PDVSA's judgment creditors out of the value of its U.S. assets, *i.e.*, the PDVH shares. Plaintiffs invite this Court to duplicate that work in new proceedings, which likely would involve a slew of claims from other PDVSA and Venezuela creditors (assuming OFAC grants Plaintiffs, other creditors, or this Court a license for a turnover, attachment, or execution of the CITGO Holding shares).

In short, awarding Plaintiffs relief in these proceedings would harm third parties and impose unnecessary burdens on this Court—all while allowing Plaintiffs to reap a windfall. Under no set of facts could such a result be equitable. *See De Letelier*, 748 F.2d at 795 n.1 (noting "strong" concern for "non-party creditors" under a rule facilitating easy piercing of the corporate veil); 1 Fletcher Cyc. Corp. § 41.70 (Sept. 2024) ("In determining whether the corporate veil can be pierced to satisfy the debt of an individual out of corporate assets, potential harm to innocent shareholders or corporate creditors must be considered.") (collecting cases).

### C.     *Plaintiffs Cannot Show Fraud or Injustice as a Matter of Law.*

This Court has twice held that Plaintiffs' claim that "PDVSA or PDVH 'abused the corporate form to avoid their obligations'" is barred by governing precedent. MTD Op. at 19 (quoting *EM Ltd. II*, 800 F.3d at 95); 1:24-cv-04448 Dkt. 130 (March 14 Order). Plaintiffs thus

cannot satisfy the "fraud or similar injustice" prong of *Bancec* as a matter of law.[24]

## II.    Defendants Are Entitled to Summary Judgment Under Delaware Law

PDVH, joined by PDVSA, respectfully renews its argument that Plaintiffs' veil-piercing claims are governed by Delaware law and not federal common law. *See VR Optics, LLC v. Peloton Interactive, Inc.*, No. 2021-1900, 2023 WL 2031213, at *7 (Fed. Cir. Feb. 16, 2023) ("In the Second Circuit, if a party raises an argument in a motion to dismiss but does 'not renew the argument in [its] motion for summary judgment,' that argument is 'not preserved for review and [is] deemed waived.'" (quoting *Darnell v. Pineiro*, 849 F.3d 17, 38 n.17 (2d Cir. 2017)).

As an initial matter, PDVH respectfully believes that Federal Rule of Civil Procedure 69(a) does apply to this proceeding. *See* 1:24-cv-04448 Dkt. 51 at 10, 13–14, 29–31; *id.*, Dkt. 61 at 6–8. Plaintiffs brought their veil-piercing claims as a "supplementary special proceeding pursuant to CPLR article 52," *id.*, Dkt. 33 at 30–31, which the Second Circuit has held is subject to Rule 69, *Tr. v. Kummerfeld*, 153 F. App'x 761, 762–63 (2d Cir. 2005); *see also Network Enters., Inc. v. Reality Racing, Inc.*, No. 09-cv-4664, 2010 WL 3529237, at *4 (S.D.N.Y. Aug. 24, 2010) (alter ego is not an independent cause of action under New York law). Plaintiffs also did not dispute PDVH's contention that Rule 69 applies. *See*, *e.g.*, 1:24-cv-04448 Dkt. 47 Dkt. 61 at 6. It also is well-established that Rule 69 has the force of a statute and requires application of state law to veil-piercing questions. *See id.*, Dkt. 51 at 13–14 (citing cases). But because this Court concluded that *Bancec* would govern even if Rule 69 applied, PDVH respectfully addresses the Court's

---

[24] No allegation in Plaintiffs' complaint and no evidence they have obtained in discovery could support a finding of fraud or injustice under any of the situations in which the Second Circuit has pierced an instrumentality's corporate veil on that basis. *See EM Ltd. II*, 800 F.3d at 95 (identifying three circumstances); *Moldovagaz*, 2 F.4th at 63–65 (same); *see also infra* Part II. Indeed, Plaintiffs cannot pierce the corporate veil simply because they would otherwise not be paid, even if the sovereign entity is paying some creditors and not others. *Moldovagaz*, 2 F.4th at 62; *EM Ltd. II*, 800 F.3d at 93 & n.70, 96.

determination that federal common law supersedes state law in either circumstance.

