**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| G&A STRATEGIC INVESTMENTS I LLC, et al., | No. 23-cv-10766-JSR |
| *Plaintiffs,* | (Consolidated with Case No. 1:23-cv-10772-JSR and Case No. 1:24-cv-04448-JSR) |
| v. | |
| PETRÓLEOS DE VENEZUELA, S.A. et al., | |
| *Defendants.* | |
| GIRARD STREET INVESTMENT HOLDINGS LLC, | No. 23-cv-10772-JSR |
| *Plaintiff,* | (Consolidated with Case No. 1:23-cv-10766-JSR and Case No. 1:24-cv-04448-JSR) |
| v. | |
| PETRÓLEOS DE VENEZUELA, S.A. et al., | |
| *Defendants.* | |
| GIRARD STREET INVESTMENT HOLDINGS LLC, | No. 24-cv-04448-JSR |
| *Plaintiff,* | (Consolidated with Case No. 1:23-cv-10766-JSR and Case No. 1:23-cv-10772-JSR) |
| v. | |
| PDV HOLDING, INC., | |
| *Defendant.* | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................. 1

UNDISPUTED FACTS ........................................................................................................... 2

    I.    PDVSA's History ......................................................................................................... 2

    II.   PDVSA's Indebtedness to G&A and Girard Street ..................................................... 3

       A.   The HAL Note ..................................................................................................... 3

       B.   The SLB Notes ................................................................................................... 4

       C.   Plaintiffs' Acquisitions of the HAL and SLB Notes ......................................... 5

    III.  Venezuela's and PDVSA's Domination of PDVH ....................................................... 7

       A.   PDVSA's Control over PDVH Under the Chávez and Maduro Regimes ...................... 7

       B.   PDVSA's Control over PDVH Under the Interim Government and the National Assembly ............................................................................................................. 12

       C.   The Pending Judicial Sale of PDVSA's Shares in PDVH .............................. 17

       D.   The Procedural History of This Action ............................................................ 18

ARGUMENT ........................................................................................................................ 19

    I.    PDVSA and Petróleo Are Liable Under the Notes and Note Agreements ........................ 19

    II.   PDVH Is Liable Under the Notes and Note Agreements as PDVSA's Alter Ego.............. 21

       A.   Prior Litigation Conclusively Establishes that PDVSA Is Venezuela's Alter Ego........ 22

       B.   On the Undisputed Facts, PDVSA Exercises "Extensive Control" Over PDVH, Establishing that PDVH Is PDVSA's Alter Ego ............................................. 24

          1.   PDVSA Uses PDVH's Property as Its Own ............................................. 24

          2.   PDVSA Ignores PDVH's Separate Status or Ordinary Corporate Formalities ........ 29

          3.   PDVSA Deprives PDVH of Independence from Close Political Control ................ 30

          4.   PDVSA Requires PDVH to Obtain Approvals for Ordinary Business Decisions ...................................................................................................... 33

          5.   PDVSA and Venezuela Issue Policies or Directives That Cause PDVH to Act Directly on Behalf of Venezuela ............................................................. 35

       C.   The *Bancec* Factors Establish that Piercing the Corporate Veil Is Equitable .............. 36

    III.  Plaintiffs Are Entitled to Judgment Against All Defendants for the Principal and Interest Due on the Notes Plus Statutory Interest and Collection Expenses..................... 39

CONCLUSION ..................................................................................................................... 40

i

## TABLE OF AUTHORITIES

**Cases**

*Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462 (S.D.N.Y. 2006) ........................19

*Cap. Ventures Int'l v. Republic of Argentina*, 552 F.3d 289 (2d Cir. 2009)..................................39

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380
    (D. Del. 2018) ....................................................................................................17, 22, 23, 30

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir.
    2019), *cert denied*, 140 S. Ct. 2762 (2020)............................................................18, 22, 23, 24

*Dresser-Rand Co. v. PDVSA*, 439 F. Supp. 3d 270 (S.D.N.Y. 2020) ...........................................19

*EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78 (2d Cir. 2015) ..........22, 24, 31

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp.
    3d 323 (S.D.N.Y. 2019), *aff'd in relevant part*, 40 F.4th 56 (2d Cir. 2022) ................... *passim*

*First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S.
    611 (1983).................................................................................................................... *passim*

*Funnekotter v. Agricultural Development Bank of Zimbabwe,* 2015 WL 9302560
    (S.D.N.Y. June 3, 2015)..............................................................................................27, 28

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62 (2d Cir. 2001) ........................................................19

*Kensington Int'l Ltd. v. Republic of Congo*, 2007 WL 1032269 (S.D.N.Y. March
    20, 2007) .......................................................................................................................31

*McKesson v. Islamic Republic of Iran,* 52 F.3d 346 (D.C. Cir. 1995)...............................34, 35, 36

*NLRB v. Thalbo Corp.*, 171 F.3d 102 (2d Cir. 1999) ....................................................................23

*NML Cap. v. Republic of Argentina*, 17 N.Y.3d 250 (N.Y. 2011) ................................................39

*OI European Group B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d
    406 (D. Del. 2023) .................................................................................................18, 22, 23

*OI European Group B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157 (3d
    Cir. 2023) ...............................................................................................................18, 22, 23

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 1999 WL 307666 (S.D.N.Y.
    May 17, 1999)........................................................................................................28, 30, 34

*Weintraub v. Great N. Ins. Co.*, 648 F. Supp. 3d 472 (S.D.N.Y. 2022) ........................................19

*Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96 (2d Cir. 2004)..............................................40

ii

**Statutes & Regulations**

31 C.F.R. §§ 501.801, 591.501 ........................................................................................28

New York Civil Practice Law and Rules §§ 5001, 5004 ...............................................39

N.Y. Judiciary Law § 489 ..............................................................................................21

**Other Authorities**

Fed. R. Civ. P. 54 ...........................................................................................................40

Fed. R. Civ. P. 56 ...........................................................................................................19

Fed. R. Civ. P. 69 ...........................................................................................................17

Plaintiffs G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, and G&A Strategic Investments VII LLC (collectively, "**G&A**") and Girard Street Investment Holdings LLC ("**Girard Street**") move for summary judgment against Defendants Petróleos de Venezuela, S.A. ("**PDVSA**"), PDVSA Petróleo, S.A. ("**Petróleo**"), and PDV Holding, Inc. ("**PDVH**") in each of the above-captioned cases. Plaintiffs seek summary judgment on Counts I and II holding PDVSA and Petróleo jointly and severally liable on defaulted promissory notes, and on Count III holding PDVH liable for the eventual judgment against PDVSA on the ground that it is an alter ego of PDVSA.

## PRELIMINARY STATEMENT

The case against PDVSA and Petróleo is a straightforward action for recovery on New York law-governed promissory notes. Plaintiffs hold promissory notes under which PDVSA as borrower and Petróleo as guarantor owe Plaintiffs more than $2 billion. PDVSA and Petróleo defaulted on their payment obligations without any justification or defense. Accordingly, Plaintiffs are entitled to judgment as a matter of law on their claims against PDVSA and Petróleo.

The case against PDVSA's U.S. subsidiary PDVH is established by undisputed facts proving that PDVH is an alter ego of PDVSA and, therefore, liable on the promissory notes. The control of PDVSA by the Bolivarian Republic of Venezuela ("**Venezuela**") has been so pervasive that U.S. courts have twice found PDVSA to be Venezuela's alter ego. For similar reasons, PDVH is an alter ego of PDVSA, as PDVSA has persistently and repeatedly extracted cash and services from PDVH and its U.S. subsidiaries to fund the Venezuelan government's political objectives while evading PDVSA's creditors. PDVSA and Venezuela's government have exercised extensive control over PDVH by, among other things: (1) appointing, removing, coercing, and otherwise controlling the leadership of PDVH and its subsidiaries; (2) using PDVH's property as their own,

1

including by siphoning off PDVH's funds through extraordinary dividends that flowed into Venezuelan government coffers; (3) requiring PDVH, against its commercial interests, to assume enormous debts and pledge substantially all of its assets to raise funds for PDVSA and Venezuela; (4) barring PDVH from paying normal dividends so that PDVSA could avoid paying its creditors; (5) causing PDVH and its subsidiaries to selectively pay the expenses of PDVSA and its leadership for sovereign functions; and (6) making PDVH the registered agent of PDVSA to lobby for PDVSA's and Venezuela's interests in the United States, including supporting a strategy to keep select sanctions in place until their frustrated creditors submit to settlement on PDVSA's and Venezuela's terms.

The primary beneficiaries of these machinations are the various political factions in Venezuela that control PDVSA. This disregard of PDVH's corporate separateness has persisted under both the Chávez and Maduro regimes and, more recently, under both the Juan Guaidó Interim Government ("**Interim Government**") and the National Assembly ("**National Assembly**") regimes recognized by the United States. Imposing alter ego liability on PDVH would equitably extend to Plaintiffs, as judgment creditors, the same prerogatives exercised by PDVSA to access the massive and commercially unreasonable amounts of capital accumulated at PDVH, which now can and should be used to satisfy PDVSA's debts to Plaintiffs.

## UNDISPUTED FACTS[1]

### I.    PDVSA's History

Venezuela formed PDVSA in 1975 as its principal state-owned-and -run oil monopoly. SUMF ¶ 6. For many years, PDVSA operated with a degree of autonomy as a commercial

---

[1] All undisputed facts herein and the evidentiary support for them are further set forth in Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("**SUMF**").

enterprise. *Id.* ¶¶ 35, 164. After Hugo Chávez was elected President of Venezuela in 1998, however, the Venezuelan government increasingly treated PDVSA as an arm of the state, using oil revenues (and the sale of Citgo Petroleum Company's ("**Citgo**") assets) for social and political programs as part of Chávez's Bolivarian Revolution. *Id.* ¶¶ 164–172. In late 2002, the government's appointment of loyalists to the PDVSA board sparked protests by PDVSA employees. *Id.* ¶ 173. In response to these protests, the government fired approximately 20,000 employees, including seven high-ranking PDVSA managers. *Id.* ¶¶ 173–75.[2]

By the mid-2010s, Venezuela's oil prices and exports had declined significantly. *Id.* ¶¶ 57, 221–22. As a result, PDVSA lacked cash and struggled to pay its trade creditors despite its control over the world's largest proven oil reserves and its ownership (through PDVH) of Citgo, a major, U.S.-based oil refiner. *Id.* ¶¶ 15, 27, 57–64. By 2016, PDVSA had amassed more than $1 billion in outstanding commercial debt. *Id.* ¶ 64.

In 2016 and 2017, under Maduro and as part of a strategy to manage its short-term debt and persuade PDVSA's service providers to continue working with PDVSA when they otherwise would have been reluctant to do so, PDVSA issued over $1 billion in promissory notes governed by New York law—including the notes at issue in this case, originally issued to affiliates of Halliburton and Schlumberger—to refinance arrears for services rendered to PDVSA. *Id.* ¶¶ 63–64.