As this Court recognized, MTD Op. 5, and as Plaintiffs conceded, 1:24-cv-04448 Dkt. 47 Dkt. 59 at 13 n.9, New York's choice-of-law rules require application of the law of the state of incorporation—here, Delaware—to veil-piercing claims. A finding that state law has been preempted even through federal common law is strongly disfavored, *Rodriguez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132, 136 (2020), especially in "areas of law traditionally occupied by the states," such as corporate law, *Marsh v. Rosenbloom*, 499 F.3d 165, 177–78 (2d Cir. 2007).

"[O]nly limited areas exist in which federal judges may appropriately craft the rule of decision." *Id.* Moreover, it is not enough to simply identify a federal interest. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 116 (2022). Federal common law also "must be *necessary* to protect" that interest. *Id.* (emphasis added). This requires a "*significant* conflict," that is, "a specific, concrete federal policy or interest that is compromised by" applying state law. *O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 87–88 (1994) (emphasis added).

Plaintiffs have identified no such conflict here. The Supreme Court recently made clear that uniform federal rules are not required merely because a suit involves a foreign sovereign. *Cassirer*, 596 U.S. at 116–17. And, as the Fourth Circuit has recognized, "[i]t is not immediately apparent" that *Bancec* should extend to an attempt to pierce the veil of a domestic U.S. corporation whose shares are owned by a foreign state instrumentality. *See Flatow v. Alavi Found.*, 225 F.3d 653, 2000 WL 1012956, at *5 n.6 (4th Cir. 2000). Plaintiffs thus must justify the extension of federal common law here,[25] but the only conflict to which they point, a supposed generic interest

---

[25] *See O'Melveny & Myers*, 512 U.S. at 87–88 ("Not only the permissibility but also the scope of judicial displacement of state rules turns upon" the existence of a "significant conflict."); *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 122 (2d Cir. 2021) (refusing to extend federal common-law defense for military contractors in design-defect cases to claims against military contractors arising out of combat activities).

in applying of "consistent standards," 1:24-cv-04448 Dkt. 59 at 5, is neither specific nor concrete.

In *Bancec*, the Supreme Court identified two concerns favoring the application of federal common law: (1) the risk that the foreign sovereign would manipulate its own law and thus "effectively insulat[e] itself from liability in foreign courts," 462 U.S. at 622, and (2) the risk that applying "conflicts principles" of the forum state would leave questions of whether a foreign state and its instrumentalities are separate "to divergent and perhaps parochial state interpretations." *Id.* at 622 n.11 (cleaned up).

Neither concern is relevant here. First, whereas foreign state instrumentalities are necessarily creations of the foreign sovereign that owns them, *see* 28 U.S.C. § 1603(b); *Bancec*, 462 U.S. at 624, domestic "[c]orporations are generally creatures of state law," *Rodriguez*, 589 U.S. at 137. Thus, there is no risk that a foreign sovereign could insulate the domestic U.S. corporations whose shares it holds from liability. Second, while the Court in *Bancec* was concerned about the direct effect on foreign relations of a state refusing to recognize the separateness of a foreign state instrumentality, 462 U.S. at 622 n.11, PDVH is a U.S. corporation, not a foreign state instrumentality, *see* 28 U.S.C. § 1603(b)(3). Every state has a well-developed corporation law recognizing—and a strong interest in protecting—the separate existence of its corporations and governing when to disregard that separateness, on which parties—including foreign sovereign shareholders—have relied in structuring their affairs.

Any concerns about uniformity here therefore relate not to a unique, specific *federal* "foreign relations concern," *Cassirer*, 596 U.S. at 117, but rather to a mere generic desire for uniformity, which is insufficient. *See Marsh*, 499 F.3d at 182. And the Supreme Court also "expressly has cautioned against displacement of state law in areas traditionally occupied by the states." *Id.* at 177. *Bancec* did not pose such a concern, since the relevant corporate entity there

was a foreign corporation, so the state choice-of-law rule would have pointed to the application of foreign or international law.