## II.    PDVSA's Indebtedness to G&A and Girard Street

### A.    The HAL Note

On June 29, 2016, under a note agreement of the same date (the "**HAL Note Agreement**"), PDVSA issued to Servicios Halliburton de Venezuela, S.A. ("**SHVSA**"), and Petróleo guaranteed,

---

[2] All citations to "Ex." refer to exhibits attached to the Declaration of Evan Glassman in Support of Plaintiffs' Motion for Summary Judgment.

a $200,000,123.50 principal amount promissory note with a maturity date of June 29, 2019 and a simple interest rate of 6.5% per annum (the "**HAL Note**").  *Id.* ¶¶ 44, 77.  PDVSA and Petróleo have never contested the validity of the HAL Note.  *Id.* ¶ 87; Girard Street Contract Action, Dkt. 41.

Under the HAL Note, PDVSA was required to make quarterly interest-only payments for one year beginning on September 29, 2016, followed by quarterly payments of both interest and principal through June 29, 2019.  *Id.* ¶¶ 77–79.  PDVSA made the first five interest-only payments and the first principal payment.  *Id.* ¶ 140.  PDVSA thereafter failed to make seven principal payments and six interest payments, beginning with the December 2017 principal payment.  *Id.* ¶¶ 141–48.  On December 29, 2017, after PDVSA's failure to make the December 2017 principal payment, an Event of Default as defined in the HAL Note Agreement occurred.  *Id.* ¶¶ 141–43.  As a result, the contractual default interest rate of 8.5% per annum applied.  *Id.* ¶ 158.  SHVSA delivered written notice of PDVSA's failure to pay on January 8, 2018, followed by written notice of an Event of Default on three separate occasions, beginning on April 17, 2018.  *Id.* ¶¶ 141–45.  The HAL Note matured on June 29, 2019.  *Id.* ¶ 77.  SHVSA delivered three additional notices of default thereafter informing PDVSA and Petróleo of the outstanding principal and accrued interest and that interest would "continue to accrue at . . . 8.50% per annum."  *Id.* ¶¶ 146–48.  To date, PDVSA and Petróleo have not made any more payments on the outstanding amounts.

### B.     The SLB Notes

On May 4, 2017, under a note agreement of the same date (the "**SLB Note Agreement**," and collectively with the HAL Note Agreement, the "**Note Agreements**"), PDVSA issued to Schlumberger Venezuela, S.A. ("**SVSA**"), and Petróleo guaranteed, a series of 14 promissory notes in the aggregate principal amount of $700,000,007.14, each with a maturity date of May 4, 2020

4

and a simple interest rate of 6.5% per annum (the "**SLB Notes**" and, collectively with the HAL Note, the "**Notes**"). *Id.* ¶¶ 51, 89. On July 20, 2017, SVSA assigned the SLB Notes to a corporate affiliate, Schlumberger Finance B.V. ("**SFBV**"). *Id.* ¶ 102. PDVSA and Petróleo have never contested the validity of the SLB Notes. Dkt. 47.[3]

Quarterly payments under the SLB Notes were due beginning August 4, 2017 (for interest only) and August 4, 2018 (for interest and principal). SUMF ¶ 89. PDVSA failed to make a single principal payment and made only one of the 12 interest payments. *Id.* ¶ 138. Petróleo made no payments on its guaranty. *Id.* ¶ 139. SVSA and its assignee SFBV sent PDVSA 17 separate letters regarding missed payments. *Id.* ¶ 129. On December 14, 2017, SFBV delivered written notice to PDVSA of an Event of Default resulting from the nonpayment of the August 2017 and November 2017 interest payments. *Id.* ¶ 136. From that date, the contractual default interest rate of 8.5% per annum applied. *Id.* ¶ 161. The SLB Notes matured on May 4, 2020 and remain unpaid. *Id.* ¶¶ 89, 138–39. To date, PDVSA and Petróleo have not made any additional payments on the outstanding amounts. *Id.* ¶¶ 138–39.

### C.    Plaintiffs' Acquisitions of the HAL and SLB Notes

Gramercy Funds Management LLC ("**Gramercy**") is an SEC-registered investment manager. *Id.* ¶ 2. Its team has decades of experience investing in emerging markets, including in distressed sovereign debt. *See e.g.*, Ex. 5, Koenigsberger Dep. Tr. 38:15–39:20. Prior to 2018, Gramercy began to pursue investment opportunities in Venezuela across its investment vehicles based on various recovery scenarios. Ex. 112, Maloney Dep. Tr. 32:12–17. In line with this investment strategy, G&A and Girard Street, entities for which Gramercy directly or indirectly

---

[3] Docket citations are to *G&A Strategic Investments I LLC, et al. v. Petróleos de Venezuela, S.A., et al.*, No. 23-cv-10766-JSR (S.D.N.Y.), unless otherwise noted.

serves as investment manager, identified opportunities to acquire the Notes. *See e.g.*, Ex. 9, Taylor 30(b)(6) Dep. Tr. 110:16–111:18.

On October 29, 2018, G&A paid ███████████ to acquire the SLB Notes from SFBV. SUMF ¶ 112. SFBV assigned the SLB Notes to Cowen and Company, LLC ("**Cowen**"), and Cowen then assigned them to G&A on the same day. *Id.* ¶¶ 106–09. Cowen and G&A contemporaneously served notices of their respective assignments on PDVSA. *Id.* ¶¶ 110–11.

On January 14, 2021, Girard Street paid ██████████ to acquire the HAL Note from SHVSA. *Id.* ¶¶ 120–22. SHVSA assigned the Note to Girard Street, and Girard Street served notice of the assignment on PDVSA that same day. *Id.* ¶¶ 120–26. This transaction took place after Girard Street had obtained a license from the U.S. Department of the Treasury's Office of Foreign Asset Control ("**OFAC**") authorizing the transaction, as required under U.S.-imposed sanctions on PDVSA. *Id.* ¶ 119.

Upon acquiring the Notes, Gramercy considered various options to monetize its investments. *Id.* ¶¶ 151–55. In late 2023, facing the expiration of the statute of limitations, Plaintiffs commenced the present actions to enforce their rights under the Notes. *Id.* ¶¶ 155–56.

PDVSA and Petróleo remain in default on their payment obligations under the HAL Note and owe $381,991,674.27 as of September 30, 2024, comprising $175,000,108.08 in principal, plus accrued and unpaid contractual interest amounting to $100,538,760.72 as of September 30, 2024, plus 9% New York pre-judgment statutory interest amounting to $106,452,805.47, accruing from the default date of December 29, 2017 through September 30, 2024, plus additional pre-judgment interest in the amount of $83,904.16 for each day from September 30, 2024 to the date of judgment (consisting of $40,753.45 per day in contractual interest plus $43,150.71 per day in statutory interest). *Id.* ¶¶ 158–60. By the terms of the HAL Note Agreement, Plaintiffs are entitled

to post-judgment interest at the 8.5% contractual rate, not at the lower federal post-judgment rate. *Id.* ¶ 158.

Likewise, PDVSA and Petróleo remain in default on the SLB Notes and owe $700,000,007.12 in principal, plus 8.5% contractual interest amounting to $491,505,191.03 as of November 21, 2024 and 9% New York pre-judgment statutory interest on each overdue interest and principal payment amounting to $400,042,078.56 as of November 21, 2024, for a total amount due as of such date of $1,591,547,276.75. *Id.* ¶¶ 161–63. Additional pre-judgment interest has accrued and will continue to accrue each day from November 21, 2024 until the date of judgment in the amount of $390,124.23 per day (consisting of $189,488.91 per day in contractual interest plus $200,653.32 per day in statutory interest). *Id.* By the terms of the SLB Note Agreement, Plaintiffs are entitled to post-judgment interest at the 8.5% contractual rate, not at the lower federal post-judgment rate. *Id.* ¶ 161.

## III.    Venezuela's and PDVSA's Domination of PDVH

PDVH is the U.S.-facing component of PDVSA's business. *Id.* ¶ 18. As a holding company, PDVH does not engage in specific operational activities but functions solely to hold and manage PDVSA's U.S. assets, Ex. 19, Coon Dep. Tr. 268:13–20, primarily its 100% interest in Citgo Holding, Inc. ("**Citgo Holding**"), which, in turn, owns 100% of Citgo. *Id.* ¶ 15. In addition to Citgo Holding, PDVH has several other wholly-owned U.S. subsidiaries—including Citgo Aruba Holding, LLC ("**Citgo Aruba**"), PDV Chalmette, LLC ("**PDV Chalmette**"), and LDC International Supply, LLC ("**LDC**")—each of which is structured to serve PDVSA's needs or comply with Citgo's debt covenants, as further discussed below. *Id.* ¶¶ 19–26; Ex. 19, Coon Dep. Tr. 72:20–74:18.

### A.    PDVSA's Control over PDVH Under the Chávez and Maduro Regimes

Since at least 2002, when Chávez peremptorily fired approximately 20,000 PDVSA

employees, SUMF ¶¶ 173–175, Venezuela has dominated PDVSA and, through PDVSA, its wholly-owned subsidiary PDVH. *See generally id.* §§ III–VII. By way of example, in August 2006, the Chávez regime directed Citgo to sell its stake in a Texas refinery for $1.3 billion and send the proceeds to Venezuela. *Id.* ¶¶ 179–82. Mr. Rafael Ramírez, Venezuela's Minister of Energy and Oil and then-President of PDVSA, stated that the sale was an example of "the new PDVSA [] acting like it should, as an instrument of the state of Venezuela . . . ." *Id.* ¶ 181. The Chávez regime continued to sell off Citgo's assets in 2007 and 2008. *Id.* ¶ 182, 227. The proceeds from those sales—though technically issued as "dividends" to PDVSA—all flowed to Venezuela. *Id.* ¶ 227. Between 2003 and 2016, PDVSA allocated $137 billion—11% of its gross revenue—to Venezuela for "Social Development Contributions." *Id.* ¶ 167. As a result, Venezuela also reduced its exposure to anticipated U.S. enforcement actions by creditors. *Id.* ¶¶ 187–91. When confronted with billions of dollars of expropriation claims Chávez announced that Venezuela "will not recognize any decision" by an arbitral panel requiring compensation, as Venezuela's award creditors "are trying the impossible: to get us to pay them. We are not going to pay them anything." *Id.* ¶ 190; *see also id.* ¶¶ 170, 176.