Consequently, Delaware veil-piercing law should apply. Under that standard, Defendants are entitled to summary judgment because Plaintiffs cannot demonstrate *both* that "the corporate structure cause[d] fraud or similar injustice" *and* "exclusive domination and control" of PDVH by PDVSA. *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183–84 (Del. Ch. 1999). Plaintiffs cannot establish "control" under the factors Delaware courts consider for that element,[26] and Plaintiffs have not tried to—and cannot—satisfy Delaware's strict requirement to show that PDVH was created or used as a sham to defraud investors and creditors. *See Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003); *Wallace*, 752 A.2d at 1184. Additionally, in the reverse-piercing context (as here), a plaintiff must satisfy a higher equitable burden, which considers *inter alia* the interests of affected creditors, third parties, and other public policies. *Manichaean*, 251 A.3d at 714–15 (listing eight factors). Plaintiffs did not allege, and the evidence could not support a finding in Plaintiffs' favor under, these additional factors.[27]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in favor of PDVH and against Plaintiffs on Counts III and IV of the operative complaints.

---

[26] *See supra* Part I.A.2 (PDVH follows corporate formalities); *supra* Part I.A.4 (FARA registration and board member overlap not evidence of façade); SUMF ¶¶ 50–53 (no undercapitalization or insolvency); *id.* ¶ 49 (no siphoning; transactions enhanced PDVSA and PDVSA paid off its own creditors).

[27] *E.g.*, SUMF ¶¶ 288, 379 (Factors 1 & 7: piercing will harm other creditors, and third-parties); *supra* Part I.B.4 (same); SUMF ¶¶ 281–82, 284–85 (Factors 2 and 3: PDVH does not control PDVSA); *supra* Part I.B.1 (Factor 3: no reasonable reliance on ability to pursue PDVH); SUMF ¶¶ 286–87 (Factor 3: PDVH has not harmed plaintiffs or original noteholders); SUMF ¶ 380 (Factor 6: plaintiffs' wrongful acts); *see supra* Part I.B.2 X (Factor 8; other remedies available). Piercing absent meeting the strict standards of Delaware law would also be contrary to Delaware law (Factor 4) and therefore be troubling precedent to shareholders, generally (Factor 1).

Dated: March 19, 2025

Respectfully submitted,

By: /s/ *Nathan P. Eimer*
Nathan P. Eimer (#1976067)
neimer@eimerstahl.com
Scott C. Solberg
ssolberg@eimerstahl.com
James W. Joseph
jjoseph@eimerstahl.com
Daniel D. Birk
dbirk@eimerstahl.com
Gregory M. Schweizer
gschweizer@eimerstahl.com
Jacob M. Hamann
jhamann@eimerstahl.com
John K. Adams
jadams@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

Camilo Cardozo
ccardozo@velaw.com
Dora Paula Georgescu
dgeorgescu@velaw.com
VINSON & ELKINS LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Telephone: (212) 237-0186

Matthew Hoffman
mhoffman@velaw.com
Andreina Escobar
aescobar@velaw.com
Aamir Siddik
asiddik@velaw.com
Briana R. Falcon
bfalcon@velaw.com
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, TX 77002
Telephone: (713) 758-2838

Samuel Hall
shall@willkie.com
Robert Meyer
rmeyer@willkie.com
Andrew English
aenglish@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
Telephone: (202) 303-1000

*Counsel for Defendant*
*Petróleos de Venezuela, S.A.*

*Counsel for Defendant*
*PDV Holding, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2025, a copy of the foregoing **Defendants PDV Holding, Inc. and Petróleos de Venezuela, S.A.'s Motion for Summary Judgment on Counts II and IV of the Consolidated Complaints** was filed under seal and caused to be served upon noticed outside counsel for Plaintiffs G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, G&A Strategic Investments VII LLC, and Girard Street Investment Holdings LLC via electronic mail.

*Nathan P. Eimer*