In 2013, when Nicolás Maduro became the President of Venezuela, he reinforced the government's hold over PDVSA and increased PDVSA's funding of Venezuela's agenda contrary to PDVSA's commercial interests and to the detriment of its creditors. *Id.* ¶¶ 193, 195–201. To these ends, Venezuela bypassed PDVH's corporate functions by directly appointing Citgo presidents under a constitutional provision granting the President of Venezuela the authority to appoint public officials. *Id.* ¶¶ 202–06. Maduro, for example, appointed José Ángel Pereira as president of Citgo through an April 26, 2017 decree that did not even mention PDVH or Citgo Holding. *Id.* ¶¶ 202–03. And in a shocking assertion of control over the U.S. entities, in November

21, 2017, the Venezuelan government arrested six top Citgo executives—including its recently appointed president, Mr. Pereira—and imprisoned them for years pursuant to a law governing the conduct of government officials for attempting to refinance Citgo's debt without obtaining advance approval from the government. *Id.* ¶¶ 492–95. Thereafter, the Venezuelan government issued Resolution 164 and Decree 44 as means to further control the actions of PDVSA and its subsidiaries. *Id.* ¶¶ 518–23. Maduro, without the involvement of the boards of PDVH or Citgo Holding, then appointed "comrade" Asdrúbal Chávez (Hugo Chávez's cousin) as president of Citgo, describing Citgo as "a company that is ours, Venezuelan capital, Venezuelan company." *Id.* ¶¶ 204–06.

Under Maduro, PDVSA board members also held government positions, and PDVSA and PDVH directors often overlapped, causing PDVH to enter into a number of conflicted transactions for the benefit of PDVSA and Venezuela. *Id.* ¶¶ 207–14, 217–20; §§ IV(C)–(F). For example, on March 14, 2016, PDVSA's Board caused PDVH to form and capitalize a subsidiary, Citgo Aruba, to refurbish, operate, and maintain a refinery. *Id.* ¶¶ 473–74. At PDVSA's direction, PDVH issued a guarantee of up to $150 million for the debt of Citgo Aruba and its subsidiaries (the "**Aruba Entities**"). *Id.* ¶ 475. Subsequently, also at PDVSA's instruction, PDVH contributed an additional $116 million to the Aruba Entities and made lease payments of $27 million on their behalf. *Id.* ¶ 479. PDVH did not deem it "necessary to understand the details of the Aruba Project" until three years later, in February 2019, when OFAC sanctions impacted the Aruba project. *Id.* ¶ 487. In 2020, now under the Interim Government's control, PDVH sought to terminate the project, acknowledging that it "was poorly conceptualized and negotiated from its inception" and that work done after the Interim Government was recognized "was done under the premise that political change in Venezuela was imminent." *Id.* ¶ 488; Ex. 353 at -715.

Between 2012 and 2016, Halliburton, Schlumberger, and other key trade creditors accrued millions of dollars of unpaid receivables for critical services provided to PDVSA.  SUMF ¶¶ 40–64.  During that time, PDVSA bypassed PDVH and directed Citgo to issue billions of dollars in debt to fund $5 billion of dividends distributed upstream to PDVSA through PDVH without any corresponding benefit to Citgo.  *Id.* §§ IV(B)–(E).  Most notably, in 2015, after contemplating (and ultimately deciding against) the outright sale of Citgo, PDVSA decided to "raise funds by borrowing at the CITGO Holding level."  *Id.* ¶ 258.  Accordingly, Citgo Holding issued $2.8 billion of debt secured by pledges of shares of Citgo and other assets to support the payment of a special dividend representing 2.8 times Citgo Holding's 2015 net earnings.  *Id.* ¶¶ 260–63, 269, 280–87.

The 2015 dividend, which was nominally "approved" by the PDVH board on the same day that PDVSA requested it, passed through PDVH and PDVSA directly to Venezuela.  *Id.* ¶¶ 261–301.  Notably, Citgo representatives "had originally hoped to pledge less" than "100% of the capital stock of CITGO" as collateral.  *Id.* ¶ 263.  Venezuela reported receiving the payment in a 2016 SEC filing.  *Id.* ¶ 300.  The dividends were motivated by Venezuela's desire to mitigate exposure arising from potential arbitral awards against Venezuela, *id.* ¶ 249, and also provided ample opportunities for graft: as OFAC observed in connection with U.S.-imposed sanctions in August 2017, "approximately $11 billion went missing" from PDVSA between 2004 and 2014, *id.* ¶ 383; Ex. 295.

In September 2016, at PDVSA's direction and PDVH's expense, and without PDVH receiving any consideration in exchange, PDVSA caused PDVH to pledge 50.1% of its equity in Citgo Holding to secure certain of PDVSA's obligations.  SUMF ¶¶ 337–43.  As a result of the transaction, PDVSA exchanged $2.8 billion in 2017-maturing bonds for $3.4 billion in new bonds due in 2020, now backed by PDVH's Citgo Holding shares rather than PDVSA's own assets.  *Id.*

¶¶ 343.    PDVH's management was not involved in negotiating the transaction, and its representatives learned about the pledge on the same day that its board was directed to "approve" it.  *Id.* ¶¶ 345–51, 354.  Venezuela's Special Attorney General recognized publicly that PDVH "had no plausible financial reasons to establish the pledge," and PDVH's witnesses testified that they were not aware of any benefit from the pledge to PDVH.  *Id.* ¶¶ 346–50.  A 2019 PDVH, Citgo, and Citgo Holding shareholder report acknowledged the deal's political nature, describing the debt exchange as "a last attempt to finance the suffocated Maduro regime."  *Id.* ¶ 581.

Then, in November 2016, at PDVSA's direction and PDVH's expense, and without receiving any consideration in return, PDVH's board, at the direction of Jesús Enrique Luongo (who served simultaneously as President of PDVH and PDVSA), pledged the remaining 49.9% of PDVH's equity in Citgo Holding to secure a questionable loan for PDVSA from Rosneft Trading S.A. ("**Rosneft**").    *Id.* § IV(E)(4);  ¶ 210.    This arrangement blatantly disregarded PDVH's interests, as reflected in its lopsided terms:  PDVH's board pledged almost 50% of its shares in Citgo Holding as collateral for PDVSA's loan of only $485 million, despite Citgo Holding's total equity being valued at the time at ████████.  SUMF ¶¶ 374–76; Ex. 208, Shoemaker Dep. Tr. 233:15–234:3.  Again, PDVH management was not involved in the transaction—its corporate representative was unaware of the amount of the loan that was to be secured and whether it had been repaid.  SUMF ¶¶ 378–81; *see also* Ex. 337, Vera Dep. Tr. 162:11–164:6; 164:14–168:3.  And, as confirmed by Citgo's treasurer, PDVH did not benefit from the transaction.  SUMF ¶¶ 360–61; Ex. 19, Coon Dep. Tr. 86:3–8, 86:9–22; Ex. 337, Vera Dep. Tr. 164:2–6.  The execution of the transaction was so rushed and shambolic that PDVH delivered a stock certificate for 49.9% of Citgo Holding to Rosneft's attorneys on December 2, 2016 without even having received a fully-executed contract.  SUMF ¶¶ 365–68.

In addition to these pledges and dividend payments, between 2015 and 2018, PDVSA had access to and routinely caused PDVH's subsidiaries to pay for expenses that PDVSA or Venezuela incurred, including legal and consulting fees, costs of Venezuela's diplomatic missions to the United Nations and United States, and third-party services to lobby the United States government on behalf of the Maduro regime. *Id.* ¶¶ 395–449. By doing so, PDVSA effectively kept assets out of the reach of its commercial creditors, like Plaintiffs, while still allowing it to spend freely. *See, e.g.*, *id.* ¶¶ 229, 450–62. Under the Interim Government and subsequently the National Assembly, PDVSA's practice of siphoning PDVH's funds has continued to this date. *See, e.g.*, *id.* ¶¶ 599, 613.

### B. PDVSA's Control over PDVH Under the Interim Government and the National Assembly

After Venezuela's 2018 elections, the United States declared the Maduro regime "illegitimate" and recognized the National Assembly elected in 2015 as the only legitimate branch of the government and Juan Guaidó, then-President of the National Assembly, as Interim President of Venezuela. *Id.* ¶¶ 525–26. In early 2019, the National Assembly enacted the Transition Statute and created the PDVSA Ad Hoc Board ("**PDVSA Ad Hoc Board**") to exercise PDVSA's shareholder rights over PDVH. *Id.* ¶¶ 527–34. Because the Maduro regime retained de facto control in Venezuela, the Interim Government only had access to certain assets outside of Venezuela, primarily those of PDVH and its subsidiaries. *Id.* ¶¶ 524–532. The Interim Government exercised this control through the PDVSA Ad Hoc Board, while the Maduro regime continued to control PDVSA's assets in Venezuela. *Id.* ¶¶ 533–36.

In February 2019, the National Assembly appointed not only the members of the PDVSA Ad Hoc Board but also an entire slate of board members for PDVH, Citgo Holding, and Citgo. *Id.* ¶¶ 559–64. PDVSA thereafter routinely sought approval from the Interim Government for director

appointments for PDVH and its subsidiaries, all of whom were forbidden by law from having any association with the Maduro regime. *See id.* ¶¶ 559–88. The PDVSA Ad Hoc Board has continued to directly appoint PDVH board members and explicitly directed PDVH and its subsidiaries to make or refrain from making appointments to, and to remove specific board members from, the Citgo and Citgo Holding boards. *Id.* § VII(B).

In late 2023, the National Assembly also amended the Transition Statute to, among other changes, remove the office of the interim president, and create the Council for the Administration and Protection of Assets ("**CAPA**"), tasked with "the protection of all property or assets of the Bolivarian Republic of Venezuela abroad, participating in the administration thereof when it deems appropriate." *Id.* ¶ 550; Ex. 397. CAPA is also in charge of—with the prior approval of the National Assembly—appointing and removing members of the PDVSA Ad Hoc Board. SUMF ¶ 552. Members of the PDVSA Ad Hoc Board, including its president, "maintain[] constant information and a close relationship with [CAPA] and with the Board of Directors of the National Assembly . . . ." *Id.* ¶ 679; Ex. 401.

The PDVSA Ad Hoc Board was given the explicit mandate to preserve Venezuela's ownership of Citgo. SUMF ¶ 536. As acknowledged by the current president of the PDVSA Ad Hoc Board, Horacio Medina, "PDVSA Ad Hoc [Board]'s mission is to protect . . . PDVSA's assets [abroad] up until there is a [regime] change in Venezuela," and "an important part of the project or the objective" is protecting assets against claims by creditors. Ex. 166, Medina Dep. Tr. 24:13–14, 25:1–2, 39:16–21. Medina also testified that "part of the way the PDVSA Ad Hoc Board pursues that objective is by preserving value in PDVH and not having PDVH make distributions to PDVSA." Ex. 166, Medina Dep. Tr. 39:16–40:8; SUMF ¶ 598. This required a strategy of

litigating every claim while resisting payment of any creditors.  SUMF ¶¶ 592–95, 696.

In an effort to shield the value of PDVH and its Citgo subsidiaries from both the Maduro regime and legitimate creditors of PDVSA, the Transition Statute also prohibited PDVH from making dividend payments to PDVSA.  *Id.* ¶ 535.  In doing so, the Transition Statute achieved two goals of the Interim Government to the detriment of PDVSA's creditors.  *First*, it deprived the Maduro regime of resources; and *second*, it enabled PDVSA to plead poverty to its creditors while accumulating significant value in its wholly-owned subsidiaries that PDVSA claims are protected by corporate separateness.  *Id.* §§ VII(A), (C)–(E).  PDVSA has thus abused PDVH's corporate separateness and exploited its control to deny creditors recourse to funds that would have flowed to PDVSA, outside of Venezuela, and would have been available for attachment and execution of PDVSA's debts in the ordinary course.  *Id.* §§ VII(D)–(E); Ex. 166, Medina Dep. Tr. 66:9–12, 68:11–12.

Although sanctions imposed by the U.S. government on August 24, 2017 created limitations on PDVH's ability to pay dividends to PDVSA, no such restrictions existed at the time the Notes were issued.  SUMF ¶ 382.  In any event, at PDVSA's behest, PDVH routinely secured OFAC licenses authorizing otherwise prohibited transactions when such licenses served PDVSA's interests, including licenses to use funds held by PDVH's U.S. subsidiaries PDV Chalmette and LDC to pay: (1) legal expenses incurred by PDVSA and Venezuela; (2) the PDVSA Ad Hoc Board members' monthly stipends; and (3) other expenses, including more than $70 million of interest payments on the 2020 bonds, which were secured by the 2016 pledge.  *Id.* ¶¶ 610–78.  Under this scheme, payments that PDV Chalmette and LDC make directly to PDVSA's vendors for legal fees and other PDVSA operating expenses are credited against amounts PDV Chalmette and LDC "owe" to Petróleo, the guarantor on the Notes.  *Id.* ¶¶ 627, 643, 652, 669–71.  In the ordinary

course, these funds would have been paid by PDV Chalmette and LDC to Petróleo, which could use them to satisfy its obligations as guarantor of the Notes. *See id.* ¶¶ 81, 94, 617.

Similarly, since the formation of the PDVSA Ad Hoc Board, PDVH and its subsidiaries have paid the travel expenses of members of the PDVSA Ad Hoc Board and CAPA and consulting expenses incurred by PDVSA. *Id.* ¶¶ 658–78, 698–700. In the ordinary course, PDVSA would have paid its own expenses, funded by dividends paid through PDVH to PDVSA. The reason for avoiding the dividend payment and having PDVH's subsidiaries pay the costs directly, as acknowledged by the president of the PDVSA Ad Hoc Board, was that any dividends paid outside of Venezuela would be attached by PDVSA's creditors. *See, e.g.*, *id.* ¶ 600; Ex. 166, Medina Dep. Tr. 140:15–141:9.

PDVSA's strategy of accumulating capital within PDVH and its subsidiaries and using those funds to selectively pay specific PDVSA expenses is not supported by any business needs of PDVH. Although PDVH's financial ability to pay dividends to PDVSA in the years immediately after the debt-financed distributions in 2015 was affected by Citgo Holding's debt covenants, SUMF ¶¶ 305–14, PDVH was projecting the resumption of dividend payments by 2019, *id.* ¶¶ 384–86. From the beginning of 2019 through the end of the third quarter of 2024, PDVH and its subsidiaries generated comprehensive income of $4.5 billion, resulting in increases of $4.5 billion in PDVH's shareholder's equity and $4.3 billion in PDVH's retained earnings. *Id.* ¶ 721.

Indeed, PDVSA has acknowledged that PDVH's failure to declare dividends is motivated by PDVSA's purpose of shielding assets from its creditors. In a recent press release responding to criticisms by the Maduro regime that PDVSA had "not received more than $5 billion in profits from CITGO," the PDVSA Ad Hoc Board cited "the multiple lawsuits arising from expropriations carried out under the irresponsible management of Hugo Chávez and Maduro" as having "made it

impossible to declare dividends to CITGO's parent subsidiaries," *id.* ¶ 556, thus confirming the desire to shield PDVH's value from paying PDVSA's obligations, like the Notes, incurred during the Maduro regime.

In the same press release, the PDVSA Ad Hoc Board also asserted that its efforts had "position[ed] CITGO favorably for a potential democratic transition in Venezuela, in which it could be safeguarded within the framework of a comprehensive restructuring of PDVSA's debt," noting the "only obstacle to this scenario remains the Maduro regime[]," thus tying the release of funds to pay creditors like Plaintiffs to its primary political goal of ousting Maduro from power. SUMF ¶ 554, Ex. 450. The president of the PDVSA Ad Hoc Board announced a similar strategy in early 2024, stating that "[t]he most appropriate thing is for **Citgo** to pay PDVSA's debts and . . . make a restructuring of the public or sovereign debt of the Republic . . . ." SUMF ¶ 718; Ex. 401, Petrogui article, at 3 (emphasis added). But no such restructuring has occurred. And, as Mr. Medina testified, any settlement would have to be approved by the National Assembly. SUMF ¶ 600; Ex. 166, Medina Dep. Tr. 119:9–12, 128:1–12, 129:15–19.

From 2022 to 2024, PDVH lobbied the U.S. government on behalf of PDVSA to support PDVSA's and the National Assembly's strategy for resolving creditor claims on their own terms. SUMF § VII(F). In connection with these efforts, PDVH generated analyses of how its assets could fund settlements with PDVSA's creditors if, among other things, PDVSA were satisfied with the terms on offer and obtained government approval for a settlement. *Id.* ¶¶ 711–12. Because of this advocacy, PDVH is registered with the U.S. Department of Justice as a "foreign agent" acting on behalf of the PDVSA Ad Hoc Board. *Id.* ¶¶ 687.

In 2023, CAPA proposed to the U.S. State Department paying claims of certain PDVSA creditors using profits generated by Citgo. SUMF ¶¶ 703–11. In exchange, CAPA asked the U.S.

government to leave in place the sanctions prohibiting other creditors from seizing PDVSA's assets until after the 2024 election in Venezuela, which CAPA hoped would displace the Maduro regime. *Id.* ¶¶ 709–11.  The PDVSA Ad Hoc Board fully supported that proposal, including the explicitly political objective of avoiding a "loss of PDVSA's ownership of CITGO before the 2024 elections [that] would embolden the Maduro regime."  SUMF ¶ 708.  To that end, PDVSA worked with PDVH to generate analyses showing PDVH's substantial capacity to generate funds to pay PDVSA's creditors.  SUMF ¶¶ 714–15; Ex. 284, Vera 30(b)(6) Dep. Tr. 207:15–208:7; 210:9–211:10.  As part of these discussions, the head of CAPA, the president of the National Assembly, and the president of the PDVSA Ad Hoc Board prepared for a meeting with representatives of the U.S. government at which they would present "estimates provided by PDVH on what is the available cash and leverage capacity that could be used to fund the different options to address these claims."  SUMF ¶ 714; Ex. 455 at -661.  Candidly acknowledging the reality of the situation, the President of the National Assembly's talking points for that meeting describe PDVSA's assets in the U.S., including PDVH, as "assets that we control."  SUMF ¶¶ 713–14; Ex. 455 at -670.  PDVSA wrote again to OFAC a month later and asked it to keep specific sanctions in place to prevent enforcement by certain creditors.  SUMF ¶ 610.  In the letter, PDVSA reiterated that Citgo is "Venezuela's most valuable and strategically important asset outside the country."  *Id.* ¶ 611.

## C.     The Pending Judicial Sale of PDVSA's Shares in PDVH

Since 2017, a Federal Rule of Civil Procedure 69 judicial sale of PDVSA's shares of PDVH has been ongoing in the District of Delaware, where judgment creditors reverse-pierced PDVSA's corporate veil and obtained writs of attachment to collect on debts owed by Venezuela against assets of its alter ego, PDVSA.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018) ("***Crystallex I***").  In connection with that litigation, on two occasions the Third Circuit affirmed the district court's findings that Venezuela and PDVSA are

alter egos:  first in 2019, based on the acts of the Chávez and Maduro governments, and again in

2023, based on the acts of the Interim Government.  *Crystallex Int'l Corp. v. Bolivarian Republic*

*of Venezuela*, 932 F.3d 126 (3d Cir. 2019) ("**_Crystallex II_**"), *cert. denied*, 140 S. Ct. 2762 (2020);

*OI European Group B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406 (D. Del. 2023)

("**_OIEG I_**"), *aff'd*, 73 F.4th 157 (3d Cir. 2023) ("**_OIEG II_**"), *cert. denied*, 144 S. Ct. 549 (2024).

PDVSA unsuccessfully contested the alter ego determinations in both cases.

###         D.        The Procedural History of This Action

Plaintiffs filed suit in this Court against PDVSA and Petróleo on the Notes and Note

Agreements on December 11, 2023.  *Girard Street Investment Holdings LLC v. PDV Holding, Inc.*,

No. 24-cv-04448-JSR (S.D.N.Y.). Dkt 1; *G&A Strategic Investments I LLC, et al. v. Petróleos de*

*Venezuela, S.A., et al.*, No. 23-cv-10766-JSR (S.D.N.Y.) (the "**G&A Action**"), Dkt., 1; *Girard Street*

*Investment Holdings LLC v. Petróleos de Venezuela, S.A., et al.*, No. 23-cv-10772-JSR (S.D.N.Y.)

(the "**Girard Street Contract Action**"), Dkt. 1.  Plaintiffs subsequently amended their Complaint

to assert alter ego claims against PDVH.  Dkt. 89.  PDVSA and Petróleo answered the Amended

Complaint, and PDVH moved to dismiss.  Dkts. 94–96.

The Court denied PDVH's motion to dismiss on February 21, 2025.  Dkt. 126 ("**MTD**

**Order**").[4]  In its order, the Court held that the test articulated by the Supreme Court in *First*

*National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("**_Bancec_**")

governs Plaintiffs' alter ego claims.  Under *Bancec*, a party can establish alter ego liability of a

subsidiary of a foreign government by showing either "extensive[] control" or "fraud or injustice."

462 U.S. at 629.  This Court's order denying the motion to dismiss held that Plaintiffs had plausibly

alleged facts concerning PDVSA's extensive control of PDVH that, if proved, would establish alter

---

[4] Plaintiffs refer to the MTD Order for a fuller recitation of the procedural history.

ego liability under *Bancec*, MTD Order at 19, but concluded that Plaintiffs had "not sufficiently alleged alter ego liability under the fraud or injustice prong of *Bancec*" *id.* at 20.  In an order dated March 14, 2025, the Court confirmed that it had "granted the defendants' motion to dismiss plaintiffs' alter ego claim under the 'fraud or injustice' theory under [*Bancec*] but denied it as to the 'extensive control' theory."  Dkt. 140 at 2.

## ARGUMENT

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Weintraub v. Great N. Ins. Co.*, 648 F. Supp. 3d 472, 475 (S.D.N.Y. 2022) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* Plaintiffs are entitled to summary judgment (1) against PDVSA and Petróleo because the undisputed facts demonstrate that PDVSA and Petróleo are liable to Plaintiffs under the Notes; and (2) against PDVH because the undisputed facts demonstrate that PDVH is an alter ego of PDVSA that should be jointly and severally liable for those debts.

## I.    PDVSA and Petróleo Are Liable Under the Notes and Note Agreements

"A *prima facie* case for recovery on a promissory note requires only 'proof of a note and failure to make payment.'" *Dresser-Rand Co. v. PDVSA*, 439 F. Supp. 3d 270, 273 (S.D.N.Y. 2020) (quoting *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 470 (S.D.N.Y. 2006). Accordingly, "[a]ctions for recovery on a promissory note are appropriately decided by motion for summary judgment" because a "promissory note stands on its own and establishes the plaintiff's right to payment." *Camofi Master LDC*, 452 F. Supp. 2d at 470.

The Notes are valid, and PDVSA failed to make payment.  There is no question that

PDVSA executed the Note Agreements and issued the Notes. SUMF ¶¶ 73–74, 76, 88. There is likewise no question that PDVSA failed to make payment. *Id.* §§ II(D)–(E). Accordingly, PDVSA is liable as issuer on the Notes.

For the same reason, the undisputed facts establish that Petróleo is liable as guarantor of the Notes. In Article VI, Section 6.03 of each of the Note Agreements, Petróleo "absolutely, irrevocably and unconditionally" guaranteed PDVSA's payment obligations under the Note Agreements "as primary obligor and not merely as surety." *Id.* ¶¶ 83, 94; Ex. 16 at -071–73; Ex. 17 at -943–45. Petróleo further agreed that Plaintiffs may recover under the guarantee regardless of whether the obligations in each Note Agreement are invalid, illegal, or unenforceable. SUMF ¶¶ 83, 94. Petróleo waived "any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations . . . ." SUMF ¶¶ 83, 96; Ex. 16 at -072–73; Ex. 17 at -945. Petróleo further waived any right to "acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party or any other person." SUMF ¶¶ 83, 97; Ex. 16 at -072–73; Ex. 17 at -945. Like PDVSA, Petróleo has failed to make payment on the Notes.

The undisputed facts also establish that Plaintiffs are the legal holders of the Notes. The SLB Notes were properly assigned to G&A on October 29, 2018. SUMF ¶¶ 102–12. The HAL Note was properly assigned to Girard Street on January 14, 2021. *Id.* ¶¶ 118–28. It is not disputed that PDVSA and Petróleo were properly notified of the Note's assignment to Plaintiffs and of their prior default on the Notes. *Id.* ¶¶ 110–17, 125–26. Although PDVSA, Petróleo, and PDVH have asserted a champerty defense in their respective answers, Dkts. 94 at 100, 132 at 84, New York's champerty statute by its terms "shall not apply" to an "assignment, purchase or transfer" of

"promissory notes" that have "an aggregate purchase price of at least five hundred thousand dollars." N.Y. JUDICIARY LAW § 489(2). Because it is undisputed that the Notes were each purchased for more than $500,000, the champerty statute does not apply as a matter of law. SUMF ¶¶ 112, 121. In any event, Plaintiffs' purchase of the Notes was not champertous, as the champerty law only restricts the purchase of debt "with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. JUDICIARY LAW § 489(1). The undisputed facts show that Gramercy purchased the Notes with the intent to participate in an eventual restructuring of PDVSA's debt and pursued various strategies to monetize the Notes, including by offering them for sale, before resorting to litigation as the statute of limitations approached. *See* SUMF ¶¶ 151–56.

## II.    PDVH Is Liable Under the Notes and Note Agreements as PDVSA's Alter Ego

The undisputed facts compel the imposition of alter ego liability on PDVH for PDVSA's obligations to Plaintiffs. For years and to this day, PDVSA and Venezuela—as led by Chávez, Maduro, the Interim Government, and the National Assembly—have alternately ignored, and then opportunistically invoked, PDVH's separate corporate form to achieve their political goals to the detriment of commercial creditors such as Plaintiffs. Venezuela and PDVSA used their extensive control over PDVH both to funnel money to the government to fund political agendas, as well as, under the Interim Government and the National Assembly, to staunch the flow of funds to shield assets from legitimate creditors pending a regime change.

As this Court has recognized, *Bancec* governs the veil piercing inquiry. MTD Order at 6–10. Under *Bancec*, the corporate veil may be pierced: "(1) where 'a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created,' **_or_** (2) where recognizing the instrumentality's separate juridical status 'would work fraud or injustice.'" *Id.* at 12 (quoting *Bancec*, 462 U.S. at 629) (emphasis added). The *Bancec* test is disjunctive; any party "may rebut the presumption of separateness by establishing either of the foregoing and need

not establish both." *Crystallex I*, 333 F. Supp. 3d at 397; *see also EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 91 (2d Cir. 2015). Here, though the Court held that Plaintiffs did not adequately plead the "fraud or injustice" prong, the undisputed material facts amply establish PDVSA's extensive control over PDVH.

### A. Prior Litigation Conclusively Establishes that PDVSA Is Venezuela's Alter Ego

The District of Delaware and the Third Circuit have applied the *Bancec* test, even without the benefit of discovery, to hold that PDVSA is and continues to be the alter ego of Venezuela. *Crystallex I*, 333 F. Supp. 3d at 400–15 (applying *Bancec* factors to hold that PDVSA is the alter ego of Venezuela); *id.* at 418 (finding that "Venezuela—through PDVSA—uses [PDVH's] shares to appoint directors, approve contracts, and pledge assets as security for PDVSA's debt"); *Crystallex II*, 932 F.3d at 140–49 (same, noting that "if the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can"); *OIEG I*, 663 F. Supp. 3d at 412 (considering additional facts from after the 2019 formal recognition of the Interim Government by the United States, and holding that PDVSA was the alter ego of Venezuela); *id.* at 420 (finding that the Guaidó government drew directly from PDVSA's commercial subsidiaries in the United States, bypassing PDVSA's corporate right to dividends, when it "tapped PDVSA and CITGO funds located in the United States to fund its legal fees and also to fund the National Assembly itself"); *OIEG II*, 73 F.4th at 172–74 (finding "the facts reveal[ed] Venezuela's significant economic control of PDVSA through both rival governments"); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 1:17-mc-151, Dkt. 902, at 11 (D. Del. Jan. 29, 2024) (finding that "PDVSA has continued to be Venezuela's alter ego through at least December 21, 2023, whether viewed from the perspective of the [U.S.] recognized National Assembly[-led] government or from the perspective of the Maduro regime").

Those findings are issue preclusive as to the alter ego relationship between Venezuela and PDVSA. Issue preclusion applies where: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *NLRB v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999). The District of Delaware and the Third Circuit both held that PDVSA was the alter ego of Venezuela based on many of the same facts as relevant here and applying the same *Bancec* standard. *See Crystallex I*, 333 F. Supp. 3d at 396–415; *Crystallex II*, 932 F.3d at 146–48, 152; *OIEG I*, 663 F. Supp. 3d at 417-39; *OIEG II*, 73 F.4th at 168, 172–74. Through the District of Delaware and the Third Circuit actions, PDVSA was given multiple opportunities to fully and fairly litigate the issue, and the alter ego relationship was the crux of each final judgment. *See id.* Those findings remain issue preclusive. As the Third Circuit recognized, it "would invite . . . the very concerns carefully cautioned against in *Bancec*" for a court to focus on alleged changes in behavior by a State "after learning that its actions surrounding an instrumentality are under scrutiny . . . ." *OIEG II*, 73 F.4th at 171. As such, PDVSA is precluded from disputing that it is the alter ego of Venezuela.

Accordingly, when evaluating PDVSA's control over PDVH, this Court should not restrict its view to PDVSA but also should look at the pervasive control that Venezuela has exercised over PDVH under the Chávez, Maduro, Interim Government, and National Assembly regimes.

PDVH is an alter ego of PDVSA for the same reasons the District of Delaware and the Third Circuit found sufficient to justify piercing the corporate veil between PDVSA and Venezuela. Venezuela's dominance of its vertically integrated oil companies did not stop at PDVSA. To the contrary, the undisputed facts identified through discovery establish at all relevant times that

PDVSA's extensive control over PDVH and its valuable businesses in the U.S. has been central to Venezuela's ability to use those assets for its own purposes while frustrating creditors. Plaintiffs are therefore entitled to summary judgment on their alter ego claim against PDVH.

> **B.    On the Undisputed Facts, PDVSA Exercises "Extensive Control" Over PDVH, Establishing that PDVH Is PDVSA's Alter Ego**

Courts assessing control under *Bancec* consider a range of factors including whether the sovereign state: "(1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." *EM Ltd.*, 800 F.3d at 91. These factors, however, are only "indicia" that "courts have articulated . . . to guide the inquiry." *Id.* "No one factor is dispositive, and the underlying facts should be weighed collectively." *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 335 (S.D.N.Y. 2019), *aff'd in relevant part*, 40 F.4th 56, 69–70 (2d Cir. 2022). Here, the five *EM Ltd.* factors establish that PDVH is PDVSA's alter ego on the undisputed facts.

> **1.    PDVSA Uses PDVH's Property as Its Own**

Extracting excessive payments from subsidiaries is quintessential evidence of an alter ego relationship. In *Bancec*, the Supreme Court affirmed that the requirement that Bancec "remit all of its profits to the Government" supported the conclusion of the alter ego finding. 462 U.S. at 617. Similarly here, while deliberately and repeatedly ignoring PDVSA's creditors' claims, PDVH's profits "ultimately [ran] to the Venezuelan government" via PDVSA's control of PDVH. *Crystallex II*, 932 F.3d at 148; SUMF §§ IV(C)–(F), VII(E). In fact, between April 2013 and

March 2015, PDVSA transferred in excess of $16.3 billion in dividends to Venezuela, a substantial amount of which was funded by PDVH and its subsidiaries. *Id.* ¶ 246.

The massive debt-financed distributions later in 2015, which saddled PDVH subsidiaries Citgo and Citgo Holding with billions of dollars of debt to fund extraordinary dividends ultimately directed to Venezuela, are only the starkest example of Venezuela and PDVSA using PDVH assets as their own. SUMF § IV(D). Instead of using the funds generated for commercial purposes or to pay creditors, PDVSA diverted the funds to Venezuela, to the financial detriment of both PDVH and PDVSA. SUMF ¶¶ 296–303; Ex. 39, Rodríguez Rep. ¶¶ 117–20. Moreover, in its description of the transaction in its SEC filing, Venezuela completely disregarded the existence of PDVH and PDVSA, reporting receipt of "U.S. $2.8 billion in dividends from *CITGO* . . . ." SUMF ¶ 300 (emphasis added).

The 2015 dividend was issued at a time when PDVSA was already in arrears on at least hundreds of millions of dollars of past-due invoices from its oil service providers, like Halliburton and Schlumberger, yet the dividend was not used to satisfy those legitimate commercial debts. *Id.* ¶¶ 48, 53, 57–72. As this Court observed in denying PDVH's motion to dismiss, "there is nothing ordinary about PDVH's subsidiaries incurring nearly $3 billion dollars in debt within a short timeframe to issue the dividends that were allegedly declared solely for the benefit of Venezuela," MTD Order at 15–16, and yet that is indisputably what transpired. *Id.* ¶¶ 259–63. Moreover, Citgo Holding's payments of "dividends greater than net earnings to its parent for several consecutive years" were "highly unusual" for a subsidiary corporation, SUMF § IV(B), Ex. 39, Rodríguez Rep. ¶¶ 113–20, and vastly exceeded the dividends paid by comparable large refining companies, SUMF ¶¶ 236–45, 287–92.

In addition to the dividend payments that were directed to Venezuela, in late 2016, PDVSA

continued to treat PDVH's property as its own when causing PDVH to collateralize the multibillion-dollar refinancing of the notes coming due in 2017 with PDVH's pledge of 50.1% of its equity in Citgo Holding, further diluting PDVH's value. *Id.* ¶¶ 337–55. And, shortly thereafter, PDVSA caused PDVH to pledge the remaining 49.9% of its equity in Citgo Holding as part of the dubious Rosneft transaction. *Id*. ¶¶ 356–81. Notably, PDVH's management was not substantively involved in the discussions leading to either transaction; its representatives learned of the first transaction on the same day its board consented to it, and, as to the second, PDVH's corporate representative was unaware even of the amount of the Rosneft loan or whether it had been paid. *Id*. ¶¶ 357–61, 366, 368, 379–80.

Prior to 2019, PDVSA also used PDVH's U.S. subsidiaries Citgo and PDV USA, Inc. ("**PDV USA**") to access funds that were no longer obtainable through cash dividends, utilizing mechanisms including non-cash dividends and so-called "crude offsets." *Id.* § IV(F). PDVSA used the funds extracted from PDV USA "logistical support services" that ranged from paying for "rent, utilities, and furniture expenses for three apartments in New York City . . . for several Venezuelan citizens including [Hugo Chávez's daughter, when she was] a member of the Venezuelan delegation to the United Nations," to funding the "VZ Soccer team patronage," "Venezuelan [U.N.] Mission Support," and "VZ Minister of Tourism Photo Exhibit donation." *Id.* ¶¶ 407–34. In total, PDV USA paid at least $52.5 million between 2014 and 2017 in "Shareholder Support" for PDVSA. *Id.* ¶¶ 431–34. In 2018, over a six-month period, PDV USA made further payments of approximately $20 million for PDVSA in connection with alleged "support services." *Id.* ¶ 427.

This appropriation and control over PDVH's property persisted under the Interim Government and continues under the National Assembly. The PDVSA Ad Hoc Board uses PDVH

and its subsidiaries to channel funds for PDVSA's benefit in ways intended to shield them from PDVSA's creditors, such as by causing PDVH and its subsidiaries to pay directly, instead of by an attachable dividend, PDVSA's travel expenses, *id.* ¶¶ 658–65, 670–72, lobbying fees, *id.* ¶¶ 702–03, consulting fees, *id.* ¶¶ 698–700, interest payments on the 2020 PDVSA bonds, *id.* ¶¶ 615–33, and legal fees, *id.* ¶¶ 634–57, as well as stipends to members of the PDVSA Ad Hoc Board, *id.* ¶ 669. In addition, PDVSA caused PDVH's subsidiaries, PDV Chalmette and LDC, to enter into a series of transactions that resulted in them unnecessarily incurring payment obligations to Petróleo—the guarantor of the Notes. *Id.* ¶¶ 435–67. Yet, instead of allowing Petróleo to receive and use these funds to repay its creditors, PDVSA caused PDV Chalmette, LDC, and Citgo to directly pay PDVSA's and Venezuela's legal fees, the monthly stipends of the members of the PDVSA Ad Hoc Board, and other expenses. *Id.* § VI(F).

As part of a separate scheme to extract value from PDVH's subsidiary Citgo, while avoiding moving funds from PDVH to PDVSA, where they might be attached by creditors, PDVSA instructed Citgo to direct payments to certain of PDVSA's own third-party service providers in lieu of paying PDVSA for amounts that Citgo owed for crude oil deliveries. *Id.* ¶¶ 395–406. PDVSA continued such strategies after the National Assembly mandated a halt to PDVH's dividend payments in 2019, artificially restricting the flow of distributions that would normally support PDVSA's operating expenses and debt service. *Id.* ¶ 531. Such selective workarounds are inconsistent with standard practices between parents and subsidiaries, *see* Ex. 229, Macey Rep. ¶ 50, were implemented at least in part to avoid paying creditors, SUMF § VII, and further evidence the existence of an alter ego relationship.

This is similar to *Funnekotter v. Agricultural Development Bank of Zimbabwe*, in which the Court found an alter ego relationship when Zimbabwe siphoned its instrumentality's revenue

and shares from its joint ventures and required its instrumentality to use dividend proceeds to repay a loan the government received from third parties. 2015 WL 9302560, at *6 (S.D.N.Y. June 3, 2015). While the mechanisms vary, the consistent thread is the government's practice of accessing a State-owned entity's assets as if they were its own. *Id.*; *accord U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 1999 WL 307666, at *9–10 (S.D.N.Y. May 17, 1999) (citing as relevant evidence of an alter ego relationship that the subsidiary's "bank accounts . . . are used by [the parent] for its worldwide transactions").

PDVSA argues that OFAC sanctions prevented ordinary dividends, but it never sought an OFAC license authorizing such payments, though it did obtain a license to pay interest on the 2020 bonds. SUMF ¶¶ 384, Ex. 292, Cárdenas 30(b)(6) Dep. Tr. 53:2–55:19, 197:12–19; Ex. 450; *see* 31 C.F.R. §§ 501.801, 591.501 (authorizing applications to OFAC for specific licenses). In fact, PDVSA and Venezuela did the opposite, and asked the U.S. government to keep the sanctions in place to prevent creditors from enforcing judgments against PDVH until a regime change in Venezuela. SUMF ¶¶ 703–11; Ex. 292, Cárdenas 30(b)(6) Depo Tr. 196:17–198:2. PDVSA further sought approval from OFAC to access funds to pay what PDVSA deems to be "████████ ████████████████████████████" while keeping in place sanctions to "████████████████████ ████████████████████████████" SUMF ¶¶ 708–11.

In the 2019 shareholder report, PDVH, Citgo Holding, and Citgo acknowledged Venezuela's and PDVSA's pervasive control of PDVH's and its subsidiaries' finances, explaining that the decline in their net income was the result of the Maduro regime's "irresponsible actions," including the "unlawful seizure of crude oil owned by [Citgo]." SUMF ¶ 581. Maduro confirmed this as well, stating in 2022 that "PDVSA owns Citgo and its dividends belong to our country," despite Venezuela and PDVSA owing many billions of dollars to U.S. creditors when that

statement was made. *Id.* ¶ 199. The same sentiments are echoed by the current president of the PDVSA Ad Hoc Board, who described Citgo as "an asset of all Venezuelans." *Id.* ¶¶ 597, 611, 718. These statements compel the same conclusion as that reached in *Esso*, where the court found an alter ego relationship between the Nigerian National Petroleum Corporation ("**NNPC**") and the Nigerian government because, among other things, the Nigerian government treated the NNPC's "property as its own." 40 F.4th at 56, 70.

### 2. PDVSA Ignores PDVH's Separate Status or Ordinary Corporate Formalities

PDVSA also ignores PDVH's separate status and ordinary corporate formalities, such as dealing with PDVH's subsidiaries only through PDVH. In practice, appointing the PDVSA Ad Hoc Board and vesting it with broad authority enabled the National Assembly to select directors for all subsidiaries down to Citgo, circumventing PDVH to directly control Citgo management in furtherance of the mission to shield government assets from creditors and the influence of the Maduro regime. SUMF § VII(B). Similarly, the PDVSA Ad Hoc Board has disregarded corporate formalities by instructing PDVH and its subsidiaries to refrain from making any appointments themselves without PDVSA's prior authorization. *Id.* ¶ 534. For example, PDVSA has acknowledged that Citgo, PDVH's indirect subsidiary, was under PDVSA's, not PDVH's, "full ownership and control" prior to 2019. *Id.* ¶ 200. Concerned about alter ego liability, PDVSA subsequently changed the public messaging but not the underlying reality that PDVSA continued to ignore PDVH's separate status to use PDVH's subsidiaries to support the political objectives of the Interim Government. *See generally*, *id.* § VII. Under the Interim Government, the issuance of Decree No. 3 codified the National Assembly's broad appointment powers and direct control over PDVSA's subsidiaries. *Id.* ¶¶ 534–36. When the National Assembly appointed the PDVSA Ad Hoc Board and the boards of PDVH, Citgo Holding, and Citgo, it did so by invoking the "series of

operational, financial and managerial difficulties" caused by the "constant administrative disorders of the [Maduro] regime" and referencing the risks posed by the 2016 pledges of PDVH's stake in Citgo Holding and the attachment of PDVSA's PDVH shares in *Crystallex*.  SUMF ¶¶ 564–66.  The National Assembly thus tasked PDVH and its subsidiaries with implementing a plan to protect their assets.  SUMF ¶¶ 536–43; Ex. 399 at -849.  Thereafter, the National Assembly appointed additional PDVSA Ad Hoc Board members, asserting "the need to take further actions to protect the assets of the Venezuelan State abroad, [that are] directly or indirectly controlled by PDVSA."  *Id.* ¶ 536; Ex. 399 at -849.

The undisputed fact that PDVSA appoints all PDVH board members, provides additional support for an alter ego finding.  SUMF § III(E), ¶¶ 590-600; *see also Crystallex I*, 333 F. Supp. 3d at 402 ("finding that Venezuela's appointment of PDVSA's Board of Directors, and that several Government Ministers are also members of PDVSA's Board of Directors, as support for finding extensive control).  Under the Chávez and Maduro regimes, Venezuela, through its alter ego PDVSA, designated members of PDVSA's board to also sit on the PDVH Board.  SUMF § III(E).  *See Braspetro*, 1999 WL 307666, at *9–11 (finding the fact that directors and officers were employed by the parent company supported alter ego finding).  Several PDVSA board members also held positions in the Venezuelan government, bolstering its political control over PDVH and its subsidiaries.  SUMF ¶¶ 217–20.  And under the Interim Government and the National Assembly, the National Assembly or its designee either (1) directly appointed the directors of PDVH and its subsidiaries or (2) approved those appointments in advance and in consultation with PDVSA.  *Id.* ¶¶ 590–600;  *see Esso*, 40 F.4th at 70 (finding that the appointment of company's board members and senior executives by the country's president supported an alter ego finding).

### 3.    PDVSA Deprives PDVH of Independence from Close Political Control

The control Venezuela exerted over PDVH and its subsidiaries, both under the Chávez and

30

Maduro regimes and the Interim Government and the National Assembly, was expressly and pervasively political, as evidenced by the direct appointments of PDVH's and its subsidiaries' boards by political bodies with explicit instructions to promote the interests of Venezuela over the interests of PDVSA's creditors, SUMF ¶¶ 202–06, 533–36, 549–51, 558–89, the National Assembly's proclamations purporting to direct the actions of PDVH, *id.* ¶¶ 539–41, 544–57, 598–600, and the use of PDVH's assets to support the political goals of the Venezuelan government rather than its own business interests. *Id.* §§ IV(F), VII(E).  In *Kensington*, the court found that comparable allegations demonstrating a subsidiary "[lacked] functional independence to make autonomous decisions in its own interest" such that it was "not even the master of its own future, personal investment policy, or organizational structure," supported an alter ego finding.  2007 WL 1032269, at *10.

Similarly, here, PDVSA's control over PDVH's affairs has left PDVH unable to act autonomously for its own benefit and supports an alter ego finding.  The undisputed facts establish that PDVSA has used its influence over PDVH's directors to interfere with PDVH's ordinary business affairs, depriving PDVH of independence.  *See EM Ltd.*, 800 F.3d at 93 (noting that a sovereign exerting influence over an instrumentality's board of directors to interfere with ordinary business affairs would satisfy the standard for extensive control).  As mentioned previously, PDVSA, appoints all PDVH board members and has directed PDVH and its subsidiaries to appoint, refrain from appointing, or remove directors, including at the direction of the Venezuelan government.  SUMF §§ VII(B)–(C).  And, more fundamentally, it is undisputed that PDVH's directors routinely allowed PDVH and its subsidiaries to be used as tools for politically motivated projects benefitting whichever Venezuelan government was in control of PDVSA, interfering with PDVH's ordinary affairs, including by acting on behalf of the PDVSA Ad Hoc Board and

advocating before the U.S. government in its role as a registered "foreign agent" on PDVSA's and Venezuela's behalf.  MTD Order at 18; SUMF §§ VII (E)–(F).  PDVSA and Venezuela have also disseminated political messages through PDVH, Citgo Holding, and Citgo's public platforms.  *See, e.g.*, *id.* ¶ 702.

The Maduro regime's arrest of six Citgo executives in 2017 for negotiating to refinance Citgo's debt without government approval demonstrates the extent of Venezuela's political interference with PDVH and its subsidiaries.  *Id.* § V.  That incident lays bare Venezuela's complete authority over PDVH; confirms Venezuela's view that executives of PDVH and its subsidiaries are Venezuelan public officials, that they will be treated as such by Venezuelan prosecutors and courts, and who required government approval before acting on behalf of the company; and clearly communicates that Venezuela is willing and able to wield the force of its judicial and police apparatus to usurp PDVH's control of its subsidiaries.  *Id.* § V.  Two weeks after the arrest of the "Citgo Six," the Maduro government began passing new laws to tighten its grip on PDVSA's subsidiaries (including PDVH), such as Resolution No. 164, which provides for civil, administrative, or corrective liability if PDVSA or its subsidiaries (including PDVH) sign any contract without prior approval or which negatively impacted PDVSA's assets.  SUMF ¶¶ 518–23.

The pervasive control of and political interference with PDVH have continued under the National Assembly and the PDVSA Ad Hoc Board.  In addition to using PDVH funds to pay for Venezuela's legal defense costs, *id.* ¶¶ 634–57, the National Assembly has been actively negotiating with the U.S. government to use PDVH's and its Citgo subsidiaries' assets and debt capacity to restructure debts of Venezuela and PDVSA premised on the hope for a future regime change.  *Id.* ¶¶ 703–19; Ex. 454; Ex. 292, Cárdenas 30(b)(6) Dep. Tr. 48:24–49:13; Ex. 455.

In furtherance of that goal, the National Assembly ordered PDVH to withhold dividend

payments to PDVSA. The stated goal of withholding dividends was to protect "PDVSA's assets [abroad]," both from the Maduro regime and also from claims by creditors. SUMF ¶¶ 597–600. As a result, billions of dollars of Citgo profits accumulated in PDVH, purportedly beyond the reach of PDVSA, but actually within its ability to direct as needed, including to pay for PDVSA's own expenses and expenses of the National Assembly. *See id.* §§ IV(F), VII(E); Ex. 166, Medina Dep. Tr. 139:13–141:9; Ex. 292, Cárdenas Dep. Tr. 193:12–197:1; 197:12–198:2; Ex. 395 at Art. 34(3)(b). By this ruse, PDVSA pled poverty, claiming that it lacked the cash necessary to pay its creditors, including Plaintiffs, while it accumulated massive wealth in PDVH (amounting to more than $3 billion). SUMF ¶ 591. Also, PDVSA and the National Assembly have been ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████. *Id.* ¶¶ 714–19; Ex. 292, Cárdenas Dep. Tr. 52:14–21, 203:20–204:6, 206:5–10. ███

████████████████████████████████████████████████████████████████

██████████████████████—establishes beyond doubt the practical and pervasive control that the Venezuelan government exercises over PDVH for political purposes. For so long as PDVSA's commercial creditors remain unpaid, the National Assembly's actions are no different than the Chávez and Maduro regimes' strategy of massively leveraging Citgo Holding and pledging assets of PDVH to generate funds for Venezuela, which the PDVSA Ad Hoc Board decries as an abuse by irresponsible management. SUMF ¶ 561.

### 4. PDVSA Requires PDVH to Obtain Approvals for Ordinary Business Decisions

The undisputed facts evidence that PDVH was unable to engage in ordinary business operations without government approval. In *Esso*, the court found Nigeria interjected itself into NNPC's "ordinary business affairs" sufficient to mandate a finding of alter ego where the Nigerian

President was: (1) empowered to make decisions for NNPC, including those that would benefit Nigeria rather than NNPC, without NNPC board approval; (2) able to approve expenses to be paid by NNPC that were not directly for the benefit of NNPC, effectively constituting an interest-free loan to the government; (3) required to approve all local and foreign contracts valued over certain thresholds; and (4) required to review and approve NNPC's annual budget and any loans taken out by NNPC. 397 F. Supp. 3d at 337–38. Similarly, in *McKesson v. Islamic Republic of Iran*, the court upheld the lower court's finding of an alter ego relationship based on, *inter alia*, allegations that the instrumentality deferred to government ministers on routine business decisions, including the entity's contractual commitments. 52 F.3d 346, 351–52 (D.C. Cir. 1995).

Discovery has yielded similar undisputed facts here. Like both the Nigerian and Iranian governments, between December 2017 and April 2018, the Maduro government enacted laws granting the Venezuelan Minister of Petroleum broad control over PDVSA and its subsidiaries (including PDVH). SUMF § VI. With respect to PDVSA's subsidiaries (including PDVH), these laws, among other things: (1) authorized oversight of their administration and by-laws; (2) mandated government review of their contracts; (3) required strict compliance with PDVSA's directives ""to evaluate compliance with the legal, financial, budgetary, and technical requirements;" and (4) specifically required PDVH and its subsidiaries to obtain PDVSA's president's sign–off before validly entering into any contracts subject to PDVSA's control. *Id.* ¶¶ 517–21. In 2017, Citgo executives' failure to obtain government approval for an ordinary business decision—the negotiation of debt refinancing—led to their summary arrest and imprisonment. SUMF § V. And similar to *Braspetro*, where contractual counterparties assumed the parent entity, not the subsidiary, controlled the subsidiary's business deals and, therefore, made no distinction between the two in their dealings, 1999 WL 307666, at *9, from 2012 to at least

34

2018, Citgo suppliers orchestrated a multi-year scheme in which they bribed PDVSA officials to win Citgo contracts, demonstrating the effective day-to-day control exercised by PDVSA over Citgo and the complete disregard of PDVH.  SUMF ¶ 420; Ex. 311.

Furthermore, the National Assembly's Transition Statute imposed additional constraints on the PDVH Board, requiring it to operate under "commercial efficiency criteria" or face "the control and accountability mechanisms exercised by the National Assembly, and other applicable control mechanisms." *Id.* ¶ 530.  This includes a prohibition on any director of PDVH or any of its subsidiaries having any association with the Maduro regime as well as a prohibition on paying dividends to any entity above PDVH, and the exclusive control by PDVSA of any potential settlement.  *Id.* ¶¶ 531, 541, 544–45.

### 5.    PDVSA and Venezuela Issue Policies or Directives That Cause PDVH to Act Directly on Behalf of Venezuela

The control exercised by PDVSA and Venezuela over PDVH is explicitly used to achieve the political objectives of the National Assembly in undermining and ultimately succeeding the Maduro regime.  Thus, the National Assembly has formulated policies, which PDVSA has dutifully imposed on PDVH, specifically designed to promote the objectives of the Interim Government and the National Assembly.  In the February 2019 Transition Statute, for example, the National Assembly ordered PDVH to halt dividend payments to PDVSA and required that assets in State-owned companies, including Citgo and Citgo Holding, not be disposed of while Maduro remains president.  *Id.* ¶ 530; *see also* Ex. 166, Medina Dep. Tr. 24:13–14, 25:1–3, 39:16–21, 73:11–74:2, 118:24–119:12, 139:3–6.  Exercising control over fundamental corporate decisions, such as declaring and paying dividends, to advance national policies is a key factor supporting an alter ego finding under *Bancec*.  *See McKesson*, 52 F.3d at 351–52 (applying *Bancec* and finding alter ego liability where "[r]outine business decisions, such as declaring and paying dividends to

shareholders and honoring the [entity's] contractual commitments, were dictated by Iran . . . and the other government representatives" on the entity's board). Considering that, as a non-operating holding company, PDVH's principal functions are owning subsidiaries and declaring dividends to its sole shareholder, such interference with that activity is even more supportive of an alter ego finding.

PDVH was used to advance Venezuela's interests in other, more direct ways as well. Under the Chávez regime, Venezuela caused Citgo to supply discounted heating fuel to American communities as part of a public relations charm offensive. SUMF ¶¶ 183–86. Under Maduro, PDVH also paid for Venezuela's U.S. Embassy and U.N. Mission, planes for government officials, and real estate rentals in New York for diplomats and other officials. *Id.* ¶ 235, § VII.E. These purchases were accounted for as non-cash dividends, but were never distributed up to PDVSA, enabling PDVSA to avoid taking possession of cash in the United States needed to pay the expenses. *Id.* And PDVH explicitly promotes PDVSA and the interests of the Interim Government and National Assembly by serving as PDVSA's registered agent and advocating on its behalf with the U.S. government. *Id.* § VII(F). Between September 29, 2021 and August 21, 2023, PDVH's public FARA filings describe 57 meetings, calls, emails, and/or texts in which it acted as PDVSA's agent to advance its interests with the U.S. government. *Id.* ¶ 684.

### C.    The *Bancec* Factors Establish that Piercing the Corporate Veil Is Equitable

PDVH may not assert that piercing the veil would be inequitable. As this Court held in denying PDVH's motion to dismiss, *Bancec* recognized the importance of applying a uniform body of federal law when piercing the corporate veil of foreign State-owned companies. MTD Order at 9. *Bancec* applies "internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." 462 U.S. at 633–34. It follows that the relevant equitable

considerations are the internationally recognized principles identified in *Bancec* and its progeny. In any event, the equities, to the extent they require balancing of the interests of PDVH and PDVSA and their creditors, require piercing PDVH's corporate veil because Venezuela and PDVSA both exercise extensive control over PDVH, which they have used to shield their assets from creditors throughout the relevant timeframe.

In its order denying PDVH's motion to dismiss, this Court noted an argument raised by some creditors in the *Crystallex* proceeding that veil piercing is "unsuitable in this context" because of Plaintiffs' tangential involvement in the *Crystallex* sale of PDVSA's shares in PDVH. MTD Order at 24. But that characterization of Plaintiffs' participation in the *Crystallex* action is mistaken. While G&A and Girard Street filed initial notices, at the *Crystallex* court's invitation, to inform the court of their pending claims, they were ineligible to participate in the *Crystallex* sale because they did not obtain judgments against PDVSA by the deadline set to share in the sale proceeds. Consequently, Plaintiffs indisputably did not: (1) register their judgments in Delaware; (2) move for writs of attachment in the U.S. district court there; or (3) seek any other relief from the court there. But in any event, that court has held, in denying a request to enjoin the continued prosecution of the present litigation before this Court, that its jurisdiction is limited to the sale of specific property—namely, certain shares held by PDVSA—and that creditors like Plaintiffs are free to pursue enforcement of judgments against PDVSA by any other means. *See, e.g., Crystallex*, No. 1:17-mc-151, Dkts. 481 (Oct. 11, 2022), 1515 (Dec. 30, 2024). This includes alter ego claims against PDVH, as that court made explicit when it denied the motion to enjoin G&A and Girard Street from pursuing their claims here. *Crystallex*, No. 1:17-mc-151, Dkt. 1515 at 12.

Neither G&A nor Girard Street seeks to "cut ahead" of other creditors to participate in the proceeds of the *Crystallex* sale or otherwise affect the priority of the attachments in that sale, as

both the U.S. District Court in Delaware presiding over the auction sale and this Court have recognized. *See* MTD Order at 24; *Crystallex*, No. 1:17-mc-151, Dkt. 1515 at 14–18; Girard Street Contract Action, Dkt. 78 at 4 (noting that the judicial sale of PDVH is "a process with which the proceedings in front of this Court will not interfere"). The judicial sale was set in motion by Crystallex to satisfy judgments against *Venezuela* by piercing PDVSA's veil and attaching the assets of PDVSA—unlike here, where Plaintiffs have claims against *PDVSA* and seek to pierce PDVH's veil to reach the assets of PDVH.

Indeed, several creditors participating in the sale process in Delaware, including creditors referred to in the MTD Order, have separately filed actions of their own, including alter ego claims, against PDVH.[5] Their choice to pursue recovery through the *Crystallex* action in the first instance was presumably made to maximize their own potential recovery and not because one collection strategy is somehow more "equitable" than the other. There is nothing inequitable about choosing a different litigation strategy, especially one that was equally available to other creditors.

Nor may the *Crystallex* creditors complain that Plaintiffs' recovery will impair the sale price of PDVSA's shares in PDVH. As the court in the *Crystallex* case has noted, potential bidders in the *Crystallex* sale are and always have been on notice of the potential for alter ego claims against PDVH, including the alter ego claims filed by Rusoro, OIEG, and Siemens, and the existence of the G&A and Girard Street claims more specifically. *Crystallex*, No. 1:17-mc-151,

---

[5] *Rusoro Mining Limited v. Bolivarian Republic of Venezuela, et al.*, No. 18-cv-01458, (S.D. Tex. filed May 7, 2018); *OI European Group B.V. v. Bolivarian Republic of Venezuela, et al.*, No. 19-cv-00290 (D. Del. filed Feb. 11, 2019); *Siemens Energy, Inc. v. PDV Holding*, No. 4:25-cv-00156 (S.D. Tex. filed Jan. 13, 2025); *see also Crystallex International Corp. v. Petróleos de Venezuela, S.A.*, No. 15-cv-1082-LPS (D. Del. filed Nov. 23, 2015); *ConocoPhillips Petrozuata B.V. v. Petróleos de Venezuela S.A.,* No. 16-cv-904 (D. Del. filed Jan. 10, 2017); *ConocoPhillips Petrozuata B.V., et al. v. Petroleos de Venezuela S.A., et al.,* No. 17-cv-00028 (D. Del. filed Oct. 6, 2016); *Crystallex International Corp. v. PDV Holding, Inc., et al.,* No. 16-cv-1007-LPS (D. Del. filed Oct. 28, 2016).

Dkt. 1515 at 16 (noting that similar alter ego actions were filed as far back as 2018 and that the Venezuela Parties had repeatedly warned the Special Master that additional claims of this sort could be filed). With regard to the value of the PDVH shares, there is also nothing special about alter ego claims: as of the date of filing, more than one hundred actions are currently pending in state and federal courts against PDVH and its subsidiaries, any of which, if successful, could indirectly reduce the sale value of PDVSA's shares in PDVH. *Crystallex*, No. 1:17-mc-151, Dkt. 1307 at 2. It would be inequitable to construe the *Crystallex* proceedings, which involve the sale of PDVSA's shares in PDVH on an "as is and where is" basis, as barring all claims against PDVH, particularly since both the *Crystallex* court and this Court have held that these particular claims may proceed. Notably, there was no appeal, including by any of the Crystallex creditors, of the *Crystallex* court's December 30, 2024 order denying an injunction.

### III. Plaintiffs Are Entitled to Judgment Against All Defendants for the Principal and Interest Due on the Notes Plus Statutory Interest and Collection Expenses

As discussed, PDVSA, its guarantor Petróleo, and its alter ego PDVH are obligated to pay all amounts due under the Notes and Note Agreements. This includes:

1.    The unpaid principal amount of the Notes. SUMF ¶¶ 158, 161.

2.    Contractual pre-judgment interest on the unpaid principal. This accrues at the 8.5% contractual default rate, because there has been an Event of Default consisting of "the failure to pay the principal of, or interest on any of the Notes, when such principal becomes due and payable," which remained uncured after notice. *Id.* ¶¶ 158, 161.

3.    Statutory pre-judgment interest on each past-due payment at the 9% statutory rate. *See* CPLR § 5001(a), 5004; *Cap. Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 296 (2d Cir. 2009); *NML Cap. v. Republic of Argentina*, 17 N.Y.3d 250, 266 (N.Y. 2011).

Together, principal and interest are as follows, *see* SUMF ¶¶ 158–63:

|  | Principal | Contractual Interest | Statutory Interest |
|---|---|---|---|
| **HAL Note** | $175,000,108.08 | $100,538,760.72 + $40,753.45 daily from 9/30/2024 to judgment | $106,452,805.47 + $43,150.71 daily from 9/30/2024 to judgment |
| **SLB Notes** | $700,000,007.14 | $491,505,191.03 + $189,488.91 daily from 11/21/2024 to judgment | $400,042,078.56 + $200,635.32 daily from 11/21/2024 to judgment |

4.    Reasonable collection expenses including attorneys' fees and court costs, as provided in Article VII, Section 6.01 of the Note Agreements.  At an appropriate time, Plaintiffs will move under Fed. R. Civ. P. 54(d)(2) for a determination of the amount of these fees and costs.

5.    Post-judgment interest at the 8.5% contractual rate on the amount of the judgment. Under both Note Agreements, PDVSA agreed that the contractual default rate of 8.5% per annum, rather than the federal post-judgment interest rate, will apply after a judgment is issued.  SUMF ¶¶ 158, 161; *see Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 101 (2d Cir. 2004) ("[P]arties may by contract set a post-judgment [interest] rate.").

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' motion for summary judgment, hold PDVSA, Petróleo, and PDVH jointly and severally liable for the amount due on the Notes, including attorneys' fees and costs as provided by the Note Agreements plus pre- and post-judgment interest, and direct entry of judgment accordingly.

Dated: March 19, 2025                    Respectfully submitted,

                                         /s/ Evan Glassman
                                         Evan Glassman
Mark W. Friedman                         **STEPTOE LLP**
William H. Taft V                        1114 Avenue of the Americas, 35th Floor
Carl Micarelli                           New York, NY 10036
Juan Fandiño                             Tel: (212) 506-3900
Jaime M. Fried                           Fax: (212) 506-3950
**DEBEVOISE & PLIMPTON LLP**             eglassman@steptoe.com
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909-6000                      Michael J. Baratz (*pro hac vice*)
mwfriedman@debevoise.com                 Molly Bruder Fox (*pro hac vice*)
whtaft@debevoise.com                     Emma Marshak (*pro hac vice*)
cmicarelli@debevoise.com                 **STEPTOE LLP**
jfandino@debevoise.com                   1330 Connecticut Avenue, NW
jmfried@debevoise.com                    Washington, DC 20036
                                         Tel : (202) 429-3000
                                         mbaratz@steptoe.com
Robert Drain                             mbfox@steptoe.com
Jay B. Kasner                            emarshak@steptoe.com
Scott D. Musoff
**SKADDEN, ARPS, SLATE, MEAGHER &**
**FLOM LLP**
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
robert.drain@skadden.com
jay.kasner@skadden.com
scott.musoff@skadden.com

*Counsel to Plaintiffs G&A Strategic Investments I LLC, G&A Strategic Investments II LLC,*
*G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic*
*Investments V LLC, G&A Strategic Investments VI LLC, G&A Strategic Investments VII LLC,*
*and Girard Street Investment Holdings LLC*

**WORD COUNT CERTIFICATION**

I, Evan Glassman, an attorney admitted to practice before the Southern District of New York, hereby certify that this Memorandum of Law includes 13,174 words, exclusive of material excluded by Local Rule 7.1(c), as permitted by Judge Rakoff.  In making this certification, I have relied upon the word count of the word-processing system used to prepare the memorandum.

Dated: March 19, 2025

*/s/ Evan Glassman*
Evan Glassman
