**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| G&A STRATEGIC INVESTMENTS I LLC, *et al.*, | |
| Plaintiffs, | Case No. 1:23-cv-10766-JSR |
| v. | (Consolidated with Case No. 1:23-cv-10772-JSR and Case No. 1:24-cv-04448-JSR) |
| PETRÓLEOS DE VENEZUELA, S.A., *et al.*, | |
| Defendants. | |
| GIRARD STREET INVESTMENT HOLDINGS LLC, | |
| Plaintiff, | Case No. 1:23-cv-10772-JSR |
| v. | (Consolidated with Case No. 1:23-cv-10766-JSR and Case No. 1:24-cv-04448-JSR) |
| PETRÓLEOS DE VENEZUELA, S.A., *et al.*, | |
| Defendants. | |
| GIRARD STREET INVESTMENT HOLDINGS LLC, | |
| Plaintiff, | Case No. 1:24-cv-04448-JSR |
| v. | (Consolidated with Case No. 1:23-cv-10766-JSR and Case No. 1:23-cv-10772-JSR) |
| PDV HOLDING, INC., | |
| Defendant. | |

**PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I.  The Parties ......................................................................................................... 1

    A.  Plaintiffs' Background ................................................................................. 1

    B.  Defendants' Background .............................................................................. 3

        1.  PDVSA, Issuer of the Notes and Alter Ego of Venezuela ............... 3

        2.  Petróleo, Guarantor of the Notes ..................................................... 4

        3.  PDVH, Alter Ego of PDVSA ........................................................... 4

II.  The Halliburton and Schlumberger Notes at Issue in this Case ............................ 9

    A.  The Venezuelan Oil Industry ...................................................................... 9

    B.  The Promissory Notes ............................................................................... 12

        1.  Halliburton and Schlumberger's Role as Key Service Providers to
            PDVSA ........................................................................................... 12

        2.  The Venezuelan Economy in 2014-2016, and PDVSA's Failure to
            Pay Service Providers ..................................................................... 18

            a.  PDVSA Failed to Pay Billions of Dollars to Service
                Providers Including Halliburton and Schlumberger ................... 18

            b.  Inflation and Currency Devaluation............................................. 21

        3.  PDVSA Issues the Promissory Notes to Replace Delinquent
            Payables ......................................................................................... 23

            a.  The HAL Note ............................................................................. 23

            b.  The SLB Notes............................................................................. 26

    C.  Ownership and Transfer of the Notes to Plaintiffs ..................................... 29

        1.  The SLB Notes Were Assigned to G&A in 2018 ................................ 29

        2.  The HAL Note Was Assigned to Girard Street in 2021 ..................... 33

    D.  Defendants' Failure to Pay the SLB Notes ................................................ 36

    E.  Defendants' Failure to Pay the HAL Note.................................................. 39

    F.  Plaintiffs Have Been Damaged .................................................................. 41

III.  Venezuela Has Controlled Its Oil Sector (Including PDVSA, PDVH, and Citgo)
    to Extract Value from PDVH and Citgo for Non-Commercial, Political Purposes.......... 44

    A.  The Chávez Regime's Political Control of PDVSA, PDVH, and Citgo ............. 44

    B.  Nationalizations, Refusal to Pay Arbitration Awards, and Withdrawal
        from the ICSID Convention ....................................................................... 50

    C.  The Maduro Government Expands Venezuela's Control over PDVSA and
        Its U.S. Subsidiaries.................................................................................. 51

    D.  Direct Appointments of Citgo President by Venezuela ............................... 54

    E.  Overlapping Appointments at PDVSA and Subsidiaries ............................. 55

    F.  PDVSA Executives Holding Venezuelan Government Positions .................. 57

IV.  The Venezuelan Government's and PDVSA's Abuse of PDVH and Its
    Subsidiaries ........................................................................................................ 58

i

A. Mechanisms by Which the Venezuelan Government and PDVSA Controlled PDVH and Citgo to Extract Value from Them ................................. 59
B. Historical Citgo Dividends Under Venezuelan Control ..................... 64
C. 2013-14 Dividend Transaction, Potential Sale of Citgo, and Projections for 2015 .................................................................................................. 67
D. 2015 Dividend Transaction ............................................................. 69
    1. Mechanics of the 2015 Dividend Transaction ......................... 71
    2. The 2015 Dividend Flowed to Venezuela, Not PDVSA ......... 81
    3. Aftermath of the Dividend Transaction ................................... 83
E. 2016 Pledges .................................................................................. 85
    1. PDVSA Promissory Notes Due in 2017 .................................. 86
    2. Unsuccessful Efforts to Exchange 2017 Notes ...................... 88
    3. October 2016 Pledge of 50.1% of Citgo Holding in 2020 Bond Exchange Offer ..................................................................... 91
    4. November 2016 Pledge of Remaining 49.9% of Citgo Holding to Rosneft ................................................................................... 96
    5. 2017 Sanctions and Their Impact on Dividends ................... 103
    6. Litigation Regarding Validity of October 2016 Pledge ......... 104
F. Other Uses of PDVH's Assets Under PDVSA and Venezuela's Control to Support PDVSA and Venezuela's Functions .................................... 106
    1. Citgo's Payment of PDVSA Expenses .................................. 106
    2. PDV USA's Provision of Services to PDVSA ...................... 109
    3. PDV Chalmette's Assumption of Liabilities for PDVSA's Benefit ....... 117
    4. LDC's Engagement in Crude Offset Transactions with No Commercial Benefit ............................................................. 120
    5. Citgo Aruba's Refinery Transaction to Serve Venezuelan Political Ends ..................................................................................... 126

V. The Citgo Six ........................................................................................ 133

VI. The Maduro Regime's Enactment of Regulations to Further Control PDVSA's Foreign Subsidiaries ............................................................................ 138

VII. The Interim Government and 2015 National Assembly's Control Over PDVSA, PDVH, and Its Subsidiaries ................................................................... 140

A. The Interim Government and National Assembly Create the PDVSA Ad Hoc Board and Issue the Transition Statute ..................................... 140
B. Direct Appointments of U.S.-Subsidiary Board Members by the Interim Government and the PDVSA Ad Hoc Board ................................... 149
C. The PDVSA Ad Hoc Board Acts to Control and Prevent the Flow of Funds from PDVH to PDVSA ........................................................ 158
D. Impact of Sanctions on Ad Hoc Board's Conduct ........................... 162
E. Use of PDVH's Assets to Pay PDVSA and Venezuela's Expenses Under the Interim Government ................................................................... 165
    1. Interest Payment on PDVSA 2020 Bonds ............................. 165
    2. Legal Expenses of the PDVSA Ad Hoc Board ..................... 172

3.      Stipends, Travel, and Other Expenses ..................................................... 178

F.    As a "Foreign Agent" Acting on Behalf of the PDVSA Ad Hoc Board, PDVH Has Advocated Before the U.S. Government for a Resolution to Creditor Claims Against Venezuela.................................................................... 182

1.      Lobbying/FARA Filings ........................................................................ 185

2.      CAPA Letter ......................................................................................... 188

Pursuant to Local Rule 56.1, Girard Street Investment Holdings LLC ("**Girard Street**") and G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, and G&A Strategic Investments VII LLC (collectively "**G&A**," and with Girard Street "**Plaintiffs**") respectfully state that the following are material facts as to which there is no genuine issue to be tried:

## I.     The Parties

### A.     Plaintiffs' Background

1.      Originally founded in 1998, Gramercy Funds Management LLC ("**Gramercy**") was formed in 2009 as a Delaware limited liability company.[1]  Gramercy is headquartered in West Palm Beach, Florida, with offices in London; Buenos Aires; Mexico City; Greenwich, Connecticut; and Miami, Florida.[2]  Its mission includes investing in distressed credit opportunities in emerging markets.[3]

2.      In 2009, Gramercy registered with the SEC as an investment advisor.[4]

3.      Gramercy operates several investment funds, each of which has its own investors and investment objectives, for a variety of types of investments.[5]

---

[1] All exhibits cited herein are attached to the Declaration of Evan Glassman (**"Glassman Declaration"**) and the Supplemental Declaration of Evan Glassman (**"Supplemental Glassman Declaration"**), dated March 19 and March 28, 2025, respectively.  *See* Ex. 1 at G_000303374; Ex. 2; Ex. 3.

[2] https://www.gramercy.com/; Ex. 4 at 28:17-29:2.

[3] https://www.gramercy.com/.

[4] https://adviserinfo.sec.gov/firm/summary/152209.

[5] Ex. 4 at 29:3-15, 110:17-111:18; Ex. 5 at 51:17-52:8; 293:22-294:12; Ex. 6 at 178:1-179:15.

4.      Girard Street is a Cayman Islands limited liability company.[6]  The sole member of Girard Street is Gramercy Venezuela Opportunity Fund II, an exempted company incorporated under the laws of the Cayman Islands.[7]  The investment manager of Girard Street is Girard Street Management LLC, a Delaware limited liability company, which is a wholly owned subsidiary of Gramercy.[8]

5.      G&A Strategic Holdings LLC ("**GASH**") is a Delaware limited liability company which is the sole owner of Plaintiffs G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, and G&A Strategic Investments VII LLC.[9]  GASH holds funds for Gramercy Distressed Opportunity Fund II LP (a Cayman Islands limited partnership), Gramercy Distressed Opportunity Fund III LP (a Cayman Islands limited partnership), Gramercy Distressed Opportunity Fund III-A LP (a Cayman Islands limited partnership), Gramercy Venezuela Opportunity Master Fund (a Cayman Islands company), Roehampton Partners LLC (a Delaware limited liability company), and Gramercy Opportunity Fund SPC-VEN SP (a Cayman Islands segregated portfolio company).[10]

---

[6] Ex. 3; Ex. 7.

[7] Ex. 3.

[8] Ex. 3.

[9] Ex. 8; Ex. 4 at 36:5-8.

[10] Ex. 8.

B.      **Defendants' Background**

1.      **PDVSA, Issuer of the Notes and Alter Ego of Venezuela**

6.      Defendant Petróleos de Venezuela, S.A. ("**PDVSA**") is a Venezuelan state-owned oil company.[11]  PDVSA was formed in 1975 after the nationalization of Venezuela's oil industry to coordinate, monitor, and control the state's oil and gas operations.[12]  PDVSA's principal place of business is Caracas, Venezuela.[13]

7.      Venezuela is the sole owner of PDVSA.[14]

8.      Venezuela's ownership of PDVSA is mandated by Article 303 of the Venezuelan Constitution "[f]or reasons of economic and political sovereignty and national strategy."[15]

9.      PDVSA is an agency or instrumentality of Venezuela pursuant to 28 U.S.C. § 1603(b), the Foreign Sovereign Immunities Act ("**FSIA**").[16]

10.     Article IX, Section 9.15(c) of both the HAL Note Agreement and SLB Note Agreement (defined in paragraphs 44 and 51 below) states that:

> To the extent that the Issuer or the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process, the Issuer and the Guarantor each hereby waives such immunity and hereby agrees not to assert, by way of motion, as a defense or otherwise, in any suit, action or proceeding the defense of sovereign immunity or any claim that it is not personally subject to the jurisdiction of the above-named courts by reason of sovereign immunity or otherwise, or that it is immune from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or

---

[11] Ex. 9 at 35:16-17; *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 413, 420 (D. Del.), *aff'd*, 73 F.4th 157 (3d Cir. 2023), *cert. denied*, 144 S. Ct. 549 (2024) ("*OIEG*"); Ex. 10 at ¶ 15.

[12] *OIEG*, 663 F. Supp. 3d at 413.

[13] Ex. 11 at 8; Ex. 12 at G_000101311; Ex. 18 at G_000032750.

[14] *OIEG*, 663 F. Supp. 3d at 411; Ex. 10 at ¶ 15; Ex. 12 at G_000101311.

[15] *OIEG*, 663 F. Supp. 3d at 420; Ex. 14 at G_000000264; Ex. 15 at G_000012967 & G_000012980.

[16] Ex. 10 at ¶ 19.

otherwise) with respect to itself or its property or from attachment either prior to judgment or in aid of execution by reason of sovereign immunity . . . .[17]

11.    PDVSA was found to be an alter ego of Venezuela both during the Maduro regime and after the 2018 elections in Venezuela when the United States recognized the Interim Government and 2015 National Assembly as the legitimate, democratically elected government of Venezuela.[18]

### 2.    Petróleo, Guarantor of the Notes

12.    Defendant PDVSA Petróleo S.A. ("**Petróleo**" or "**PPSA**") is a Venezuelan corporation.[19]

13.    Petróleo is a wholly-owned PDVSA subsidiary created for oil production and exploration.[20]  Petróleo sold crude oil and facilitated business between PDVSA and its U.S.-based direct and indirect subsidiaries.[21]

### 3.    PDVH, Alter Ego of PDVSA

14.    Defendant PDV Holding, Inc. ("**PDVH**") is a Delaware corporation with its principal place of business in Houston, Texas.[22]  PDVH is a wholly-owned PDVSA subsidiary.[23]

---

[17] 28 U.S.C. §§ 1605-07; Ex. 16 at G_000100083; Ex. 17 at G_000300955.

[18] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 406 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) ("*Crystallex*"); *OIEG*, 663 F. Supp. 3d at 412.

[19] Ex. 18 at G_000032737; Ex. 10 at ¶ 16; Ex. 182 at ¶ 14.

[20] Ex. 18 at G_000032847.

[21] *See* Ex. 19 at 234:10-13, 252:4-12 (discussing flow of funds between PDVSA and LDC, its U.S.-based subsidiary, and noting Coon is "generally interchanging [the term] PDVSA and PPSA in [her] mind").

[22] Ex. 20; Ex. 10 at ¶ 17; Ex. 21 at PDVH_Girard Street_000007624; Ex. 22 at PDVH_Girard Street_000007750.

[23] *OIEG*, 663 F. Supp. 3d at 411; Ex. 180 at ¶¶ 3 & 17.

15.     PDVH owns all the shares of Citgo Holding, Inc. ("**Citgo Holding**"), a Delaware Corporation.[24]  In turn, Citgo Holding owns 100% of the shares of Citgo Petroleum Corporation ("**Citgo**" or "**CPC**").[25]

16.     Citgo is a U.S.-based oil refiner.[26]  During at least the period from 2019 through 2021, it had thousands of employees.[27]

17.     PDVSA indirectly owns 100% of Citgo through PDVH and Citgo Holding.[28]

18.     PDVH, Citgo Holding, and Citgo comprise PDVSA and Venezuela's primary U.S. assets.[29]

19.     The below organizational chart shows PDVSA's overall ownership of PDVH and its subsidiaries as of February 12, 2015:[30]

---

[24] Ex. 23 at 4; *OIEG*, 663 F. Supp. 3d at 414; Ex. 20; Ex. 10 at ¶ 3.

[25] Ex. 10 at ¶ 3.

[26] Ex. 23 at 4-5; Ex. 74 at G_000011642.

[27] Ex. 298 at 36:7-16.

[28] Ex. 23 at 4; Ex. 18 at G_000032751, G_000032775, G_000032793, G_000032845; Ex. 25 at G_000035447.

[29] Ex. 214 at PDVSA_0000565.

[30] Ex. 31.



20.    The structure changed over time.  After the PDVSA Ad Hoc Board appointed by the Interim Government took control of PDVSA, PDVH's direct subsidiaries as of January 5, 2021, were as follows:[31]



---

[31] Ex. 32.

21.     Additional changes were made, and the below organizational chart shows PDVH's direct subsidiaries as of November 7, 2024:[32]



22.     PDVH has a number of other wholly-owned direct subsidiaries in addition to Citgo Holding.[33]  PDVH's wholly-owned, direct subsidiaries, CITGO Aruba Holding, LLC ("**Citgo Aruba**"), LDC International Supply, LLC ("**LDC**"), PDV Chalmette LLC ("**PDV Chalmette**" or "**PDVC**"), and PDV USA, Inc. ("**PDV USA**"), are relevant to some of the ways in which Venezuela and PDVSA have exerted control over PDVH, including extracting value from PDVH and its subsidiaries for the benefit of Venezuela and PDVSA.

23.     Citgo Aruba is a Delaware-based holding company formed in February 2016 to hold the following entities:  CITGO Aruba Refining N.V. ("**CAR**"), CITGO Aruba Terminal, N.V. ("**CAT**"), CITGO Aruba Marine Operations N.V. ("**CAMO**"), CITGO Aruba Supply N.V.

---

[32] Ex. 30.

[33] Ex. 27 at PDVH_Girard Street_000009334-35, -337-38, -343-44; Ex. 28 at PDVH_Girard Street_000009348, -352, -352, -354-55, -373, -378, -382-83; Ex. 29 at 150:17-151:21 (citing and explaining Ex. 30).

("**CAS**") (collectively, the "**Aruba Entities**").[34]  Citgo Aruba and the Aruba Entities were created with the intention to refurbish a refinery in Aruba, operate and maintain the refinery pursuant to a lease agreement with the government of Aruba, and ultimately supply refined Venezuelan crude oil to the government of Aruba.[35]  PDVH guaranteed the Aruba Entities' payment obligations on the refurbishment project, which was never completed.[36]  All of the entities other than Citgo Aruba and CAR have since wound down their operations.[37]

    24.    LDC, a Delaware limited liability company,[38] was created to "procure[] diluents for PDVSA and subsidiaries and bought from third parties,"[39] as well as products including "crude oil, condensate, feedstock, industrial products and refined products,"[40] which were then "sold to PDVSA."[41]  LDC also provided services to PDVSA that included, but were not limited to, identifying and negotiating with third-party suppliers, making partial or total payments on the transactions, and providing "other services that LDC [deemed] necessary to complete any transaction."[42]

    25.    PDV Chalmette is a Delaware limited liability company created to form a joint venture among itself, Exxon Mobil Oil Corporation ("**ExxonMobil**"), and Mobil Pipe Line

---

[34] Ex. 33 at PDVH_Girard Street_000000930; Ex. 34 at PDVH_Girard Street_000107667; Ex. 28 at PDVH_Girard Street_000009348.

[35] Ex. 28 at PDVH_Girard Street_000009348; Ex. 352 at PDVH_Girard Street_000015332 (PDVH's 2017 Financial Statements); *see also* Ex. 19 at 205:9-20.

[36] Ex. 35 at PDVSA_0036996; Ex. 19 at 206:8-13.

[37] Ex. 36 at PDVH_Girard Street_000107678.

[38] Ex. 28 at PDVH_Girard Street_000009346, PDVH_Girard Street_000009373.

[39] Ex. 29 at 150:20-151:18.

[40] Ex. 28 at PDVH_Girard Street_000009373.

[41] Ex. 29 at 150:20-151:18.

[42] Ex. 28 at PDVH_Girard Street_000009373.

Company, each of which held an equity interest in Chalmette Refining, LLC ("**Chalmette Refining**"), a refinery located in Chalmette, Louisiana.[43]  Chalmette Refining purchased crude oil and other products from affiliates of both ExxonMobil and PDVSA, including Petróleo and PetroMonagas S.A.[44]

26.     PDV USA is a Delaware corporation created to hold commercial and residential leases and subleases on properties in New York City, and well as provide shareholder "support services" for PDVSA, including but not limited to, financing operations and paying for legal expenses on behalf of PDVSA.[45]

## II.    The Halliburton and Schlumberger Notes at Issue in this Case

### A.    The Venezuelan Oil Industry

27.     Venezuela has the world's largest oil reserves,[46] and the oil industry is an important sector of Venezuela's economy, accounting for a large share of Venezuela's public fiscal revenues (29% on average from 2010 through 2015),[47] and a large share of Venezuela's exports (96% in 2014).[48]

28.     Reliance on oil revenues made Venezuela vulnerable to fluctuations in global oil market conditions.[49]

---

[43] Ex. 28 at PDVH_Girard Street_000009378; Ex. 38 at PDVH_Girard Street_000020858.

[44] Ex. 19 at 73:25-74:18, 234:2-13; Ex. 326 at PDVH_Girard Street_000020797.

[45] Ex. 28 at PDVH_Girard Street_000009383; Ex. 29 at 150:20-151:18.

[46] Ex. 39 at ¶ 58; Ex. 24; Ex. 75.

[47] *See* Ex. 39 at ¶ 41 & Appendix C.17, C.19.

[48] *See* Ex. 39 at ¶ 40 & Appendix C.16.

[49] Ex. 39 at ¶ 42 & Appendix C.18.

29.    International oil sales are the key factor determining Venezuela's "fiscal and external balance, economic growth, inflation, and other macroeconomic variables."[50]

30.    The vast majority of Venezuela's proved crude oil reserves are extra-heavy crude oil—much denser than light crude oil—that are "located in the Orinoco Oil Belt [and] have a low development grade" and "require significant future development costs to produce and refine."[51]

31.    In 1975, Venezuela nationalized its oil industry and created PDVSA, a state-owned-and-run oil monopoly.[52]

32.    In a sworn declaration submitted to the United States District Court for the District of Delaware on June 1, 2020, in *Tidewater Investment SRL et al. v. Bolivarian Republic of Venezuela*, ECF No. 15, No. 1:19-mc-00079-LPS (D. Del.) (the "**Ignacio Hernández Declaration**"), Venezuela's Special Attorney General José Ignacio Hernández explained that PDVSA is subject to:

> [T]wo sets of controlling legal structures under Venezuelan Law.  First, the Commercial Law specifies that the Republic, as the single share-holder, shall exercise the ordinary rights of the shareholder.  PDVSA's directors are appointed by Presidential Decree.  Second, the Organic Hydrocarbons Laws and the Organic Law of the Public Administration provide for the Venezuelan Oil Ministry to exercise 'tutelage control' over PDVSA, which refers to the setting of strategic policy.[53]

33.    Venezuela's Special Attorney General explained to the court that "PDVSA's role was enshrined in article 303 of the Venezuelan Constitution," providing that "[f]or reasons of

---

[50] Ex. 39 at ¶ 35.

[51] Ex. 46 at PDVSA_0023676-77.

[52] Ex. 47.

[53] Ex. 47 at ¶ 4.

economic and political sovereignty and national strategy, the State shall retain all shares of Petróleos de Venezuela, S.A., or the organ created to manage the petroleum industry."[54]

34.    In 1986, PDVSA acquired a 50% interest in Citgo, the U.S.-based refiner, which was specifically equipped to refine heavy crude oil.[55]  In 1990, PDVSA purchased the remaining half of Citgo.[56]

35.    In the early 1990s, Venezuela and PDVSA "encouraged private initiatives and investment in the oil industry" and "enter[ed] into operating and association agreements with private entities" including international companies like ExxonMobil, ConocoPhillips, Shell, and Chevron.[57]

36.    Hugo Chávez was elected to power in 1998.[58]

37.    As further detailed in Section III.A below, Chávez focused on taking control of PDVSA and extracting value from it to fund the political goals of his regime.

38.    In 2006 and 2007, the joint operating agreements executed with private entities "were converted into joint ventures, in which CVP [Corporación Venezolana del Petróleo, S.A.[59]]" held "between 60% and 80%" of the equity.[60]

---

[54] Ex. 47 at ¶ 3, n.2.

[55] Ex. 48 at PDVH_Girard Street_000008775-76; Ex. 170 at PDVH_Girard Street_000017172; Ex. 164 Jordá Dep. Tr. 27:5-16.

[56] Ex. 48 at PDVH_Girard Street_000008776.

[57] Ex. 46 at PDVSA_0023679-80 & PDVSA_0023690.

[58] Ex. 50 at 7-8.

[59] Ex. 46 at PDVSA_0023591 & PDVSA_0023761.

[60] Ex. 46 at PDVSA_0023679.

39.     In 2009, Chávez's government nationalized hundreds of assets from 76 oil service companies,[61] including docks, shipyards, and vehicles.[62]

**B.      The Promissory Notes**

    **1.      Halliburton and Schlumberger's Role as Key Service Providers to PDVSA**

40.     Following the 2009 nationalizations, PDVSA continued to depend on private oil service companies, including the Venezuelan affiliates of two multinational energy companies, Halliburton (Servicios Halliburton de Venezuela, S.A. ("**SHVSA**")) and Schlumberger (Schlumberger Venezuela, S.A. ("**SVSA**")).[63]

41.     SHVSA and SVSA each provided tens or hundreds of millions of dollars' worth of services to PDVSA and Venezuela every year and issued invoices to Petróleo.[64]

42.     Halliburton, a leading global provider of oilfield services, had operated in Venezuela since 1940.[65] Through SHVSA, Halliburton provided PDVSA and Petróleo with services such as drilling, well completion, and maintenance operations.[66]

43.     Petróleo began to fall behind on invoices issued by SHVSA for services rendered in 2011.[67] As described in greater detail below, Petróleo's severe payment delays eventually led

---

[61] Ex. 54 at 2 & G_000096391.

[62] Ex. 39 at ¶ 52; Ex. 55; Ex. 56.

[63] Ex. 39 at ¶ 23; *see* Ex. 57; *see also* Ex. 17 at G_000300977-301038; *see also* Ex. 16 at G_000100101-G_000100570.

[64] Ex. 16 at G_000100101-570; Ex. 17 at G_000300977-301038.

[65] Ex. 39 at ¶ 23; Ex. 59 at G_000096345.

[66] Ex. 39 at ¶ 23; Ex. 60; Ex. 17 at G_000300977-301038.

[67] *See* Ex. 17 at G_000300977-301038.

Halliburton to "begin curtailing activity in Venezuela," as it described in greater detail below in its 2016 financials:[68]

> We have continued to experience delays in collecting payments on our receivables from our primary customer in Venezuela. These receivables are not disputed, and we have not historically had material write-offs relating to this customer. Additionally, we routinely monitor the financial stability of our customers. During the second quarter of 2016, we executed a financing agreement with our primary customer in Venezuela in an effort to actively manage these customer receivables, resulting in an exchange of $200 million of outstanding trade receivables for an interest-bearing promissory note. We recorded the note at its fair market value at the date of exchange, which resulted in a $148 million pre-tax loss on exchange in the second quarter. This instrument provides a more defined schedule around the timing of payments, while we generate a return awaiting payment. We are using an effective interest method to accrete the carrying amount to its par value as it matures. We received interest payments on this promissory note during the third and fourth quarters, and the carrying amount of the note was $70 million as of December 31, 2016. In the fourth quarter of 2016, we agreed to exchange this promissory note for a new note with the same maturity and coupon, but which is expected to be tradeable in a more liquid market. We intend to hold the new note to maturity.
>
> Our total outstanding net trade receivables in Venezuela were $610 million as of December 31, 2016, excluding the $200 million promissory note receivable discussed above, compared to $704 million as of December 31, 2015, which represents 15% and 14% of total company trade receivables at the respective balance sheet dates. The majority of our Venezuela receivables are United States dollar-denominated receivables. Of the $610 million receivables in Venezuela as of December 31, 2016, $409 million has been classified as long-term and included within "Other assets" on our consolidated balance sheets. As a result of current conditions in Venezuela and the continued delays in collecting payments on our receivables in the country, we began curtailing activity in Venezuela during the first quarter of 2016.

44.     The promissory note receivable Halliburton disclosed in its 2016 financials is the "**HAL Note Agreement**"[69] dated June 29, 2016, under which PDVSA, as Issuer, and Petróleo, as Guarantor, agreed to issue a note to SHVSA designated as a "Series 2016E" note and numbered R-1 ("**HAL Note**").[70]  The principal amount of the HAL Note is $200,000,123.50.[71]  The HAL Note Agreement contains a novation agreement[72] and a list of the novated receivables.[73]

---

[68] Ex. 58 at G_000108948.

[69] Ex. 17.

[70] Ex. 100.

[71] Ex. 100 at G_000323678.

[72] Ex. 17 at G_000300916; Ex. 103.

[73] Ex. 17 at G_000300977-301038.

45.    Although the receivables had been accumulating since 2011, the volume and scope of unpaid receivables novated in the HAL Note increased sharply in 2014, to over 1,250 unpaid invoices for over $105 million.[74]

46.    In its 2015 Form 10-K, Halliburton disclosed it had "experienced delays in collecting payment on [its] receivables from [its] primary customer in Venezuela [Petróleo], which contributed to the increase in receivables during the period[,]" which "was partially offset by a decline due to the currency devaluation."[75]  Halliburton disclosed then-total trade receivables in Venezuela of $704 million as of December 31, 2015, up from $670 million as of December 31, 2014.[76]

47.    Of the cumulative amounts owed from 2011 through February 12, 2015—which is when the dividend transaction discussed in Section IV.D, *infra*, occurred—Petróleo owed SHVSA at least $125 million.[77]

48.    As of June 29, 2016—months before either of the pledge agreements described in Section IV.E, *infra*—SHVSA was owed $200,000,123.50 in unpaid receivables that were subsequently novated and incorporated into the HAL Note.[78]  The below chart is a graphic representation of the cumulative receivables Petróleo owed SHVSA for services SHVSA provided in 2015 which were subsequently novated in the HAL Note:[79]

---

[74] Ex. 17 at G_000300977-301038.

[75] Ex. 61 at 28.

[76] Ex. 61 at p. 58.

[77] Ex. 17 at G_000300977-301038.

[78] Ex. 17 at G_000300977-301038.

[79] *See* Ex. 17 at G_000300977-301038.



49.    Schlumberger, a world-leading provider of technology to the oil and gas industry for reservoir characterization, drilling, production, and processing, also provided services to PDVSA and its subsidiaries like Petróleo through SVSA.[80]

50.    As described in greater detail below, Petróleo fell behind on invoices owed to SVSA; this delay in payment led Schlumberger to "reduce its activity in Venezuela"[81]; and Schlumberger novated receivables into a promissory note.

51.    Under the "**SLB Note Agreement**" dated May 4, 2017,[82] PDVSA, as Issuer, and Petróleo, as Guarantor, agreed to issue 14 notes to SVSA designated as "Series 2017D" notes and

---

[80] Ex. 39 at ¶ 23; Ex. 62 at G_000104204; Ex. 63; Ex. 16 at G_000100101-570.

[81] Ex. 76 at 23.

[82] Ex. 16 at G_000100039.

numbered R-1 through R-14 (each a "**SLB Note**" and collectively, the "**SLB Notes**").[83]  The principal amount of each SLB Note is $50,000,000.51, with a combined total principal amount of $700,000,007.14.[84]  The SLB Note Agreement contains a novation agreement[85] and a list of the novated receivables.[86]

52.    In its 2014 Form 10-K, Schlumberger disclosed that "[a]t times in recent years, Schlumberger has experienced delays in payments from its national oil company customer in Venezuela."[87]  In its 2015 Form 10-K, Schlumberger reiterated that it "has experienced delays in payment from its national oil company customer in Venezuela" and disclosed that it had "entered into an agreement with its national oil company customer in Venezuela to receive certain fixed assets in lieu of payment of approximately $200 million of accounts receivable." [88]

53.    As of February 12, 2015—when the dividend transaction discussed in Section IV.D, *infra*, occurred—Petróleo and another PDVSA subsidiary (PDVSA Gas, S.A.) collectively owed SVSA at least $2.5 million in cumulative receivables for unpaid invoices dating back to 2013.[89]  By year-end of 2015, however, the amount increased to over $420 million on over 4,000 unpaid invoices.[90]  These amounts were novated and incorporated into the SLB Notes.[91]

---

[83] Ex. 16 at G_000100590-660.

[84] Ex. 16 at G_000100590-660; Ex. 10 at ¶ 33.

[85] Ex. 16 at G_000100089.

[86] Ex. 16 at G_000100101-570.

[87] Ex. 64 at 24.

[88] Ex. 65 at 27.

[89] Ex. 16 at G_000100101-570.

[90] Ex. 16 at G_000100101-570.

[91] Ex. 16 at G_000100101-570.

54.    The below chart is a graphic representation of the cumulative receivables Petróleo and PDVSA Gas, S.A. owed SVSA for services SVSA provided in 2015 which were subsequently novated in the SLB Notes:[92]



55.    At least $276 million in 2016 receivables was also novated and incorporated into the SLB Notes.[93]

56.    In its 2016 Form 10-K, Schlumberger disclosed that it "continues to experience delays in payment from its national oil company customer in Venezuela" and that "it would reduce its activity in Venezuela to align operations with cash collections as a result of insufficient payments received in recent quarters and a lack of progress in establishing new mechanisms that

---

[92] *See* Ex. 16 at G_000100101-570.

[93] Ex. 16 at G_000100101-570.

17

address past and future accounts receivable."[94]  As of December 31, 2016, Schlumberger's net receivable balance in Venezuela was approximately $1.2 billion.[95]

### 2. The Venezuelan Economy in 2014-2016, and PDVSA's Failure to Pay Service Providers

#### a. PDVSA Failed to Pay Billions of Dollars to Service Providers Including Halliburton and Schlumberger

57.     PDVSA fell behind in payments to Halliburton, Schlumberger, and other suppliers and joint venture partners during a period when the price of a Venezuelan barrel of oil fell from $101 in June 2014 to $22 by January 2016,[96] contributing to increased short-term liabilities in the oil sector from $746 million in 2006 to $13.8 billion in 2015.[97]

58.     For example, in addition to Halliburton and Schlumberger, another service provider, Weatherford International, disclosed in its 2014 Form 10-K that it "may continue to see a delay in payment on [its] receivables from [its] primary customer in Venezuela or may be compelled to accept bonds as payment, which may then be sold at a loss."[98]  In December 2013, Weatherford International "accepted bonds with a face value of $127 million from PDVSA in full settlement of $127 million in trade receivables.  Upon receipt, [Weatherford International] immediately sold these bonds in a series of transactions recognizing a loss of $58 million."[99]

59.     Additionally, in its 2016 Form 10-K Weatherford disclosed that "[d]uring the second quarter of 2016, [it] accepted a note with a face value of $120 million from Petroleos de

---

[94] Ex. 76 at 23.

[95] Ex. 76 at 23.

[96] Ex. 39 at ¶ 71.

[97] Ex. 67.

[98] Ex. 68 at 13.

[99] Ex. 68 at 13.

Venezuela, S.A. ('PDVSA') in exchange for $120 million in net trade receivables[,]" which was sold to a third party in the fourth quarter of 2016.[100]  Separate from the 2016 promissory note, in its 2017 Form 10-K Weatherford disclosed recording a $230 million "charge equal to a full allowance on [its] accounts receivable [in Venezuela] for revenue earned prior to September 30, 2017."[101]

60.     On March 27, 2015, General Electric Capital Corporation entered into a Note Agreement with PDVSA pertaining to over $131 million in unpaid receivables from 2012 to 2015.[102]  On May 13, 2016, GE Capital EFS Financing Inc. entered into a Note Agreement with PDVSA regarding over $193 million in receivables from 2012 to 2016.[103]  Both Notes were assigned to Red Tree Investments, LLC on January 25, 2019. [104]

61.     Similarly, on January 2017, Dresser-Rand Company, which was acquired by Siemens in 2014,[105] entered into a Note Agreement with PDVSA.[106]  Petróleo owed Dresser-Rand almost $120 million in unpaid invoices for services provided to PDVSA and Venezuela between 2012 and 2015.[107]

---

[100] Ex. 77 at 35.

[101] Ex. 78 at 53.

[102] Ex. 233 at 5-7; Ex. 244 at 65.

[103] Ex. 233 at 5, 8; Ex. 26 at 66.

[104] Ex. 233 at 5.

[105] Ex. 191 at 1.

[106] Ex. 81 at 7.

[107] Ex. 191 at 1; Ex. 81 at 7, 79.

62.    PDVSA was in arrears to numerous other commercial partners as well, including, but not limited to, Surpass Commercial Corp. ($48 million incurred between 2011 and 2015)[108]; Eni SpA (€500 million in 2017);[109] and Elecnor ($166 million as of 2017).[110]

63.    In May 2016, Reuters reported that PDVSA was "struggling to prevent oil services providers from stopping work in Venezuela in protest over billions of dollars in unpaid bills" and had "not made any cash payments in dollars to providers in at least six months as a result of its difficult cash-flow situation."[111]  Reuters also reported that "a package of $1.5 billion in [private debt issuances] maturing in three to five years is being discussed as a way of settling debts with small and medium-sized oil services firms."[112]

64.    In a September 2016 Offers to Exchange filing under the subheading "Conversion of Commercial Debt with Strategic Suppliers," PDVSA stated that it had implemented "different transactions that allow [it] to partially convert the outstanding commercial debt maintained with certain commercial suppliers into financial debt."[113]  The filing lists over $1 billion in notes issued to convert outstanding commercial debt with various companies, including Halliburton.[114]

---

[108] Ex 86 at 1, 5-7, 126-128 (Surpass Arbitration Award).

[109] Ex. 306 at 110.

[110] Ex. 510 at 65.

[111] Ex. 69 at 2.

[112] Ex. 69 at 2.

[113] Ex. 46 at PDVSA_0023589.

[114] Ex. 46 at PDVSA_0023659.

### b.  Inflation and Currency Devaluation

65.  The decline in Venezuela's external asset holdings, combined with PDVSA's significant arrears, ultimately led Venezuela to default on its external debt in 2017.[115]

66.  From 2012 to 2016, Venezuela's consolidated public sector ran an average fiscal deficit of 12.9% of GDP.[116]

67.  To cover the fiscal deficit, the government of Venezuela implemented inflationary policies and expanded Venezuela's monetary base at an annual rate of 98.9% during the same period.[117]

68.  Venezuela's annual inflation rate increased from 20% in 2012 to 274% in 2016, and its economic growth decelerated from +5.6% in 2012 to -17.0% in 2016.[118]

69.  Between 2012 and 2016, Venezuelan imports of goods and services plummeted by 70%,[119] leading to widespread scarcity and the collapse of domestic production that depended on imported intermediate inputs and capital goods.[120]

70.  The Venezuelan government issued IOUs, which took the form of authorizations for the purchase of foreign exchange currency issued by the nation's exchange control authority, to importers whose demand for dollars it could not immediately satisfy.[121]

---

[115] Ex. 39 at ¶ 74 & Fig. 6; Ex. 82 at G_000119014; Ex. 80 at G_000095751.

[116] Ex. 84 at ¶ 31; Ex. 83 at G_000118829.  12.9% is the average of the annual Consolidated Public Sector Deficit as a percentage of real GDP figures in the "Principal Economic Indicators" table.

[117] Ex. 84 at ¶ 31 and Appendix C.5; Ex. 82 at G_000119014.

[118] Ex. 84 at ¶ 30 & Fig.2; Ex. 87 at G_000098141, Table 1.

[119] Ex. 39 at ¶ 72; Ex. 89.

[120] Ex. 40 at G_000099490.

[121] Ex. 90 at G_000110238.

71.     The hyperinflation and the economic crisis forced the Maduro government to devalue the official exchange rate to reduce local currency liabilities in foreign currency terms.[122] Venezuela's multi-tier foreign exchange rate system has restrictions on foreign currency, and large differences between official and parallel exchange rates.[123]  In 2015, the official exchange rate for Venezuelan Bolivars to U.S. Dollars was 6.3 VEF/USD and the parallel exchange rate was 833.3 VEF/USD.[124]  In 2016, the official exchange rate was 10.0 VEF/USD and the parallel exchange rate was 3,164.7 VEF/USD.[125]

72.     Despite the ongoing poor economic background, PDVSA's liabilities measured in U.S. dollars declined between 2014-2015.[126]  This was a direct consequence of the government's decision to monetize its fiscal deficits by increasing the rate of money creation and generating high levels of inflation.[127]  PDVSA adjusted the exchange rate used in its financial statements between 2014 and 2015, reflecting a devaluation of 69.7%.[128]  A doubling of the exchange rate causes the value of local currency debt expressed in foreign currency to drop; however, the reduction of liability on paper does not mean that any creditors were paid.[129]

---

[122] Ex. 84 at ¶ 32; Ex. 91; Ex. 92; Ex. 93; Ex. 87 at 6.

[123] Ex. 84 at ¶¶ 29-30 and Fig. 1.

[124] Ex. 84 at ¶¶  30-34; Ex. 94 at p. 75.

[125] Ex. 84 at ¶¶  30-34; Ex. 94 at p. 75.

[126] Ex. 46 at PDVSA_0023772.

[127] Ex. 84 at ¶ 35

[128] Ex. 84 at ¶ 34; Ex. 280 at 4.

[129] Ex. 99 at 122:5-16.

### 3.    PDVSA Issues the Promissory Notes to Replace Delinquent Payables

73.    As PDVSA went into arrears with SHVSA, SVSA, and other service providers, PDVSA started issuing them New York law-governed promissory notes in lieu of payment.[130]

74.    The promissory notes at issue in this case—a $200 million notional note issued to SHVSA in June 2016 and a series of notes with a notional amount of $700 million issued to SVSA in May 2017—effectively converted unpaid accounts receivable owed to SHVSA and SVSA by PDVSA and Petróleo, respectively, into instruments, with the total principal amounts matching the total outstanding balance of the unpaid invoices.[131]

75.    This was part of a dedicated PDVSA strategy to convert commercial trade debt into financial debt.[132]  In just a few months in 2016, PDVSA converted $1.151 billion in commercial debt owed to ten "strategic suppliers" including SHVSA into financial debt by executing:

> [N]ote agreements which provide for (i) the assumption by PDVSA of a portion of [Petróleo's] debt (evidenced in outstanding commercial invoices and contracts) with certain strategic suppliers; (ii) the novation of said commercial debt into a financial debt that cancels the former one; and (iii) the issuance of a three-year note (or several notes) regulated by a Note Agreement, with quarterly amortizations and an annual interest rate of 6.5%, to each of the participating strategic suppliers.[133]

### a.    The HAL Note

76.    As discussed in ¶ 44, *supra*, on June 29, 2016, PDVSA, as Issuer, and Petróleo, as Guarantor, entered into the HAL Note Agreement regarding the HAL Note.

77.    The HAL Note accrued interest at a rate of 6.5% per annum, with quarterly payments due beginning September 29, 2016 (for interest only) and September 29, 2017 (for

---

[130] Ex. 39 at ¶ 24; Ex. 46 at PDVSA_0023589.

[131] Ex. 39 at ¶ 24; Ex. 16 at G_000100101-570; Ex. 17 at G_000300977-301038.

[132] Ex. 46 at PDVSA_0023589.

[133] Ex. 46 at PDVSA_0023589.

interest and principal) and a maturity date of June 29, 2019.[134]  The default interest rate set forth in the HAL Note Agreement, which applies "after as well as before judgment," is 8.5% per annum.[135]

78.    The HAL Note Agreement defined PDVSA's "payment date" as the date on which the principal and interest is due as set forth in the schedule of payments in Exhibit A to the Form of Note attached to the Note Agreement.[136]

79.    Based on the repayment schedule in the HAL Note, PDVSA was required to make quarterly interest-only payments for one year beginning on September 29, 2016, followed by quarterly payments of both interest and principal through June 29, 2019.[137]

80.    Pursuant to Article III, Section 3.01(c), Issuer's and Guarantor's Representations and Warranties, Enforceability, the HAL Note Agreement "constitute[s] a legal, valid and binding obligation of the Issuer, the Guarantor and any Subsidiary which is a party thereto, enforceable against the Issuer, the Guarantor and any such Subsidiary in accordance with its terms[.]"[138]

81.    Pursuant to Article VI, Section 6.01 of the HAL Note Agreement, Petróleo "absolutely, irrevocably and unconditionally" guaranteed PDVSA's payment obligations under the Note Agreement "as primary obligor and not merely as surety."[139]

82.    Petróleo further agreed, pursuant to Section 6.01 of the HAL Note Agreement, that it was liable for "all costs and expenses including all court costs and attorneys' and paralegals'

---

[134] Ex. 100 at G_000323678.

[135] Ex. 17 at G_000300927.

[136] Ex. 17 at G_000300921 & G_000300964; Ex. 101 at 8.; Ex. 102 at 7.; Ex. 102 at 7.

[137] Ex. 17 at G_000300964.

[138] Ex. 17 at G_000300931.

[139] Ex. 17 at G_000300943-44; Ex. 102 at 8.

fees . . . and expenses paid or incurred by the Administrative Agent and the Noteholders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Issuer."[140]

83.    Pursuant to Article VI, Sections 6.03(b) and 6.04 of the HAL Note Agreement, Petróleo agreed that its obligations were "not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, or unenforcability" of any of the obligations in the Note Agreement, and waived "any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations."[141]

84.    Petróleo further waived any right to "acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party or any other person." [142]

85.    The HAL Note Agreement provides that:

(i) the Initial Noteholder released certain Affiliates of the Issuer as described on Annex I hereto from their obligations to pay the accounts receivable due to the Initial Noteholder as described on Annex I hereto, (ii) in consideration of such release, the Issuer assumed and agreed to pay in full the obligations of such Affiliates in respect of the novated accounts receivable describe on Annex I hereto (collectively, the ('**Novated Receivables**'), and (iii) the Initial Noteholder agreed to release the Issuer from the Novated Receivables in consideration of the concurrent issuance of the Initial Note by the Issuer pursuant to this Agreement to the Initial Noteholder in a principal amount equal to the aggregate unpaid balance of the Novated Receivables held by the Initial Noteholder as of the Effective Date[.][143]

---

[140] Ex. 17 at G_000300943.

[141] Ex. 17 at G_000300944-45.

[142] Ex. 17 at G_000300945.

[143] Ex. 17 at G_000300916.

86.    Pursuant to Article II, Section 2.01(b), Issuance of Initial Note, the HAL Note

Agreement states:

> [T]he outstanding Novated Receivables held by the Initial Noteholder shall be
> released pursuant to the Novation Agreement[144] and converted into the Initial Note
> issued by the Issuer pursuant to this Agreement to the Initial Noteholder in a
> principal amount equal to the aggregate outstanding amount of such Novated
> Receivables of the Initial Noteholder as of the Effective Date as set forth on Annex
> I hereto.[145]

87.    In September 2016, PDVSA disclosed the HAL Note Agreement and explained that

it was issued as a "result of the conversion of PDVSA's outstanding commercial debt maintained

with [SHVSA] into financial debt."[146]

### b.    The SLB Notes

88.    As discussed in ¶ 51, supra, on May 4, 2017, PDVSA, as Issuer, and Petróleo, as

Guarantor, entered into the SLB Note Agreement regarding the SLB Notes.

89.    The SLB Notes accrued interest at a rate of 6.5% per annum, with quarterly

payments due beginning August 4, 2017 (for interest only) and August 4, 2018 (for interest and

principal) and a maturity date of May 4, 2020.[147]  The default interest rate set forth in the SLB

Note Agreement, which applies "after as well as before judgment," is 8.5% per annum.[148]

90.    The SLB Note Agreement provides that:

(i) the Initial Noteholder released certain Affiliates of the Issuer as described on
Annex I hereto from their obligations to pay the accounts receivable due to the
Initial Noteholder as described on Annex I hereto, (ii) in consideration of such
release, the Issuer assumed and agreed to pay in full the obligations of such
Affiliates in respect of the novated accounts receivable describe on Annex I hereto

---

[144] Ex. 103 at G_000301043.

[145] Ex. 17 at G_000300927.

[146] Ex. 46 at PDVSA_0023660.

[147] Ex. 16 at G_000100650.

[148] Ex. 16 at G_000100054.

(collectively, the '**Novated Receivables**'), and (iii) the Initial Noteholder agreed to release the Issuer from the Novated Receivables in consideration of the concurrent issuance of the Initial Note by the Issuer pursuant to this Agreement to the Initial Noteholder in a principal amount equal to the aggregate unpaid balance of the Novated Receivables held by the Initial Noteholder as of the Effective Date[.][149]

91.    Pursuant to Article II, Section 2.01(b), Issuance of Initial Note, the SLB Note Agreement states:

[T]he outstanding Novated Receivables held by the Initial Noteholder shall be released pursuant to the Novation Agreement and converted into the Initial Notes issued by the Issuer pursuant to this Agreement to the Initial Noteholder in an aggregate principal amount equal to the aggregate outstanding amount of such Novated Receivables held by the Initial Noteholder as of the Effective Date as set forth on Annex I hereto.[150]

92.    The SLB Note Agreement defined PDVSA's "repayment date" as the date on which each payment of the principal and interest was due, as set forth in the schedule of payments in Exhibit A to the Form of Note attached to the SLB Note Agreement.[151]

93.    Based on the specified repayment schedule in the SLB Note Agreement, PDVSA was required to make quarterly interest-only payments for one year beginning on August 4, 2017, followed by quarterly payments of both interest and principal through May 4, 2020.[152]

94.    Pursuant to Article VI, Section 6.01 of the SLB Note Agreement, Petróleo "absolutely, irrevocably and unconditionally" guaranteed PDVSA's payment obligations under the SLB Note Agreement "as primary obligor and not merely as surety."[153]

---

[149] Ex. 16 at G_000100042.

[150] Ex. 16 at G_000100053.

[151] *See* Ex. 16 at G_000099976-100038; Ex. 10 at ¶ 50; Ex. 104 at 8; Ex. 105 at 7.

[152] Ex. 104 at 9; Ex. 16 at G_000100574; Ex. 10 at 14; Ex. 104 at 9.

[153] Ex. 16 at G_000101028; Ex. 10 at 21; Ex. 102 at 8.

95.    Petróleo further agreed, pursuant to Section 6.01 of the SLB Note Agreement, that it was liable for "all costs and expenses including all court costs and attorneys' and paralegals' fees . . . and expenses paid or incurred by the Administrative Agent and the Noteholders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Issuer."[154]

96.    Pursuant to Article VI, Sections 6.03(b) and 6.04 of the SLB Note Agreement, Petróleo agreed that its obligations were "not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, or unenforcability" of any of the obligations in the Note Agreement, and waived "any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations…"[155]

97.    Petróleo further waived any right to "acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party or any other person."[156]

98.    The SLB Note Agreement reflects the same three-part process for converting outstanding commercial debt into financial debt that PDVSA set forth in the 2016 offering circular:

> (i) the assumption by PDVSA of a portion of its affiliates' debt (evidenced in commercial invoices and contracts) with certain strategic suppliers; (ii) the novation of said commercial debt into a financial debt that cancels the former one; and (iii) the issuance of a three-year note (or several notes) regulated by a Note Agreement, with quarterly amortizations and an annual interest rate of 6.5%, to each of the participating strategic supplies.[157]

---

[154] Ex. 16 at G_000100071.

[155] Ex. 16 at G_000100072.

[156] Ex. 16 at G_000100072.

[157] Ex. 46 at PDVSA_0023589.

### C.    Ownership and Transfer of the Notes to Plaintiffs

99.    Section 9.04(b) of the HAL Note Agreement grants the Noteholder the right to assign the Notes to "any Person or Persons (other than an Ineligible Transferee) . . . with notice to, but without the prior written consent of, the Issuer and the Administrative Agent."[158]  Section 9.04(b) of the SLB Note Agreement grants the Noteholder the same right.[159]

100.    The HAL and the SLB Note Agreements grant assignees "the rights and obligations of a Noteholder from and after the Effective Date specified in the Assignment and Acceptance" and warrant that assignor is "the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Note."[160]  The SLB Note Agreements passed through a series of assignments (first internally within SLB, then externally) and the HAL Note Agreement passed straight to Girard Street on that basis.[161]

101.    The HAL and the SLB Note Agreements were issued before the January 28, 2019, imposition of sanctions by the United States prohibiting U.S. persons from engaging in transactions relating to PDVSA promissory notes absent specific authorization from OFAC.[162]

### 1.    The SLB Notes Were Assigned to G&A in 2018

102.    On July 20, 2017, SVSA assigned the SLB Notes to a corporate affiliate, Schlumberger Finance BV ("**SFBV**").[163]

---

[158] Ex. 17 at G_000300950.

[159] Ex. 16 at G_000101035.

[160] Ex. 17 at G_000300931; Ex. 16 at G_000101035; Ex. 10 at ¶ 49.

[161] *See e.g.*, Ex. 16 at G_000100661-1048; Ex. 107 at G_000037499; Ex. 108; Ex. 109; Ex. 110.

[162] Ex. 49.

[163] Ex. 16 at G_000100662.

103.    On July 20, 2017, SFBV provided a Notice of Assignment and Appointment of Successor Administrative Agent to PDVSA.[164]

104.    On July 21, 2017, SVSA provided a Notice of Assignment to PDVSA.[165]

105.    On August 16, 2017, Norton Rose Fulbright LLP, counsel for SVSA, issued an Opinion Letter to PDVSA regarding the United States Securities Act of 1933 and the Resale of the Promissory Notes.[166]  Norton Rose Fulbright opined that the offer and sale of the SLB Notes from SVSA to SFBV "does not require registration under the United States Securities Act of 1933".[167]

106.    On October 29, 2018, SFBV assigned the SLB Notes to Cowen and Company, LLC ("**Cowen**").[168]

107.    G&A Strategic Investments I-VII were formed to acquire the SLB Notes.[169]

108.    On October 29, 2018, Cowen emailed PDVSA and SLB notifying them of the assignment from SFBV to Cowen, attaching copies of the assignments and acceptances, the notice of assignment and appointment of successor administrative agent, the resignation of SFBV as the administrative agent, and the legal opinion issued by Katten Muchin Rosenman LLP on the United States Securities Act of 1933.[170]  Katten Muchin Rosenman opined that the offer and sale of the SLB Notes to Cowen "do[es] not require registration under the Securities Act of 1933."[171]

---

[164] Ex. 16 at G_000100689.

[165] Ex. 16 at G_000100691-92.

[166] Ex. 108 at G_000037284-85.

[167] Ex. 108 at G_000037284.

[168] Ex. 16 at G_000100696 -705.

[169] Ex. 111 at 45:22-46:11; Ex. 112 at 229:7-22.

[170] Ex. 113; Ex. 114.

[171] Ex. 114 at G_000037828.

109.    On the same day, October 29, 2018, Cowen assigned the SLB Note to G&A, a subsidiary of Gramercy, endorsing G&A as the party to whom the instrument is payable by noting "the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor . . . the interest in and to all of the Assignor's rights and obligations under the Note Agreement."[172]

110.    On October 29, 2018, Cowen provided a Notice of Assignment to PDVSA regarding the Assignment from SFBV to Cowen.[173]

111.    On the same day, October 29, 2018, G&A provided a Notice of Assignment to PDVSA regarding the Assignment from Cowen to G&A.[174]

112.    G&A paid ███████████ in cash for the SLB Notes on October 29, 2018.[175] G&A purchased the SLB Notes for value without notice of a defect.[176]

113.    The fully executed pricing letter outlined the details of the SLB Notes, Series 2017D, Nos. R-1 through R-14, including the purchase price, the G&A entities to which each of the fourteen SLB Notes would be assigned, and the payment method through wire of funds to Cowen's bank.[177]

114.    The below organizational chart shows the current ownership of the SLB Notes[178]:

---

[172] Ex. 109 at G_000037513; Ex. 16 at G_000100830.

[173] Ex. 116.

[174] Ex. 117 G_000037484-G_000037489.

[175] Ex 118 at G_000038542; Ex. 119 at G_000063975-79; Ex. 120 at G_000037099.

[176] Ex. 109 at G_000037518-19.

[177] Ex. 119 at G_000063975-79.

[178] Ex. 8 at G_000057713.



115.    G&A delivered a Notice of Assignment and Resignation of Administrative Agent in both English and Spanish to PDVSA, which PDVSA stamped "received" on October 29, 2018.[179]  The Notice informed PDVSA that Cowen was resigning as Administrative Agent, that G&A Strategic Holdings LLC would perform all duties of the Administrative Agent, that Cowen was relieved, released, and discharged of all of its duties and obligations set forth in the Note Agreement, and that the note was in default and SFBV had informed PDVSA and Petróleo of that fact.[180]

116.    On October 29, 2018, G&A's counsel provided notice of the assignment to PDVSA via email, including as attachments stamped Assignment and Assumption documents.[181]  PDVSA

---

[179] Ex. 121 at G_000302660.

[180] Ex. 121 at G_000302665-68.

[181] Ex. 122 at G_000035573.

confirmed receipt on October 30, 2018.[182]  That same day, G&A's counsel also provided notice of the assignment to PDVSA via mail[183] and fax.[184]

117.    On November 28, 2023, Cowen gave written notice to PDVSA confirming the October 29, 2018, assignment of the Notes to G&A Strategic Investments, and confirming Cowen's resignation as Administrative Agent and the appointment of G&A Strategic Holdings as Successor Administrative Agent.[185]

### 2.    The HAL Note Was Assigned to Girard Street in 2021

118.    PDVSA has publicly recognized the existence of the HAL Note since September 2016, when it disclosed to potential investors that "[i]n June 2016, PDVSA issued a three-year note for the amount of U.S. $200,000,123.50 in favor of [SHSVA], with amortizations and interest to be paid quarterly and an interest rate of 6.5% per annum."[186]

119.    On December 31, 2020, Gramercy obtained a license from the Office of Foreign Assets Control ("**OFAC**") authorizing it to enter into an agreement with SHSVA for the assignment of the HAL Note.[187]

120.    On January 14, 2021, SHVSA assigned the HAL Note to Girard Street, an entity formed to acquire the HAL Note,[188] endorsing Girard Street as the party to whom the instrument is payable by noting "the Assignor hereby irrevocably sells and assigns to the Assignee, and the

---

[182] Ex. 123 at G_000063999.

[183] Ex. 124 at G_000124575.

[184] Ex. 125 at G_000037179-194; Ex. 126 at G_000037705.

[185] Ex. 127 at G_000061981.

[186] Ex. 46 at PDVSA_0023660.

[187] Ex. 128 at G_000075716-17.

[188] Ex. 4 at 27:12-16.

Assignee hereby irrevocably purchases and assumes from the Assignor . . . the interest in and to all of the Assignor's rights and obligations under the Note Agreement."[189]

121.    Girard Street paid ███████ in cash for the HAL Note on January 14, 2021.[190] Girard Street purchased the HAL Note for value without notice of a defect.[191]

122.    On January 14, 2021, Mr. David Moses, Senior Manager, Treasury Operations, Halliburton, sent a confirmatory email to Mr. Jonathan Ching, Girard Street's counsel at Linklaters LLP, that the funds for the HAL Note were "received."[192]

123.    The below organizational chart shows the ownership of the HAL Note:[193]

---

[189] Ex. 130 at G_000038018; Ex. 100 at G_000323677.

[190] Ex. 132 at ¶ 6; Ex. 130 at G_000037947.

[191] Ex. 130 at G_000037947-51.

[192] Ex. 133 at G_000039154.

[193] Ex. 3.



124.    The HAL Agreement permits each Noteholder to "assign to any Person or Persons (other than an Ineligible Transferee) all or a portion of its interests, rights and obligations under this Agreement . . . *with notice to*, but without the prior written consent of, the Issuer and the Administrative Agent."[194]

125.    On January 14, 2021, Girard Street hand-delivered a Notice of Assignment and Resignation of Administrative Agent in both English and Spanish to PDVSA, which informed PDVSA that SHVSA was resigning as Administrative Agent, that Girard Street Investment Holdings LLC would perform all duties of the Administrative Agent, that SHVSA was relieved, released, and discharged of all of its duties and obligations set forth in the Note Agreement, and

---

[194] Ex. 17 at G_000300950.

that the note was in default and SHVSA had informed PDVSA and Petróleo of that fact.[195] The notice was stamped "received" by PDVSA on January 14, 2021.[196]

126.    On January 14, 2021, Altum Abogados, local counsel for Girard Street for Venezuelan law matters, provided notice of the assignment to PDVSA via email, including as attachments the stamped Assignment and Assumption documents indicating receipt by PDVSA.[197]

127.    On August 19, 2022, PDVSA sought by email a waiver from Girard Street of delivery of year-end financial statements and repeatedly acknowledged that the Note had been assigned to Girard Street.[198]

128.    On September 6, 2022, Girard Street agreed to the waiver of delivery of the financial statements but reserved all other rights.[199]

### D.    Defendants' Failure to Pay the SLB Notes

129.    PDVSA failed to make the required interest payment on the SLB Notes on August 4, 2017 – the "Initial Repayment Date" under the SLB Note contract.[200]  SVSA and its assignee SFBV sent PDVSA 17 separate letters regarding this missed payment, and subsequent missed payments, before declaring an Event of Default on December 14, 2017.[201]

130.    Petróleo has not paid the August 4, 2017, interest payment as Guarantor.[202]

---

[195] Ex. 134 at G_000036659.

[196] Ex. 134 at G_000036659-61.

[197] Ex. 135 at G_000036658; Ex. 134 at G_000036659.

[198] Ex. 136 at G_000036651; Ex. 137 at G_000036652; *see, e.g.*, Ex. 138 at G_000036650; Ex. 139 at G_000301407; Ex. 140 at G_000128532.

[199] Ex. 141 at G_000036649.

[200] Ex. 142 at G_000073758; Ex. 16 at G_000100902; Ex. 143 at G_000072341-42; Ex. 16 at G_000100574.

[201] Ex. 16 at G_000100858-906.

[202] Ex. 142 at G_000073758; Ex. 16 at G_000100902; Ex. 143 at G_000072341-42.

131.    SVSA delivered written notice to PDVSA on August 14, 2017, that PDVSA had failed to pay interest on a Repayment Date, and requested "payment during the cure period listed in Article VII(a) of the Note Agreement."[203]

132.    SVSA delivered nine additional written notices to PDVSA extending the cure period for the missed August 2017 interest payment, on August 21, 2017,[204] August 31, 2017,[205] September 12, 2017,[206] September 15, 2017,[207] September 22, 2017,[208] September 29, 2017,[209] October 6, 2017,[210] October 13, 2017,[211] and October 27, 2017.[212]

133.    After SVSA assigned the SLB Notes to SFBV, on November 3, 2017, SFBV delivered written notice to PDVSA ratifying SVSA's extensions and waivers, and granting an additional extension of the cure period for the missed August 2017 interest payment to November 10, 2017.[213]

134.    PDVSA failed to make the required interest payment on the SLB Notes on November 4, 2017, and Petróleo did not pay the November 4, 2017, interest payment as Guarantor.[214]

---

[203] Ex. 145 at G_000129476.

[204] Ex. 16 at G_000100860-61.

[205] Ex. 16 at G_000100863-864.

[206] Ex. 16 at G_000100866-867.

[207] Ex. 16 at G_000100869-870.

[208] Ex. 16 at G_000100872-873.

[209] Ex. 16 at G_000100875-876.

[210] Ex. 16 at G_000100878-879.

[211] Ex. 16 at G_000100881-882.

[212] Ex. 16 at G_000100884-885.

[213] Ex. 16 at G_000100889-890.

[214] Ex. 16 at 000100905.

135.    After the November 4, 2017, interest payment was missed, SFBV delivered written notices to PDVSA extending the cure period for both the August and November 2017 interest payments on November 10, 2017,[215] November 17, 2017,[216] November 24, 2017,[217] and November 29, 2017.[218]

136.    On December 14, 2017, SFBV, as Noteholder and Administrative Agent, delivered written notice to PDVSA that an Event of Default for non-payment of the August 2017 and November 2017 interest payments had occurred, and was continuing.[219]

137.    PDVSA failed to make the required interest payment on the SLB Notes on February 4, 2018, and Petróleo did not pay the February 4, 2018, interest payment as Guarantor.[220]

138.    PDVSA has failed to make any principal payments and has made only one of 12 interest payments.[221]    On March 9, 2018, SFBV received one payment equivalent to $11,468,493.27 from PDVSA; however, PDVSA did not specify which of the three then-outstanding interest payments (August 4, 2017, November 4, 2017, and February 4, 2018) it intended to settle when it transferred the funds.[222]

139.    Petróleo, as Guarantor, has made no payments.[223]

---

[215] Ex. 16 at G_000100892-893.

[216] Ex. 16 at G_000100895-896.

[217] Ex. 16 at G_000100898-899.

[218] Ex. 16 at G_000100901-902.

[219] Ex. 16 at G_000100905.

[220] Ex. 109 at G_000037518.

[221] Ex. 16 at G_000100909; Ex. 109 at G_000037518.

[222] Ex. 16 at G_000100909; Ex. 109 at G_000037518.

[223] Ex. 109 at G_000037518.

### E.    Defendants' Failure to Pay the HAL Note

140.    PDVSA made the first principal payment and five interest payments on the HAL Note.[224]

141.    On January 8, 2018, SHVSA sent PDVSA written notice that it had not received the interest and principal payments due on December 29, 2017, and advised PDVSA that "[i]f the Outstanding Payment is not received . . . within ten (10) days after the date of this notice, an Event of Default could occur under the Note Agreement."[225]  PDVSA did not make either the required principal or interest payments on March 29, 2018.[226]

142.    Petróleo has not paid the December 29, 2017, principal payment or the March 29, 2018, principal and interest payment as Guarantor.[227]

143.    On April 17, 2018, SHVSA delivered written notice to PDVSA of an Event of Default for non-payment of principal payments on December 29, 2017, and March 29, 2018, each in the amount of $25,000,015.44; and the interest payment due on March 29, 2018, in the amount of $2,404,111.17, reserving certain rights and remedies.[228]

144.    On August 6, 2018, SHVSA delivered written notice to PDVSA of an Event of Default for non-payment of principal payments on December 29, 2017, and March 29, 2018, each in the amount of $25,000,015.44; and the interest payments due on March 29, 2018, and on June

---

[224] Ex. 146 at G_000056937.

[225] Ex. 467 at G_000307168; Ex. 146 at G_000056937.

[226] Ex. 147 at G_000323759; Ex. 101 at 20-21.

[227] Ex. 147 at G_000323759; Ex. 102 at 14-15.

[228] Ex. 147 at G_000323759.

28, 2018, in the amount of $2,404,111.17 and $2,047,946.47 respectively, reserving certain rights and remedies.[229]

145.    On May 14, 2019, SHVSA delivered written notice to PDVSA of an Event of Default for non-payment of principal payments on December 29, 2017, March 29, 2018, June 29, 2018, September 29, 2018, December 29, 2018, and March 29, 2019 in the aggregate amount of $150,000,092.64; and the interest payments due on March 29, 2018, June 29, 2018, September 29, 2018, December 29, 2018, and March 29, 2019 in the aggregate amount of $21,378,781.30 as of March 29, 2019, reserving certain rights and remedies.[230]

146.    On November 1, 2019, SHVSA delivered written notice to PDVSA of an Event of Default for non-payment of principal payments on December 29, 2017, March 29, 2018, June 29, 2018, September 29, 2018, December 29, 2018, March 29, 2019, and June 29, 2019 in the aggregate amount of $175,000.108; and the interest payments due on March 29, 2018, June 29, 2018, September 29, 2018, December 29, 2018, March 29, 2019, and June 29, 2019, in the aggregate amount of $27,345,566.08 as of October 31, 2019, reserving certain rights and remedies.[231]

147.    On December 4, 2019, SHVSA delivered written notice to PDVSA of an Event of Default for non-payment of December 29, 2017, March 29, 2018, June 29, 2018, September 29, 2018, December 29, 2018, March 29, 2019, and June 29, 2019 principal payments in the aggregate amount of $175,000,108; and for an interest payment on November 30, 2018 in the amount of $28,568,169.03, reserving certain rights and remedies.[232]

---

[229] Ex. 148 at G_000323494.

[230] Ex. 149 at G_000323601.

[231] Ex. 88 at G_000307177.

[232] Ex. 150 at G_000324514.

148.    On May 19, 2020, SHVSA, the Noteholder and Administrative Agent at the time, delivered written notice to PDVSA of an Event of Default for non-payment of the December 29, 2017, March 29, 2018, June 29, 2018, September 29, 2018, December 29, 2018, March 29, 2019, and June 29, 2019, principal payments in the aggregate amount of $175,000,108; and for non-payment of the March 29, 2018, June 29, 2018, September 29, 2018, December 29, 2018, March 29, 2019, and June 29, 2019 interest payments in the aggregate amount of $8,516,786, reserving certain rights and remedies.[233]

149.    Petróleo as Guarantor of the HAL Note has made no payments.[234]

150.    On October 28, 2022, Mr. Rob Cloud, Assistant Treasurer, Halliburton, confirmed with Mr. Matt Maloney, former Head of Public Credit, Gramercy, that Halliburton "ha[s] not received any payments or distributions associated with the [HAL Note]."[235]

### F.    Plaintiffs Have Been Damaged

151.    For years, Gramercy has considered different alternatives to monetize its investment in Venezuelan debt and obtain a reasonable return for the investors without resorting to litigation.[236]

152.    At the time of purchase of each of the SLB Notes and HAL Note (collectively, the "**Notes**"), Gramercy formulated strategies to monetize the investment, including selling the Notes or monetizing them as part of a restructuring of Venezuela's sovereign debt.[237]

---

[233] Ex. 151 at G_000126095.

[234] Ex 130 at G_000037950-51; Ex. 151 at G_000126095.

[235] Ex. 152 at G_000053715.

[236] *See* Ex. 9 at 89:5-90:7.

[237] *See*, *e.g.*, Ex. 153 at G_000288109; Ex. 154 at G_000291746-47; Ex. 155, attaching Ex. 156; Ex. 157; Ex. 6 at 120:6-11.

153.    The primary investment thesis for the Notes was either a consensual restructuring of debt or selling them.[238]

154.    Nevertheless, Gramercy also considered litigation "as backstop to preserve rights in case the statute of limitations was at risk of expiring."[239]

155.    In late 2023, Gramercy was concerned that the limitations period might soon expire on some of the claims related to the Notes.[240]

156.    On December 11, 2023, Gramercy commenced these consolidated suits.[241]

157.    PDVSA is liable to Girard Street and G&A for failure to pay the Notes.[242]

158.    Under the HAL Note, PDVSA is liable to Girard Street for the amount of $175,000,108.08 in principal plus 8.5% default interest[243] from December 29, 2017, to September 30, 2024,[244] in the amount of $100,538,760.72, for a total of $275,538,868.80[245] plus fees and other costs.[246]  For each day between September 30, 2024 and the date of entry of judgment, these sums will continue to accrue interest at the contractual default rate of 8.5% per annum, or $40,753.45 per day.[247]

---

[238] Ex. 9 at 90:13-17, 91:2-5.

[239] Ex. 9 at 88:21-90:2, 90:5-14.

[240] Ex. 9 at 89:16-20; Ex. 111 at 176:15-19.

[241] *See G&A Strategic Investments I LLC et al. v. Petroleos de Venezuela, S.A., et al.*, No. 23-cv-10766-JSR, ECF 1 (S.D.N.Y. Dec. 11, 2023); *Girard Street Investment Holdings LLC v. Petroleos de Venezuela, S.A., et al.*, No. 23-cv-10772-JSR, ECF 1 (S.D.N.Y. Dec. 11, 2023).

[242] *See supra* Sections II.D-E.

[243] Ex. 6 at 222:12-18.

[244] Ex. 6 at 222:19-224:7.

[245] Ex. 6 at 224:11-16.

[246] Ex. 158.

[247] Ex. 158.

159.    PDVSA is also liable to Girard Street for 9% statutory interest pursuant to New York C.P.L.R. § 5001 from December 29, 2017, to September 30, 2024,[248] in the amount of $106,452,805.47.[249] For each day between September 30, 2024, and the date of entry of judgment, these sums will continue to accrue interest at the statutory interest rate of 9% per annum, or $43,150.71 per day.[250]

160.    As of September 30, 2024, PDVSA is liable to Girard Street for $381,991,674.27, plus fees and other costs, a sum which will accrue interest at the rate of $83,904.16 per day for each day between September 30, 2024, and the date of entry of judgment.[251]

161.    Under the SLB Notes, PDVSA is liable to G&A for the amount of $700,000,007.14 in principal, plus 8.5% default interest[252] from December 14, 2017, to November 21, 2024,[253] in the amount of $491,505,191.03, for a total of $1,191,505,198.19 plus fees and other costs.[254] For each day between November 21, 2024, and the date of entry of judgment, these sums will continue to accrue interest at the contractual default rate of 8.5% per annum, $189,488.91 per day.[255]

162.    PDVSA is also liable to G&A for 9% statutory interest pursuant to New York C.P.L.R. § 5001 on each overdue payment to November 21, 2024, in the amount of $400,042,078.56.[256] For each day between November 21, 2024, and the date of entry of judgment,

---

[248] Ex. 6 at 225:5-12.

[249] Ex. 158.

[250] Ex. 158.

[251] Ex. 158.

[252] Ex. 6 at 235:22-236:2.

[253] Ex. 6 at 236:3-7.

[254] Ex. 159; Ex. 6 at 249:5-17.

[255] Ex. 159.

[256] Ex. 159; Ex. 6 at 248:20-249:4.

these sums will continue to accrue interest at the statutory interest rate of 9% per annum, or $200,635.32 per day.[257]

163.    As of November 21, 2024, PDVSA is liable to G&A for $1,591,547,276.75, plus fees and other costs, a sum which will accrue interest at the rate of $390,124.23 per day for each day between November 21, 2024, and the date of entry of judgment.[258]

## III.    Venezuela Has Controlled Its Oil Sector (Including PDVSA, PDVH, and Citgo) to Extract Value from PDVH and Citgo for Non-Commercial, Political Purposes

### A.    The Chávez Regime's Political Control of PDVSA, PDVH, and Citgo

164.    During his 1998 campaign, Chávez expressed criticism that Venezuela's oil industry had continued to function as an autonomous commercial operation rather than serving national development goals.[259]  After he assumed office, Chávez's government pursued a new constitutional framework for the oil industry that reinforced public ownership of oil resources—a "Bolivarian Revolution."[260]

165.    Chávez focused on taking control of PDVSA and extracting value to "put the oil industry to work on behalf of the interest of the nation."[261]

166.    According to the Ignacio Hernández Declaration, beginning in 2003 "PDVSA's autonomy was systematically destroyed through predatory policies adopted by former President

---

[257] Ex. 159.

[258] Ex. 159.

[259] Ex. 160 at G_000096362-364.

[260] Ex. 161 at G_000015415, G_000015423 (articles 12-13, and 302-303); Ex. 522 at G_000095858; Ex. 395 at PDVSA_0003293, Clause I.

[261] Ex. 39 at ¶¶ 48-50; Ex. 160 at G_000096362-364.

Hugo Chávez and his successor, Nicolás Maduro, that aimed to concentrate powers in the Presidency."[262]

167.    Between 2003 and 2016, PDVSA allocated $137 billion, or 11% of its gross revenues, to the government for a line item that it labeled "Social Development Contributions" in its financial statements.[263]

168.    Much of this funding went to Venezuela's National Development Fund ("**FONDEN**").[264]

169.    A retrospective analysis published in a 2018 report notes that Citgo had previously sold assets, including refineries, to finance Venezuela's government public spending.[265]

170.    Upon taking control, the Chávez regime sought to immediately extract value from Citgo by selling the company and transferring the proceeds to Venezuela.  Citgo's current CEO, Mr. Carlos Jordá, testified that:

> When President Chávez got into Venezuela, the -- one of the issues is that -- in general, the new government of Venezuela felt that having assets outside of Venezuela was not a good idea, that these monies should be deployed into projects in Venezuela.  And so I was sent to the United States as chairman of the board of CITGO to sell CITGO.  My -- I was sent here to define a plan to sell CITGO . . . So I came April of 2000, and in October of 2000, I went back to Venezuela with a plan on how to sell CITGO.[266]

Mr. Jordá recalled the President of PDVSA telling him that:

> [T]he shareholder, in this case the government, believed that the money . . . should be deployed in Venezuela, in projects in Venezuela, that there was really no need to have money outside and that, you know, more refining capacity, more petrochemical capacity should be in country.  More upstream.  So they felt that the

---

[262] Ex. 47 at PDVH_Girard Street_000134939.

[263] Ex. 39 at ¶ 62 and Fig. 2.

[264] Ex. 39 at ¶ 62.

[265] Ex. 162 at G_000097204.

[266] Ex. 164 at 26:1-13.

money would be better deployed in Venezuela to generate employment and value in Venezuela.[267]

171.   "From April of 2000 to October of 2000, [Jordá] worked with several banks and worked with the CITGO team at the time to look at the best way to sell the company. And [they] developed a plan which involved an IPO of CITGO. It involve[d] merging into CITGO other assets, other international assets to make it more attractive."[268]

172.   Ultimately, the Chávez regime decided to keep Citgo, not because the regime gave up on extracting Citgo's value, but because a sale would be too onerous. Mr. Jordá "went back to Venezuela in October of 2000, and at that time the shareholder had changed their mind completely."[269] Mr. Jordá's perception at the time was that:

> [T]his is early days of the Chávez administration. So they have a series of views on how the oil industry is being conducted. Once they become more familiar and they understand results and they look at the difficulty of selling the oil and all of that, this is just, you know, my understanding -- what could have happened is that they change their mind. They figured this is not a good idea, and they decided to drop it.[270]

173.   Chávez appointed government loyalists to the PDVSA board; this sparked protests from PDVSA workers, after which "Chávez publicly fired seven high-ranking PDVSA managers," contributing to a political crisis including a brief ouster of Chávez during a coup and a two-month oil strike.[271] Mr. Jordá testified that:

> At the end of 2002, there was a strike in Venezuela; and it was a general strike called by the labor unions. And PDVSA employees in their majority decided to

---

[267] Ex. 164 at 26:18-27:5.

[268] Ex. 164 at 28:1-7.

[269] Ex. 164 at 28:18-24.

[270] Ex. 164 at 30:1-10.

[271] Ex. 39 at ¶ 51.

join the strike.  And Chávez started to fire the employees, and he did that on national television, and he fired [approximately] 20,000 people.[272]

174.    Following the mass firings, Venezuela's "energy minister (who also serve[d] as PDVSA president) boasted that the company had 'removed 19,500 enemies of the country from the [oil] business' and would continue to do so, telling PDVSA employees that anyone who disagreed with the government 'should give up their post to a Bolivarian.'"[273]

175.    Mr. Horacio Medina, President of the PDVSA Ad Hoc Board appointed by the Interim Government, was among those fired in 2002 by Chávez.[274]  During his deposition, Mr. Medina testified that the firings "originated due to the fact [we] were against their trying to control PDVSA,"[275] noting that "there was a persecution against all of the employees" and that he "had to leave the country" as a result.[276]

176.    In May 2005, Mr. Rafael Ramírez, Venezuela's Minister of Energy and Oil and then-President of PDVSA, explained during a speech to the Venezuelan National Assembly that PDVSA was "putting an end to th[e] perverse structure" of the "iron 'Corporate Veil' that stood between international business and the control of the Venezuelan State."[277]  Mr. Ramírez continued:

> Our instructions to PDVSA to cooperate, without restriction, with the SENIAT [Venezuela's revenue service], marks an attitude diametrically opposed to the attitude of the old PDVSA that allowed its activity to become a black box impenetrable to the control of the Venezuelan State.  We are dismantling this black

---

[272] Ex. 164 at 31:4-10.

[273] Ex. 165 at G_000096858.

[274] Ex. 166 at 22:20-23.

[275] Ex. 166 at 23:5-7.

[276] Ex. 166 at 22:20-23.

[277] Ex. 167 at G_000039315.

box, one by one in its parts, to definitively make the management of the new PDVSA transparent.[278]

Mr. Ramírez concluded that "PDVSA now belongs to the People [and] is perfectly aligned with the guidance of the Venezuelan State" and "its workers are now an integral part of the country."[279]

177.    Also in 2005, Chávez "sought to maximize the capture of oil revenues by modifying the Venezuelan Central Bank Law to divert oil incomes from the national budget to extra-budgetary funds."[280]

178.    In 2006, Mr. Ramírez stated, "the new PDVSA is with President Chávez . . . the new PDVSA is red, very red, from top to bottom," in an allusion to the color (red) associated with the government party.[281]

179.    In August 2006, Mr. Ramírez announced that the Government would sell Citgo's 41.25% share participation in the Texas-based Lyondell-Citgo refinery to its partner Lyondell Chemical Co. for just over $1.3 billion.[282]

180.    Mr. Ramírez stated that "the executive council of PDVSA, approved the sale of our participation in the Lyondell-Citgo refinery" and clarified that, "effective immediately," the money, or "cash", from the sale would be delivered to FONDEN.[283]

181.    Mr. Ramírez explained that the sale was the realization of a key government "program" and that "the new PDVSA is acting like it should, as an instrument of the state of

---

[278] Ex. 167 at G_000039319.

[279] Ex. 167 at G_000039323-324.

[280] Ex. 47 at PDVH_Girard Street_000134941.

[281] Ex. 39, ¶ 52.

[282] Ex. 169 at G_000030871; Ex. 170 at PDVH_Girard Street_000017184, PDVH_Girard Street_000017191.

[283] Ex. 169 at G_000030872.

Venezuela to operate and produce the exploitation of our resources, but also to defend our interests in our country and abroad."[284]

182.    As Mr. Jordá explained at his deposition, "[t]he shareholder [*i.e.*, PDVSA, acting at the direction of Venezuela] wanted money to invest in Venezuela, and the assets -- some of the assets were sold.  The Lyondell Refining Company was sold; the asphalt business was sold."[285]

### ▶ Historical Net Income



183.    Chávez also exploited Venezuela's control over Citgo to pursue the Venezuelan government's foreign policy objectives in the United States.

184.    For example, in 2005, following discussions with members of the United States Congress, and with the intent of "mak[ing] him look good in the eyes of the US media,"[286]  Chávez announced the creation of a program through which Citgo would sell subsidized refined oil products to poor communities and organizations in the United States.[287]

---

[284] Ex. 169 at G_000030872-873.

[285] Ex. 164 at 80:25-81:1-10; Ex. 95 at PDVH_Girard Street_000109977.

[286] Ex. 171 at G_000095818; Ex. 39 at ¶ 132.

[287] Ex. 172; Ex. 39 at ¶ 132.

185.    The program was "a sign of solidarity between the peoples of Venezuela and the United States," according to a statement made by Venezuela's Vice-Minister of Foreign Affairs in 2014.[288]

186.    Mr. Alejandro Granado, then-President of Citgo, also emphasized this sentiment during a 2007 fuel delivery event in New York, stating, "this is a gift coming from the heart of the Venezuelan people to the heart of the American people."[289]

### B.    Nationalizations, Refusal to Pay Arbitration Awards, and Withdrawal from the ICSID Convention

187.    Around 2007, Chávez began a wave of nationalizations, including of large oil and gas projects.[290]  All operating agreements between PDVSA, including its subsidiaries, and private sector companies were converted into "joint ventures" in which PDVSA had a minimum stake of 60%.[291]

188.    Chávez's government subsequently nationalized hundreds of assets owned by oil service providers, including docks, shipyards, and vehicles.[292]

189.    Some of the entities whose assets had been nationalized initiated international arbitration proceedings through the International Centre for Settlement of Investment Disputes ("**ICSID**"), seeking compensation for the value of their expropriated property.[293]

190.    Venezuela had been a signatory to the ICSID Convention since 1995, but in January 2012 Chávez declared that Venezuela "will not recognize any decision" rendered against

---

[288] Ex. 172 at G_000121178; Ex. 39 at ¶ 132.

[289] Ex. 173.

[290] Ex. 174; Ex. 175; *see supra*, Section II.A.

[291] Ex. 175 at G_000110117.

[292] Ex. 39 at ¶¶ 52, 60; Ex. 55; Ex. 56.

[293] *See e.g.*, Ex. 176.

it, and that Venezuela's award creditors "are trying the impossible: to get us to pay them.  We are not going to pay them anything."[294]

191.    Following that declaration, Venezuela withdrew from the ICSID Convention.[295]

### C.    The Maduro Government Expands Venezuela's Control over PDVSA and Its U.S. Subsidiaries.

192.    Chávez was re-elected for a third six-year term in 2012 but died shortly after the start of his term.[296]

193.    In April 2013, following Chávez's death, Nicolas Maduro was elected President to complete Chávez's term.[297]  In June 2013, the United States recognized Maduro as President of Venezuela.[298]

194.    Before Maduro's election, Venezuela's public finances had become severely strained, with the public sector running a deficit of 15% of GDP in 2012.[299]

195.    Maduro increased control over PDVSA and its subsidiaries as part of a strategic plan.[300]

196.    An October 2014 offering memorandum for $3 billion in PDVSA notes explained that because PDVSA is wholly owned by the Venezuelan government, it has certain "social commitments" "in favor of the welfare of the Venezuelan people," as set forth below:[301]

---

[294] *See* Ex. 178 at G_000319843.

[295] Ex. 179 at G_000095726.

[296] Ex. 180 at ¶¶ 100-101; Ex. 181 at ¶¶ 82-83.

[297] Ex. 180 at ¶ 101; Ex. 181 at ¶ 83.

[298] Ex. 182 at G_000121970, ¶ 66; Ex. 180 at ¶ 101; Ex. 181 at ¶ 83.

[299] Ex. 39 at ¶ 70; Ex. 83; Ex. 46.

[300] *See* Ex. 183 at G_000003366-3367, G_000003385, G_000003409-3413.

[301] Ex. 475 at PDVSA_0024341.

We have operated as an independent commercial entity since our formation; however, since hydrocarbons are vital to the economy and future development of Venezuela due to the fact that they are the primary revenue-generating resource of Venezuela, the revenues received from hydrocarbons activities, according to Article 5 of the Organic Hydrocarbons Law, are required to be used to finance health and education, to create funds for macroeconomic stabilization and to make productive investments, all in favor of the welfare of the Venezuelan people. Those social commitments may affect our ability to place additional funds in reserve for future uses and, indirectly, our commercial affairs. Given that we are controlled by the Venezuelan government, we cannot assure you that the Venezuelan government will not, in the future, impose further material commitments upon us or intervene in our commercial affairs in a manner that will adversely affect our operations, cash flow and financial results.

197.    PDVSA further disclosed the risk that Venezuela might cause PDVSA "to pursue certain . . . social objectives that may adversely affect our results of operations and financial condition," including:[302]

The Bolivarian Republic of Venezuela, as our sole owner, has pursued, and may pursue in the future, certain of its macroeconomic and social objectives through us. As a result, we may engage in activities that give preference to the objectives of the Venezuelan government rather than our economic and business objectives. We may make investments, incur costs and engage in sales on terms that affect our results of operations and financial condition. For instance, pursuant to the Venezuelan Constitution and the Organic Hydrocarbons Law, we are required to foster Venezuela's socio-economic development and the welfare of its citizens. To that effect, the government requires us to make significant financial contributions to social programs, including transfers to FONDEN, as well as requiring us to fund specific projects. In addition, in the past the Venezuelan government required us to acquire several electricity generation and distribution companies, as well as certain food companies, all of which have been divested as of the date of this information memorandum. The Venezuelan government has also nationalized and continues to nationalize other companies in Venezuela. For example, on October 10, 2010, the Venezuelan government announced the nationalization of Venoco (a lubricant manufacturer) and Fertinitro (a petrochemical company) and its related entities and required PEQUIVEN to acquire the assets of Fertinitro and us to acquire the assets of Venoco at a price to be determined in the future. We cannot assure you that the government of Venezuela will not require us to increase our financial contributions to social programs or to purchase other businesses. Any such actions could expose us to increased costs, litigation and contingent liabilities, which would have a material adverse effect on our financial condition and results of operations.

---

[302] Ex. 475 at PDVSA_0024342.

198. The Maduro regime, like the Chávez regime, also leveraged Venezuela's control over Citgo for express political purposes in the United States.

199. For example, a March 17, 2016, presentation regarding Citgo's operational and financial results noted previous years' spending aimed at developing an "Image and Reputation Protection Plan" on behalf of not only Citgo but also Venezuela and PDVSA, which included a "[l]obby campaign with congressmen and government officials."[303] The presentation describes the "Background" for the Plan as follows:[304]



200. In a December 23, 2016, press release, PDVSA stated that Citgo is under PDVSA's "full ownership and control."[305]

---

[303] Ex. 163 at PDVH_Girard Street_000014214.

[304] Ex. 163 at PDVH_Girard Street_000014213

[305] Ex. 185 at G_000121162.

201.    More recently, after the United States Government recognized the Interim Government and PDVSA Ad Hoc Board (*see infra* at ¶ 526), Maduro stated on November 30, 2022, that "PDVSA owns CITGO and its dividends belong to our country."[306]

### D.    Direct Appointments of Citgo President by Venezuela

202.    On April 26, 2017, Maduro signed a decree appointing Mr. José Ángel Pereira, then Citgo's Vice President of Finance, as the company's interim president and delegating to the Minister of Oil the responsibility of swearing in Mr. Pereira.[307]  Maduro explained in the decree that his authority to appoint Mr. Pereira was conferred by Article 236(16) of the Venezuelan Constitution, which provides that the President may "appoint and remove those public officials whose designation is attributed to him by this Constitution and the Law."[308]  Mr. Pereira held the job for only a few months before he was arrested and imprisoned by the Maduro regime, *see* Section V, *infra*.

203.    Maduro's April 26, 2017, appointment decree did not mention PDVH or Citgo Holding.[309]

204.    On November 22, 2017, the day after Mr. Pereira was arrested, Maduro announced:

I have decided to appoint as president of Citgo, [a] Venezuelan company in the United States, comrade Asdrubal Chávez . . . . Asdrubal Chávez, from Barinas, is going directly [to serve] as president of Citgo now, to restructure Citgo, to recover Citgo, to strengthen Citgo in the United States, which is a company that is ours, Venezuelan capital, Venezuelan company.[310]

---

[306] Ex. 448 at G_000001633.

[307] Ex. 186 at G_000111592.

[308] Ex. 39 at ¶ 83; Ex. 186 at G_000111592.

[309] Ex. 186 at G_000111592.

[310] Ex. 39 at ¶ 84; Ex. 187 (video of announcement available at https://elpais.com/internacional/2017/11/23/america/1511404464_208070.html).

205.    On the same day, Maduro signed a decree, pursuant to the authority conferred by Article 236(16) of the Constitution, appointing Mr. Asdrúbal Chávez—a cousin of Hugo Chávez[311]—as interim president of Citgo and delegating to the Minister of Oil the responsibility of swearing him in.[312]  Maduro's November 22, 2017, decree did not mention PDVH or Citgo Holding.[313]

206.    Pursuant to the terms of the decree, Mr. Chávez's appointment became effective on November 22, 2017.[314]

### E.    Overlapping Appointments at PDVSA and Subsidiaries

207.    PDVSA, the corporate alter ego of Venezuela, appointed directors for PDVH and its subsidiaries, which often overlapped among numerous entities – both under the Maduro regime, and later, while the PDVSA Ad Hoc Board has been under the control of the Interim Government (*see* discussion of Interim Government and the Ad Hoc Board *infra* at Section VII.A).[315]

208.    Several individuals served as directors or officers of both PDVSA and PDVH (or its subsidiaries).

209.    For example, Mr. Víctor Aular served as Director of PDVH, Director of Citgo from July 2011 to January 2015, and as Internal Director of PDVSA in at least October 2011.[316]

210.    Mr. Jesús Enrique Luongo served simultaneously as the President and Director of PDVH from January 2015 to March 2017, and as PDVSA Director in May 2011 and January 2015

---

[311] Ex. 39 at ¶ 83 & n.265.

[312] Ex. 188 at PDVH_Girard Street_000036974-75; Ex. 39 at ¶ 84.

[313] Ex. 188 at PDVH_Girard Street_000036974-75.

[314] Ex. 188 at PDVH_Girard Street_000036974.

[315] Ex. 190 at 4-14.

[316] Ex. 190 at 4; Ex. 504 at PDVSA_0017522-523.

and its Vice President of Refining, Trade and Supply in October 2016.[317]  In October 2016, while holding positions in both firms, Mr. Luongo signed the pledge agreement for 50.1% of PDVH's equity, discussed *infra* at Section IV.E.[318]

211.    In July 2015, Mr. Orlando Enrique Chacín served as a PDVSA Director in May and October 2011 and October 2016 and PDVSA's Vice President of Exploration and Production in July 2015.[319]  He also served as a Director of PDVH from 2015 to 2017, and as a Director of Citgo from 2014 to 2015 and 2016 to 2017.[320]

212.    Mr. Antón Rafael Castillo served as a Director of PDVH from 2015 to 2017 and was simultaneously a Director of PDVSA in October 2016.[321]

213.    Mr. Eulogio Del Pino Díaz was President of PDVSA in July 2015, a PDVSA Director in May 2011 and October 2016, Chairman of the Board and President of Citgo Holding from 2008 to 2015, and President and Director of PDVH from 2008 to 2015.[322]  He was actively involved in the bond restructuring discussed in Section IV.E, *infra*.

214.    Mr. Chávez served as Director of PDVH and Acting President of Citgo,[323] after having served as a Director and Vice President of PDVSA.[324]

---

[317] Ex. 190 at 9; Ex. 519 at PDVH_Girard Street_000072510; Ex. 182 at ¶¶ 94, 107, 111; Ex. 115 at PDVH_Girard Street_000076405; Ex. 245 at PDVH_Girard Street_000036889-6890.

[318] Ex. 182 at ¶¶ 103, 111.

[319] Ex. 182 at ¶ 77; Ex. 504 at PDVSA_0017522-523; Ex. 519 at PDVH_Girard Street_000072510; Ex. 245, PDVH_Girard Street_000036890.

[320] Ex. 190 at 5.

[321] Ex. 190 at 5; Ex. 182 at ¶¶ 77, 94.

[322] Ex. 190 at 6; Ex. 182 at ¶ 77; Ex. 245 at PDVH_Girard Street_000036890.

[323] Ex. 190 at 6.

[324] Ex. 504 at PDVSA_0017523; Ex. 519 at PDVH_Girard Street_000072510; Ex. 245, PDVH_Girard Street_000036890.

215.    Mr. Jordá, who is the current President and CEO of Citgo,[325] has also served as a Director of Citgo, Citgo Holding, and PDVH,[326] and held various positions at PDVSA in the 1990s and 2000s.[327]

216.    Venezuela's control over the PDVH, Citgo Holding, and Citgo boards under the U.S.-recognized Interim Government and 2015 National Assembly is discussed *infra* at Section VII.B.

### F.    PDVSA Executives Holding Venezuelan Government Positions

217.    Some executives of PDVSA, Citgo, and Citgo Holding also held Venezuelan government positions.[328]

218.    Mr. Nelson Martinez served as Venezuela's oil minister as well as PDVSA's president.[329] He served as the CEO and President of Citgo in 2016 and was involved in many of the decisions discussed in Section IV.E and Section IV.F.2, *infra*.  He was also arrested and imprisoned by the Maduro regime in 2017, *see* Section V, *infra*.

219.    Mr. Del Pino also served as oil minister, along with his executive roles in PDVSA and Citgo Holding.[330]

220.    Lieutenant Colonel Antonio Perez Suarez served as vice president of PDVSA's supply and trading division.[331]

---

[325] Ex. 195; Ex. 190 at 8.

[326] Ex. 190 at 8; Ex. 197 at PDVSA_0000478.

[327] Ex. 164 at 20:8-22:19.

[328] *See e.g.*, Ex. 199; Ex. 200.

[329] Ex. 199; Ex. 200; Ex. 311 at PDVH_Girard Street_000140661.

[330] Ex. 201.

[331] Ex. 200.

## IV. The Venezuelan Government's and PDVSA's Abuse of PDVH and Its Subsidiaries

221.     The following chart describes average Venezuelan oil basket prices and oil exports at the time of certain transactions and events described herein:[332]



222.     As oil prices and sale volumes rose between 2006 and 2008, Venezuela sold some of Citgo's assets and nationalized oil and gas production in Venezuela.  When oil prices and sales volumes declined after 2011 to 2013, Venezuela and PDVSA engaged in several transactions, described in more detail below, that extracted value from PDVH and its subsidiaries to the detriment of PDVSA's creditors.

---

[332] Ex. 202; Ex. 164 at 79:2-15 ("The strategy that PDVSA had devised was a strategy of increased production to 5 million barrels a day.  The government of Venezuela, being a member of OPEC, was more inclined to a price strategy defending the oil price.  And in my view, that -- that strategy was beneficial to other producers like Saudi Arabia.  But Venezuela would have been better served if it followed a volume strategy leveraging its geographic closeness to the United States and selling crude oil here and keeping that market with a higher volume.  And Luis Pacheco and I, when we worked together at PDVSA, would talk about these things.").

A.    **Mechanisms by Which the Venezuelan Government and PDVSA Controlled PDVH and Citgo to Extract Value from Them**

223.    To fund the political goals outlined in Section III.A above (and particularly in the face of falling oil revenues and a faltering economy), the Venezuelan Government relied heavily on funds it could extract from PDVSA.  PDVSA obtained significant revenue from PDVH and its U.S. subsidiaries, including, ultimately, from Citgo, which was PDVSA's most valuable offshore asset.[333]

224.    Venezuela has employed at least four means of extracting value from PDVSA and its U.S. subsidiaries to the detriment of PDVSA's creditors and/or in disregard of PDVH and its subsidiaries' distinct corporate form: (i) cash dividends (including, in addition to regular dividends, large one-time payments and extraordinary financing to fund them); (ii) "non-cash dividends"; (iii) crude oil offsets; and (iv) netting related parties' receivables and payables.

225.    Each method allowed Venezuela to utilize Citgo's assets for its own benefit while simultaneously removing Citgo's assets from the reach of PDVSA's commercial creditors.  The first method, cash dividends, allowed Venezuela to extract value from Citgo to fund Venezuela's political programs.  The other three methods are different kinds of offsets by which the Venezuelan government, through PDVSA, has been able to transfer value *below* PDVSA's level, which allowed PDVSA to operate without receiving funds necessary to pay its creditors.  Each of these methods is described in more detail herein.

226.    <u>First</u>, to generate large, one-time infusions of cash, Venezuela and PDVSA required Citgo to sell or encumber assets, even if on unfavorable terms or at low prices, and in complete

---

[333] Ex. 39 at ¶ 77 & Table 1.

disregard of the long-term interests of the U.S.-based corporate entities.[334]  Rather than utilizing the funds generated by those transactions to pay commercial creditors of PDVSA, the Venezuelan government would simply obtain the funds from PDVSA and spend them on sovereign purposes, as discussed *infra* in Sections IV.B-E.

227.    An example of one such transaction was the sale of the Lyondell-Citgo refinery in 2006, discussed in Section III.A, *supra*, a fact pattern that recurred in the sales of Citgo's interests in the Explorer, Eagle, and Colonial pipelines and CITGO Asphalt Refining in 2007 and 2008, respectively.[335]  "The income generated from these sales was sent to PDVSA in the form of dividends"[336] but then directly on to Venezuela.[337]

228.    Other examples of this kind of large-scale value-extraction are the 2015 Dividends and 2016 Pledges, detailed in Sections IV.D-E, *infra*.

229.    Venezuela's and PDVSA's practice of causing PDVH and its subsidiaries, including Citgo, to leverage their assets to generate cash for Venezuelan purposes, bypassing PDVSA's creditors, was so common that, reflecting on the history of Citgo decades later, Mr. Carlos Jordá, current CEO of Citgo, noted in a July 26, 2020, email to Ms. Luisa Palacios, President, CEO, and Director of Citgo Holding and PDVH, and Chairwoman of Citgo's Board; Ms. Mireya Ripanti, Shareholder Relations Manager, Citgo; and Mr. Luis Pacheco, then-President of the PDVSA Ad Hoc Board:[338]

---

[334] Ex. 170 at PDVH_Girard Street_000017170 ("Good prices were obtained for the sale of those assets, others did not go as well[.]").

[335] Ex. 170 at PDVH_Girard Street_000017184 & -191; Ex. 203 at PDVH_Girard Street_000088893.

[336] Ex. 170 at PDVH_Girard Street_000017191.

[337] Ex. 39 at ¶¶ 63-64; *see also* Section III.A, *supra*.

[338] Ex. 170 at PDVH_Girard Street_000017170.

*También es interesante que PDV America hizo un financiamiento por $1000 MM en 1993 para pasar un dividendo a PDVSA que luego fue pagado por Citgo. (Sounds familiar).*

230.    The foregoing translates to:

*It is also interesting that PDV America financed $1 billion in 1993 to pass a dividend to PDVSA which was then paid by Citgo. (Sounds familiar).*

231.    To achieve these ends, Venezuela and PDVSA would require PDVH and its subsidiaries to issue dividends, including advance dividends, by entering into financing arrangements that left PDVH's subsidiaries over-leveraged compared to their peers, for no independent economic rationale.  Instead, the purpose was to push dividends up to Venezuela. These issues are discussed in more detail in Sections IV.B-D, *infra*.

232.    The detrimental effect of these dividend-generating transactions on PDVH and its subsidiaries was recognized by Citgo itself.  For example, a June 2021 Citgo presentation recognized that a "[h]igh level of indebtedness" is one factor that does not "allow value to be generated in [a] refining business" such as Citgo, [339] and further notes that "CPC's net debt-to-capital ratio has been at the top end of its peer group" and "CITGO Holding's net debt-to-capital ratio far exceeds that of any comparable company."[340]

233.    This is illustrated in the following chart included in a presentation sent by PDVH and Citgo Holding's Dr. Palacios on August 14, 2020:[341]

---

[339] Ex. 203 at PDVH_Girard Street_000088901.

[340] Ex. 203 at PDVH_Girard Street_000088902.

[341] Ex. 204 at PDVH_Girard Street_000008586 & -589.



234.    Similarly, "[c]apital investments [in Citgo] [were] significantly below industry standard" as of June 2021, and the "[l]ack of growth / improvement in investments affect[ed] yields and energy efficiency affecting gross margin and EBITDA."[342]

235.    Second, PDVSA caused Citgo to employ what it termed a "non-cash dividend." At PDVSA's instructions, PDVH's subsidiaries, including Citgo, paid for a number of items on behalf of PDVSA, many of which were directed at supporting sovereign functions, such as supporting Venezuela's U.S. Embassy and United Nations Mission, paying for planes that were used by government officials, and renting real estate in New York to be used by Venezuelan diplomats and other officials.[343] These items were then accounted for as a "non-cash dividend" on PDVH's books, as if an actual dividend had been distributed up through the corporate chain. But such payments were never actually distributed in cash to PDVSA or Venezuela; instead, PDVSA caused

---

[342] Ex. 203 at PDVH_Girard Street_000088903.

[343] Ex. 205 at G_000036867-68.

the expenditures to be made directly on its own and/or Venezuela's behalf, using funds that were outside of the reach of PDVSA's creditors. Non-cash dividends are further discussed in Section IV.F, *infra*.

236. <u>Third</u>, and similar in practice, are crude oil offsets. PDVSA entered into a variety of agreements—itself, through its affiliates, and/or with or among its direct and indirect subsidiaries—by which PDVSA would receive services from its U.S.-based subsidiaries without ever paying for them directly. For example, under PDVSA's Crude Supply Agreement with Citgo,[344] Citgo received crude and hydrocarbon materials from PDVSA. Rather than pay PDVSA in cash for the crude, Citgo would be directed to "procure" items and equipment on behalf of PDVSA, pay the third-party for the services or equipment, and then offset the costs of the procurement or services from the amount owed on the purchased oil. This was PDVSA and Citgo's ordinary course of business, rather than PDVSA paying for these amounts directly to the third-party provider or having Citgo pay PDVSA for the crude it had purchased. Crude offsets were directed by PDVSA to permit it to obtain goods and services to its creditors' detriment, as discussed in Section IV.F.1, *infra*.

237. <u>Fourth</u>, and relatedly, Venezuela and PDVSA used offsets and "netting" against inter-affiliate balances to reach the funds of their U.S.-based subsidiaries when it served their interests. For example, relying on the outstanding balance PDV Chalmette owed to PPSA in connection with the 2015 sale of the Chalmette Refinery, *see infra* at Section IV.F.3, Venezuela and PDVSA funded their legal expenses and lobbying campaigns by instructing PDV Chalmette to deduct the amounts it owed to PPSA, *see infra* at Section VII.E.

---

[344] Ex. 206 at PDVH_Girard Street_000094453; Ex. 194 at PDVH_Girard Street_000121861.

238.    The effect of these arrangements—in particular the non-cash dividends, the crude oil offsets, and the netting of receivables and payables—was to keep money away from PDVSA and out of the reach of its creditors.  If Citgo had instead paid for its petroleum supply and paid dividends up to PDVSA in cash, that would have increased the amount of money at PDVSA that would have been available to creditors for payment in the ordinary course or levied as part of the judicial process.  But PDVSA and Venezuela were able to control their transactions, bring value back to Venezuela, and frustrate creditors' efforts to recover their commercial debts.

### B.    Historical Citgo Dividends Under Venezuelan Control

239.    Before 2015, Citgo historically declared regular dividends equal to 100% of its net income.[345]

240.    According to internal Citgo documents, the scale of these dividends was substantially larger than other U.S.-based refining companies which, based on Citgo's own assessments, remitted approximately 16% of net income as dividends.[346]

241.    From 1986 to 1997, Citgo distributed approximately $176 million in dividends to PDVSA,[347] a time period during which, "[i]n 1993, PDV America [Citgo Holding's predecessor], the U.S. holding company for CITGO stock, issued [$1 billion] of bonds and transferred these funds to Venezuela."[348]

---

[345] Ex. 207 at PDVH_Girard Street_000131366; *see also* Ex. 208 at 188:7-11; Ex. 213 at PDVH_Girard Street_000030951.

[346] Ex. 207 at PDVH_Girard Street_000131366.

[347] Ex. 210 at PDVH_Girard Street_000017272.

[348] Ex. 170 at PDVH_Girard Street_17178.

242.    From 1998 to 2013, Citgo distributed dividends to PDVH from normal operations of approximately $7.4 billion.[349]

243.    A June 2021 Citgo Company Profile presentation shows dividends paid and distributed by Citgo to PDVSA for the period beginning in 1986 through 2020:[350]



244.    However, in an April 2023 Citgo financial performance presentation, this language was revised to say that between 1986 and 2022, Citgo distributed income from debt as dividends to PDVH:[351]

---

[349] Ex. 210 at PDVH_Girard Street_000017272.

[350] Ex. 203 at PDVH_Girard Street_000088858.

[351] Ex. 215 at PDVH_Girard Street_000008637.



245.    Another slide in the same presentation illustrates Citgo's "History of Debt Issuances and Redemptions":[352]



246.    PDVSA, in turn, reported large dividends made to Venezuela in 2013, 2014, and 2015: $952 million in April 2013 (charged to accumulated income), $10 billion in December 2013, $5 billion in March 2014, $289 million in September 2014 (charged to accumulated income),

---

[352] Ex. 215 at PDVH_Girard Street_000008644.

66

and $87 million in March 2015 (offset against accounts receivable owed by Venezuela "arising from agreements related to the sale of crude oil by PDVSA to other countries").[353] These dividends from PDVSA to Venezuela totaled over $16.3 billion.[354] As discussed in Section IV.A, *supra*, a substantial amount of such dividends was funded by PDVH and its subsidiaries.

### C.    2013-14 Dividend Transaction, Potential Sale of Citgo, and Projections for 2015

247.    In May 2013, Reuters reported that PDVSA's "U.S.-based refining subsidiary Citgo will pay a record first-quarter dividend of $461 million" to PDVSA, an amount "nearly six times the $77 million PDVSA collected in dividends from all [of] its foreign subsidiaries in 2012."[355]

248.    In July 2014, Citgo prepared to issue $1.6 billion in debt.[356] The proceeds were used to pay a $300 million one-time dividend and repay certain preexisting debt.[357]

249.    Venezuelan officials acknowledged that their decision to monetize PDVSA's subsidiaries in the U.S. was "motivated by concerns in Caracas that two arbitration panels at [ICSID] likely will issue rulings soon ordering [PDVSA] to compensate ConocoPhillips and ExxonMobil for their stakes in Venezuelan integrated Orinoco assets that were nationalized in 2007."[358] *See supra* at Section III.B.

---

[353] Ex. 46 at PDVSA_0023652.

[354] Ex. 46 at PDVSA_0023652.

[355] Ex. 216.

[356] Ex. 217 at PDVH_Girard Street_000025300.

[357] Ex. 46 at PDVSA_0023661.

[358] Ex. 226 at G_000319377-78.

250.    Also, in 2014, news outlets reported that PDVSA was considering a sale of Citgo Petroleum.[359]

251.    The speaker notes to a February 18, 2015, Citgo Finance Department Meeting presentation further state, however, that although "[o]ne option was the sale of CITGO," "at the same time, PDVSA also asked that we look into other options."[360]    Accordingly, PDVSA investigated ways to raise additional funds based on its indirect ownership interest in Citgo.

252.    Reflecting on this period years later, Mr. Jordá shared a summary on January 21, 2021 of the evolution of Citgo with Mr. Horacio Medina, President of the PDVSA Ad Hoc Board, at his personal email address, which noted that, after PDVSA "attempt[ed] to sell CITGO through a formal process," including the rejection of "offers that [were] evaluated in Venezuela," PDVSA "in the end decide[d] not to materialize the sale and decide[d] to leverage the company with $2.8 [billion] of debt held by CITGO Holding, of this money $2.2 [billion] is sent as dividends to [PDVSA]."[361]

253.    Mr. Jordá retrospectively described these events in another letter dated June 25, 2023, which states: "In 2014, PDVSA began a process of selling Citgo for which it received multiple offers that ultimately ruled out and decided to extract value from the company by indebting it and generating a dividend to PDVSA of $2.2 billion[.]"[362]

254.    One portion of the debt issuance was the issuance of $650 million in 6.25% senior secured notes due in 2022.[363]    Citgo's offering memorandum for this issuance disclosed certain

---

[359] Ex. 226 at G_000319376-77.

[360] Ex. 227 at G_000008095.

[361] Ex. 85 at PDVSA_0046851; Ex. 164 at 15:21-16:3.

[362] Ex. 95 at PDVH_Girard Street_000109972.

[363] Ex. 218; Ex. 219 at PDVH_Girard Street_000118810.

"Risks Related to Our Relationship with PDVSA," including that "[t]he credit rating of our indirect shareholders [PDVSA and Venezuela] could increase our costs of borrowing money and limit our access to capital markets and trade credit."[364]

255.    Another portion of the debt issuance was memorialized in a July 29, 2014, credit agreement.[365]

256.    News outlets commenting on the transaction stated that, as a result, Citgo would "be indebted to deliver resources to its parent company [PDVSA]."[366]

257.    In late December 2014—approximately six weeks before the 2015 dividend transaction—Citgo projected only $724 million in 2015 dividends.[367]  However, as discussed below, the actual 2015 dividends after the transaction were over $2.5 billion.

### D.    2015 Dividend Transaction

258.    Ultimately, PDVSA decided "to keep their ownership of CITGO, but raise funds by borrowing at the CITGO Holding level."[368]

259.    "Because of the success in borrowing money at the CITGO Holding level," which succeeded in its "primary purpose" of "pay[ing] a dividend to PDVSA," "CITGO [was] no longer for sale." [369]  "This allow[ed] [PDVSA] to raise the funds they desired, protect CITGO the operating company, and preserve their ownership in CITGO."[370]

---

[364] Ex. 218 at PDVH_Girard Street_000117862-63.

[365] Ex. 220 at PDVH_Girard Street_000118112.

[366] Ex. 281 at G_000039229.

[367] Ex. 520 at PDVH_Girard Street_00010530; *see also* Ex. 211 at PDVH_Girard Street_000017094; Ex. 212 at PDVH_Girard Street_000017311.

[368] Ex. 227 at PDVH_Girard Street_000008095.

[369] Ex. 227 at PDVH_Girard Street_000008095.

[370] Ex. 227 at PDVH_Girard Street_000008095.

260.    Thus, in early 2015 Citgo Holding issued an additional $2.8 billion of debt—pledging shares of Citgo and other assets—to support the payment of extraordinary dividends ultimately directed to Venezuela.[371]

261.    Specifically, in a January 21, 2015, written consent, PDVSA as PDVH's sole stockholder directed PDVH's subsidiary, PDV America (later Citgo Holding) to borrow up to $3,000,000,000 that PDVH was to use to "fund a cash dividend to its shareholder," *i.e.*, PDVSA.[372] The transaction was authorized the same day.[373]  Mr. Jesús Enrique Luongo signed the relevant documents both as a Director of PDVSA and of PDVH.[374]

262.    Citgo's marketing of the debt issuance explained it would be used to fund a "special one-time distribution to [its] ultimate parent company [PDVSA]."[375]

263.    In a February 18, 2015, presentation, Citgo characterized the debt as having the "primary purpose" of paying dividends to PDVSA.[376]   Drafts of the script for the presentation show that Citgo "had originally hoped to pledge less" than "100% of the capital stock of CITGO" as collateral.[377]

---

[371] Ex. 10 at ¶ 133; Ex. 228 at G_000033171-72; Ex. 229 at ¶ 41; Ex. 229 at ¶ 41; Ex. 230 at G_000001560.

[372] Ex. 231 at PDVH_Girard Street_000000074.

[373] Ex. 232 at PDVH_Girard Street_000000046.

[374] Ex. 231 at PDVH_Girard Street_000000075; Ex. 232 at PDVH_Girard Street_000000049; Ex. 115 at PDVH_Girard Street_000076405.

[375] Ex. 236 at PDVH_Girard Street_000012070; Ex. 237 at PDVH_Girard Street_000012124; Ex. 238 at PDVH_Girard Street_000018680; Ex. 239 at PDVH_Girard Street_000009995.

[376] Ex. 227 at PDVH_Girard Street_000008095.

[377] Ex. 234 at PDVH_Girard Street_000011030; Ex 235 at PDVH_Girard Street_000008132.

264.    Though directed "to" PDVSA from Citgo, the dividend ultimately flowed to the government of Venezuela.[378]  *See also infra* Section IV.D.2.

### 1.    Mechanics of the 2015 Dividend Transaction

265.    PDVSA retained Deutsche Bank Securities, Inc. ("**Deutsche Bank**") in New York as its agent to facilitate this transaction and to assist it with other efforts to liquidate assets.[379]

266.    The Citgo Holding transaction was structured in two parts: first, the issuance of $1.5 billion in high-yield bonds ("**Senior Secured Notes**"); and second, the execution of a $1.3 billion loan facility ("**Senior Secured Term Loan B**").[380]

267.    To place the two debt issuances, Citgo Holding pledged 100% of its shares of Citgo and other assets.[381]

268.    The $1.3 billion loan facility (Senior Secured Term Loan B) was:

[S]ecured by 100% of CITGO's capital stock and 100% of the limited liability company interests in CITGO Holding's other direct subsidiaries, CITGO Holding Terminals, Southwest Pipeline Holding and Midwest Pipeline Holding, as well as by minority pipeline interests and terminals owned by these other subsidiaries, and is guaranteed by CITGO Holding's direct subsidiaries other than CITGO.[382]

269.    Citgo also transferred approximately $750M in terminals and pipelines to Citgo Holding to use as collateral for the loan facility.[383]

---

[378] *See* Ex. 83 at G_000118934.

[379] Ex. 250 at PDVH_Girard Street_000118558; Ex. 251 at PDVH_Girard Street_000058837.

[380] Ex. 250 at PDVH_Girard Street_000118618, PDVH_Girard Street_000118791; Ex. 252 at PDVH_Girard Street_000032845; Ex. 96 at PDVH_Girard Street_000058792; Ex. 97 at PDVH_Girard Street_000058884.

[381] Ex. 253 at G_000108364-65.

[382] Ex. 253 at G_000108364.

[383] Ex. 227 at G_000008097; Ex. 208 at 65:14-67:13.

270.    The $1.5 billion in Senior Secured Notes was "secured on a ratable basis by the same collateral that secures the CITGO Holding Senior Secured Term Loan B and [was] guaranteed by CITGO Holding's subsidiaries other than CITGO."[384]

271.    The offering memorandum for the notes was dated February 9, 2015, and noted the "expect[ation] that delivery of the notes will be made in New York, New York on or about February 12, 2015."[385]

272.    One of the risk factors disclosed in the offering memorandum was Citgo Holding's "substantial indebtedness," which "could impair our financial condition and our ability to fulfill our debt obligations":[386]

**Our substantial indebtedness could impair our financial condition and our ability to fulfill our debt obligations, including our obligations under the notes, and adversely affect our liquidity.**

We currently have and, following this offering, will continue to have substantial indebtedness. As of September 30, 2014, on an adjusted basis after giving effect to this offering, the Issuer Term Loan Facility and the application of the net proceeds therefrom as described under "Use of Proceeds" as if these events had occurred on September 30, 2014, we would have had total indebtedness on a consolidated basis of approximately $5.0 billion, consisting of the notes, the anticipated $1.3 billion principal amount under the Issuer Term Loan Facility, $694 million under CITGO's senior secured credit facility (net of original issue discount), $650 million of CITGO's 6.25% senior secured notes, $108 million of CITGO's industrial revenue bonds, $250 million in capital lease obligations and $450 million under CITGO's accounts receivable securitization facility. As of September 30, 2014, CITGO also had $290 million of industrial revenue bonds held in treasury until such time as they are either retired or remarketed at our option.

273.    The offering memorandum explained, "[o]ur indebtedness could . . . place us at a competitive disadvantage compared to certain competitors that may have proportionally less debt."[387]

---

[384] Ex. 253 at G_000108365; Ex. 457 at PDVH_Girard Street_000118399 & - 411. (2/12/15 Indenture for $1.5B 10.75% Senior Secured Notes Due 2020. Collateral described at - 8411).

[385] Ex. 223 at PDVH_Girard Street_000119380.

[386] Ex. 223 at PDVH_Girard Street_000119432.

[387] Ex. 223 at PDVH_Girard Street_000119432.

274.    In fact, Citgo Holding's interest expense increased $294 million, or 251%, from 2014 to 2015 "due to the CITGO Holding financing completed in February 2015."[388]

275.    The offering memorandum further explained that "[s]ubstantially all of the proceeds from this offering will be used to pay the Total Shareholder Dividend . . . and none of such proceeds will be used to further invest in our business":[389]

**Substantially all of the proceeds from this offering will be used to pay the Total Shareholder Dividend to the issuer's shareholder, and none of such proceeds will be used to further invest in our business.**

The issuer intends to use the total net proceeds that the issuer receives from borrowings under the Issuer Term Loan Facility and from this offering to (i) deposit an amount sufficient to cover twelve months of interest and required amortization payments under the Issuer Term Loan Facility and certain hedge settlement payments in a debt service reserve account with the collateral agent for the benefit of the lenders under the Issuer Term Loan Facility, (ii) deposit an amount sufficient to cover two semi-annual interest payments on the notes in a debt service reserve account with the collateral agent for the benefit of the holders of the notes, (iii) allocate up to $100 million for working capital and other general corporate purposes, (iv) fund the Direct Acquisition, the proceeds of which CITGO will use to pay the Direct Acquisition Dividend which the issuer intends to then use to pay an estimated $750.0 million of the Total Shareholder Dividend to the issuer's shareholder and (v) pay the remaining portion of the Total Shareholder Dividend to the issuer's shareholder. As a result, substantially all of such total net proceeds will not be used to further invest in our business. See "Use of Proceeds."

276.    The offering memorandum contained an entire section disclosing "Risks Related to Our Relationship with PDVSA."[390]  These risks included that Venezuela might "adopt policies or exercise its control of PDVSA in a manner that might adversely affect [a purchaser's] interests," that "PDVSA has the ability to control the election, and change the members, of [Citgo Holding's] board of directors," and that "PDVSA may pursue transactions or other opportunities that could involve risks to [Citgo Holding's] creditors."[391]

---

[388] Ex. 254 at PDVH_Girard Street_000009684.

[389] Ex. 223 at PDVH_Girard Street_000119434.

[390] Ex. 223 at PDVH_Girard Street_000119455-56.

[391] Ex. 223 at PDVH_Girard Street_000119455.

277.    The offering memorandum disclosed the risk that creditors of PDVSA or Venezuela would seek to attach assets of PDVH, and noted the liability protections generally afforded under U.S. law, absent a veil piercing determination:[392]

In addition, in connection with the arbitrations and lawsuits against PDVSA and the Bolivarian Republic of Venezuela, the claimants may seek to freeze or attach our assets and/or assets of PDVSA, PDV Holding and/or CITGO. A freeze or attachment of assets of the issuer and/or CITGO could adversely affect our financial condition and results of operation, including precluding dividends from CITGO to the issuer, which could affect our ability to make payments under the notes offered hereby. In addition, an attachment of shares of PDV Holding, the issuer and/or CITGO, depending on the percentage of shares affected, could result in a change of control of the issuer and/or CITGO. Before a claimant in a proceeding against PDVSA or the Bolivarian Republic of Venezuela is able to attach assets of PDV Holding, CITGO or the issuer, it would first have to succeed in proceedings seeking to pierce the corporate veils of PDV Holding and, in the case of assets of the issuer or CITGO, the issuer and, in the case of CITGO's assets, CITGO. A claimant in a proceeding against the Bolivarian Republic of Venezuela would also have to succeed in piercing the corporate veil of PDVSA. Although no assurances can be made as to the ultimate outcome of any such proceeding, we note that under U.S. law, corporate entities are presumed to be separate and distinct entities until proven otherwise and that, in order to defeat the separate corporate form and pierce the corporate veil, a claimant generally would have to show either that the corporate form had been used to defraud creditors or that the companies involved had so ignored corporate formalities as to act as if they were not separate. Piercing the veil is difficult under US law and is a very fact specific analysis. Generally, without a strong showing that the corporate form has been abused or used for improper purposes, piercing the veil is not allowed. Any claimant seeking to attach assets of CITGO or the issuer would be an unsecured creditor and any claims it may have against such assets would be subject to the prior liens of CITGO's and the issuer's respective secured creditors, including in the case of the issuer, the holders of the notes offered hereby and the lenders under the Issuer Term Loan Facility. However, any such attachment of the assets of CITGO would be structurally senior to any claim against those assets by the issuer or the holders of the notes.

278.    To place the two debt issuances, Citgo Holding also entered into restrictive debt covenants that imposed limits on the amount of dividends that it could pay in the future.[393]

279.    In its 2016 financial report, Citgo Holding described the transaction as follows:[394]

---

[392] Ex. 223 at PDVH_Girard Street_000119456.

[393] Ex. 253 at G_000108364-65.

[394] Ex. 254 at PDVH_Girard Street_000009689.

CITGO Holding used the net proceeds received from its borrowing of the $1.3 billion senior secured term loan and its issuance of $1.5 billion of its 10.75% senior secured notes due 2020 to (i) establish debt service reserve accounts with funds sufficient to cover the first two semi-annual interest payments on the senior secured notes and twelve months of interest and required amortization of principal payments and certain hedge settlement payments under the senior secured term loan, (ii) retain $100 million of the proceeds for working capital and general corporate purposes and (iii) pay a one-time cash dividend of $2.2 billion to our shareholder.

280.    A Citgo Finance Department Meeting presentation also depicts the mechanics of the transaction in the following flowchart:[395]



281.    To complete the transaction PDVH (Citgo Holding's direct parent) "use[d] all of the other total net proceeds it receives from the CITGO Holding Distribution [including proceeds

---

[395] Ex. 227 at PDVH_Girard Street_000008097; *see also id.* at PDVH_Girard Street_000008099.

from the $1.3 billion Senior Secured Loan and $1.5 billion Senior Secured Notes] to declare and pay, subject to required withholding taxes, a dividend to [PDVSA]."[396]

282.    The "Standard flow of Dividend[s]" from Citgo to PDVSA consisted of four steps, as set forth in the flowchart below: 1) money was transferred from Citgo's bank account to the bank account of Citgo Holding (formerly PDV America), 2) money was transferred from Citgo Holding's bank account to PDVH's bank account, 3) PDVH paid taxes, and 4) money was transferred from PDVH's bank account to PDVSA.[397]



---

[396] Ex. 255 at PDVH_Girard Street_000000219.

[397] Ex. 256 at PDVH_Girard Street_000011111.

283.    According to Citgo Holding's quarterly report for the quarter ending March 31, 2015, the proceeds from the Senior Secured Term Loan B, "together with the proceeds from the CITGO Holding senior secured notes issued on February 12, 2015 . . . were used to . . . pay a one-time cash dividend of $2.2 billion from additional capital to the Company's shareholder," *i.e.*, PDVSA.[398]  PDVH's consolidated financial statements for the two-year period ending December 31, 2015 contained nearly identical language: the proceeds from the Citgo Holding senior secured term loan B, "together with the proceeds from the CITGO Holding senior secured notes issued on February 12, 2015 . . . were used to . . . pay a one-time cash dividend of $2.2 billion from additional capital to the Company's shareholder," *i.e.*, PDVSA.[399]  In other words, the financial statements reported that $2.2 billion flowed from Citgo Holding to PDVH, and the same $2.2 billion flowed from PDVH to PDVSA.

284.    However, that standard flow was not in fact followed in the 2015 dividend transaction.  Instead, Citgo considered three options for where it should instruct Deutsche Bank to transfer the money: 1) "[Deutsche Bank] pays directly to PDVSA's bank account in China," 2) "DB pays directly to CITGO Holding's bank account in China," and from there to PDVSA, or 3) "DB pays directly to CITGO Holding's bank account in NY"[400] and from there to PDVSA.  The below flowchart illustrates these three options:[401]

---

[398] Ex. 106 at PDVH_Girard Street_000011937-38; *see also id* at PDVH_Girard Street_000011928 (reflecting "Divided paid to parent") & -930 (PDVSA is "ultimate parent"); *see also id* at PDVH_Girard Street_000011947 (noting "On February 12, 2015, CITGO Holding distributed 100% of the capital stock of the Company's direct wholly-owned subsidiary, PDV USA, Inc. to PDV Holding.").

[399] Ex. 129 at PDVH_Girard Street_000001476.

[400] Ex. 256 at PDVH_Girard Street_000011110.

[401] Ex. 256 at PDVH_Girard Street_000011112.



285.    Ms. Gina Coon, former Corporate Treasurer, Citgo, testified that Citgo went with Option 3,[402] and that "the only money that was transferred to PDV Holding was the amount necessary to pay the taxes for the dividends."[403]  She further explained that "from a banking efficiency standpoint, I think [the money] processed directly from CITGO Holding to the PDVSA bank," even though "[p]aperwork and accounting demonstrated a dividend as it went from CITGO Holding to PDV Holding and from PDV Holding to PDVSA."[404]

286.    Citgo Holding's total 2015 dividend payments to PDVH were $2.56 billion, which comprised $2.2 billion in proceeds from debt issuance[405] and $360 million in additional dividends based on retained earnings of Citgo Holding.[406]

---

[402] Ex. 19 at 154:9-158:9.

[403] Ex. 19 at 158:6-9.

[404] Ex. 19 at 37:18-20, 38:2-4.

[405] Ex. 257 at PDVH_Girard Street_000025171 & -192; Ex. 163; Ex. 250 at PDVH_Girard Street_000118574; Ex. 265 at PDVH_Girard Street_000013394.

[406] Ex. 257 at PDVH_Girard Street_000025171.

287.    Citgo Holding's 2015 net income was $924 million.[407]  The total 2015 dividend of $2.56 billion from Citgo Holding to PDVH was approximately 2.8 times Citgo Holding's 2015 net earnings,[408] and approximately 2.34 times Citgo Holding's retained earnings.[409]

288.    According to an internal presentation which considered historical dividends paid each year between 1986 and 2019, the 2015 dividend was the highest on record during that period.[410]  Citgo Holding's 2015 cash dividends were approximately 280% of its net earnings,[411] whereas its cash dividends from 2012 to 2014 averaged 88% of its net earnings per year.[412]

289.    A January 1, 2016, presentation circulated by Ms. Coon, titled "2015 Year-in-Review," similarly referred to the 2015 dividend transaction as the "largest dividend refinancing ever."[413]

290.    Plaintiffs' expert witness Dr. Francisco Rodríguez, the Rice Family Professor of the Practice of Public and International Affairs at the University of Denver's Josef Korbel School of International Studies, opined that the ratio of Citgo Holding's dividends to its net earnings was abnormally high, both in comparison to other large U.S. refiners and in comparison to its own historical tradition.[414]  By one measure, this dividend ratio is approximately 10 times higher than

---

[407] Ex. 257 at PDVH_Girard Street_000025170.

[408] Ex. 257 at PDVH_Girard Street_000025170 & -172.

[409] Ex. 257 at PDVH_Girard Street_000025169; Ex. 228 at G_000033541 & - 344; Ex. 253 at G_000108647-788.

[410] Ex. 258 at PDVH_Girard Street_000017770.

[411] Ex. 259 at PDVH_ Girard Street_000025643-754 & 5705-706.

[412] Ex. 228 at G_000033542 & -544; Ex. 260 at G_000002404 & -406.

[413] Ex. 261 at PDVH_Girard Street_000014190; Ex. 262 at PDVH_Girard Street_000014192.

[414] Ex. 39 at ¶¶ 10(f), 111, 113-120 & Fig. 7; Ex. 84 at ¶¶ 49, 59 & Fig. 4, 64-69 & Fig. 5.

the ratios of U.S. refining peers such as Phillips 66, Valero, and Marathon;[415] by another, it is over 3 times higher than the ratios of peers.[416]

291.    According to PDVH's financial statements, equity as a share of PDVH's assets fell from 25.6% ($2,075,817,000/$8,106,284,000) in 2014 to only 4.7% ($386,592,000/$8,219,274,000) in 2015.[417] Similarly, according to Citgo Holding's financial statements for the same time period, equity as a share of Citgo Holding's assets fell from 25.1% ($2,014,515,000/$8,021,981,000) in 2014 to only 4.4% ($357,395,000/$8,064,645,000) in 2015.[418]

292.    By contrast, the equity/assets figures for Phillips 66 were 45.3% in 2014 and 49.3% in 2015,[419] for Valero the figures were 46.6% in 2014 and 48.2% in 2015,[420] and for Marathon the figures were 37.4% in 2014 and 45.6% in 2015.[421]

293.    According to PDVH's financial statements, PDVH's total interest expense grew 222.6% between 2014 and 2015 (to $428,832,000).[422] Similarly, Citgo Holding's total interest expense grew 221% between 2014 and 2015 (to $427,188,000).[423]

---

[415] Ex. 39 at ¶ 115, n. 342.

[416] Ex. 84 at ¶ 64 & Figure 5.

[417] Ex. 224 at PDVH_Girard Street_000021962.

[418] Ex. 257 at PDVH_Girard Street_000025169; Ex. 259 at PDVH_Girard Street_000025704.

[419] Ex. 168 at G_000327216.

[420] Ex. 189 at G_000101985-986.

[421] Ex. 193 at G_000102403 & -405.

[422] Ex. 224 at PDVH_Girard Street_000021963.

[423] Ex. 257 at PDVH_Girard Street_000025170.

294.    By contrast, between 2014 and 2015 the total interest expense for Phillips 66 rose 16.1% (to $310 million),[424] for Valero it increased 9.1% (to $433 million),[425] and for Marathon it grew 42.6% (to $288 million).[426]

## 2.    The 2015 Dividend Flowed to Venezuela, Not PDVSA

295.    PDVSA did not use the 2015 Dividend for commercial purposes, including to pay its commercial debts.[427]

296.    In 2019, Mr. Jordá and Dr. Palacios acknowledged in an interview that Citgo's 2019 dividends were being used to pay down the $2.8 billion debt incurred by Citgo Holding when it "repatriate[d] divdends" to Venezuela as part of the 2015 Dividend transaction.[428]

297.    When discussing the 2015 Dividend in a 2022 interview, Mr. Medina stated that Mr. Nelson Martinez, President and CEO of Citgo and Chairman of the Citgo Board of Directors, and the Maduro regime *created* Citgo Holding to be able to borrow $2.8 billion, which was sent to Venezuela through PDVSA.[429]

298.    The $2.8 billion financing closed on or about February 12, 2015.[430]  On February 12, Citgo Holding made same day transfers to PDVSA for $1.341 billion and $0.75 billion, for a total of $2.091 billion.[431]

---

[424] Ex. 168 at G_000327213.

[425] Ex. 189 at G_000101986.

[426] Ex. 193 at G_000102428.

[427] *E.g.,* Ex 39 at 9.

[428] Ex. 268 at G_000039253

[429] Ex. 269 at PDVH_ Girard Street_000140603-05.

[430] Ex. 46 at PDVSA_0023574.

[431] Ex. 52 at PDVH_Girard Street_000031017-021.

299.    On February 13, 2015, the reported reserves of the Venezuelan Central Bank were $21.192 billion, and on February 18, 2015, the reported reserves increased by $2.063 billion (to $23.255 billion).[432]  This increase in U.S. dollar reserves of the Venezuelan Central Bank is consistent with PDVSA's dividend transaction.[433]

300.    Venezuela reported in an SEC filing that it had "received U.S.$2.8 billion in dividends from CITGO in February 2015."[434]

301.    The 2015 dividend represented at least 5% of total Venezuelan revenue for the year.[435]

302.    When the 2015 dividend was issued, the creditors at issue in this case—Halliburton and Schlumberger—were already owed over $125 million in receivables for services provided to PDVSA.  Yet those invoices, along with other receivables (*see supra* at Section II.B.2.a) remained unpaid.

303.    Other PDVSA service providers went unpaid as well.  *See* Section II.B.2.a, *supra*.

304.    As discussed in Section II.B.2.b, *supra*, hyperinflation and an economic crisis led the Maduro government to devalue the official exchange rate to reduce local currency liabilities in foreign currency terms, which means that even though PDVSA's liabilities measured in US dollars may have declined between 2014-2015, that reduction of liability on paper does not mean that any creditors were paid.

---

[432] Ex. 264.

[433] *See* Ex. 264.

[434] *See* Ex. 83 at G_000118934.

[435] Ex. 39 at ¶ 114; Ex. 39, Appendix C.4; Ex. 270 at ¶ 186; Ex. 83 at G_000118826.

### 3.    Aftermath of the Dividend Transaction

305.    The 2015 Dividend—and the debt covenants associated with the loans used to fund it—had a direct financial impact on PDVH's U.S. subsidiaries, including Citgo and Citgo Holding. As recognized in a retrospective Citgo report, from 2015-2019 "Citgo had limited access to the debt markets after the Citgo entities [] incurred $2.8 billion in debt on terms that significantly restricted future dividends."[436]

306.    In April 2021, Citgo Holding prepared a cash forecast which showed that the debt associated with the 2015 dividend transaction was expected to result in Citgo Holding exhausting its available cash by September 2021.[437]

307.    Months after the 2015 dividend transaction, at 7:11 a.m. on October 30, 2015, Mr. Fernando Valera (a Citgo employee hired as an advisor[438]) asked Mr. José Ángel Pereira, then-Vice President of Finance at Citgo, for "[t]he expected flow of dividends to PDVSA for the coming years."[439]  Mr. Valera explained that he needed the information "to assess the entire business, because it is part of what PDVSA would receive in the period."  He informed Mr. Pereira that he had been "talking that the model could yield about 15 billion," when they were already at around $11 billion, but advised Mr. Pereira that "it needs to be fine-tuned more, I think the final assessment may be close to $20 billion, but there is still work to be done, all of this is preliminary."[440]

308.    Several minutes later, at 7:28 a.m., Mr. Pereira forwarded the email to Mr. Curtis Rowe, Chief Financial Officer, Citgo, and Ms. Balvy Bhogal-Mitro, Head of Corporate Strategic

---

[436] Ex. 230 at G_000001559.

[437] Ex. 225 at PDVH_Girard Street 000008744.

[438] Ex. 517 at PDVH_Girard Street_000141574; Ex. 29 at 126:24-127:1.

[439] Ex. 274.

[440] Ex. 274 at PDVH_Girard Street_000008022_EN.

Planning, Citgo, and requested "the expected dividends stream for the next five years according to MTP (from cito [sic] to Citgo holding and Citgo to pdvsa)."[441]  The same day, at 10:42 a.m., Mr. Rowe responded to Mr. Pereira that the assumption for "CITGO Holding to Pdvsa" was "100 percent debt repayment in April[,] [b]ut maximum dividends after that.  Is that Ok?"[442]

309.    On October 30, 2015, Mr. Robert Shoemaker, Citgo's Manager of Budgets and Performance Analysis at the time, responded to Mr. Rowe in the same email chain, "OK, I will work with that.  We have agreed dividend payments only in April (end of annual period), yes?"[443] Mr. Rowe responded, "Yes. I will let u [sic] know if I get confirmation from jose."[444]

310.    In a different set of responses to the same chain, on October 30, 2015, Mr. Rowe provided Mr. Shoemaker with projected dividends of $180-200 million in each of 2018 and 2019.[445]

311.    Mr. Shoemaker responded to Mr. Rowe on November 1, 2015, as follows[446]:

Will the 2016-2020 MTP earnings (Balvy's latest numbers) pay off the CITGO Holding debt?  Short answer, yes they will.

Will the 2016-2020 MTP earnings both pay off the debt if the maximum permitted dividend is paid to PDVSA?  No, there will be a balanced remaining on the bonds in February 2020 when they come due.

It all depends on which question we're being asked.  And much of the time I am not sure which question it is.

---

[441] Ex. 274 at PDVH_Girard Street_000008023.

[442] Ex. 274 at PDVH_Girard Street_000008023.

[443] Ex. 246 at PDVH_Girard Street_000016769.

[444] Ex. 246 at PDVH_Girard Street_000016769.

[445] Ex. 274 at PDVH_Girard Street_000008022.

[446] Ex. 274 at PDVH_Girard Street_000008022.

312.    Mr. Shoemaker explained at his deposition that this email was setting forth a binary choice: either "to pay off the debt" or, "if dividends permit[ted] under the debt covenants are paid," "to have a remaining balance."[447]

313.    On May 1, 2017, PDVSA asked what dividends Citgo Holding could pay.[448]  In response, on May 2, 2017, Mr. Shoemaker wrote that "[d]ue to debt covenant restrictions, no dividend can be paid by CITGO Holding to PDV Holding before the CITGO Holding Term Loan B matures in May 2018."[449]

314.    In a December 2017 draft presentation to the Citgo Board of Directors on the "Path Forward for Debt Refinancing, Aruba, Natural Gas Pipeline, Upstream Integration, and Compensation," the "Highest Priority" upcoming debt maturity was the fact that "**The 2018 CITGO Holding Term Loan is due May 2018**".[450]  The presentation noted that "Fitch has already downgraded CITGO Holding because the maturity is so close," and "Lenders and Trade Creditors are beginning to get nervous about this refinancing risk."[451]

   **E.    2016 Pledges**

315.    In late 2016, PDVSA caused PDVH to pledge 100% of its equity in Citgo Holding in two transactions,[452] both of which were "for the benefit of [PDVSA's] public credit operation . . . which in no way benefitted PDV Holding, Inc."[453]

---

[447] Ex. 29 at 135:23-137:4.

[448] Ex. 275 at PDVH_Girard Street_000007989.

[449] Ex. 275 at PDVH_Girard Street_000007989.

[450] Ex. 276 at PDVH_Girard Street_000094538.

[451] Ex. 276 at PDVH_Girard Street_000094538.

[452] Ex. 280.

[453] Ex. 182 at ¶ 327.

316.    Venezuela's Special Attorney General, Mr. José Ignacio Hernández, stated in an August 2019 memorandum that PDVH "had no plausible financial reasons to establish the pledge in order to guarantee an obligation of its shareholder, unrelated to its line of business."[454]

### 1.    PDVSA Promissory Notes Due in 2017

317.    In April 2007, PDVSA issued $3,000,000,000 in aggregate principal amount of notes due in April 2017 (the "**April 2017 Notes**"), and in October 2010 and January 2011, PDVSA issued $6,150,000,0 in aggregate principal amount of notes due in November 2017 (the "**November 2017 Notes**").[455]  The principal on the November 2017 Notes was due in three equal installments of $2,050,000,000 due on November 2, 2015; November 2, 2016; and November 2, 2017.[456]

318.    Thus, in 2016, when oil prices were low and the Venezuelan economy was weak, *see* Section II.B.2, *supra* (discussing the Venezuelan economy in 2014-2016 and PDVSA's need to convert over $1 billion in commercial debt into financial debt), and when some large arbitration awards had already been issued against Venezuela and other large arbitration awards were expected, *see* Section IV.C, *supra*, PDVSA was faced with the prospect of a $2 billion payment in November 2016 and an additional $5 billion due within the following year.

319.    However, PDVSA had extracted over $2 billion in dividends from Citgo Holding the year before in 2015, *see* Section IV.D, *supra* (discussing the 2015 dividend transaction), in

---

[454] Ex. 182 at ¶ 327; Ex. 10 at 153.

[455] Ex. 180 at ¶ 145; Ex. 181 at ¶ 126; Ex. 46 at PDVSA_0023574.

[456] Ex. 180 at ¶ 145; Ex. 181 at ¶ 126.

transactions with clear debt covenants.[457]  Furthermore, most banks "declined to do business with"

Citgo, as the below slides demonstrate:[458]

| ABN Amro | BBVA | DiabNor | Natixis |
|---|---|---|---|
| Allied Irish Bank | BCI | DZ Bank | Nomura |
| Amegy | Beachpoint Capital | E. Sun | OakTree Capital |
| ANZ | Beale Bank | East West | Omega Advisors |
| BAC Florida | BES (Banco Espirito Santo) | Eaton Vance | PNC Bank |
| Bancaribe | BNP Paribas | EDC | RABO Bank |
| Banco de Brasil | BOTM | Erste Group | Raymond James |
| Banco de Sabadell | Cadence Bank | Fifth Third Bank | RBS |
| Banco Espirito Santo - BES | Capital One | GE Capital | Regions |
| Banco Itau | Chang Hwa | Glendon/Altair Global Opp Fund | RZB |
| Banco Santander | China Construction Bank | Glendon/Altair Global Opp Fund | Scotia |
| Bancoex | China Merchants Bank | Goldman Sachs | SMBC (Sumitomo Mitsui) |
| Bank Leumi | CIBC | Helaba | Societe Generale |
| Bank of America | CIC | HSBC | TD Bank (Toronto Dominion) |
| Bank of Australia | CIT | Iberia | Trustmark |
| Bank of China | Citbank N.A. | ING Capital | U.S. Bank |
| Bank of Communications | Citizens Bank | Israel Discount Bank | UBS |
| Bank of East Asia | Comerica | JP Morgan Chase | Unicredit |
| Bank of Montreal | Commerzbank | Key Bank | Union Bank |
| Bank of New York | Credit Agricole | Mercantil | United Overseas Bank |
| Bank of Oklahoma (BOK) | Credit Suisse | Mercantile Bank | Wells Fargo |
| Bank of Taiwan | Deutsche Bank | Mizuho | York Capital |

Legend:
| Declined in Past (many multiple declines) |
|---|
| Exited/Exiting the Current Facility |
| Non-Traditional Lender (cost) |

*It is a challenge to find Banks willing to participate in a CITGO Revolver.*

*72 of the 88 banks (about 80%) listed below have declined to do business with us.*

*We will work with the Lead Bank to approach many of these banks again.*

---

[457] Ex. 19 at 164:1-167:11 (describing excess cash flow requirements "associated with the 2015 financing transaction" as a sort of minimum threshold that "define[s] the context within which additional dividends can make their way outside of CITGO Holding," and that "no additional monies could be released outside of CITGO Holding to PDV Holding unless the -- the terms of the excess cash flow were met"); Ex. 208 at 114:14-17 (noting that there are "situations where CITGO may not be able to enter into new lines of business activity at the CITGO Petroleum level due to that -- covenant restrictions and the like").

[458] Ex. 518 at PDVH_Girard Street_000046140-141.



320.    PDVSA, under Venezuela's control, spent much of 2016 seeking to resolve this conundrum, as described below.

## 2.    Unsuccessful Efforts to Exchange 2017 Notes

321.    On February 24, 2016, Frontier Management Group Limited ("**Frontier**"), Petróleo, Citgo, and PDVH entered into a "confidentiality, exclusivity, and fees Agreement" regarding a proposed transaction.[459]

322.    Subject to clawback.[460]

323.    Subject to clawback.[461]    Subject to clawback.[462]

---

[459] Ex. 277 at PDVH_Girard Street_000046954.

[460] Subject to clawback.

[461] Subject to clawback.

[462] Subject to clawback.

324.    Subject to clawback.[463]

325.    Subject to clawback.[464]   Subject to clawback.[465]

326.    Subject to clawback.[466]

327.    Subject to clawback.[467]

328.    By letter dated March 22, 2016, Mr. Abraham Ortega, Financial Planning Executive Director for Petróleo, and Mr. Nelson Martinez, CEO of Citgo, contacted Mr. Fateh Khazal, Chairman and CEO of Frontier, to advise him that Petróleo and Citgo were "terminat[ing] further efforts to pursue the Transaction."[468]

329.    Venezuela's total control of PDVH and its Citgo subsidiaries' role in efforts to refinance PDVSA's debts is highlighted by the "Citgo Six" episode, discussed below, in which six executives involved in other negotiations with Frontier in 2017 were arrested and imprisoned for not obtaining the Venezuelan government's approval of their actions.  *See infra* Section V.

330.    On July 7, 2016, Mr. Vincent Danjoux and Mr. Stéphane Charbit of Rothschild & Co. ("**Rothschild**") emailed Mr. Martinez, President and CEO of Citgo, to inform him that they had "been mandated to discuss with PDVSA a potential voluntary exchange transaction of the Company's 2016 and 2017 bonds, which represent a total of $8.1 bn debt, acting at the request of PDVSA's bondholders."[469]  They further informed Mr. Martinez that they had "an ongoing

---

[463] Subject to clawback.

[464] Subject to clawback.

[465] Subject to clawback.

[466] Subject to clawback.

[467] Subject to clawback.

[468] Ex. 277.

[469] Ex. 279 at PDVH_Girard Street_000008549.

dialogue with all of PDVSA's main creditors, and ha[d] identified in total over 45 bondholders," which they "believe[d] [was] close to the whole of the market."[470]  The subject line of the email was "Pdvsa bond exchange potential transaction."[471]

331.    On July 8, 2016, Mr. Martinez forwarded the email from Mr. Danjoux and Mr. Charbit to Mr. Eulogio Del Pino Díaz, then-President of PDVSA.[472]  Mr. Martinez explained that he had "requested this note" from Rothschild "because on the one hand they were waiting for a response to their previous proposal," to which they "had [received] no answer," and on the other because he "believe[d] that Rothschild's proposal is better" than the proposal "Pereira and Bianco [had] talked with Renny and Ana Maria" about "in which they would make new issuance and would use the shares of PDV Holding as transaction collateral."[473]  Mr. Martinez recommended to Mr. Del Pino that Rothschild representatives "go to Venezuela to explain . . . the scope and safety of the proposal."[474]

332.    On July 9, 2016, Mr. Del Pino told Mr. Martinez, Ms. Ana Maria España, a PDVSA Director and Assistant Treasurer of PDVH, and Mr. Renny Bolivar, Financial Planning Executive Director for PDVSA, that "Renny and Anna we are going to receive these people and evaluate their proposal well."[475]

---

[470] Ex. 279 at PDVH_Girard Street_000008549.

[471] Ex. 279 at PDVH_Girard Street_000008549.

[472] Ex. 279 at PDVH_Girard Street_000008549.

[473] Ex. 279 at PDVH_Girard Street_000008549.

[474] Ex. 279 at PDVH_Girard Street_000008549.

[475] Ex. 279 at PDVH_Girard Street_000008548.

333.    On July 12, 2016, Mr. Pereira told Mr. Martinez that Ms. España would be meeting with Lazard, who was "also making a proposal" at 9 a.m. on Friday, and with Rothschild at 2 p.m. on Friday.[476]

334.    Lazard is "an international financial adviser."[477]

335.    Mr. Pereira told Mr. Martinez that the "benefits" of Rothschild's proposal included: "there is no pledging of shares of Citgo Holding, there is no new issue of bonds it is only exchange, there is no cash issue for this year to pay bonds, they have contacted large bondholders 'anchors' the [NPV] is positive it is a quick transaction etc."[478]

336.    Neither the Rothschild proposal nor the Lazard proposal were enacted; instead, the bonds were exchanged in the transaction discussed in further detail below.

### 3.    October 2016 Pledge of 50.1% of Citgo Holding in 2020 Bond Exchange Offer

337.    In advance of the public announcement of the exchange, as emails between Credit Suisse and PDVSA exchanging pricing models reflect,[479] PDVSA and Credit Suisse modeled three options for a bond exchange for two PDVSA bonds (the April 2017 Notes and the November 2017 Notes) with a combined face value of $7.1 billion ($3.0 billion and $4.1 billion, respectively).[480]

338.    The first option modeled by Credit Suisse was the exchange of 2017 bonds for new 2020 bonds secured by 50.1% of PDVSA's equity ownership in Citgo at a 1:1 exchange ratio, meaning that the new bonds would continue to have a combined face value of $7.1 billion

---

[476] Ex. 279 at PDVH_Girard Street_000008549.

[477] Ex. 208 at 218:3-13.

[478] Ex. 279 at PDVH_Girard Street_000008548.

[479] Ex. 267.

[480] Ex. 338.

assuming a 100% participation rate.[481]  The model assumed that 50.1% of the Citgo equity was worth $4.409 billion.[482]

339.



340.    Under both the first and second options, the new 2020 bonds would have the same terms and amortization profile,[488] but an upfront cash payment to investors would be required if the Citgo Holding shares were not used as collateral.[489]  Credit Suisse therefore calculated an

---

[481] Ex. 338 at tab "Citgo."

[482] Ex. 338 at tab "Citgo," cell F9.

[483] Ex. 338 at tab "No Citgo (cash)."

[484] Ex. 266; Ex. 514 at PDVSA_0042335.

[485] Ex. 338 at UBS0000074, tab "No Citgo (cash)," cells Z24, AA24.

[486] Ex. 338 at UBS0000074, tab "No Citgo (cash)," cell Z30.

[487] Ex. 338 at UBS0000074, tab "No Citgo (cash)," cell AA30.

[488] Ex. 338 at UBS0000074, tab "Citgo," cells AC7:AS43, & tab "No Citgo (cash)," cells AC7:AS43.

[489] Ex. 338 at UBS0000074, tab "Citgo," column Z (showing zero "Aggregate Cash"), & tab "No Citgo (cash)," column Z (showing non-zero "Aggregate Cash").

upfront cash payment that would make it indifferent between new bonds with and without shares in Citgo as collateral.[490]

341.    The third option proposed, "No Citgo (no cash)," modeled that, in order for PDVSA "[t]o get to similar premiums as in the other scenarios, the exchange ratio would be need to [be] ███████."[491] In other words, with neither the security of the Citgo Holding shares nor an upfront cash payment, the bonds were worth only 63% as much as the bonds secured by Citgo Holding shares (a $50 present value for a $100 face value unsecured 2020 bond compared with $79.02 for a $100 face value secured 2020 bond).[492] Assuming 40% investor participation, Credit Suisse modeled that PDVSA would be required to incur additional debt of $1.58 billion.[493] Assuming 100% investor participation, PDVSA would be required to incur additional debt of $3.96 billion.[494]

342.    PDVSA elected not to offer an upfront cash payment and, in a September 2016 offering circular, offered to exchange the April 2017 Notes and the November 2017 Notes for "U.S. dollar denominated 8.50% Senior Secured Notes due 2020" secured by PDVH's pledge of 50.1% of its shares of capital stock of Citgo Holding.[495]

343.    On October 28, 2016, the exchange offer closed.[496] Through this exchange, PDVSA exchanged $2.8 billion in maturing, *unsecured* bonds for $3.4 billion of new bonds (an

---

[490] Ex. 338 at UBS0000074, tabs "Citgo" and "No Citgo (cash)."

[491] Ex. 267 at UBS0000072; Ex. 338 at UBS0000074, tab "No Citgo (no cash)," cells M30 & Q30. In the first two options, the new bonds had a face value of 100. However, in the last option, the new bonds were issued at 150 and 160, respectively, representing exchange ratios of 1.5 and 1.6.

[492] Ex. 338 at UBS0000074, tab "No Citgo (no cash)," cells AJ32 & AS32.

[493] Ex. 338 at UBS0000074, tab "No Citgo (no cash)," cell W24.

[494] Ex. 338 at UBS0000074, tab "No Citgo (no cash)," cell W30.

[495] Ex. 46.

[496] *See* Ex. 82 at G_000119043.

exchange ratio of 1:1.2) secured by a collateral of 50.1% of the shares of Citgo Holding owned by PDVH.[497]



344.    The Pledge and Security Agreement among PDVH as pledgor, PDVSA as issuer, PPSA as guarantor, GLAS Americas LLC as collateral agent and MUFG Union Bank, N.A. as trustee, is dated October 28, 2016.[500] That agreement recited that, pursuant to an indenture dated October 28, 2016, "the Issuer will issue U.S. $3,367,529,000 8.50% senior secured notes due 2020"; PDVH "is the legal and beneficial owner of 100% of the issued and outstanding common stock in CITGO Holding"; and PDVH "agreed to pledge and charge the Collateral" (which consisted primarily of "50.1% of the shares of capital stock of CITGO Holding, Inc.") "in consideration of the foregoing and for other good and valuable consideration."[501]

345.    When PDVH's corporate representative was asked, "in preparing for your 30(b)(6) deposition, did you come across any other additional documentary support other than this document, in that one sentence, explaining why PDVH thought that this transaction was a benefit to it?" the response was, "Right now, I do not recall other documents."[502]

---

[497] Ex. 82 at G_000119043.

[498] Ex. 46; Ex. 266; Ex. 514 at PDVSA_0042335.

[499] *See* Ex. 338.

[500] Ex. 283.

[501] Ex. 283 at PDVSA_0034162 & -164.

[502] Ex. 208 at 223:1-7.

346.    Ms. Coon was asked if she was aware of PDVH "receiving any benefits from the 2020 bond financing," and testified "I don't know of any that I could state."[503]

347.    PDVH's expert witness Mr. Jack Schwager, Senior Managing Director in FTI Consulting's Forensic & Litigation Consulting segment, testified that he was "not aware of any value [PDVH] did or did not receive from th[e] pledge" of its assets.[504]

348.    Mr. Jordá was asked if he was aware, from the time he "came in August of 2019, all the way up through present," of any benefits PDVH "received from the 2020 bond transaction."[505]  He responded, "No, I don't – you know, benefit to the shareholder, not to the company.  Normally companies don't appreciate dividends being taken out."[506]

349.    Mr. Jordá was asked, "Are you aware of any benefit that CITGO Holding received from the 2020 bonds transaction?" and responded, "No."[507]

350.    Mr. Jordá was asked if there was "any benefit to CPC from the 2020 bond transaction?" and responded, "Same answer, no."[508]

351.    PDVH's corporate representative, Mr. Fernando Vera, testified that the date on which PDVH first "learned that its stock in CITGO Holding was pledged as part of a 50.1 percent transaction" was the same day the PDVH Board of Directors signed a unanimous written consent approving the pledge.[509]

---

[503] Ex. 19 at 85:19-25, 86:9-22.

[504] Ex. 99 at 57:3-11.

[505] Ex. 164 at 74:18-22.

[506] Ex. 164 at 74:24-75:1.

[507] Ex. 164 at 75:2-6.

[508] Ex. 164 at 75:7-9.

[509] Ex. 284 at 87:12-88:2.

352.    Mr. Vera testified that the physical stock certificate for the 50.1% of Citgo Holding securing the 2020 bonds is in the possession of the agent associated with the 2020 bondholders.[510] That agent is GLAS Americas LLC.[511]

353.    A physical stock certificate for 50.1% of PDVH's equity in Citgo Holdings is held in a vault in New York.[512]

354.    Ms. Coon testified that she "d[id] not know who was involved in" the pledge of the Citgo Holdings stock, and commented, "the only item I could offer is I was asked" by Citgo's "legal group" "to provide stock certificates that ultimately, I find, was used for this purpose."[513]

355.    PDVSA subsequently took the position in litigation in the U.S. that the exchange offer required the approval of the National Assembly under Venezuelan law, and that the failure to satisfy this requirement rendered the 2020 bonds null and void.[514]

### 4.    November 2016 Pledge of Remaining 49.9% of Citgo Holding to Rosneft

356.    A month later, on November 30, 2016, PDVH as pledgor, PDVSA as guarantor, and PPSA as seller executed a pledge and security agreement ("**Rosneft PSA**") wherein PDVH's remaining 49.9% of the shares of capital stock of Citgo Holding were pledged as collateral in another transaction with the Russian state oil company, Rosneft.[515]

---

[510] Ex. 284 at 92:17-93:21.

[511] Ex. 283.

[512] Ex. 285, *Petroleos de Venezuela S.A., et al., v. MUFG Union Bank, N.A*, No. 19-cv-10023-KPF, Dkt. No. 127 ¶ 10; Ex. 180, PDVH Answer to G&A Am. Compl. ¶¶ 28, 30

[513] Ex. 19 at 86:9-18.

[514] *See Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 41 N.Y.3d 462, 467-69 (2024).

[515] Ex. 286.

357.    The Rosneft PSA recited that Rosneft Trading S.A. ("**Rosneft**"), the "Buyer" and "Secured Party" in the Rosneft PSA, had prepaid and/or would prepay for certain goods pursuant to Commercial Export Contract No. SA 37000193.[516]

358.    The Rosneft PSA did not set forth the dollar figure of Rosneft's prepayments.[517]

359.    PDVH's corporate representative, when asked if PDVH was aware "how much the Rosneft loan was at issue for that collateral," testified, "I do not have that number readily available."[518]  When asked if "PDVH, in its corporate records, kn[e]w how much the Rosneft loan was before 49.9 percent of its stock in CITGO Holding was pledged," PDVH's corporate representative testified, "The documents I have reviewed are related to the approval of the pledge by the PDV Holding Board. I do not remember from that review the amount of the pledge – the amount of the – the Rosneft amount."[519]  When asked if the representative did not "remember the amount, or [didn't] remember seeing any documents that had the amount," PDVH's corporate representative testified, "I don't remember having seen an amount."[520]

360.    Ms. Coon, who provided the stock certificates that were used as collateral, was asked if she was aware of "any benefits PDVH . . . received from the Rosneft transaction," and testified, "I am not aware."[521]

---

[516] Ex. 286 at PDVH_Girard Street_000048694-697.

[517] Ex. 286.

[518] Ex. 208 at 228:19-22.

[519] Ex. 208 at 228:23-229:6.

[520] Ex. 208 at 229:7-10.

[521] Ex. 19 at 86:3-8.

361.    PDVH's corporate representative was asked, "What were the substantial direct and indirect benefits that PDVH received by entering into this pledge agreement?" and responded," I don't know. I don't—I don't have that information."[522]

362.    Citgo described this pledge agreement as "a transaction where [PDVSA] had PDV Holding pledge 49.9% of Citgo Holding's stock . . . to secure PDVSA's obligations," as set forth below[523]:

## Rosneft Stock Pledge (49.9%)

- *Background*
    - *PDVSA recently completed a transaction where they had PDV Holding pledge 49.9% of CITGO Holding's stock in relation to secure PDVSA's obligations to deliver crude associated with an prepayment-type agreements with Rosneft.*

363.    Citgo sought to allay investor concerns regarding Rosneft's status as a sanctioned party by highlighting that Rosneft owned only 49.9% of Citgo Holding, rather than 50% or more, and "the relevant OFAC sanctions" therefore did not apply[524]:

*Are there **OFAC-sanctions** considerations if Rosneft exercised?*
- *Although Rosneft is a sanctioned party, the relevant OFAC sanctions apply to entities who are 50% or more owned by a listed entity. The stock pledge is only secured by 49.9%, not 50% or more*
- *Furthermore, at a default in the secured obligations and an enforcement by Rosneft does not mean that Rosneft would acquire the shares. An enforcement on the pledge would most likely result in a foreclosure or other commercially reasonable sale process, and the party that acquires the shares would be the party that offers the highest value in that process. This would be the case whether Rosneft or any other party is a beneficiary of just the 49.9% pledge, or also of additional interests in CITGO, or of no security interest at all.*

364.    On December 1, 2016, the day following PDVH, PDVSA, and PPSA's execution of the Rosneft PSA, Ms. Rivas emailed Ms. María Martinez, Corporate Secretary of the PDVH

---

[522] Ex. 284 at 164:2-6.

[523] Ex. 287 at PDVH_Girard Street_000131913 (highlighting original).

[524] Ex. 287 at PDVH_Girard Street_000131913 (highlighting original).

Board of Directors, and informed her, "contractually we are obliged to deliver **the original of the Stock Certificate** to Rosneft by tomorrow . . . via its attorneys Norton Rose who are located in Houston."[525]  Ms. Rivas informed Ms. Martinez that if the original stock certificate was not delivered within two days after the execution of the Rosneft PSA—*i.e.*, by December 2, 2016— "there may be consequences of a potential default, so we therefore kindly request your assistance in making the making [sic] necessary arrangements to deliver this document to Rosneft's attorneys."[526]

365.    On December 2, 2016, PDVH delivered a stock certificate for 49.9% of Citgo Holding to Rosneft's attorneys without a fully-executed contract.  Ms. Rivas emailed "María and Jeff" the "duly executed Pledge and Security Agreement related to the Stock Certificate that must be delivered today to the person indicated by Norton Rose."[527]  The copy of the Rosneft PSA attached to Ms. Rivas's email was signed by PDVH, PDVSA, and PPSA but was not signed by Rosneft.[528]  When asked, "Did PDVH hand over the stock without a fully executed contract?" PDVH's corporate representative testified, "I don't know.  This document contains the signatures that are listed here.  I don't know if another document exists with the Rosneft signature."[529]

366.    On December 23, 2016, Ms. Julie Okwara, Senior Corporate Counsel at Citgo, emailed Mr. Richard Lopez, Corporate Treasurer at Citgo, a copy of the Rosneft PSA.[530]  In the cover email, Ms. Okwara noted:

---

[525] Ex. 288.

[526] Ex. 288.

[527] Ex. 288.

[528] Ex. 286 at PDVH_Girard Street_000048717; Ex. 208 at 229:13-17.

[529] Ex. 208 at 229:20-25.

[530] Ex. 289 at PDVH_Girard Street_000094716-717.

This is a partially executed copy, and we don't have the fully executed copy or the other transaction documents. Maria Martinez as the Corporate Secretary for the Pledgor – PDV Holding, Inc. – has made numerous attempts to obtain a copy of the fully executed Pledge and Security Agreement, but to no avail I understand.[531]

367.    On January 4, 2017, Ms. Okwara emailed Mr. Francois Proust at Rothschild, among others, the unanimous written consent of the PDVH Board of Directors authorizing the pledge of 49.9% of Citgo Holding stock.[532]  In the cover email, Ms. Okwara noted, "we are still waiting on PDVSA's counsel for copies of the underlying transaction documents."[533]

368.    PDVH's corporate representative was asked, "Does PDVH have any knowledge as to why it did not still have all of the underlying transaction documents here two months after the transaction?" and testified, "Ms. Okwara was engaged in this communication, as evidenced by this email. I did not discuss with her or others information regarding this."[534]

369.    At some point, the fully-executed Rosneft PSA came into the possession of PDVSA.[535]

370.    Although PDVH was unaware of the amount of the Rosneft loan that was secured by 49.9% of its shares in Citgo Holding, *see* ¶¶ 359-61, *supra*, that information was set out in PDVSA's publicly-available financial statements for the year ending December 31, 2016.[536] PDVSA's corporate representative, when shown the 2016 financial statements, testified that he was familiar with the document and that it "used to be publicly accessible on PDVSA's website,"

---

[531] Ex. 289 at PDVH_Girard Street_000094716-717.

[532] Ex. 289.

[533] Ex. 289.

[534] Ex. 208 at 230:24-231:6.

[535] Ex. 290.

[536] Ex. 291.

and also testified that PDVSA used to "regularly issue and publish its consolidated financial statements."[537]

371.    Specifically, Note 24, "Accruals and Other Liabilities" to the Consolidated Financial Statements of PDVSA and its subsidiaries, with the Independent Auditors' Report Thereon, contained a subheading titled "Customer advances" as set forth below[538]:

**Customer advances**

During 2016 dollar-denominated agreements were signed for the sale of crude oil and products to Rosneft Trading S.A., which paid in advance to PDVSA the amount of $1,485 million, [no advance was received in 2015, and $4,000 million in 2014] and detailed as follows (in millions of dollars):

| Agreement Number | Advance US$ | Guarantee |
|---|---|---|
| 1st advance (May 2014) | 2,000 | No guarantees |
| 2nd advance (November 2014) | 2,000 | No guarantees |
| 3rd advance (May 2016) | 500 | No guarantees |
| 4th advance (November 2016) | 500 | Collaterals and call options over the shares of certain Empresas Mixtas. |
| 5th advance (November 2016) | 485 | Collaterals over 49.9% of the CITGO Holding capital stock. |

All of these advances have variable interest rates, grace periods and diverse delivery dates.

The grace period of advances received in 2014 expired in May and November 2016, and as a consequence, the compliance with crude oil and products dispatch obligation with TNK Trading International S.A. (Rosneft Trading S.A. related Company) commenced.

372.    No guarantees were provided for Rosneft's May 2014 advance of $2 billion, November 2014 advance of $2 billion, or May 2016 advance of $500 million.[539]

373.    Rosneft's fourth advance, of $500 million in November 2016, was guaranteed with "Collaterals and call options over the shares of certain Empresas Mixtas."[540]  (Empresas Mixtas are joint ventures between PDVSA and foreign oil companies, *see* ¶ 35, *supra*.[541])

---

[537] Ex. 292 at 242:14-243:18.

[538] Ex. 291.

[539] Ex. 291.

[540] Ex. 291.

[541] Ex. 46 at PDVSA_0023711.

374.    Rosneft's fifth advance, of $485 million in November 2016, was guaranteed with "Collaterals over 49.9% of the CITGO Holding capital stock."[542]

375.    Rosneft advanced a total of $1.485 billion to PDVSA in three tranches; the last tranche, of only $485 million, was secured by 49.9% of PDVH's stock in Citgo Holding.[543]

376.    Two months earlier, Credit Suisse had valued 50.1% of the Citgo Holding stock at ██████████[544]

377.    Dr. Rodríguez relied on "the sum of [the] 2015 and 2016 dividend payments by Citgo Holding, [the] $2.8 billion PDVSA 2020 bond, and the $485 million Rosneft pledge" to calculate the ratio of capital returned to shareholders/net earnings as 5.96—a ratio far higher than the 0.83 for three other large U.S. refiners.[545]

378.    When PDVH was asked, "And so PDVH pledged 49.9 percent of the CITGO Holding capital stock to secure a $485 million loan; correct?"  PDVH's corporate representative testified only that, "I see the information in the audited financial statements of PDVSA."[546]

379.    PDVH's corporate representative did not know whether the loan secured by 49.9% of Citgo Holding had been paid back.[547]  However, the physical stock certificates for the 49.9% of Citgo Holding pledged in November 2016 are presently located in Houston, Texas.[548]

---

[542] Ex. 291; Ex. 280.

[543] Ex. 291 at G_000000374; Ex. 280; Ex. 293.

[544] Ex. 338 at UBS0000074, tab "Citgo," cell F9.

[545] Ex. 84 at ¶ 71 & n.104.

[546] Ex. 208 at 233:21-234:2.

[547] Ex. 337 at 96:6-15.

[548] Ex. 337 at 93:22-96:5.

380.    PDVH's corporate representative did not recall when the stock certificates had been returned to PDVH, except that "[i]t was some time ago."[549]

381.    PDVH's corporate representative testified that as of the date of the February 21, 2025, deposition, 49.9% of Citgo Holding's stock was not currently pledged as collateral to any entity or party.[550]

### 5.    2017 Sanctions and Their Impact on Dividends

382.    The U.S. government "has included PDVSA and its subsidiaries in the definition of the Government of Venezuela" since August 24, 2017,[551] when the United States issued Executive Order 13808 prohibiting "dividend payments or other distributions of profits to the Government of Venezuela from any entity owned or controlled, directly or indirectly, by the Government of Venezuela."[552]

383.    The Executive Order followed a July 2017 press release by OFAC announcing sanctions against Venezuelan officials and noting allegations that between 2004 and 2014, approximately $11 billion went missing from PDVSA.[553]

384.    In October 2015, before the onset of the U.S. sanctions, Citgo Holding expected to pay dividends to PDVSA in April 2018 ($180-$200 million) and in April 2019 ($180-$200 million), subject to meeting the requirements of debt covenants and availability of funds.[554]  Mr.

---

[549] Ex. 337 at 94:13-21.

[550] Ex. 337 at 96:16-22.

[551] Ex. 203 at PDVH_Girard Street_000088857.

[552] Ex. 294.

[553] Ex. 295 at G_000121514.

[554] Ex. 208 at 148:17-152:16; Ex. 246; Ex. 29 at 117:9-123:5; Ex. 274.

Shoemaker testified that the debt covenants associated with the 2015 dividends would not necessarily have prohibited the payment of 2018 and 2019 dividends.[555]

385.    However, "[s]anctions applied in August 2017 would have prevented these dividends being paid [from] Citgo Holding."[556]

386.    An internal presentation also stated that "Order 13808 [the U.S. sanctions] prevented PDVSA from collecting dividends in 2017, 2018 and 2019."[557]

### 6.    Litigation Regarding Validity of October 2016 Pledge

387.    On October 29, 2019, PDVSA, Petróleo, and PDVH filed a lawsuit asking the U.S. District Court for the Southern District of New York to declare invalid the notes secured by 50.1% of PDVH's shares of Citgo Holding, the pledge of which is discussed in Section IV.E.3, *supra*.[558] The lawsuit is *Petroleos De Venezuela S.A. et al. v. MUFG Union Bank, N.A. et al.*, No. 19-cv-10023-KPF (S.D.N.Y.) ("**_MUFG_**").

388.    Dr. Palacios, who was President and CEO of both PDVH and Citgo Holding at the time the suit was brought, admitted that it was the PDVSA Ad Hoc Board's idea to bring the lawsuit.[559]

389.    The complaint explained that the PDVSA Ad Hoc Board had "appointed new boards of its subsidiaries, including PDV Holding."[560]  PDVSA, Petróleo, and PDVH alleged that "the Maduro regime unilaterally and illegally orchestrated an exchange offer" by which "PDV

---

[555] Ex. 29 at 134:5-137:4.

[556] Ex. 29 at 134:18-20.

[557] Ex. 258 at PDVH_Girard Street_000017770.

[558] Ex. 29; Ex. 39 at ¶ 93.

[559] Ex. 298 at 161:14-163:11.

[560] Ex. 296 at ¶ 8.

Holding's principal asset—the CITGO Shares—were purportedly pledged to secure PDVSA's debt."[561]  PDVSA, Petróleo, and PDVH further alleged that the pledge amounted to a contract in the national public interest and was therefore invalid without prior authorization by the National Assembly.[562]

390.    PDVSA, Petróleo, and PDVH did not take the position that National Assembly authorization was required for the issuance of PDVSA debt, but rather that it was required for the pledge of Venezuela's most important asset.[563]

391.    The United States District Court for the Southern District of New York denied PDVSA's motion for summary judgment and granted defendants' motion for summary judgment in part.[564]  The Second Circuit deferred decision, and certified several questions to the New York Court of Appeals.[565]  The New York Court of Appeals issued its decision in February 2024,[566] the Second Circuit vacated and remanded in July 2024,[567] and the parties are presently re-briefing summary judgment before the Southern District of New York.[568]

---

[561] Ex. 296 at ¶ 5.

[562] Ex. 296 at ¶ 7; Ex. 39 at ¶ 93; Ex. 297.

[563] Ex. 39 at ¶ 94; Ex. 161.

[564] *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257 (S.D.N.Y. 2020), *vacated and remanded*, 106 F.4th 263 (2d Cir. 2024).

[565] *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456 (2d Cir. 2024).

[566] *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 235 N.E.3d 949 (N.Y. 2024).

[567] *Petroleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263 (2d Cir. 2024).

[568] *E.g. MUFG*, ECF Nos. 333, 338, 346, 347, 360, 363, and 364.

**F.     Other Uses of PDVH's Assets Under PDVSA and Venezuela's Control to Support PDVSA and Venezuela's Functions**

392.    In addition to the cash dividends and sale or leveraging of assets described *supra* at Sections IV.B-E, PDVSA extracted value from its U.S.-based subsidiaries through offsets of amounts purportedly due and owing to PDVSA—specifically, crude offsets and "non-cash dividends."

393.    During Maduro's tenure, PDVSA had access to and routinely used the funds of its subsidiaries—including PDVH and its direct subsidiaries, Citgo Holding (and its subsidiary Citgo), PDV Chalmette, LDC, Citgo Aruba, and PDV USA—to support parent and sovereign functions.

394.    Those actions—accessing funds held by PDVH's subsidiaries—have continued under the Ad Hoc Board as well, as further detailed *infra* at Section VII.E.

**1.     Citgo's Payment of PDVSA Expenses**

395.    Financial records indicate that Citgo paid a variety of expenses for PDVSA, including over $8 million in medical expenses for individuals associated with PDVSA between 2014 and 2017,[569] over $415,000 in travel expenses for PDVSA executives between 2014 and 2017,[570] and over $493 million in supply expenses for various PDVSA projects in 2015.[571]

396.    Ms. Coon testified that, in exchange for paying PDVSA expenses, Citgo was often compensated in the form of "offsets of crude" received from PDVSA:[572]

> CITGO Petroleum purchased crude from PDVSA. CITGO
> Petroleum was a refiner of crude and marketer of petroleum

---

[569] Ex. 299 at tab "Non-Cash CITGO&PDVUSA," cells C10:AJ10.

[570] Ex. 299 at tab "Database CITGO."

[571] Ex. 163 at PDVH_Girard Street_000014209.

[572] Ex. 19 at 180:24-181:7; *see also id.* at 247:9-10 ("Crude offsets were used as support for a variety of shareholder services . . . .").

products. So CITGO owed money to PDVSA for the crude, and from time to time, PDVSA would say, instead of paying me X amount for the crude, please redirect that payment to this third party for -- for these other services they have provided.[573]

397.    Moreover, PDVSA used PDVH to allocate funds to affiliates and at times garnered discounts from PDVH subsidiaries.[574]

398.    Beginning in 2010, Citgo entered into agreements with PDVSA "under which it manage[d] and administer[ed] the procurement of equipment and other goods and services for PDVSA," including the supply of crude oil to PDVSA's affiliate, PPSA.[575] Under these agreements, Citgo agreed to "purchase/procure materials for PDVSA and its subsidiaries" and "deduct the amount of procured material/services (done in [sic] behalf of PDVSA) from the amounts that CITGO owes PDVSA under the CSA [Crude Supply Agreement], and/or any other hydrocarbon agreement."[576]

399.    Ms. Coon explained that the crude offset process involved PDVSA sending requests for services to Citgo, directed to Citgo's CEO,[577] and such "requests were procured through the CITGO procurement group leveraging their services with vendors primarily in the United States . . . ."[578]

400.    On March 10, 2016, at the direction of PDVSA, Mr. Rafael Rodriguez, Static Equipment and Piping Engineer at PDVSA, sent a letter to Mr. Pereira, Mr. Bednar, and Mr. Lopez instructing Citgo to pay "on a monthly basis, offsetting against amounts payable by CITGO to

---

[573] Ex. 19 at 97:16-23.

[574] Ex. 300 at PDVH_Girard Street_000046116-119.

[575] Ex. 37 at PDVH_Girard Street_000013897-98.

[576] Ex. 301; *see also* Ex. 37 at PDVH_Girard Street_000013897.

[577] Ex. 19 at 181:2-7.

[578] Ex. 19 at 248:3-5.

[PPSA] invoices for professional fees and reimbursable expenses issued by [Curtis, Mallet-Provost, Colt & Mosle LLP ("**Curtis Mallet**")] for services provided to PDVSA . . . or other PDVSA affiliates . . . ."[579]

401.    In 2016, Citgo paid a total of approximately $30 million to Curtis Mallet on PDVSA's behalf.[580]  Citgo offset the payments to Curtis Mallet against crude cargoes.[581]

402.    Citgo paid for other PDVSA expenses using non-cash dividends.[582]  PDVSA would direct Citgo to pay for certain services, including travel expenses for PDVSA personnel and charitable donations, and such payments made by Citgo on behalf of PDVSA were then distributed to PDVH as non-cash dividends, resulting in an accounts receivable from PDVSA on PDVH's books.[583]  Prior to August 24, 2017, PDVH would reduce the accounts receivable by declaring dividends to PDVSA.[584]

403.    Citgo and the Simon Bolivar Foundation ("**SBF**"), a 501(c)(3) private foundation that is 100% owned by Citgo,[585] paid medical expenses on behalf of PDVSA.  SBF was created "to provide medical access/support for women/children in/from VZ [Venezuela]."[586]  In 2014 and 2015, the Foundation served 125 "Venezuelan patients living in Venezuela" and 22 "Venezuelan Patients living in Venezuela related to the Venezuelan Government."[587]  SBF paid

---

[579] Ex. 302.

[580] Ex. 304 at PDVH_Girard Street_000126868, hidden tab "Vendor_Detail," cell H10833 (filtering for vendor Curtis Mallet).

[581] Ex. 304 at PDVH_Girard Street_000126868, hidden tab "Vendor_Detail," column O.

[582] Ex. 299 at tab "Non-Cash CITGO&PDVUSA," cells A26 & A:33.

[583] Ex. 305 at PDVH_Girard Street_000141037.

[584] Ex. 305 at PDVH_Girard Street_000141037.

[585] Ex. 28 at PDVH_Girard Street_00009384.

[586] Ex. 27 at PDVH_Girard Street_000009342.

[587] Ex. 163 at PDVH_Girard Street_0000 14218.

these medical expenses directly to patients, whereas Citgo was reimbursed through the non-cash dividend process.[588]

404.    A 2015 presentation on Citgo's operations, financial results, and budgets dated March 17, 2016, states that, in 2015, purchases for PDVSA totaled $493 million.[589]

405.    From 2012 to 2016, expenditures made by Citgo for PDVSA in the form of procurement services ranged from $279 million to $480 million per year.[590]

406.    In June 2015, Citgo paid a total of $1.2 million in "miscellaneous shareholder support" that encompassed "PDVSA Ex[e]cutives Trips," "Usage of CITGO's plane by PDVSA," and "Medical Patients" expenses.[591]

### 2.    PDV USA's Provision of Services to PDVSA

407.    PDV USA, a PDVH subsidiary, was created for the express purpose of providing services to *PDVSA* (often for the express benefit of the Venezuelan government), including financing operations related to residential and commercial leases on property in New York City.[592]

408.    Ms. Coon testified that PDV USA provided a variety of "logistical support services" for PDVSA, including paying for "medical expenses, apartment, and legal expenses,"[593] as well as funding PDVSA's "attendance of meetings and conferences in the US," for which "it

---

[588] Ex. 19 at 94:22-96:17.

[589] Ex. 163 at PDVH_Girard Street_000014209; Ex. 208 at 185:6-15, 187:19-188:2, 188:7-15.

[590] Ex. 307 at PDVH_Girard Street_000019805, tab "1Rpt_AuditCommRev," cells H24 & K24.

[591] Ex. 308 at tab "Cust 462," cells A7:A13 & C15.

[592] Ex. 28 at PDVH_Girard Street_000009383; *see also* Ex. 19 at 16:9-12 ("Q : What does PDV USA do ? A: PDV USA was a US-based subsidiary of PDVH that provided services in the US at the direction of PDVSA and PDVH.").

[593] Ex. 19 at 183:13-14.

would be compensated through a noncash dividend, that it would pass from PDV USA to PDV Holding and from PDV Holding to PDVSA."[594]

409.    Mr. Robert Shoemaker, Citgo's Corporate Controller and Chief Accounting Officer, testified that "PDV USA was not subject to the restrictions of dividends for CITGO Holding or CITGO Petroleum as PDV USA is a direct subsidiary of PDV Holding."[595]

410.    A February 27, 2020 audit report of PDV USA and PDVH transactions conducted by Citgo's audit committee covering the period from January 1, 2016 through March 31, 2018 indicates that a number of payments made on behalf of PDVSA lacked appropriate documentation and approval, and at times were made using the "highly discouraged" pay-on-approval process.[596] The report further states that the pay-on-approval process is inherently risky in part because "there is no pre-approval and dollar limit set."[597]

411.    According to Mr. Shoemaker, the pay-on-approval process "involve[d] a manual as opposed to an automated approval activity in [Citgo's] financial system."[598]  Citgo approved payments through the pay-on-approval process based on either "[a]n invoice presented with authorized signatures,"[599] or an invoice internally entered through a "parked document system," where it was processed and sent for approval by someone with requisite authority.[600]

---

[594] Ex. 19 at 47:12-14, 50:4-6; *see also* Ex. 208 at 212:7-25.

[595] Ex. 29 at 164:4-7.

[596] Ex. 305 at PDVH_Girard Street_000141033-34; *see also* Ex. 310 at PDVH_Girard Street_000089175, tab "All past due," cells B2:D2.

[597] Ex. 305 at PDVH_Girard Street_000141040.

[598] Ex. 29 at 191:19-25.

[599] Ex. 29 at 191:25-192:3.

[600] Ex. 29 at 192:4-10.

412.    Mr. Vera, explained that the pay-on-approval process entailed PDV USA paying for services that PDVSA requested.[601]  PDV USA was compensated for these expenses paid on behalf of PDVSA as follows:  PDV USA "ha[s] a payable to PDVSA that requested services" and PDV USA "pay[s] the services," thereby "reduc[ing] the payable."[602]

413.    Accordingly, when PDVSA requested "services" related to "rent, utilities, and furniture expenses for three apartments in New York City . . . for several Venezuelan citizens including a member of the Venezuelan delegation to the United Nations," PDVH explained: "Again, because of the payable" from PDV USA, "we paid the service.  I mean, PDV USA."[603]

414.    Mr. Vera further admitted at his deposition that PDVH does not know what business purpose was served through these payments for Venezuela's United Nation delegation.[604]

415.    In a July 20, 2015 email, Gustavo Cárdenas informed other Citgo employees that Citgo had received a request sent on behalf of Mr. Del Pino, President of PDVSA, to "support the Mission of Venezuela to the UN with the donation of various computer equipment, which will be used at its headquarters in New York City," noting that the "request ha[d] already been approved by the relevant authority in CITGO to be processed through PDV USA."[605]

416.    On July 21, 2015, Mr. Pereira forwarded the email to Mr. Lopez, Ms. Coon, and Mr. Cárdenas, stating: "Please be aware that [the equipment] will [be] paid through PDV USA."[606]

---

[601] Ex. 284 at 130:5-23; 131:16-132:4.

[602] Ex. 284 at 129:5-13.

[603] Ex. 284 at 130:6-23.

[604] Ex. 284 at 129:21-25.

[605] Ex. 313 at PDVH_Girard Street_000080037-38.

[606] Ex. 314 at PDVH_Girard Street_000080036; Ex. 313 at PDVH_Girard Street_000080037.

417. On September 24, 2015, Mr. Barry Treas, Citgo's Corporate Controller, sent an email to Mr. Cárdenas stating that "[a]ccounting is asking for proof of authorization for installing workstations and network support in the New York UN offices."[607]

418. Later the same day, Mr. Cárdenas sent an email to Mr. Treas explaining that the "purchase and installation of computer equipment was requested by" Mr. Del Pino, "to be executed by PDV USA with the support of CITGO" and attached emails containing proof of authorization.[608]

419. Ms. Coon testified that "PDV USA requests would have been communicated through paperwork from PDVSA to the designated official at PDV USA,"[609] which was "[e]ither Nelson Martinez or Jose Pereira."[610]

420. Mr. Martinez was the chairman of the Citgo Board of Directors and the President and CEO of Citgo.[611] He also served as Venezuela's Minister of Oil and head of PDVSA until November of 2017.[612] According to an internal PDVH memo entitled "Individuals and Entities Accused in the Public Record of Corruption Involving PDVSA," ("**PDVSA Corruption Report**") Mr. Martinez was later implicated in a bribery scheme connected to "bid panels" for companies seeking contracts with Citgo and/or PDVSA.[613]

---

[607] Ex. 314 at PDVH_Girard Street_000080036; Ex. 313 at PDVH_Girard Street_000080037.

[608] Ex. 314 at PDVH_Girard Street_000080036.

[609] Ex. 19 at 182:3-5.

[610] Ex. 19 at 183:17.

[611] Ex. 311 at PDVH_Girard Street_000140661; *see also* Ex. 312 at PDVH_Girard Street_000010181.

[612] Ex. 311 at PDVH_Girard Street_000140661.

[613] Ex. 311 at PDVH_Girard Street_000140659.

421.    Mr. Pereira was the treasurer of PDV USA, the treasurer of LDC, the Treasurer and Chief Accounting Officer at Citgo, and an officer at other entities within the corporate chain.[614] For the most part, Mr. Pereira verbally communicated to Citgo's finance department PDVSA's requests for services from PDV USA, but the capacity in which he was acting (*i.e.* on which entity's behalf he was acting) was made known only later in the process, when he followed up with documentation "signed by his position within the designated company that [indicated] he was directing those activities."[615]

422.    Beginning in December 2020, PDV USA began filing retrospective FARA statements regarding expenses it paid for the benefit of or at the direction of the principal, PDVSA.[616]  For example, PDV USA reported that, between March 2015 and February 2017, it paid $751,612.80[617] to a third-party vendor, Caribbean Style, Inc., at the direction of PDVSA, for the placement of four advertisements in U.S. newspapers.[618]  PDV USA further stated:  "The pro-Venezuelan and anti-U.S. sanctions regime content of these advertisements suggests they were intended to influence the U.S. Government's or the U.S. public's perspective of the U.S. sanctions regime relating to Venezuela during the time period."[619]

423.    On March 21, 2017, PDV USA, at the instruction of PDVSA, entered into a $50 million contract with Interamerican Consulting, Inc. ("**Interamerican Consulting**"), a company

---

[614] Ex. 19 at 16:23-24, 17:6-9, 19:22-20:2; Ex. 190 at 11-12.

[615] Ex. 19 at 17:10-24.

[616] Ex. 309.

[617] Ex. 309 at G_000036821.

[618] Ex. 309 at G_000036821.

[619] Ex. 309 at G_000036815.

owned by former U.S. Congressman David Rivera, for "strategic consulting services" for PDVSA and Venezuela.[620]

424.    Citgo executives helped negotiate the contract with Interamerican Consulting to represent the government of Venezuela in attempts to lobby the U.S. government to improve relations with the Maduro government.[621]  Mr. Rivera's company received $15 million in payments under the contract through bank accounts controlled by Citgo and PDV USA.[622]  The Interamerican Consulting contract was one of the subjects of the PDVSA Corruption Report.[623]

425.    In an April 30, 2021 FARA filing, PDV USA admitted to paying $993,425.14 to Caribbean Style, Inc. to cover travel and logistics for Venezuela diplomatic representatives between July 2016 and July 2017;[624] $1,188,184.10 to various contractors related to renovations of the Venezuela Embassy and Ambassador's residence between January 2016 and August 2017;[625] and $1,938,244.60 to GFC Consultores LLC to cover travel and logistics for Venezuelan diplomatic representatives as well as sponsorship of a Spanish journalist and the Venezuelan Youth Orchestra, between February 2016 and June 2017.[626]

---

[620] Ex. 309 at G_000036819, 36821; Ex. 319 at PDVH_Girard Street_000007796 & -7802; *see also* Ex. 320 at PDVH_Girard Street_000020433 (referencing a "[s]trategy letter approved by PDVSA directing PDV USA to engage with Interamerican Consulting" and a "[d]ocument [that] informed Board of Directors on March 8, 2017 to hire Interamerican Consulting for $50MM international consulting"); *PDV USA, Inc. v. Interamerican Consulting Inc.*, No. 20-cv-3699 (May 13, 2020 S.D.N.Y.), Dkt. No. 1 ¶¶ 7, 60.

[621] Ex. 311 at PDVH_Girard Street_000140679-81; *see also United States v. Rivera*, No. 22-cr-20552-DPG (S.D. Fla. Nov. 16, 2022), ECF No. 3 at 6-7.

[622] Ex. 309 at G_000036821; *see also Rivera*, No. 22-cr-20552-DPG, ECF No. 3 at 6, 8.

[623] Ex. 311 at PDVH_Girard Street_000140679-81.

[624] Ex. 205 at G_000036868-69.

[625] Ex. 205 at G_000036874-79.

[626] Ex. 205 at G_000036869-72.

426.    On November 18, 2015, Ms. Martinez sent a unanimous consent on behalf of PDVH for a $3 million capital contribution to PDV USA "to cover PDV USA's estimated expenses for the remainder of fiscal year 2015 and the first half of 2016," to which Ms. Coon, then-Manager of Cash Operations for Citgo, responded on the same day confirming that the $3 million would be "h[e]ld in an investment account until funds are needed."[627]  The unanimous consent was dated two days later, for November 20, 2015.[628]

427.    PDV USA paid rent on residential property in New York City, which "was supposedly for the use of María Gabriela Chávez," daughter of deceased president Hugo Chávez, while she acted as a representative to the Venezuelan Mission at the United Nations.[629] Specifically, FARA filings show that PDV USA paid $419,945.56 to various realty agencies related to three apartment rentals in New York between April 2016 and September 2017.[630]

428.    Also in March 2017, PDV USA, at the instruction of PDVSA, hired the law firm Wiss & Partners for $6 million to provide legal services to PDVSA and its subsidiaries.[631]

429.    A Citgo slide deck discussing the PDV USA funding plan from March to May 2017 reflects detailed funding plans for PDV USA's payments to the United Nations and for diplomatic missions to North America in 2017.[632]  The plan also proposed a payment structure in which Citgo

---

[627] Ex. 315 at PDVH_Girard Street_000007917-18.

[628] Ex. 316.

[629] Ex. 317; Ex. 318 at G_000118803.

[630] Ex. 205 at G_000036872-73.

[631] Ex. 311 at PDVH_Girard Street_000140681-683; *see also* Ex. 320 at PDVH_Girard Street_000020426 & -434; Ex. 309 at G_000036819.

[632] Ex. 321 at PDVH_Girard Street_000009920.

directs payment of crude cargo for $5 million to PDVH and then PDVH provides that $5 million to PDV USA.[633]

430.    A spreadsheet calculating PDV USA's cash projection for 2017 demonstrates that such expenses included PDV USA incurring millions of dollars in debt to support PDVSA's "NYC Office," including "North American Diplomatic Missions Support," "Executive Communication," and PDVSA's "Committed Spending & Other Key Projects," among other things.[634]

431.    From February 2016 through June 2017, at the request of PDVSA, PDV USA "provided financial support in connection with travel and logistics for events and activities relating to [Venezuelan government officials]."[635]    In 2017 specifically, $3.79 million of PDV USA expenditure was approved for PDVSA travel and logistics.[636]    Further, in 2017 PDV USA spent money on "Patronage to Venezuelan Soccer Selection", "Venezuelan UN Mission Support," and "VZ Minister of Tourism Photo Exhibit donation."[637]

432.    An April 21, 2020, presentation to the Board of Directors of PDVH details the types of "Shareholder support" provided to PDVSA and Venezuela through Citgo and PDV USA in 2017:[638]

---

[633] Ex. 321 at PDVH_Girard Street_000009921.

[634] Ex. 321 at PDVH_Girard Street_000009922, tab "New Format CF," column "PDV USA CASH PROJECTION (2017)."

[635] Ex. 205 at G_000036867.

[636] Ex. 321 at PDVH_Girard Street_000009922, tab "Project Summary-Act v Forecast," column "FY2017 Project Approval."

[637] Ex. 321 at PDVH_Girard Street_000009922, tab "Project Summary-Act v Forecast," column "PDV USA Project Summary and Spending."

[638] Ex. 323 at PDVH_Girard Street_000000673.

## CITGO / PDV USA Non Cash Dividend to PDVH

(Thousands of Dollars)

| | 2017 Calendar Year | | | |
| | **Mar 30, 2017** | **May 11, 2017** | **Aug 9, 2017** | **Total** |
| Date Paid: / Quarter End: | Dec 31, 2016 | Mar 31, 2017 | June 30, 2017 | |
|---|---|---|---|---|
| **_Shareholder support thru CITGO_** | | | | |
| Plane related expenses | 742.0 | 678.4 | 503.5 | 1,923.8 |
| Usage of CITGO's aircraft | 2,050.6 | 2,446.1 | 2,540.0 | 7,036.8 |
| Medical expenses - PDVSA Patients | 762.5 | 1,746.5 | 2,289.7 | 4,798.6 |
| PDVSA's personnel expenses (travel & Per diem) | - | 22.5 | 123.7 | 146.2 |
| CITGO assignee to PDVSA | - | - | 166.7 | 166.7 |
| _Total Shareholder support_ | 3,555.0 | 4,893.4 | 5,623.6 | 14,072.1 |
| **_Interest_** | | | | |
| Note Planes Note; Vessels Note; CRJ's | 919.3 | 3,497.5 | 909.4 | 5,326.2 |
| _Based on agreements, interest on Planes and Vessels charged every six months in Q1 & Q3_ | | | | |
| _Non-Cash Dividend - CITGO / CITGO Holding_ | 4,474.4 | 8,390.9 | 6,533.0 | 19,398.3 |
| **_Shareholder support thru PDV USA_** | | | | |
| Support to Sport Organizations (FVF & Roger Cedeno Foundation) | - | 8,235.5 | 3.0 | 8,238.5 |
| Support to UN Mission and Vzla Embassy in NY (Logistics expenses, | 1,301.8 | 341.0 | 418.3 | 2,061.1 |
| _PDVSA expenses paid by PDV USA (Financial & Legal consultants, NY_ | 3,859.5 | 7,635.3 | 13,510.8 | 25,005.6 |
| _PDV USA - Shareholder support_ | 5,161.3 | 16,211.8 | 13,932.1 | 35,305.2 |
| _Gross Non-Cash Dividend - PDV Holding_ | - | - | - | 54,703.5 |
| Crude Offset | | | | (3,000.0) |
| Other PDVSA expenses paid by PDVH | | | | 581.0 |
| _Net Accounts PDVH Receivable_ | | | | 52,284.5 |

433.     In total, PDV USA paid at least $52.5 million between 2014 and 2017 in "Shareholder Support" to PDVSA and Venezuela.[639]

434.     In 2018, over a six-month period, PDV USA made payments of approximately $20 million in connection with alleged "support services."[640]

### 3.     PDV Chalmette's Assumption of Liabilities for PDVSA's Benefit

435.     PDV Chalmette, a wholly-owned subsidiary of PDVH, was a Delaware corporation until June 12, 2015, when it was converted into an LLC.[641]

436.     PDVH had a tax allocation agreement ("**TAA**") between it and its subsidiaries, including PDV Chalmette, under which these entities consolidated their federal income tax returns, allowing them to reduce their tax liabilities and make one payment via Citgo (which was

---

[639] Ex. 299 at tab "Non-Cash CITGO&PDV USA.".

[640] Ex. 19 at 189:3-190:12.

[641] Ex. 38 at PDVH_Girard Street_000020858 & n.1.

designated the paying agent for the group).[642]  The TAA allowed earnings at Citgo to be offset with losses at other PDVH subsidiaries, such as PDV Chalmette.[643]

437.    PDV Chalmette held a 50% equity interest in Chalmette Refining, a crude oil refinery in Chalmette, Louisiana, which was a joint venture with ExxonMobil and Mobil Pipeline Company.[644]

438.    On June 17, 2015, the three joint venture partners entered into an agreement for the sale of Chalmette Refining to PBF Holding Company, LLC (“**PBF**”).[645]

439.    Prior to the sale of Chalmette Refining, PDV Chalmette's accumulated losses in excess of its investments in Chalmette Refining were approximately $111 million.[646]

440.    When Chalmette Refining was sold in 2015, it had outstanding payables due to PDVSA affiliates, including PPSA, of approximately $446 million.[647]

441.    The sale and purchase agreement for Chalmette Refining provided that:[648]

> 3.5.3    each Vendor shall forgive or assume (at the election of the applicable Vendor) any Inter-Affiliate Payables identified in the final calculation of Inter-Affiliate Payables and not accounted for in the calculation of the Estimated Inter-Affiliate Payables Amount and exceeding the amount of any cash payment under Clause 3.5.2.

442.    The introductory paragraph to the sale and purchase agreement defined "Vendor" to include PDV Chalmette.[649]

---

[642] Ex. 225 at PDVH_Girard Street_000008750; Ex. 19 at 215:5-216:24.

[643] Ex. 19 at 215:5-216:24.

[644] Ex. 38.

[645] Ex. 285 at PDVH_Girard Street_000020494.

[646] Ex. 38 at PDVH_Girard Street_000020860.

[647] Ex. 324 at tab "PDV Chalmette Summary," cells C36:C38; Ex. 325 at PDVH_Girard Street_000020803.

[648] Ex. 285 at PDVH_Girard Street_000020516 (§ 3.5.3); *see also* Ex. 326.

[649] Ex. 285 at PDVH_Girard Street_000020494.

443.    PDV Chalmette elected to *assume* the remaining debt, which it could have forgiven outright.[650]  Forgiving the debt would have been a benefit to PDV Chalmette and PDVH.

444.    PDV Chalmette assumed the debt—an on-demand payable owed to PPSA—resulting in a $156 million fund that PDVSA could access at will, but that remained out of the reach of PDVSA's commercial creditors.  Assuming the debt also resulted in PDV Chalmette owing interest on the balance that it otherwise would not have owed.[651]

445.    PDV Chalmette also received cash distributions of $78 million and $280 million from sale proceeds, bringing its total cash proceeds from the sale of Chalmette Refining to $358 million.[652]  PDV Chalmette **paid $290 million** of this amount to PPSA in order to partially satisfy the payable it assumed from Chalmette Refining.[653]  Therefore, the sale of Chalmette Refining left PDV Chalmette with a deficit—that is, a $156 million note payable due to one of PDVSA's affiliates, PPSA, and only $68 million in cash.[654]

446.    In 2016, PDVC received an additional $7,145,892 from PBF Energy in post-sale settlements for final working capital adjustments and the partial release of amounts held in escrow for a pre-sale contingency.[655]

447.    Mr. Shoemaker testified that, because "PDV Chalmette held the interest in the asset being sold"—Chalmette Refining—"it would incur any gain or loss from that sale."[656]

---

[650] Ex. 326 at PDVH_Girard Street_000020797; Ex. 324 at tab "PDV Chalmette Summary," cells B21 & B37; Ex. 38 at PDVH_Girard Street_000020860.

[651] Ex. 38 at PDVH_Girard Street_000020862; Ex. 208 at 174:9-22.

[652] Ex. 324 at tab "PDV Chalmette Summary," cells B4:B8.

[653] Ex. 324 at tab "PDV Chalmette Summary," cell C50.

[654] Ex. 324 at tabs "PDV Chalmette Summary" and "PDVH Cash Summary (082316)."

[655] Ex. 324 at tab "PDV Chalmette Summary," cells B59-B62.

[656] Ex. 208 at 176:2-6.

448.    In its 2023 financial statements, PDVH disclosed that the note payable to PPSA in connection with the sale of Chalmette Refining remained outstanding and had been regularly settled "through offsetting of receivables from and payments made on behalf of certain PDVSA affiliates."[657]

449.    In recent years, and as detailed further in Section VII.E, *infra*, the PDVSA Ad Hoc Board has used the funds still held in PDV Chalmette to pay its own expenses, including legal fees and board member stipends.

### 4.    LDC's Engagement in Crude Offset Transactions with No Commercial Benefit

450.    LDC was created to purchase petroleum products requested by PPSA (*i.e.*, PDVSA)[658] that PDVSA/PPSA needed to dilute extra-heavy crude and which could not be purchased from Citgo due to Citgo's debt covenants.[659]  LDC typically received prepayments for these products from PPSA; PPSA would then direct Citgo to pay a portion of PPSA's payable directly to LDC, thereby offsetting amounts Citgo owed PPSA for purchases of crude oil.[660]  As explained below, the LDC arrangement, particularly the offset mechanism, was an initiative conceived by, and for the benefit of, PDVSA.[661]

451.    In April 2015, PDVSA began conceiving plans to support its strategy for the production and dilution of extra-heavy crude oil from the Orinoco Belt in Venezuela.[662]  A

---

[657] Ex. 327 at PDVH_Girard Street_000007276.

[658] Ex. 19 at 252:10-12 ("LDC would receive a request from -- and when I use the term 'PDVSA,' I am generally interchanging PDVSA and PPSA in my mind.").

[659] Ex. 19 at 73:16-24.

[660] Ex. 19 at 132:24-133:18, 250:1-11, 252:4-25.

[661] Ex. 300 at PDVH_Girard Street_000046118.

[662] Ex. 328 at PDVH_Girard Street_000012195; Ex. 329.

December 9, 2015, presentation on "Strategic Planning and Alignment" between Citgo and PDVSA characterizes this plan as "Support Shareholder in Key Initiatives."[663]

452.   PDVSA initially considered purchasing the supply directly from Citgo,[664] but Citgo's debt covenants provided that it could neither "take title to crude it intends to resell" nor "issue purchase orders."[665]

453.   A May 19, 2015, presentation to the Citgo Board of Directors reflects PDVSA's consideration of a workaround through which it would create a new subsidiary of PDVH to purchase and supply the diluent to PDVSA:[666]



**Phase 2: Creation of a Subsidiary of "PDV Holding" (PDVH SUB)**                    | Diluent Supply

Under this option, the activities will be performed as follows:
- "PDVH SUB" purchases diluent to subsequently supply PDVSA Petroleo, for the purpose of diluting the extra heavy crude
- "PDVH SUB" sells the diluent to PDVSA Petroleo
- Minimize the risk of non-compliance with the agreements between CITGO and "CITGO Holding"
- CITGO negotiates the diluent supply, and if needed, diluted crudes on the market on behalf of "PDVH SUB"

**Scope of activities and responsibilities of CITGO within the operation:**
- Provide system of controls, accounting, treasury, information technology, human resources and related logistics pertaining to the purchase of diluents on behalf of PDVH SUB
- Provide the necessary funding to support the operation
- Offset the cost for the activities within the service management agreement from the crude oil invoices with PDVSA

CITGO          65          

---

[663] Ex. 330 at PDVH_Girard Street_000031752, PDVH_Girard Street_000031756.

[664] Ex. 331 at PDVH_Girard Street_000089782-791.

[665] Ex. 241 at PDVH_Girard Street_000010062.

[666] Ex. 331 at PDVH_Girard Street_000089789.

454.    On June 19, 2015, Citgo employees in Houston and PDVSA employees in Caracas met via videoconference to discuss the "light crude blending strategy," during which they "agreed that using LDC" was the preferred option "to comply with CITGO debt covenants."[667]

455.    Action items following the June 19, 2015, meeting reveal that PDVSA orchestrated the proposed operation and management of LDC.  For example, PDVSA was tasked with developing and "[a]greed to share with CITGO" a "[m]atrix including: suppliers, crude quality available, volume available, pricing marker, pricing dates, all supply cost elements, sales point, [and] payment terms."[668]  The group also discussed the "[n]eed to identify timing and financial resource contribution to phase 2 of Chalmette tax issue," as well as for PDVSA "to help with the offset prioritization."[669]

456.    The PDVSA Board of Directors ultimately approved a proposal to create LDC in July 2015.[670]  The LDC proposal, as approved by the PDVSA Board of Directors, was intended to "maximiz[e] extended payment terms to PPSA."[671]

457.    An earlier proforma financial statement for LDC from 2015 to 2018 showed LDC's sales as roughly equivalent to its cost of goods sold, indicating that LDC was expected to sell crude oil to PDVSA subsidiary PPSA at cost without capturing any margin.[672]

458.    On January 13, 2016, LDC and PPSA entered into a Procurement Services Agreement, as amended on July 1, 2016 ("**LDC-PPSA PSA**"), which provided for LDC's

---

[667] Ex. 332 at PDVH_Girard Street_000111975.

[668] Ex. 332 at PDVH_Girard Street_000111975_0001.

[669] Ex. 332 at PDVH_Girard Street_000111975.

[670] Ex. 242 at PDVH_Girard Street_000013024; Ex. 243 at PDVH_Girard Street_000013028.

[671] Ex. 243 at PDVH_Girard Street_000013038, 13040; Ex. 208 at 110:9-14, 111:18-24.

[672] Ex. 243 at PDVH_Girard Street_000013040.

acquisition of "crudes, condensates, diluents, hydrocarbon-based products and hydrocarbon by-products on behalf of PPSA."[673]  This agreement did not include any explicit price terms,[674] and when asked to explain the process of how the setoff and the already-purchased oil were priced, Mr. Shoemaker agreed that "the amounts are defined here without a formal detail formula calculation," but may have been addressed in a separate contract between LDC and Citgo.[675]

459.    The services agreement between LDC and Citgo ("**LDC-Citgo Services Agreement**"), however, also lacked any explicit terms that provided for LDC to make any profits. Effective January 14, 2016, the LDC-Citgo Services Agreement stated that Citgo would provide many, if not all, of the services LDC was to provide to PPSA.[676]  For example, LDC "was operated by CITGO Commerce and Supply,"[677] its entire operational team was expected to consist of Citgo employees,[678] and LDC transactions were governed by "[a]n authority and approval system . . . whereby the President of CITGO and the Vice-President of Refinery [of PDVSA] approve[d] the request."[679]

460.    PPSA prepaid for LDC's procurement services in the vast majority of transactions, although LDC was also authorized to purchase crude and products "from international refiners or 'traders'" directly for delivery to PPSA.[680]

---

[673] Ex. 333 at PDVSA_0004678; Ex. 334; Ex. 335.

[674] Ex. 29 at 80:3-82:16.

[675] Ex. 29 at 86:18-87:20.

[676] Ex. 336 at PDVH_Girard Street_000087471.

[677] Ex. 300 at PDVH_Girard Street_000046116.

[678] Ex. 243 at PDVH_Girard Street_000013028, 13036.

[679] Ex. 300 at PDVH_Girard Street_000046116, 46118.

[680] Ex. 333 at PDVSA_0004678-79.

461.    PPSA, in turn, sold the crude to and received payment from Citgo under an April 1, 2013 Crude Supply Agreement, or, "if PPSA did not advance funds on time to LDC, PPSA directed CITGO to redirect payments, from CITGO to PPSA for crude, to LDC."[681]  PPSA's purchases from LDC were funded primarily, if not entirely, by crude offsets.[682]

462.    The crude offset mechanism demonstrates how PDVSA disregarded PDVH and its subsidiaries as separate entities.  Not only did the LDC arrangement give it "[a]ccess to CITGO supplier portfolio and hydrocarbons originating from CITGO refineries," but "[o]ffset[s] in the transactions" generated "discount[ed] transfers to PDVSA."[683]  As a result of "discounts obtained from gasoline and diesel exports from [the] USA" between 2016 up to February 2017, "LDC transferred to PDVSA approximately $30 million."[684]  There is no evidence that the $30 million was used to pay creditors of PDVSA.

463.    LDC's margins on the transactions were miniscule.  In 2017, LDC's net income was only $1.9M, and in 2016 LDC's net income was negative $0.269M.[685]

464.    The following graphic shows the passage of diluent products and crude oil from third-party suppliers through LDC and PPSA, and then to Citgo, which in turn sends cash payments to LDC as well as crude offsets to pay for diluents:[686]

---

[681] Ex. 333 at PDVSA_0004678-79.

[682] Ex. 339 at tab "CO 5057 Crude_Pdt," column G (reflecting crude offsets applied to LDC's receivables for sales of product to PPSA, indicated in green, as well as the revenue LDC received for these sales); Ex. 341 (attaching, *inter alia*, Exs. 343-50).

[683] Ex. 300 at PDVH_Girard Street_000046117.

[684] Ex. 300 at PDVH_Girard Street_000046119.

[685] *See* Ex. 340 (cells H70, G70).

[686] Ex. 204 at PDVH_Girard Street_000008602.



465.    Crude offsets were explicitly requested to satisfy PPSA payables to LDC and LDC payables to third-party suppliers (often Citgo).[687]  A February 25, 2016, "Notice of Designation," *i.e.*, request for payment, shows how crude offsets were used to satisfy PPSA payables to LDC (to pay for the product delivered to PPSA from LDC) and LDC payables to third party suppliers (to pay for LDC's purchase of the product from its suppliers) pursuant to (i) the LDC-PPSA PSA and (ii) a Payment Instruction Letter dated July 1, 2016, the same date as the PSA, addressed to Citgo Petroleum and LDC from PPSA.[688]

466.    The February 25, 2016, Notice of Designation shows the value of crude deliveries from PPSA to be used as crude offsets for purchases from LDC,[689] how these crude offsets were applied to satisfy receivables due to LDC from PPSA's purchases,[690] and the amount of crude offsets to be applied to satisfy LDC's payables due to its third-party suppliers.[691]

---

[687] *See* Ex. 341; Ex. 342.

[688] Ex. 342.

[689] Ex. 342 at PDVH_Girard Street_000087509 ("Designation of CSA cargoes (payable to PPSA, CITGO directed to pay LDC)").

[690] Ex. 342 at PDVH_Girard Street_000087509 ("Application of Discharge Amounts (applied to LDC receivable from PPSA)").

[691] Ex. 342 at PDVH_Girard Street_000087509 ("Payment of Setoff Amount Proceeds (applies to LDC 3rd party payable)").

467.    Typically, the unit prices applied to LDC's payables to suppliers were lower than the unit prices applied to LDC's receivables from PPSA.[692]  However, in this instance, the unit price corresponding to 485,000 barrels of oil ("**Bbls**") offset to be applied to LDC's payable to its supplier ($35.78) was higher than the unit price applied to LDC's receivable from PPSA ($35.10).[693]

### 5.    Citgo Aruba's Refinery Transaction to Serve Venezuelan Political Ends

468.    Dr. Rodríguez opined that the Aruba arrangement was one of "numerous additional instances of PDVH and its subsidiaries taking actions that lack meaningful economic rationale and appear to have the goal of promoting the international political agenda of the Venezuelan government."[694]  Dr. Rodríguez relied on an article from Argus, an energy news group, to form his opinion.[695]

469.    The Argus article reported that "[PDVSA] went through Citgo to pursue the Aruba lease because it has no capital or credit to execute it on its own" and that "the deal has sparked fury among Citgo's senior non-Venezuelan executives, who tell Argus that the deal was conducted behind their backs and hurts the company's financial standing."[696]

470.    The Argus article further reported, according to one Citgo executive, that the deal "was entirely a Venezuelan undertaking and the terms and conditions are opaque, to say the least."[697]

---

[692] *See, e.g.*, Ex. 341 (attaching, inter alia, Ex. 343-350).

[693] Ex. 342 at PDVH_Girard Street_000087509.

[694] Ex. 39 at ¶ 127.

[695] Ex. 39 at ¶ 134.

[696] Ex. 263.

[697] Ex. 263.

471.    According to a Citgo press release, the ceremony for the deal was held in Caracas, Venezuela, and attended by the Venezuelan president and Aruban prime minister.[698]

472.    Mr. Shoemaker, who was at Citgo at the time and ultimately became Chief Accounting Officer, did not deny what was reported in the Argus article.  When asked if he had any personal information to dispute that Aruba "was entirely a Venezuelan undertaking," he testified:  "I do not have information or recollection to either confirm or refute the issue."[699]

473.    The PDVSA Board approved the execution of the Aruba project on March 14, 2016.[700]  Citgo Aruba entered into agreements with Refineria di Aruba N.V. ("**Refineria di Aruba**"), the entity acting on behalf of the Government of Aruba, to restart the Aruba refinery and provide a logistics facility to refine Venezuela's extra-heavy crude oil and export it to the Asia-Pacific region.[701]

474.    The 15-year lease agreement allowed Citgo Aruba and the Aruba Entities "to lease the refining, terminal and marine assets on the island of Aruba."[702]

475.    The arrangement was backed by a guarantee of up to $150 million by PDVH, as well as the assets of the Aruba Entities, in favor of Refineria di Aruba and did not provide "any exit clauses due to force majeure."[703]

---

[698] Ex. 523 at G_000097850-51.

[699] Ex. 29 at 212:19-20.

[700] Ex. 351 at PDVH Girard Street_000057950.

[701] Ex. 35 at PDVSA_0036996, 37000; Ex. 263.

[702] Ex. 352 at PDVH_Girard Street_000015332.

[703] Ex. 353 at PDVSA_0000714; Ex. 35 at PDVSA_0036995.

476.    The Aruba project was initially financed with "funds from debts between subsidiaries of PDV Holding."[704]  The initial funding strategy occurred in three phases:  first, Citgo paid $43.6 million to PDV Chalmette to settle balances owed under the tax allocation agreement; second, PDV Chalmette loaned PDVH $43 million; and third, PDVH made a capital contribution of $47.5 million to Citgo Aruba, as depicted in the following graphic:[705]



477.    Citgo's $43 million payment settled an approximately $100 million balance owed by Citgo to PDV Chalmette by the end of 2015 under the tax allocation agreement.[706]  The origin of this inter-affiliate liability is summarized in the following slide:[707]

---

[704] Ex. 354 at PDVH Girard Street_000057951.

[705] Ex. 355.

[706] Ex. 354 at PDVH_Girard Street_000057951.

[707] Ex. 354 at PDVH_Girard Street_000057951.

**Aruba Project Financing**

**Background:**

In June 1993, PDVSA's US subsidiary, PDV Holding, created a Tax Offsetting Agreement among its subsidiaries.

In October 2015 and as a result of the sale of the Chalmette refinery, it was necessary to convert from PDV Chalmette Inc, to PDV Chalmette LLC; this generated a tax liability from CITGO in favor of Chalmette LLC, valued at approximately $100 million, by the end of 2015.

**Proposal:**

Use the funds generated by this inter-affiliate liability for PDV Holding to make a capital contribution to CITGO Aruba Holding.

 CITGO.                    47                     PDVSA

478.    As a result of the agreements Citgo Aruba entered in 2016, PDVH that year recorded $285 million of additions to the property, plant and equipment balance sheet items.[708] As of year-end 2017, the present value of lease payments due for the Aruba refining and terminal assets was $290 million.[709]

479.    From October 2016 through February 2019, PDVH provided Citgo Aruba funding through "capital contributions and/or loans," the proceeds of which were used to pay rent and employees to continue managing and operating the refinery.[710] PDVH ultimately contributed $116 million to Citgo Aruba "as per instructions of PDVSA" and made lease payments of $27 million.[711]

---

[708] Ex. 352 at PDVH_Girard Street_000015332.

[709] Ex. 352 at PDVH_Girard Street_000015333.

[710] Ex. 19 at 207:19-25.

[711] Ex. 353 at PDVSA_0000716; Ex. 356 at PDVH_Girard Street_000008499.

480.    The Aruba refinery refurbishment project was unsuccessful and operated at a loss for several years.[712] As of December 31, 2017, Citgo Aruba had a $64 million cash balance,[713] which dropped to $1.33 million by December 31, 2020.[714] As of September 2024, Citgo Aruba had not paid back any of the PDVH loan receivable for $117 million.[715]

481.    When asked whether the Citgo Aruba project was profitable, Mr. Shoemaker explained that "[t]he project would have required significant investment on . . . PDV Holding's part to restart the refinery" "but that refurbishment project never got fully underway."[716]

482.    As of year-end 2017, PDVH disclosed that it had "intended to obtain a $100 million bridge loan and subsequent project financing to pay for the refurbishment of the CITGO Aruba assets"; however, "as a result of the financial sanctions [], [PDVH] was unable to obtain the $100 million bridge loan or subsequent project financing."[717]

483.    PDVH also disclosed that management believed "it [was] highly unlikely that [PDVH] will be able to support its operations in Aruba without additional capital contributions," and the "asset group is not forecasted to generate positive cash flows without additional capital contributions."[718]

---

[712] Ex. 357 at PDVH_Girard Street_000134871; Ex. 352 at PDVH_Girard Street_000015332.

[713] Ex. 359.

[714] Ex. 360 at PDVH_Girard Street_000030577.

[715] Ex. 358 at PDVH_Girard Street_000030900 (row 21).

[716] Ex. 29 at 209:11-19.

[717] Ex. 352 at PDVH_Girard Street_000015332.

[718] Ex. 352 at PDVH_Girard Street_000015332.

484.    In its 2017 financial statements, PDVH reported that it had "determined that the fair market value of the [Citgo Aruba] assets [was] $0 at December 31, 2017, and that the asset value [was] not recoverable."[719]

485.    A May 13, 2019 presentation to the PDVSA Ad Hoc Board notes that Citgo intended to "work with PDVSA to determine [a] path forward on [the] project within [PDVSA's] overall strategic plan to reclaim and expand crude production capacity," given that "[s]ignificant changes in project costs, market price structure, and PDVSA production and upgrading capability [had] occurred since project initiation."[720]  Citgo recognized that "[t]he longer the facility sits the worse condition will get and cost will trend upwards."[721]

486.    In June 2019, PDVSA instructed PDVH to provide more information regarding operations in Aruba, for PDVSA to determine whether and how the project should proceed.[722]

487.    A January 20, 2020, letter from PDVH to the PDVSA Ad Hoc Board notes that the PDVH Board did not determine that it was "necessary to understand the details of the Aruba Project" until February 2019, when:

> [T]he effects related to OFAC sanctions . . . reduce[d] the activities of said Project, since OFAC consider[ed] that it directly benefit[ted] PDVSA (Venezuela) because the purpose thereof would be to process extra heavy oil from the Orinoco Belt, in order to sell it in the Gulf of Mexico market.[723]

488.    Before concluding with a request that the project be terminated, the memorandum further explains:

---

[719] Ex. 352 at PDVH_Girard Street_000015332.

[720] Ex. 35 at PDVSA_0037000.

[721] Ex. 35 PDVSA_0037003.

[722] Ex. 361 at PDVSA_0000722.

[723] Ex. 353 at PDVSA_0000714.

It is important to clarify that initially **work was done under the premise that political change in Venezuela was imminent** and that, therefore, when this occurred, **sanctions would be lifted and a new PDVSA administration could resume the analysis of the Aruba Project**, and the convenience of reactivating it within a recovery strategy of the Venezuelan oil industry.

Over the course of the months, in the face of a more uncertain political scenario, PDV Holding Inc. began to explore a scenario of friendly and orderly termination of the contracts of the Aruba Project with RDA, including the cancellation of the corporate guarantee granted for USD 150 million to ensure compliance with the obligations of CITGO Aruba Holding and its subsidiaries. The reason for this action is that **the Aruba Project is an intense project in capital, does not represent a strategic asset for PDV Holding and its subsidiaries for the development of its business in the USA**, and it is also considered that the project was poorly conceptualized and negotiated from its inception.[724]

489.    PDVH concluded by "recommend[ing] that the Ad-Hoc Administrative Board of Petroleos de Venezuela, S.A. support the proposal."[725]

490.    On April 30, 2020, the PDVH board approved a termination agreement that concluded the Aruba project.[726]

491.    Citgo Aruba entered into an agreement with Refineria di Aruba to transfer operations and surrender the possession of leased assets in Aruba, thus terminating the leases.[727] PDVH recognized a $375 million gain related to lease and tax obligation write-offs as a result of the termination in 2020.[728]  The termination resulted in estimated savings of $135 million for PDVSA.[729]

---

[724] Ex. 353 at PDVSA_0000715.

[725] Ex. 353 at PDVSA_0000720.

[726] Ex. 362 at PDVH_Girard Street_ 000000682-83; Ex. 298 at 205:18-207:2.

[727] Ex. 363 at PDVH_Girard Street_000007405.

[728] Ex. 363 at PDVH_Girard Street_000007405.

[729] Ex. 357 at PDVH_Girard Street_000134849.

### V.    The Citgo Six

492.    On November 21, 2017, the Venezuelan government arrested Citgo President and Chairman Mr. José Ángel Pereira and five top executives:  Mr. Gustavo Cárdenas (Vice President, Shareholder Relations and Government and Public Affairs), Mr. Jorge Toledo (Vice President, Supply and Marketing), Mr. Jose Luis Zambrano (Vice President, Shared Services), Mr. Alirio Zambrano (Vice President and General Manager, Corpus Christi Refinery), and Mr. Tomeu Vadell (Vice President, Refining) (the "**Citgo Six**").[730]

493.    The Citgo Six were prosecuted for engaging in a Citgo business "transaction without the approval of the Venezuelan authorities."[731]  The specific stated reason for the arrests and prosecutions was that the Citgo Six had signed a contract to refinance loans under "leonine [*i.e.,* excessive] and unfavorable conditions."[732]

494.    Specifically, the Citgo Six were accused of having signed a loan agreement in June 2017 to refinance Citgo's debt for $4 billion with Frontier Group Management and Apollo Global Management that offered Citgo as collateral and thereby "compromised the national patrimony and the future of this important subsidiary."[733]

495.    Venezuelan Prosecutor General Tarek William Saab stated that the agreement "did not count [] with the approval of the Republic's National Executive"[734] and "exposed the subsidiary to a potential criminal situation for non-compliance with the subscribed contracts,"

---

[730] Ex. 364 at G_000096304-08; Ex. 39 at ¶ 97; Ex. 366 at G_000121662-64.

[731] Ex. 367 at 273:4-5.

[732] Ex. 39 at ¶ 97; Ex: 368 at G_000098025; Ex. 369 at p. 1-2.

[733] Ex. 370; Ex. 369; Ex. 208.

[734] Ex. 39 at ¶ 97; Ex. 368 at G_000098025.

concluding that "one must have a truly anti-Venezuelan vision to put at risk our main subsidiary, which is Citgo."[735]

496.    On June 7, 2017, five months before the arrest of the Citgo Six, the "Alternative Proposal for Restructuring the Debt of CITGO and CITGO Holding Submitted by Apollo/Frontier" was presented to the PDVSA Board of Directors.[736]

497.    The presentation contained "an alternative private proposal for the Restructuring of the Debt of CITGO and CITGO Holding, which does not have the restrictions of a Market transaction but meets the same objectives and parameters proposed."[737]

498.    The request to the PDVSA Board was to "[a]uthorize the signing of the agreement to begin negotiations of the Private Alternative Proposal for Restructuring the Debt of CITGO and CITGO Holding submitted by Apollo/Frontier within the parameters already proposed and authorized."[738]

499.    On June 14, 2017, Mr. Guillermo Blanco, the Vice President of PDVSA and General Secretary of Corporate Entities, as well as Mr. Humberto Perniciaro, the Secretary, signed and stamped a letter with the subject "Alternative Proposal for Restructuring the Debt of CITGO and CITGO Holding Submitted by Apollo/Frontier."[739]

500.    The letter informed the recipients that the PDVSA Board of Directors, "at its Meeting No. 2017-17," held on June 14, 2017, agreed to "authorize the signing of an agreement upon review by the PDVSA Legal Advisors, to begin negotiations" on the Apollo/Frontier

---

[735] Ex. 39 at ¶ 97; Ex. 368 at G_000098025.

[736] Ex. 371 at PDVH_Girard Street_000089684.

[737] Ex. 371 at PDVH_Girard Street_ 000089685.

[738] Ex. 371 at PDVH_Girard Street_000089689.

[739] Ex. 371 at PDVH_Girard Street_000089683.

proposal "within the parameters already proposed and authorized."[740]  The letter continued, "[o]nce the negotiation is complete, the final terms must be submitted to the PDVSA Board of Directors for approval."[741]

501.    Fifteen individuals were copied, as set forth below, three of whom (Delcy Rodriguez, Ricardo Menéndez, and Rodolfo Marco Torres), were sitting members of Maduro's cabinet:[742]



502.    PDVH's corporate representative explained that the proposed transaction was "a restructuring of the debt of CITGO Petroleum and CITGO Holding" that was "comprehensive in nature, looking at all the debt and obligations of the two entities."[743]

503.    The proposed Apollo/Frontier transaction did not close.[744]

---

[740] Ex. 371 at PDVH_Girard Street_000089683.

[741] Ex. 371 at PDVH_Girard Street_000089683.

[742] Ex. 371 at PDVH_Girard Street_000089683; Ex. 84 at n.155.

[743] Ex. 208 at 235:1-11.

[744] Ex. 208 at 236:1-7.

504.    On November 30, 2017, former PDVSA president Mr. Nelson Martinez was arrested due to his presumed connection with the contract executed by the Citgo Six.[745]

505.    On November 26, 2020, a Venezuelan court sentenced former Citgo President José Ángel Pereira to 13 years and 7 months in prison for fraudulent embezzlement and association between a public official and a government contractor with criminal purposes, and the other five executives to 8 years and 10 months in prison for association between a public official and a government contractor with criminal purposes.[746]

506.  Prosecutors in the Maduro regime charged the Citgo officials with violating certain provisions of the Law Against Corruption (the "**Venezuela Anti-Corruption Act**") and the Law Against Organized Crime and the Financing of Terrorism.[747]

507.  Article 3 of the Venezuela Anti-Corruption Act, under which the Citgo Six were prosecuted, "explicitly states" that "directors of companies ultimately owned by the Republic are considered public officials." [748]

508.  The Venezuelan Special Attorney General concurred in the Venezuela Anti-Corruption Act's potential application to control the business activity of Citgo executives by treating them as public officials, opining in 2019 that the Act "governs officials of public sector agencies and entities that carry out their activities abroad" and thus "could potentially apply to the directors of Citgo Holding, Inc."[749]

---

[745] Ex. 39 at ¶ 99; Ex. 372 at G_000096784, available at https://www.youtube.com/watch?v=LtqxpOgaXmw.

[746] Ex. 39 at ¶ 100; Ex. 373 at G_000096808.

[747] Ex. 368 available at https://www.youtube.com/watch?v=uFkMAq--rvE; Ex. 374.

[748] Ex. 377 at pp. 24-25; Ex. 374 at PDVH_Girard Street_000037015.

[749] Ex. 378 at PDVSA_0006147.

509.    As previously noted, on November 22, 2017, the day after the arrest of the Citgo Six, then-President of Venezuela Nicolás Maduro announced the appointment of Mr. Asdrúbal Chávez as President of Citgo.[750]

510.    In January 2021, the Trump administration stated that the Venezuelan prosecutor working on the Citgo Six matter and the judge overseeing the trial were involved in what the United States believed to be "false corruption charges" in that case.[751]

511.    A document entitled "2018 Q3 CITGO Investor Call QA_FIN RPTG,"[752] which PDVSA's corporate representative testified had the "purpose" of "prepar[ing] the CITGO executives for [Citgo's] quarterly earnings call with investors,"[753] contained a discussion of the Citgo Six, as shown below[754]:

## Update on the detentions of Citgo officials in Venezuela last November Rick

> *We don't have a lot of information but can say they are still detained. CITGO has been in contact with each of the family members.  CITGO has previously met with the State department and met with Louisiana's Senator Cassidy to discuss their status.  We understand they are able to periodically call home and have had family visitors.  We understand that those that were taking medicine are receiving it.*

512.    PDVH's corporate representative testified that this material—which was "information that has gone through CITGO's legal process to determine if it is—if it can

---

[750] Ex. 39 at ¶ 84; Ex. 187 at G_000096773-76; Ex. 379 at G_000121458.

[751] Ex. 380 at p. 1-2.

[752] Ex. 381 at PDVH_Girard Street_000131865; Ex. 287 at PDVH_Girard Street_000131866.

[753] Ex. 208 at 244:15-18.

[754] Ex. 287 at PDVH_Girard Street_000131910 (highlighting original).

appropriately be disclosed to . . . the investors"—was prepared for a specific Citgo executive to enable him to respond to investor questions on that topic.[755]

513.    Mr. Gustavo Cárdenas was released from Venezuelan prison on March 9, 2022, four years, three months, and 16 days after his arrest in November 2017.[756]  His release was negotiated by the U.S. government.[757]

514.    Messrs. Pereira, Vadell, J. L. Zambrano, Toledo, and A. Zambrano were released from Venezuelan prison on October 1, 2022, four years, 10 months, and 10 days after their arrest in November 2017.[758]

515.    Their release was part of a prisoner swap negotiated by the U.S. government.[759]

516.    In May 2024, Mr. A. Zambrano and Mr. J. L. Zambrano filed a $400 million suit in Texas against Citgo, Citgo Holding, and PDVH, alleging that Citgo had conspired with Venezuela's government to falsely convict them, resulting in their wrongful imprisonment.[760]

## VI.    The Maduro Regime's Enactment of Regulations to Further Control PDVSA's Foreign Subsidiaries

517.    After the arrest of the Citgo Six, the Venezuelan government enacted laws to exert additional control over PDVSA's subsidiaries and decentralized entities.

518.    On December 6, 2017, two weeks after the Citgo 6 arrests, the Venezuelan government passed Resolution No. 164, titled "Regime for the Review and Validation of National

---

[755] Ex. 208 at 244:9-245:19.

[756] Ex. 382 at p. 1.

[757] Ex. 383 at p. 1-4.; Ex. 384 at p. 1-3.

[758] Ex. 385 at p. 1.

[759] Ex. 386 at p. 2-8.

[760]  Ex. 389 at 2.; Ex. 515 at PDVH_Girard Street_000007364.

and/or International Contracts Entered Into by PDVSA, its Affiliates and Mixed Companies Where PDVSA Holds Shares." [761]

519.    Resolution No. 164 mandated that all contracts signed by PDVSA, its subsidiaries (including PDVH), and mixed companies in which PDVSA holds shares must undergo prior review and validation by PDVSA's president "to evaluate compliance with the legal, financial, budgetary, and technical requirements" and thereby assess "their existence, validity, and convenience for [PDVSA]."[762]

520.    Resolution No. 164 also provided that if any contract is found to lack a required element of validity or to negatively impact PDVSA's assets, corrective measures will be taken in accordance with applicable regulations without prejudice to any civil, administrative, or criminal liability that may arise, which will be referred to the relevant authorities.[763]

521.    Finally, Resolution No. 164 also stated that no Administrative and/or Financial Authority of PDVSA, subsidiary or mixed company, in which PDVSA holds shares, may validly give its consent to the contracts that are the subject of this Resolution.[764]

522.    In April 2018, the Venezuelan government issued Decree No. 44, which empowered the Minister of Petroleum to exercise a number of further controls over PDVSA, including, but not limited to, the following: to create, eliminate, or make changes to state-owned oil companies, including PDVSA and its affiliates; to create, eliminate, make changes to, or centralize the bodies that direct, administer, and manage state-owned oil companies; to determine, eliminate, make changes to, or centralize the responsibilities, management or procedures in state-

---

[761] Ex. 388 at G_000121676.

[762] *See* Ex. 388 at G_000121676.

[763] *See* Ex. 388 at G_000121676.

[764] *See* Ex. 388 at G_000121677.

owned oil companies; to establish general norms that all state-owned oil companies will follow; to create, eliminate, make changes to, or centralize procurement committees for state-owned oil companies; to establish procurement norms and procedures for the registration or suspension of clients and suppliers of state-owned oil companies; and to order the amendment of the by-laws of state-owned oil companies. [765]

523.    Decree No. 44 also provided that the directors and officers of state-owned oil companies "are obliged to carry out the actions required to effectuate the modifications that must be made pursuant to the provisions of this decree and pursuant to the instructions issued by the Minister of Petroleum."[766]

## VII.    The Interim Government and 2015 National Assembly's Control Over PDVSA, PDVH, and Its Subsidiaries

### A.    The Interim Government and National Assembly Create the PDVSA Ad Hoc Board and Issue the Transition Statute

524.    After an election in 2018, Maduro claimed victory over the opponents that remained in the electoral race after the major opposition party candidates had been jailed or exiled.[767]

525.    On January 23, 2019, the Venezuelan National Assembly—the legislative branch of the Venezuelan government (the "**National Assembly**"), which had been controlled since December 2015 by the opposition[768]—invoked Article 233 of the Venezuelan Constitution to

---

[765] *See* Ex. 392 at G_000110218; Ex. 390 at G_000001873.

[766] *See* Ex. 392 at G_000110218; Ex. 390 at G_000001873.

[767] *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, Case No. 1:19-cv-10023 (S.D.N.Y. June 15, 2020), ECF No. 118, ¶ 116; Ex. 393.

[768] Ex. 181 at ¶ 89; Ex. 180 at ¶ 108.

declare Maduro's presidency illegitimate and name National Assembly President Juan Guaidó as the Interim President of Venezuela.[769]

526.    That same day, President Donald Trump declared that the Maduro regime was "illegitimate" and officially recognized "the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela" and the National Assembly as the "only legitimate branch of government duly elected by the Venezuelan people."[770]    The U.S-recognized government headed by Guaidó is the "**Interim Government**".

527.    On February 5, 2019, the National Assembly enacted the Statute Governing the Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "**Transition Statute**").[771]

528.    Article 15 of the Transition Statute provided that "[t]he National Assembly may adopt any decisions necessary to defend the rights of the Venezuelan State before the international community, to safeguard assets, property and interests of the State abroad" and authorized the Interim President to "[a]ppoint Ad Hoc Administrative Boards to assume the direction and administration of . . . State companies, including companies established abroad, and any other decentralized entity, for the purpose of appointing administrators and, in general, adopting the measures necessary to control and protect State company assets."[772]

529.    Article 34(1) stated that the PDVSA Ad Hoc Board:

[M]ay be composed of persons domiciled abroad and shall have powers to act as shareholders' assembly and Board of Directors of PDVSA, with the objective of

---

[769] *Petróleos de Venezuela, S.A.*, Case No. 1:19-cv-10023, ECF No. 118, ¶ 117; Ex. 10 at ¶ 108.

[770] Ex. 394; *see also Petróleos de Venezuela, S.A*, Case No. 1:19-cv-10023, ECF No. 118, ¶ 118; Ex. 10 at ¶ 109.

[771] Ex. 395 at PDVSA_0003307, PDVSA_0003310; Ex. 395; Ex. 10 at ¶ 143.

[772] Ex. 395 at PDVSA_0003300-01.

taking all actions that may be necessary to designate the Board of Directors of PDV Holding, Inc., in representation of PDVSA as sole shareholder of that company. The new directors of PDV Holding, Inc. shall proceed to appoint new boards of directors for the PDV Holding, Inc.'s subsidiaries, including Citgo Petroleum Corporation.[773]

530.    Article 34(3)(a) of the Transition Statute also required PDVH Directors to "follow commercial efficiency criteria," while clarifying that they would still be subject "to the control and accountability mechanisms exercised by the National Assembly, and other applicable control mechanisms."[774]

531.    Article 34(3)(b) of the Transition Statute ordered PDVH not to carry out dividend payments to PDVSA while Maduro remained in power, stating that "PDV Holding, Inc. and its subsidiaries shall have no relationship whatsoever with the people currently usurping the Presidency of the Republic. For as long as such usurpation persists, PDV Holding, Inc. and its subsidiaries shall make no payments or distributions to PDVSA."[775]

532.    Article 36 of the Transition Statute provided that "State assets that are recovered through mechanisms established in this Statute may not be disposed of or realized until the usurpation ends and a provisional Government of national unity is formed."[776]   In other words, Article 36 required that assets in state-owned companies not be disposed of while Maduro remains president.[777]

---

[773] Ex. 395 at PDVSA_0003307.

[774] Ex. 395 at PDVSA_0003308.

[775] Ex. 395 at PDVSA_0003308.

[776] Ex. 395 at PDVSA_0003308.

[777] Ex. 395 at PDVSA_0003308.

533.     On February 6, 2019, the Interim Government created the PDVSA Ad Hoc Board

to manage PDVH and PDVSA's assets in the United States.[778]  In PDVSA's Responses and

Objections to Girard Street and G&A's 30(b)(6) Notices, PDVSA in General Objection No. 5:

> object[ed] to each Topic to the extent it seeks information known or
> reasonably available to the Nicolás Maduro-appointed board of
> PDVSA (the "Maduro Board") but not the "ad hoc Managing
> Board" appointed in 2019 by Interim President Juan Guaidó (the
> "Ad Hoc Board").  As set forth in PDVSA's Memorandum of Law
> in Support of its Motion to Vacate Default Judgment in Girard Street
> Investment Holdings, LLC v. Petróleos de Venezuela, S.A. et al.,
> Case No. 1:23-cv-10772-JSR, Dkt. 41, in 2019, pursuant to the
> Statute to Govern a Transition to Democracy to Reestablish the
> Validity of the Constitution of the Republic of Venezuela, Guaidó
> appointed the Ad Hoc Board to govern PDVSA. Guaidó's
> appointment of the Ad Hoc Board is valid under U.S. law.  *See
> Jiménez v. Palacios*, 250 A.3d 814, 831–41 (Del. Ch. 2019), as
> revised (Aug. 12, 2019), aff'd, 237 A.3d 68 (Del. 2020).  The Ad
> Hoc Board manages PDVSA's assets from the United States and
> runs parallel to the Maduro Board, which the United States does not
> recognize.[779]

534.     On April 4, 2019, Guaidó issued Decree No. 3, which required the PDVSA Ad Hoc

Board to "to take all necessary decisions to appoint the boards of directors and other directors of

PDVSA subsidiaries organized abroad, representing PDVSA and its affiliated companies at the

relevant shareholder meetings."[780]  As discussed in Section VII.B, the Interim Government also

instructed Guaidó to appoint specific individuals to the PDVSA Ad Hoc Board.[781]

535.     Citing Article 34 of the Transition Statute, Decree No. 3 prohibited PDVH from

issuing dividends to PDVSA while Maduro remained in power "[f]or the duration of the usurpation

of the Office of the President of the Republic, PDV Holding Inc. may not pay dividends or any

---

[778] Ex. 396 at G_000323292.

[779] Ex. 247.

[780] Ex. 398 at G_000006724.

[781] Ex. 407 at PDVSA_0006668.

other payments to PDVSA, nor may it grant any guarantee on assets owned by PDVSA or any third party designated by PDVSA."[782]

536.    On April 10, 2019, the National Assembly authorized Guaidó to expand the PDVSA Ad Hoc Board's powers, including to act on behalf of PDVSA's U.S. subsidiaries, noting that the need to adopt new measures to protect the Venezuelan State's assets abroad that are directly or indirectly controlled by PDVSA had become evident after the creation of the PDVSA Ad Hoc Board.[783]

537.    On July 1, 2019, the Office of the Special Attorney General published the Guidelines for the Renegotiation of the Chávez/Maduro Era Legacy Public External Debt.[784]

538.    These guidelines state that all foreign currency-denominated claims against the public sector will be renegotiated on equal terms.[785]

539.    On July 18, 2019, Guaidó sent a letter to Mr. Luis Pacheco, then-President of the PDVSA Ad Hoc Board, thanking him for his "management and dedication in our mission to rescue the nation's assets that are in the name of [PDVSA] and related companies," and requesting "information regarding the work plan proposed in order to comply with the objective of safeguarding the interests of the nation in this matter."[786]

---

[782] Ex. 398 at G_000006728.

[783] Ex. 399 at PDVSA_0004849; Ex. 376 at ¶ 19.

[784] Ex. 497 at G_000109768; Ex. 498.

[785] Ex. 498 at G_000111847. ("[N]o different treatment shall be accorded to eligible foreign currency-denominated claims as a result of their origin . . . the nature or domicile of the holder of the claim, and/or the identity of the public sector obligor (the Republic, PDVSA or another public sector entity, whether the claim has been reduced to a court judgment or otherwise[)].").

[786] Ex. 431 at PDVSA_0040835.

540.    Mr. Pacheco responded in a letter dated July 28, 2019, which recognized the intention of the Interim Government "to control and protect [Citgo] as property of the Venezuelan Nation," and noting that the PDVSA Ad Hoc Board had "rescued [Citgo] to put it at the service of the reconstruction of the national oil industry."[787]

541.    On October 1, 2019, the National Assembly executed the "Agreement that Authorized the Use of Resources of Petróleos De Venezuela, S.A. (PDVSA) to Defend Its Assets Abroad," and published it in the Legislative Gazette of the National Assembly of the Bolivarian Republic of Venezuela on October 24, 2019.[788]  The resolution did not separate PDVSA's legal decisions from the Republic's control, but rather authorized the Special Attorney General, a member of the executive branch appointed by Guaidó, to sign necessary contracts related to the use of PDVSA resources for the defense of its assets, and approved the use of $2 million of PDVSA funds (which was available to PDVSA within the U.S.) for such purposes.[789]

542.    According to the resolution approved by the National Assembly, "the contracts entered into, the payments made, and the results of all judicial and extrajudicial actions to protect PDVSA's assets" needed to be authorized both by PDVSA Ad Hoc Board and by the Finance and Development Commission of the National Assembly, and could only be signed by the Special Attorney General.[790]

543.    Reflecting its understanding that the Republic should exercise economic control over PDVSA's transactions, the Interim Government objected to the Maduro regime's sale of

---

[787] Ex. 131 at PDVSA_0039472, -9474 and -9481.

[788] Ex. 400 at G_000109918-19.

[789] Ex. 400 at G_000109918-19.

[790] Ex. 400 at G_000109918-19.

PDVSA's stake in a Swedish refinery, Nynas AB, by noting that the National Assembly's energy committee considered the deal null "as it was not approved by congress."[791]

544.    On November 19, 2019, the National Assembly executed an "Agreement that Authorized the Creation of the Special Litigation Fund" ("**Litigation Fund Agreement**"), which established a "Special Litigation Fund" consisting of resources found in bank accounts abroad (including in the accounts of PDVH and its U.S. subsidiaries) in favor of, among others, the State (*i.e.*, the Republic of Venezuela), the Central Bank of Venezuela, and PDVSA.[792]

545.    Pursuant to the express terms of the Litigation Fund Agreement, the National Assembly considered PDVSA and its assets as Venezuelan assets held abroad and effectively required PDVSA to seek approval from the Republic to spend its own resources.[793]

546.    All of the funds established by the Litigation Fund Agreement are to be overseen by a "technical commission" appointed by the National Assembly.[794]

547.    In an interview published January 19, 2024, Mr. Horacio Medina, the President of the PDVSA Ad Hoc Board, described this process as follows:

> [T]he Special Attorney for the Defense of the State, at the beginning of this entire process in 2019, approved a fund to pay the lawyers who represent the Republic in a lawsuit; and if these payments had not been met, the asset would have been lost early. So the figure of the loan was resorted to and PDVSA ad hoc made an agreement and paid on behalf of the Attorney General's Office to those lawyers for once. . . . It was an imperative necessity because it was at risk precisely what we must defend, such as the assets of the Republic. Those lawyers were paid and that is a debt that the Attorney General's Office has with PDVSA . . ."[795]

---

[791] Ex. 456.

[792] Ex. 403 at PDVSA_0001394-95; *see also* Ex. 214 at PDVSA_0000570; Ex. 402 at PDVH_Girard Street_000000758 (noting that sources of funds included "Subsidiary and PDVH's Bank Accounts" as of March 31, 2019).

[793] Ex. 403 at PDVSA_0001394-95; *OIEG*, 663 F. Supp. 3d at 421.

[794] Ex. 403 at PDVSA_0001394-95; *OIEG*, 663 F. Supp. 3d at 421.

[795] Ex. 401 at 5.

548.    On August 7, 2020, Mr. Pacheco shared a copy of a letter with the Standing Commission of Comptrollers of the National Assembly, in which he followed up on a meeting between the PDVSA Ad Hoc Board and the Energy and Petroleum Commission of the National Assembly of Venezuela held on August 5, 2020.[796]  In the letter, Mr. Pacheco thanked the Commission for allowing PDVSA to "present the management of the ad hoc Board and the subsidiaries that encumber it," and noted that the meeting "allows the [National] Assembly to comply with its duties of control."[797]

549.    On December 30, 2022, the National Assembly approved a reform of the Transition Statute in which it did not extend the validity of the Guaidó-led Interim Government, thereby letting it expire as of January 4, 2023.[798]  After January 4, 2023, the U.S.-recognized government is the "**2015 National Assembly**."

550.    The 2015 National Assembly, however, did not relinquish control of PDVSA, PDVH, or their subsidiaries to the Maduro regime.  In the same reform, the 2015 National Assembly created the Council for the Administration and Protection of Assets ("**CAPA**"), tasked with "the protection of all property or assets of the Bolivarian Republic of Venezuela abroad, participating in the administration thereof when it deems appropriate."[799]

---

[796] Ex. 444 at PDVSA_0004211, 0004213.

[797] Ex. 444 at PDVSA_0004211, 0004213.

[798] *See* Ex. 397 at PDVSA_0003197.

[799] Ex. 397 at PDVSA_0003202.

551.    The 2015 National Assembly clarified that "[i]n the exercise of its powers, [CAPA] shall represent shares belonging to the Republic in any of the entities in which the Republic is a shareholder."[800]

552.    CAPA then replaced the former President, Guaidó, as the entity in charge of appointing PDVSA Ad Hoc Board members, requiring prior National Assembly approval before making such appointments or subsequent removals.[801]

553.    In a May 2023 press release, the 2015 National Assembly "clarif[ied] the situation" surrounding Citgo's legal challenges, attributing them to "corruption, mass expropriations and excessive and irresponsible indebtedness of the governments of Hugo Chávez Frías and Nicolás Maduro."[802]

554.    In the press release, the 2015 National Assembly explained that CITGO has been under the protection of the Interim Government since 2019, noting that Guaidó's administration and the Special Prosecutor's Office prioritized legal action over negotiations with Venezuela's creditors.[803]

555.    The 2015 National Assembly also stated that responsibility for negotiating with creditors falls on the PDVSA Ad Hoc Board, which was "to act without delay to preserve the property of CITGO and to seek solutions that do not jeopardize the integrity of said asset of the Venezuelan state abroad."[804]

---

[800] Ex. 397 at PDVSA_0003196, 0003202, 0003204; Ex. 397 at PDVSA_0003202.

[801] Ex. 397 at PDVSA_0003200-204.

[802] Ex. 449.

[803] Ex. 449.

[804] Ex. 449.

556.    In a February 2025 response letter to Maduro's claim that "his regime 'has not received more than $5 billion in profits from CITGO,'" the PDVSA Ad Hoc Board stated that:

> [T]he level of debt to which CITGO was subjected by the Maduro regime, along with the multiple lawsuits arising from expropriations carried out under the irresponsible management of Chávez and Maduro, has made it impossible to declare dividends to CITGO's parent subsidiaries (CITGO Holding and PDV Holding) during the entire 2019-2024 period.[805]

557.    In that same February 2025 letter, the PDVSA Ad Hoc Board cited to the Transition Statute, governing the "Disposition and Administration of State Assets," as "strictly limit[ing] the declaration of dividends [from PDVH] to PDVSA Ad Hoc,"[806] while asserting that the Transition Statute "only permit[s] the execution of internal operational expenses to ensure the continued functioning of a company that has successfully restored after being neglected and left in poor operational condition by the Maduro regime."[807]

## B.    Direct Appointments of U.S.-Subsidiary Board Members by the Interim Government and the PDVSA Ad Hoc Board

558.    As part of the enactments described above (*see supra* at Section VII.A), the National Assembly and Interim Government took numerous steps to control PDVSA and its U.S. subsidiaries, including but not limited to through board appointments.[808]

559.    In its February 13, 2019, resolution, the National Assembly "authorize[d] the citizen Juan Gerardo Guaidó Márquez, acting President of the Bolivarian Republic of Venezuela,

---

[805] Ex. 450, ¶ 2; Ex. 451 ("In order to avoid the disinformation emanating from the regime, we are making available to all Venezuelans the information about the management that the *Ad Hoc* PDVSA Administrative Board has made about CITGO.").

[806] Ex. 450 at ¶ 3; Ex. 451.

[807] Ex. 450 at ¶ 5; Ex. 451.

[808] *See* Ex. 203 at PDVH_Girard Street_000088906 (describing challenges facing Citgo in 2019-2021, including "Corporate governance corrective actions- Strengthening of Controls and cultural change").

to use his legal powers to appoint" several individuals as members of the PDVSA Ad Hoc Board.[809]

560.    Specifically, the National Assembly ordered the February 13, 2019 appointments of Messrs. Simón Antunes, Gustavo Velásquez, Carlos José Balza, Ricardo Alfredo Prada, and David Smolansky as members of the PDVSA Ad Hoc Board.[810]

561.    The National Assembly also directed the forthcoming PDVSA Ad Hoc Board in the February 13, 2019 resolution to "proceed to carry out all of the actions necessary" to designate the new boards of directors of the subsidiaries of PDVH, Citgo Holding, and Citgo, which the National Assembly directed were to be made up of the following people:

**PDV Holding, Inc.:**

- • Luisa Palacios;
- • Edgar Rincón;
- • Oswaldo Nuñez;
- • Fernando Vera;
- • Elio Tortolero; and
- • Andrés Padilla.

**Citgo Holding, Inc.:**
- • Luisa Palacios;
- • Edgar Rincón;
- • Ángel Olmeta;
- • Oswaldo Nuñez;
- • Javier Troconis; and
- • Rick Esser.

**Citgo Petroleum Corporation:**

- • Luisa Palacios;
- • Edgar Rincón;
- • Luis Urdaneta;

---

[809] Ex. 407 at PDVSA_0006668; Ex. 453.

[810] Ex. 407 at PDVSA_0006668.

• Ángel Olmetta;

• Andrés Padilla; and

• Rick Esser.[811]

562.    Guaidó announced the decisions through an X (formerly Twitter) post where he stated:  "From the @AsambleaVE [National Assembly] we appointed the new Board of Directors of CITGO, made up by Luisa Palacios, Ángel Olmeta, Édgar Rincón, Luis Urdaneta, Andrés Padilla and Rick Esser."[812]

563.    In a press release on the official website of the National Assembly, Guaidó further stated:  "We [have] started the reconstruction of Venezuela with the appointment of Citgo's board of directors.  People of Venezuela, this is a historic agreement that not only protects Venezuela's assets but also safeguards each developing asset of the country."[813]

564.    The boards of PDVH, Citgo Holding, and Citgo were voted in on February 15, 2019, two days after National Assembly issued its instruction.[814]

565.    The National Assembly justified these appointments on the basis that Citgo was "facing a series of operational, financial and managerial difficulties due to the constant administrative disorder of the regime implemented by the National Government," and the "legal contingencies" that weigh on "this Venezuelan company in the United States," namely the 2016 Pledges and "seizure order in favor of Crystallex for shares owned by [PDVH]."[815]

---

[811] Ex. 407 at PDVSA_0006669, Article 1.

[812] Ex. 412.

[813] Ex. 413.

[814] Ex. 414 at PDVH_Girard Street_000000492; Ex. 415 at PDVH_Girard Street_000134951; Ex. 416 at PDVH_Girard Street_000134986.

[815] Ex. 407 at PDVSA_0006668; Ex. 271 at PDVSA_0003287.

566.    The National Assembly further considered as a justification the fact that the "[o]peration of . . . CITGO currently falls to a management team made up of U.S. personnel with significant legal limitations, due to the absence of the members of the Venezuelan Board of Directors because of their relationship with the usurping Maduro Government[.]"[816]

567.    Commenting on these appointments, Mr. Medina testified during his deposition that the Interim Government "needed to take control of the company, and [] needed to cover those positions" because it was "an emergency."[817]

568.    Following the National Assembly's directives, Guaidó's April 10, 2019 Decree No. 3 made clear that the Interim Government would control the actions of the PDVSA Ad Hoc Board, including the appointment of the Boards of the U.S.-based subsidiaries, and that the board would be "reorganize[d]" and "assign[ed] . . . new powers and duties."[818]

569.    Article 2.1 of Decree No. 3 states:

The ad-hoc administrative board shall exercise all powers that, in accordance with the law, statutes and other regulations, correspond to the shareholders' meeting, board of directors and office of the chairman of Petróleos de Venezuela, S.A. (PDVSA) and its affiliated companies organized in Venezuela, for exercise of the following rights: 1. To take all necessary decisions to appoint the boards of directors and other directors of PDVSA subsidiaries organized abroad, representing PDVSA and its affiliated companies at the relevant shareholder meetings, in accordance with Article 3.[819]

570.    Article 3.3 of Decree No. 3 states:

For purposes of exercise of the right defined in Article 2.1, the ad-hoc administrative board of PDVSA shall perform the following actions: . . . 3. In particular, and without prejudice to the other powers indicated herein, the ad-hoc administrative board shall exercise the representation of PDVSA and its affiliated companies organized in Venezuela that are shareholders of the following affiliated

---

[816] Ex. 407 at PDVSA_0006668.

[817] Ex. 166 at 85:23-86:1.

[818] Ex. 408 at PDVSA_0003257.

[819] Ex. 398 at G_000006724; Ex. 408 at PDVSA_0003258.

companies organized abroad, for the purpose of appointing their directors and members of their boards of directors[.][820]

571.    Article 8 of Decree No. 3 states:

[T]he ad-hoc administrative board of PDVSA and its affiliated companies organized in Venezuela consists of nine (9) members appointed by the President-in-Charge of the Republic under the control of the National Assembly, in accordance with the statute governing the transition to democracy to restore the constitution of the Bolivarian Republic of Venezuela. They may be removed by decision of the President-in-Charge.[821]

572.    Article 17 of Decree No. 3 appoints the following persons to the PDVSA Ad Hoc Board:  Simón Antunes, Gustavo Velásquez, Carlos José Balza, Ricardo Alfredo Prada, Luis Pacheco, Claudio Martínez, León Miura, María Lizardo and Alejandro Grisanti.[822]  This almost doubled the size of the five-person board originally appointed on February 13, 2019, and removed Mr. Smolansky from the board after only a few months.[823]

573.    Several individuals appointed by the National Assembly as Directors of PDVH, Citgo Holding, and Citgo held multiple positions simultaneously.[824]  For example, Dr. Palacios and Mr. Rincón served concurrently as Directors of PDVH, Citgo Holding, and Citgo, and Mr. Olmeta and Mr. Esser concurrently served as Directors of both Citgo Holding and Citgo.[825]

---

[820] Ex. 398 at G_000006725; Ex. 408 at PDVSA_0003259.

[821] Ex. 398 at G_000006727; Ex. 408 at PDVSA_0003261.

[822] Ex. 398 at G_000006730; Ex. 408 at PDVSA_0003264.

[823] Ex. 407 at PDVSA_0006668.

[824] Ex. 409 at PDVSA_0000418; Ex. 190.

[825] Ex. 409 at PDVSA_0000418; Ex. 407 at PDVSA_000669; Ex. 190 at 7, 10-12; Ex. 411.

574.    In August 2019, Guaidó announced that "together with members of the National Assembly's board and the Parliament's Energy and Petroleum Commission, we have appointed" Mr. Jordá as CEO of Citgo "to protect and safeguard this asset, ensuring it serves Venezuela."[826]

575.    Guaidó stressed that the appointment of Mr. Jordá and other appointments he "will continue to make and announce" were aimed at "protec[ting] Venezuela, protect[ing] its assets so that they do not continue to plunder the nation."[827]

576.    Mr. Jordá, who still serves as Citgo's CEO, testified that "protection of the asset" means "protection of PDVH, CITGO Holding and CPC . . . from the creditors."[828]

577.    On November 20, 2019, Dr. Palacios, acting for PDVH, Citgo Holding, and Citgo, sent a letter to Mr. Pacheco asking that Mr. Jordá be appointed to the boards of PDVH subsidiaries.[829]

578.    It was not until July 6, 2020, that the PDVSA Ad Hoc Board held a meeting to "consider[] and resolv[e]" the "authorization of the appointment of Mr. Carlos Jordá as a member of the Board of Directors of CITGO Petroleum Corporation and CITGO Holding Inc."[830]  At that meeting, the Board also considered and resolved "the appointment of Mr. Pablo Perez as a member of the Board of Directors of CITGO Petroleum Corporation and CITGO Holding," and "the appointment of Mr. Marcelo Laprea as a member of the Board of Directors of CITGO Petroleum

---

[826] Ex. 417.

[827] Ex. 417.

[828] Ex. 164 at 49:5-11.

[829] Ex. 418 at PDVH_Girard Street_000008546.

[830] Ex. 282; Ex. 166 at 144:12-145:21 (Mr. Medina explaining that there was a typo in the board minutes, and the meeting was actually held on July 6, 2020).

Corporation."[831]  Mr. Pacheco was instructed "to inform the Board of Directors of PDV Holding Inc. of said appointments, so that said company may make the appointments effective."[832]

579.    Commenting on the PDVSA Ad Hoc Board's July 6, 2020, meeting minutes, Mr. Medina testified that he "believed it was appropriate for the PDVSA Ad Hoc Board to authorize the appointment of a director to CITGO Petroleum Corporation's Board" even though "PDVSA is not itself a shareholder in CITGO Petroleum Corporation."[833]  He added that, "if there is an important objection" to the appointment of a Citgo official by the PDVSA Ad Hoc Board, he or she "cannot be appointed,"[834] because "[w]henever PDVH [] requests an authorization and there is no objection to it, it's because it has already been approved by the chain of corporations."[835]

580.    On July 11, 2020, Mr. Pacheco, on behalf of the PDVSA Ad Hoc Board, informed Dr. Palacios, Director, CEO, and President of PDVH, that the PDVSA Ad Hoc Board had approved the appointments of Messrs. Jordá, Pérez, and Laprea.[836]

581.    In July 2020, Citgo issued a shareholder report which stated that the boards of directors of Citgo Holding and Citgo were appointed by the PDVSA Ad Hoc Board.[837]  The report further stated that the decline in Citgo's net income that year was due to "[i]rresponsible actions of the Maduro regime," including its "unlawful seizure of crude oil owned by CPC" and referred to the 2016 PDVSA debt exchange as "a last attempt to finance the suffocated Maduro regime."[838]

---

[831] Ex. 282.

[832] Ex. 282 at PDVH_Girard Street_000008888.

[833] Ex. 166 at 146:5-13.

[834] Ex. 166 at 151:18-2.

[835] Ex. 166 at 151:5-13.

[836] Ex. 419.

[837] Ex. 420; Ex. 421 at PDVH_Girard Street_000038392.

[838] Ex. 421 at PDVH_Girard Street_000038394, PDVH_Girard Street_000038413.

582.    On October 26, 2020, the PDVSA Ad Hoc Board appointed Mr. Fernando Vera as president of PDVH and Mr. Jordá as chairman of the board of Citgo.[839]

583.    On December 17, 2020, Mr. Medina wrote on behalf of the PDVSA Ad Hoc Board to Guaidó and asked that Guaidó authorize the appointment of Mr. Jose Ramón Pocaterra to the board of Citgo.[840]    Thereafter, at a December 29, 2020 PDVH board meeting, a PDVH director stated that the PDVSA Ad Hoc Board had authorized the appointment of a new director to the Citgo Petroleum board.    Accordingly, the PDVH board ordered the PDVH secretary to tell Citgo Holding to take steps to have Mr. Pocaterra appointed to the Citgo board.[841]

584.    The procedure by which Mr. Andrés Yrigoyen Luna was appointed as a Director of PDVH and Citgo Holding was as follows:    on December 16, 2020, Mr. Pacheco emailed Mr. Medina "a draft memorandum requesting approval for the appointment of Eng. Irigoyen [sic] as a member on the boards of PDVH Holding and CITGO Holdings," noting that Mr. Yrigoyen's "name was suggested from the government . . . and I understand that it is peremptory to do so as soon as possible."[842]    Mr. Pacheco attached to his email minutes of a December 17, 2020 PDVSA Ad Hoc Board meeting—which had of course not yet taken place—wherein Mr. Medina submitted Mr. Yrigoyen as a member of the PDVH and Citgo Holding Boards, and the PDVSA Ad Hoc Board unanimously approved the appointments and authorized Mr. Medina to inform Guaidó and then, following the anticipated receipt from Guaidó of his agreement, to inform the PDVH board of the appointment.[843]    On January 11, 2021, Guaidó sent a letter to Mr. Medina, acknowledging

---

[839] Ex. 197 at PDVSA_0000478; Ex. 422; Ex. 423.

[840] Ex. 424.

[841] Ex. 425 at PDVH_Girard Street_000000815.

[842] Ex. 198.

[843] Ex. 209 at PDVSA_0000474-75

receipt of PDVSA's notification to the National Assembly of the appointment of Mr. Luna as a Director of PDVH and Citgo Holding.[844]  The notification was submitted pursuant to Article 142 of the Venezuelan Constitution, which states that "public interests in corporations or entities of any nature, will be subject to the control of the State, in the manner that the law sets forth."[845]

585.    In other words, Guaidó instructed Mr. Pacheco to instruct Mr. Medina to have the PDVSA Ad Hoc Board approve Mr. Yrigoyen's appointment to the PDVH and Citgo Holding boards.[846]

586.    In March 2021, during criminal proceedings against Mr. Jose Luis de Jongh Atencio, a former Citgo employee, the Executive Branch of the U.S. government told the U.S. District Court for the Southern District of Texas, "PDVSA's U.S. subsidiaries, including Citgo, are controlled by the ad hoc Administrative Board of PDVSA, appointed by President Guaidó."[847]

587.    On June 14, 2021, the PDVSA Ad Hoc Board voted to appoint three new directors to the board of Citgo Holding (Elio Tortolero, Samuel Wilhelm, and Ernesto Hernández).[848]  The next day, the PDVSA Ad Hoc Board sent a memorandum informing Citgo Holding of these appointments, and these individuals assumed their positions later in June 2021.[849]

588.    On September 28, 2021, Mr. Edgar Rincón—director of PDVH, Citgo Holding, and Citgo—sent an email to Mr. Medina in which he provided a "summary of the conversation [they] had just a few minutes ago," including "the resolutions that PDVH needs to approve during

---

[844]  Ex. 426.

[845]  Ex. 161.

[846] Ex. 198; Ex. 209; Ex. 426.

[847] *OIEG*, 663 F. Supp. 3d 406 at 419 (citing U.S. Gov. Trial Brief at 8, *United States v. Atencio*, No. 20-cr-00305, (D. Del. Mar. 23, 2023) (S.D. Tex. Mar. 16, 2021), ECF No. 80).

[848] Ex. 192; Ex. 427 at PDVSA_0046876.

[849] Ex. 428; Ex. 190 at 4-5, 13-14.

tomorrow's Board Meeting," which included instructing the Citgo board to reverse the appointment of its chairman.[850]

589.     On January 5, 2022, Mr. Medina wrote to Mr. Samuel Wilhelm Belloso, President of the PDVH Board, and instructed him that all "removals and restructuring proposals" of entities in the corporate chain were to be deferred pending a discussion with PDVSA.[851]

### C.     The PDVSA Ad Hoc Board Acts to Control and Prevent the Flow of Funds from PDVH to PDVSA

590.     As discussed *supra* at Section IV.E, Citgo was significantly leveraged by the prior regime.  Citgo's capital structure is depicted in a presentation sent by Dr. Palacios, Chairwoman of the Citgo Board of Directors, on August 14, 2020:[852]



---

[850] Ex. 429.

[851] Ex. 524.

[852] Ex. 204 at PDVH_Girard Street_000008588.

591.    In the absence of dividend distributions, the earnings from PDVSA subsidiaries' activities have accumulated in the form of cash holdings and reinvestments in the subsidiaries.[853]

592.    A June 2021 presentation prepared by Citgo describes litigation with creditors of the Republic and PDVSA—including arbitration awards obtained by Crystallex (for $1.2 billion), ConocoPhillips ($1.5 billion), OIEG ($378 million), PDVSA 2020 Bondholders, and "Others"—and includes the following graphic depicting which entities within the PDVSA corporate structure are directly implicated by these lawsuits:[854]



593.    Although litigation was occurring at the PDVH level,[855] these lawsuits were treated as Citgo's challenges.[856]

---

[853] *See* CITGO Parties' Memorandum at 6, *Crystallex*, 333 F. Supp. 3d 380 (D. Del Oct. 28, 2024), ECF No. 1398 ("PDVH had approximately $3.5 billion of cash on hand at June 30, 2024, and negative net debt as of that date[.]"); *see also* Ex. 410 at G_000095940 ("Citgo . . . is accumulating hundreds of millions of dollars in cash it may not be able to pay out as dividends for at least a year . . . . The refiner had $1.36 billion in cash at June 30[, 2019] and should generate another $1.4 billion in funds from operations over the next 12 months.").

[854] Ex. 203 at PDVH_Girard Street_000088909-10.

[855] Ex. 203 at PDVH_Girard Street_000088909.

[856] Ex. 203 at PDVH_Girard Street_000088906-07, PDVH_Girard Street_000088910.

594.    Ms. Gina Coon, former Corporate Treasurer, Citgo, testified that the "PDVSA Ad Hoc board was in a variety of . . . lawsuits and activities to defend itself and needed the ability to make payments to legal firms."[857]

595.    The concluding slides of the June 2021 presentation explain that one of Citgo's roles relative to Venezuela is making dividend payments to the shareholder:[858]



596.    In February 2022, Mr. Medina, in his capacity as "President of the Ad Hoc Management Board of Petróleos de Venezuela, S.A. (PDVSA)," emailed Citgo employees to

---

[857] Ex. 19 at 136:3-7.

[858] Ex. 203 at PDVH_Girard Street_000088911-12.

explain that the "role . . . for which[] each and every [member of the PDVSA Ad Hoc Board] was appointed, in different instances and with different responsibilities" had "a single objective: Defend and Recover the assets of PDVSA abroad, in particular, [Citgo]."[859]

597.    Mr. Medina's position has remained consistent over the years:  at his deposition in this case, he testified that the "PDVSA Ad Hoc Board['s] mission is to protect . . . PDVSA's assets [abroad] up until there is a [regime] change in Venezuela."[860]  He further testified:  "My mission and duty is to protect the assets; not to sell them or negotiate with them.  So, I have to negotiate without compromising the [assets] . . . .  That means protecting them."[861]

598.    Mr. Medina also testified that "part of the mission of the Ad Hoc Board is to **defend PDVSA against claims by creditors** . . . . **[as] an important part of the project or objective**" "[a]nd **part of the way the Ad Hoc Board pursues that objective is by preserving value in PDVH and not having PDVH make distributions to PDVSA.**"[862]

599.    Mr. Medina testified that the Transition Statute required "that for as long as the Maduro regime is in place, PDVH shall make no payments or distributions to PDVSA and he noted that "in fact, since 2019, PDVH has not made any distributions to PDVSA."[863]

600.    ████████████████████████████████████████

████████████████████████████████████████████████

---

[859] Ex. 433 at PDVSA_0048904.

[860] Ex. 166 at 24:13-25:9.

[861] Ex. 166 at 119:2-7.

[862] Ex. 166 at 39:16-40:8 (emphasis added).

[863] Ex. 166 at 30:12-31:2.

████████ [864] ████████████████████████████████████

████████████ [865]

### D.    Impact of Sanctions on Ad Hoc Board's Conduct

601.    The U.S. Government imposed additional Venezuela-related sanctions in November 2018 and August 2019.[866]

602.    Notwithstanding the 2017, 2018, and 2019 sanctions, a May 2021 Citgo presentation stated that if:

> PDVSA or other Government of Venezuela entities are involved in a given transaction, or if the specific transaction otherwise remains restricted under the sanctions (e.g. collateralizing Citgo's equity), CITGO will likely need to receive a license from the U.S. Government before participating. That said, CITGO maintains a strong relationship with the U.S. Government and has received dozens of such licenses.[867]

603.    The presentation also stated that:

> [S]ince August 24, 2017, the U.S. Government has consistently issued authorizations for U.S. persons to transact with CITGO, notwithstanding most of these sanctions, so long as CITGO and its U.S. parent companies and subsidiaries are the only entities involved in the transaction that meet the definition of the Government of Venezuela.[868]

604.    In August 2017, October 2017, and October 2018, the U.S. government issued licenses to the Maduro government that exempted certain transactions from the scope of the 2017 sanctions.[869] The U.S. government then further limited those sanctions through licenses issued in

---

[864] Ex. 166 at 140:15-141:9.

[865] Ex. 166 at 128:1-12.

[866] Ex. 404 at G_000096785; Ex. 405 at G_000095728.

[867] Ex. 406 at PDVH_Girard Street_000018174; Ex. 29 at 46:10-18.

[868] Ex. 406 at PDVH_Girard Street_000018181.

[869] Ex. 518 at PDVH_Girard Street_000046132.

October 2019 and July 2021, after the 2015 National Assembly had taken over.[870] Several other licenses were also issued after 2018 to narrow the scope of the 2018 and 2019 sanctions.[871]

605.    In a January 2024 interview, Mr. Medina was asked, "How is the relationship between you as PDVSA's ad hoc Board of Directors and OFAC maintained?" and responded, "In no way is there a bad relationship."[872]

606.    Mr. Medina has referred to Citgo's commercial activities in the United States as part of a quid pro quo, in exchange for U.S. government decisions that restrict creditors from seizing PDVSA's ownership stake in the company.[873]

607.    In 2022, Mr. Medina stated:

> Certainly, we have been protected [from creditor attempts to attach PDVH or Citgo Holding shares] and hopefully that protection will continue until we can find a solution to the country but that protection, at this moment we are repaying it in an incredible manner: CITGO delivers more than 380 thousand barrels of gasoline to the market, more than 370 thousand barrels of diesel, and we continue operating with, giving an example, in the country.[874]

608.    The PDVSA Ad Hoc Board announced that if the opposition reaches power in Venezuela, Citgo would supply gas and diesel to solve fuel shortages in Venezuela, despite the fact that Citgo has not publicly presented such plans, and neither Citgo nor PDVSA have explained how these plans would benefit Citgo.[875]

---

[870] Ex. 518 at PDVH_Girard Street_000046132.

[871] Ex. 518 at PDVH_Girard Street_000046132.

[872] Ex. 401 at 8.

[873] Ex. 39, ¶ 131 (providing English transcription of a Spanish-language speech recorded in the video attached to an August 11, 2022 X post by Juan Guaidó (@jguaido), available at https://x.com/jguaido/status/1557858867681312769).

[874] Ex. 39, ¶ 131 (providing English transcription of a Spanish-language speech recorded in the video attached to an August 11, 2022 X post by Juan Guaidó (@jguaido), available at https://x.com/jguaido/status/1557858867681312769).

[875] Ex. 39 at ¶ 131; *see* Ex. 446; Ex. 447.

609.    Similarly, Citgo's website states, "[w]hen PDVSA's operations are controlled by an administration appointed by a democratic government—which enjoys legitimacy and the recognition of the international community—CITGO will be able to play a key role in the reconstruction of Venezuela."[876]

610.    Furthering efforts to prevent PDVH from allowing PDVSA or its creditors to access the funds of PDVH or its subsidiaries, on October 13, 2023, Mr. Medina—on behalf of the PDVSA Ad Hoc Board—sent a letter to OFAC asking that it revoke, or continue the suspension of, OFAC General License 5L.[877]

611.    

612.    In a January 12, 2024, follow-up letter to OFAC, Mr. Medina reiterated these points with respect to a new OFAC license that had supplanted the earlier General License 5L.[880]

---

[876] Ex. 39 at ¶ 133.

[877] Ex. 434 at PDVSA_0005700-01.

[878] Ex. 434 at PDVSA_0005700.

[879] Ex. 434 at PDVSA_0005701.

[880] Ex. 435 at PDVSA_0005769-70.

### E.    Use of PDVH's Assets to Pay PDVSA and Venezuela's Expenses Under the Interim Government

613.    As under the Maduro administration (*see supra* at Section IV.F), the Interim Government and PDVSA Ad Hoc Board funded their own expenses through offsetting inter-affiliate balances and payables owed to PDVSA and PPSA.[881]

614.    During an October 29, 2020, PDVH special board meeting, the Citgo management team gave a presentation on the 2019-2020 budget and financial resources available to resolve issues facing the Interim Government and PDVSA Ad Hoc Board,[882] highlighting that funds were available within "[s]ubsidiary and PDVH's Bank Accounts" as of March 31, 2019.[883]

#### 1.    Interest Payment on PDVSA 2020 Bonds

615.    In March and early April 2019, Mr. José Ignacio Hernández, the Special Attorney General for the Interim Government of Venezuela, engaged in direct discussions with attorneys at the U.S. Department of the Treasury—including from his personal email address—regarding the use of Citgo's funds to pay the interest payment due to the 2020 PDVSA bondholders in April 2019, and regarding the OFAC license application and the Treasury attorneys' communications with OFAC about the license.[884]

616.    In April 2019, in advance of the actual payment of the interest, Mr. Hernández participated in negotiations on behalf of PDVSA with an ad hoc committee of 2020 PDVSA bondholders, assuring them that "Guaidó's Government already initiated all the process in Venezuela and the U.S. to advance in the fulfillment of our obligation," *i.e.*, the upcoming interest

---

[881] Ex. 459 at PDVH Girard Street_000112149.

[882] Ex. 402 at PDVH_Girard Street_000000748, 000000758.

[883] Ex. 402 at PDVH_Girard Street_000000758.

[884] Ex. 436 at PDVSA_0035805.

payment, "despite the difficulties that we are facing in Venezuela."[885]  Mr. Hernández further assured the 2020 bondholders that despite the "procedural and logistical hurdles" impeding PDVSA's ability to make the interest payment on time, he had "already initiated the preliminary actions that will allow the National Assembly to authorize the payment, including the request of the OFAC license."[886]

617.    Mr. Hernández also signed an April 3, 2019, letter, in his capacity as Attorney General of Venezuela and on behalf of PDVSA, describing the 2020 Notes transaction and asking OFAC to issue a license to authorize principal and interest payments.[887]  The license request was granted, and PDVSA was authorized to make an interest payment on the 2020 PDVSA Bonds and fund the PDVSA Ad Hoc Board's litigation expenses using funds owed by LDC and PDV Chalmette to PPSA.[888]

618.    On March 13, 2019, Mr. Vera sent an email to Mr. Pacheco "to inform you that the payment of the coupon of the 2020 Bond [in the amount of $71,559,991.25] has been processed."[889]

619.    On May 7, 2019, the PDVH board authorized LDC to make an interest payment on the 2020 Notes "in accordance with the instruction contained in the Direction Letter" from the PDVSA Ad Hoc Board.[890]  On May 9, 2019, Mr. Vera wrote an email explaining that "We have to receive the letter of directions from the PDVSA Ad-Hoc Board in order to proceed, and we have

---

[885] Ex. 438 at PDVSA_0046271.

[886] Ex. 438 at PDVSA_0046270.

[887] Ex. 437 at PDVSA_0034722.

[888] Ex. 333 at PDVSA_0004674-76.

[889] Ex. 463 at PDVSA_0036946; *see also* Ex. 464 at PDVSA_0036976-078.

[890] Ex. 461 at PDVH_Girard Street_000000552.

to have the license from OFAC in order to keep the remaining balance."[891]  According to Mr. Vera, LDC made this payment because "LDC received instruction . . . to pay the agent of the 2020s" instead of paying the payable it owed to PDSVA.[892]



[891] Ex. 462.

[892] Ex. 284 at 57:21-58:3.

[893] Ex. 516 at PDVSA_0040353.

[894] Ex. 430 at PDVSA_0040439.

[895] Ex. 432 at PDVSA_0040401.

[896] Ex. 432 at PDVSA_0040403.

[897] Ex. 432 at PDVSA_0040405

[898] Ex. 432 at PDVSA_0040407.



622.    

[899]

623.

[900]

---

[899] Ex. 432 at PDVSA_0040420.

[900] Ex. 516 at PDVSA_0040361.



624. 

625.

---

901 Ex. 516 at PDVSA_0040380-81.

902 Ex. 516 at PDVSA_0040381.



627.    The debts owed by LDC and PDV Chalmette to PPSA, on which the interest payments were justified, only existed because of PDVSA's improper influence on the entities under prior administrations, as discussed at Section IV.F, above.  Although Mr. Hernández stated at the time in his negotiations with the 2020 PDVSA bondholders that the April 2019 interest payment "was possible because PDVSA had resources available in a blocked account . . . that were used completely for that purpose," and could not "make any more piecemeal payments,"[906] PDVSA has nonetheless sought—and been granted—three additional licenses from OFAC authorizing the use of PDVSA's subsidiaries' funds to make payments on its behalf.[907]

628.    In January 2021, PDVSA explored ways to increase cash at the PDVH level in order to pay down its outstanding obligations on the 2020 PDVSA Bonds.[908]  To avoid increasing Citgo's debt and interfering with its debt covenants, PDVSA considered having PDVH incur new debt, which PDVH would repay through a crude-product swap agreement with PDVSA.

---

[903] Ex. 513 at PDVSA_0042316-317.

[904] Ex. 514 at PDVSA_0042335.

[905] Ex. 514 at PDVSA_0042342-48.

[906] Ex. 438 at PDVSA_0046264-65.

[907] Ex. 460 at PDVH_Girard Street_000107683.

[908] Ex. 465 at PDVH_Girard Street_000080004-05.

629. Mr. Jordá mapped out the proposed structure in a January 28, 2021, email, explaining that the "New Debt at PDVH would be used to pay down 2020 bonds in a negotiation," and the debt "would be paid from margin to be generated from [the] trading operation by PDVH."[909]  He further clarified through testimony that the agreement would provide for PDVH to sell the crude to Citgo, and Citgo would in turn pay with products.[910]  To succeed, there would "need[] to be a margin at CPC which would be equivalent to its current operation, and PDVH would also have to have a margin to pay new debt that would . . . be used to" pay PDVSA's creditors.[911]

630. Although this particular proposal did not materialize, PDVSA effectively implemented similar workarounds of the Citgo debt restrictions through LDC, PDV Chalmette, PDV USA, and Citgo Aruba.[912]

631. A PDVH Board of Directors presentation notes that:

The placement of PDVSA on the SDN list affected the crossing of accounts between LDC and PPSA leaving a credit bank balance for PPSA of US$ 76.4 million (as of April 30, 2019), funds that PPSA had advanced to LDC without materializing the sale of the products.  Likewise, accounts payable to PPSA of US$ 90.6 million as of March 31, 2019.[913]

632. A June 29, 2021, presentation prepared by PDVH describing "PDVSA Ad Hoc Services Agreements" lists four licenses authorizing PDVH subsidiaries to make payments on

---

[909] Ex. 465 at PDVH_Girard Street_000080005.

[910] Ex. 164 at 120:14-123:4.

[911] Ex. 164 at 121:2-9.

[912] Ex. 466 at PDVH_Girard Street_000045515.

[913] Ex. 333 at PDVSA_0004679.

behalf of PDVSA.[914] 

[915]

633.    The PDVSA Ad Hoc Board described the payment as coming "from one of the many accounts' receivables owed to the company."[916]

### 2.    Legal Expenses of the PDVSA Ad Hoc Board

634.    The Interim Government and the PDVSA Ad Hoc Board continued to fund payments of their legal expenses using the funds of Citgo and other PDVH subsidiaries, notwithstanding their inability to declare cash dividends.

[917]

635.    On August 9, 2019, LDC and the PDVSA Ad Hoc Board received an OFAC license authorizing LDC "to use funds up to US$ 2 million to make payments on behalf of PDVSA for Legal Services including litigation and arbitration services led by the PDVSA Ad Hoc Board of Directors."[918]

636.    On March 6, 2020, OFAC authorized use of funds up to $20 million from PDV Chalmette's accounts payable to PPSA, to pay for "legal services."[919]  Thereafter, PDVH approved

---

[914] Ex. 460 at PDVH_Girard Street_000107683.

[915] Ex. 460 at PDVH_Girard Street_000107683.

[916] Ex 79 at PDVSA_0050524.

[917] Ex. 432 at PDVSA_0040386.

[918] Ex. 333 at PDVSA_0004676.

[919] Ex. 33 at PDVH_Girard Street_000000931.

PDV Chalmette paying $20 million to cover PDVSA litigation and arbitration costs, including costs associated with the 2020 notes litigation.[920]

637.    On November 5, 2020, OFAC issued another license authorizing "LDC Supply to pay legal services on behalf of PDVSA Ad Hoc up to $7.5MM."[921]

638.    LDC Supply exhausted the initial $2 million it was authorized to pay and soon spent down the additional $7.5 million to a remaining balance of $1.9 million.[922]

639.    On March 29, 2021, Ms. Mireya Ripanti, Shareholder Relations Manager, Citgo, listed payments made by PDV Chalmette and LDC on behalf of PDVSA from October 2019 to September 2020 in an email summarizing the balance remaining in the authority granted by the OFAC license.[923]

640.    The legal services expenditures include payments to law firms based in the United States, such as Paul Hastings, Munger, Tolles & Olsen, and Hogan Lovells.[924]

641.    On December 7, 2021, Mr. Medina wrote to Mr. Wilhelm, the President of the PDVH board, to instruct him to request ██████████████████████[925]

642.    In January 2022, Ms. Ripanti informed Mr. Medina and Mr. Julián Cárdenas, current Board Director of the PDVSA Ad Hoc Board and PDVSA's corporate representative, that approximately $12 million per year was being disbursed from the OFAC licenses.[926]  Mr. Cárdenas

---

[920] Ex. 468 at PDVH_Girard Street_000000627; Ex. 298 at 178:13-181:5.

[921] Ex. 460 at PDVH_Girard Street_000107683.

[922] Ex. 33 at PDVH_Girard Street_000000931.

[923] Ex. 469 at PDVSA_0004672-73.

[924] Ex. 469 at PDVSA_0004672-73.

[925] Ex. 71 at PDVSA_0005116.

[926] Ex. 72 at PDVSA_0005114.

responded with a copy of the December 7, 2021 letter, and asked Ms. Ripanti what the maximum amount they could request would be.[927]  In other words, the PDVSA Ad Hoc Board was communicating directly with Citgo regarding actions PDVH should take to request an OFAC license.

643.    The PDVSA Ad Hoc Board also used PDV Chalmette's assets, in addition to LDC's assets, to pay for legal services on its behalf.  Relying on the outstanding balance PDV Chalmette owed to PPSA in connection with the 2015 sale of the Chalmette Refinery, *see supra* at Section IV.F.3, the Ad Hoc Board obtained authorizations from the National Assembly and OFAC that allowed PDV Chalmette to deduct the amounts owed for purposes of the payment of the PDVSA Ad Hoc Board's legal expenses.[928]

644.    For example, on September 2, 2022, the PDVSA Ad Hoc Board sent a letter to Mr. Guaidó informing him that:

> PDVSA Ad Hoc's work on protecting PDVSA assets abroad has been crucial in managing the interim government, which has allowed CITGO to have achieved $1.5 billion dollars in profits in the first half of 2022, and an increase in asset valuation from approximately $8 billion to $12 billion dollars, approximately.[929]

645.    The letter also stressed the need "to approve the budget for the management of PDVSA Ad Hoc and the Special Attorney General's Office of the Republic, given that the defense of cases of the Republic is equally crucial for the protection of PDVSA's assets, given the creditors' strategy of intending to execute PDVSA's assets."[930]

---

[927] Ex. 72 at PDVSA_0005114.

[928] Ex. 488 at PDVSA_0002723-2724; Ex. 166 at 107:7 -111:25 (emphasis added).

[929] Ex. 488 at PDVSA_0002723.

[930] Ex. 488 at PDVSA_0002724.

646.     In his deposition, Mr. Medina testified that with that letter, "we were requesting approval to [] use that money" corresponding to "funds that belong to PDVSA Petroleos," but located in "**an account that belongs to PDVSA Chalmette**" "to pay expenses incurred by PDVSA."[931]  He also testified that PDVSA Ad Hoc did not "suggest using any of the $1.5 billion of profits generated by CITGO to pay creditors of PDVSA"[932] at the time, and also confirmed that "[t]hose profits generated by CITGO were not distributed to PDVSA."[933]

647.     PDV Chalmette entered into services agreement with the PDVSA Ad Hoc Board and PPSA on August 30, 2022 and September 11, 2023, under which PDV Chalmette was to pay for the PDVSA Ad Hoc Board's legal expenses.[934]  Mr. Medina sent a letter to PDVH and PDV Chalmette "direct[ing] [them] to pay, or reimburse PDV Chalmette for paying legal services, service fees, and expenses incurred under the Services Agreement dated as September 2023 among PDV Chalmette, PDVSA and PPSA."[935]

648.     The PDVSA Ad Hoc Board obtained a license extension as recently as July 22, 2024, allowing it to use an additional $35 million of PDV Chalmette's funds, "bringing the total up to USD 80 million," for payment of legal expenses "directed by the PDVSA Ad Hoc Board" and "payments at the direction of the [PDVSA Ad Hoc Board] to compensate the Special Master" in Crystallex.[936]

---

[931] Ex. 166 at 110:18 -111:25 (emphasis added).

[932] Ex. 166 at 112:1-17 (emphasis added).

[933] Ex. 166 at 112:21-23.

[934] Ex. 221 at PDVH_Girard Street_000039004, 000039007; Ex. 222 at PDVH_Girard Street_000007560, 000007563, 000007572.

[935] Ex. 222 at PDVH_Girard Street_000007590; Ex. 458 at PDVH_Girard Street_0031937; Ex. 240 at PDVSA_0003465.

[936] Ex. 273 at PDVH_Girard Street_000031939-40.

649.    The Interim Government and PDVSA Ad Hoc Board also used inter-affiliate balances and offsetting to clear an outstanding receivable from PDVSA to PDVH, which needed to "be addressed to finalize [PDVH's] financial statements."[937]  The net-out process is illustrated in the following slide of a draft presentation to the PDVH Board of Directors in February 2022:[938]

1. **PDV Holding has outstanding net receivable from PDVSA** ("PDVH Receivable")
   - $54.7MM in non-cash dividends distributed to PDV Holding
   - Reflected as a receivable from PDVSA
   - Non-Cash dividends were used to compensate PDV Holding entities for support services provided to PDVSA prior to sanctions.

2. **PDV Holding has demand note payable to PDV Chalmette**
   - Relates to initial capital funding for CITGO Aruba
     - PDV Chalmette made loans to PDV Holding, which were then loaned to CITGO Aruba Holding
     - Funds resulted from settlement of Tax Allocation balances following the sale of Chalmette Refining.
   - Debt Balance at 02/28/2022 $122.7MM   Includes $7MM of accrued interest

3. **PDV Chalmette has demand note payable to PPSA**
   - Relates to sale of interest in Chalmette Refining in October 2015
   - As part of sale, PDV Chalmette assumed Chalmette Refining's payables to PPSA
   - Debt Balance at 02/28/2022 $125.8MM   Includes accrued interest of $19.5MM (10% withholding tax on interest)

650.    On June 3, 2022, OFAC authorized PDV and its subsidiaries "to net certain funds owed by [PDVSA] to PDVH against debt PDVH subsidiary PDV Chalmette owed to [PPSA], and to reject and write off obligations involved in netting the funds at issue[.]"[939]

651.    The approximately $49.5 million receivable from PDVSA originated from payments made by Citgo and PDV USA, and accounted for as non-cash dividends by PDVH, at the request of PDVSA for shareholder support services, interest payments, and expenses.[940]

---

[937] Ex. 471 at PDVH_Girard Street_000001087.

[938] Ex. 320 at PDVH_Girard Street_000020424.

[939] Ex. 472 at PDVH_Girard Street_000031513.

[940] Ex. 471 at PDVH_Girard Street_000001088.

652.    On September 16, 2022, the PDVSA receivable was assigned from PDVH to PDV Chalmette, reducing PDV Chalmette's payable of $123 million to PPSA by approximately $49.5 million, to $73.2 million.[941]

653.    Approximately $4.9 million in expenses paid by Citgo and PDV USA, and accounted for as a non-cash dividend to PDVH, were excluded from the netting process:  medical expenses totaling $4,798,588 paid directly by Citgo on behalf of PDVSA in March 2017,[942] and a total of $358,691 paid by PDV USA in February 2017 for "Medical expenses – Hosp. Sirio Libanes" and "NY Times ad – February 2017."[943]

654.    Ms. Coon testified that these medical expense payments, which included "doctor fees, hospital expenses, [and] lodging while treatment is being conducted," were paid by Citgo to "medical patients identified through the PDVSA health organization" and "reimbursed through noncash dividend processes."[944]

655.    Because these rejected expenses had already been paid by Citgo and PDV USA in prior years, Citgo and PDV USA ultimately paid these expenses without any corresponding non-cash dividend or offset.[945]

---

[941] Ex. 471 at PDVH_Girard Street_000001088; Ex. 473.

[942]  Ex. 474 at tab "1037 Support."

[943] Ex. 474 at tab "4045 Support."

[944] Ex. 19 at 94:22-96:14.

[945] Ex. 474 at tabs "PART 1 1037 #1" and "PART 1 4045;" Ex. 320 at  PDVH_Girard Street_000020426; Ex. 476; Ex. 19 at 237:20-238:5 (explaining that "the entity that provided support [to PDVSA] for the roughly $5 million of balances would have to consume those as personal expenses because they didn't demonstrate what they needed for those to be processed").

656.     Through at least 2023, the note payable from PDV Chalmette to PPSA has been regularly settled "through offsetting of receivables from and payments on behalf of certain PDVSA affiliates."[946]

657.     At no time did PDVSA seek consent from its creditors for the diversion of assets to operating expenses, nor did it seek permission from OFAC to make payments to creditors.

### 3.     Stipends, Travel, and Other Expenses

658.     A July 11, 2019, PDVH board presentation indicated that PDV USA had continued to pay for certain PDVSA expenses, such as office and travel expenses, through 2019.[947]

659.     In January 2022, PDVH paid for travel and any other expenses associated with PDVSA Ad Hoc Board members' visiting the Lake Charles Refinery.[948]

660.     PDV Chalmette paid Mr. Medina a regular stipend for his services of "[a]ct[ing] as President of the PDVSA Ad Hoc Board and represent[ing] the PDVSA Ad Hoc Board to third parties" through 2024.[949]

661.     In late 2022, Mr. Medina was paid $3,400 on each of November 3, 2022; November 23, 2022; and December 9, 2022, for a total of $10,200.[950]

662.     Through May 2024, PDV Chalmette continued to pay Mr. Medina's stipend, paying $40,000 on September 14, 2023, and $5,000 on each of October 2, 2023; November 1, 2023; December 1, 2023; January 1, 2024; February 1, 2024; March 1, 2024; and April 1, 2024.[951]

---

[946] Ex. 327 at PDVH_Girard Street_000007276.

[947] Ex. 477 at PDVH_Girard Street_000140375.

[948] Ex. 478 at PDVH_Girard Street_000141043.

[949] Ex. 13 at ¶ 72.

[950] Ex. 481 at G_000121953.

[951] Ex. 479 at G_000097575; Ex. 480 at G_000122438; Ex. 13 at ¶ 71.

663.    PDV Chalmette also paid monthly stipends to other PDVSA Ad Hoc Board Members.[952]  Financial records indicate that funds in PDV Chalmette's account, previously allocated to pay for legal services under an existing OFAC license, were used to pay the following invoices:[953]

Funds Available in the PDV Chalmette Account to pay for Legal Services on behalf of the PDVSA Ad Hoc Board of Directors

| | | | | USD |
|---|---|---|---|---|
| BALANCE AVAILABLE @ September 1, 2023 FOR PAYMENT OF SERVICES, COMPENSATION, REIMBURSEABLES | | | | 10,037,965.96 |
| COMPANY/ CATEGORY | Invoice number | Invoice Date | Invoice Amount (USD) | |
| 8 months Compensation Horacio Medina | Invoice 2023-HM-001-008 | September 13, 2023 | 40,000.00 | |
| 8 months Compensation Julian Cardenas | Invoice 2023-JC-001-008 | September 13, 2023 | 38,000.00 | |
| 8 months Compensation Ricardo Prada | Invoice 2023-RP-001-008 | September 13, 2023 | 38,000.00 | |
| 8 months Compensation Ivan Lara | Invoice 2023-IL-001-008 | September 13, 2023 | 38,000.00 | |
| APPROVAL PDVSA Ad Hoc Board | | | | 154,000.00 |

664.    During the same month, PDV Chalmette's funds were used to pay "September Compensation" of $5,000 and $4,750 to Mr. Medina and the other PDVSA Ad Hoc Board Members, respectively.[954]  PDV Chalmette also paid $2,500 per month to Juan Soteldo for "services rendered to the Administrative Ad Hoc Board" in his capacity as Executive Secretary on September 1, 2023, and $2,500 on October 19, 2023.[955]

665.    Funds from PDVH subsidiaries Citgo and PDV USA were used to cover travel expenses for Mr. Medina to visit the United States.[956]

---

[952] Ex. 482 at tab "PDV CH3 Available Funds."

[953] Ex. 482 at tab "PDV CH3 Available Funds."

[954] Ex. 482 at tab "PDV CH3 Available Funds."

[955] Ex. 483; Ex. 484; Ex. 485.

[956] *See* Ex. 19 at 91:17-94:14, 97:15-98:1, 182:12-183:14; Ex. 487 at G_000000030.

666.    Ms. Coon testified that PDVH's subsidiaries also covered non-business expenses for PDVSA, including buying planes and travel to the United States "from time to time."[957]

667.    PDVSA paid Mr. Medina directly for costs of travel to the United States to visit the Venezuelan UN embassy, along with other political efforts.[958]

668.    Ms. Coon testified that PDVSA "would compensate [subsidiaries for services] ultimately through [] noncash dividend[s] passed from PDV USA to PDV Holding to PDVSA."[959]

669.    During PDVSA's 30(b)(6) deposition, Mr. Cárdenas testified that PDV Chalmette pays his US$4,750 monthly stipend.[960] ████████████████████████████████

████████████████████████████████████████████[961] █████████████

████████████████████████████████████████████████████████████

███████████████████████████████████[962]

670.    During his deposition, Mr. Medina testified that PDV Chalmette paid his salary as President of the PDVSA Ad Hoc Board due to a debt that Chalmette owes to Petróleo, and that he did not "distinguish between Petroleos and PDVSA for purposes of this debt."[963]

671.    On September 2, 2022, PDVSA Ad Hoc sent a letter to Guaidó informing him that OFAC "granted to PDVSA subsidiaries abroad [a license] . . . to use funds owed to PPSA," of up to $15 million:

---

[957] Ex. 19 at 97:10-98:1.

[958] Ex. 487 at G_000000030.

[959] Ex. 19 at 93:25-94:5.

[960] Ex. 292 at 20:18-21:24.

[961] Ex. 292 at 244:2-246:18.

[962] Ex. 292 at 246:19-254:3.

[963] Ex. 166 at 18:12-20:4.

[T]o make payments on behalf of the PDVSA Ad Hoc Management Board . . . related to PDVSA expenses incurred by: 1) the protection and recovery of assets abroad, particularly in cases where CITGO is exposed as collateral, or is involved or affected as a defendant; 2) PDVSA Ad Hoc management operating expenses; 3) expenses related to the Special Master's activity, their counselors and lawyers, in the case of [Crystallex].[964]

672.    Additionally, between September 1, 2023, and February 29, 2024, the PDVSA Ad Hoc Board reports having disbursed $46,864 to cover travel of National Assembly legislators and $43,113 to cover travel of CAPA members.[965]

673.    In April 2023, Citgo hosted members of CAPA at its Houston offices for a series of meetings that took place over two days, with Citgo "assum[ing] the food and lodging expenses."[966]  The second day of meetings on April 19, 2023, was dedicated entirely to two topics—"the trials" and "[s]trategies for Asset Protection"—"so that [the attendees] can discuss these topics in detail and establish, if possible, action plans."[967]

674.    Citgo hosted CAPA again in February 2024 for a series of meetings that took place over the course of three days, between February 24 and 29, 2024, including a "meeting with the Shareholder (CAPA)" and "Board members of the U.S. entities."[968]

675.    Between January 3 and 26, 2024, Mr. Medina attended four meetings with producers from Altamira Cinema Corp. ("**Altamira**"), a production company, including one meeting with both Altamira and "social media influencers" on January 24, 2024.[969]  Mr. Medina submitted his expenses for "breakfasts and lunches with [the] producers" to Citgo for

---

[964] Ex. 488 at PDVSA_0002723.

[965] Ex. 489 at G_0000000011.

[966] Ex. 490 at PDVSA_0007735.

[967] Ex. 490 at PDVSA_0007735.

[968] Ex. 491 at PDVSA_0007774-75.

[969] Ex. 492; Ex. 493; Ex. 494 at PDVH_Girard Street_000140936-39.

reimbursement by PDV Chalmette, citing "the funds that PDV Chalmette owes to PPSA" as a basis for the repayment.[970]

676.    The purpose of the meetings was to discuss Altamira's production of a documentary.[971]

677.    On November 23, 2024, Ms. Ripanti emailed Mr. Medina and other members of the PDVSA Ad Hoc Board, informing them that Altamira was "approved as a SAP Vendor," but payment could not be processed without either "a) bank account approval for PDVSA AHB or, b) FARA registration of PDV Chalmette."[972]

678.    Ms. Ripanti attached, *inter alia*, a contract dated January 5, 2024, and signed by Altamira providing for the payment of $100,000 to produce the documentary,[973] noting that "this copy does not have the signature of Horacio Medina," as well as an invoice dated January 8, 2024, from Altamira to the Ad Hoc Board for a $40,000 installment payment.[974]

**F.    As a "Foreign Agent" Acting on Behalf of the PDVSA Ad Hoc Board, PDVH Has Advocated Before the U.S. Government for a Resolution to Creditor Claims Against Venezuela**

679.    Mr. Medina explained in a 2024 interview that the PDVSA Ad Hoc Board "maintain[s] constant information and a close relationship with the Board of Directors and Asset Protection [CAPA] and with the Board of Directors of the National Assembly," and makes "every effort to ensure that the political world is duly informed."[975]

---

[970] Ex. 493.

[971] Ex. 494; Ex. 496 at PDVH_Girard Street_000140917.

[972] Ex. 495.

[973] Ex. 496.

[974] Ex. 495.

[975] Ex. 401 at 2.

680.    During his deposition, Mr. Medina further testified that in his "role as President of the Ad Hoc Board, [he] interact[ed] with the National Assembly" "[w]henever needed."[976]  He also testified that he interacted with the "Council for the Administration and Protection of Assets [CAPA] more frequently than with the [National] Assembly" and separately with Guaidó.[977]

681.    On October 6, 2021, Mr. Medina, along with Mr. Vera (General Counsel of PDVH), Mr. Wilhelm (Director and President of PDVH), and Mr. Jordá (CEO of Citgo), attended a meeting in Bogota, Colombia with the U.S. Ambassador to Venezuela, James Story, as well as Mr. Domingo Villaronga, Economic Chief of the Venezuela Affairs Unit at the U.S. State Department.[978]  The minutes of a PDVH special board meeting note that "one of the objectives of that meeting was to emphasize the importance of an oil company, like CITGO, for the Venezuelan community residing in the U.S." and that Mr. Story "provided them with a significant amount of advice and guidelines to help garner support and attention from key people in Washington."[979]

682.    Mr. Jordá testified that the group discussed "concerns about Mr. Story's view of the protection of the asset and the interim government," and explained that they "wanted the goodwill of the ambassador to help [them] on the continuing protection of the asset through General License 5 for the 2020s and for the Crystallex case."[980]

---

[976] Ex. 166 at 56:11-58:15.

[977] Ex. 166 at 58:4-58:15, 57:17-57:12.

[978] Ex. 499 at PDVH_Girard Street_000007700, 000007703.

[979] Ex. 53 at PDVH_Girard Street_000000969-71.

[980] Ex. 164 at 47:1-9.

683.    PDVH later reported in a March 2022 FARA filing that two calls and a videoconference took place with Mr. Villaronga as a "[f]ollow-up to [the] October 6 meeting," on October 7 and October 15, 2021, and January 26, 2022, respectively.[981]

684.    Between September 29, 2021 and August 21, 2023, PDVH's public FARA filings describe 57 meetings, calls, emails, and/or texts in which it acted as PDVSA's agent to advance its interests with the U.S. government.[982]  Furthermore, Mr. Jordá listed dozens of additional contacts between 2019 and 2020 in a separate FARA filing.[983]

685.    During PDVSA's 30(b)(6) deposition, Mr. Cárdenas testified that the PDVSA Ad Hoc Board has regular "Zoom meetings" and "in-person meetings" with CAPA on "as-needed basis,"[984] and the PDVSA Ad Hoc Board met with CAPA "between four and six" times in 2024 and "between five and seven" times in 2023.[985]  At these meetings, the PDVSA Ad Hoc Board and CAPA discuss topics including the PDVSA Ad Hoc Board's use of funds and the progress of the various ongoing litigations in which the PDVSA Ad Hoc Board is involved.[986]

686.    Mr. Cárdenas testified that the PDVSA Ad Hoc Board met with Guaidó in November or December of 2021 and that the president of the PDVSA Ad Hoc Board would have "a handful of calls in a year" with Guaidó.[987]  He also testified that the PDVSA Ad Hoc Board met with the Office of the Venezuelan Special Attorney "between seven to ten times in a year," with

---

[981] Ex. 499 at PDVH_Girard Street_000007700, 000007702.

[982] Ex. 66 at PDVH_Girard Street_000007717-18; Ex. 70 at PDVH_Girard Street_000007731-32.

[983] Ex. 500 at G_000319385, G_000319387-89.

[984] Ex. 292 at 35-36.

[985] Ex. 292 at 36.

[986] Ex. 292 at 33-36; *see also* Ex. 491; Ex. 492.

[987] Ex. 292 at 39-40.

some "individual members of the ad hoc board" meeting separately with the Special Attorney's Office team.[988]

### 1.    Lobbying/FARA Filings

687.    PDVH is registered with the U.S. Department of Justice as a "foreign agent" acting on behalf of the PDVSA Ad Hoc Board.[989]  Citgo Holding, Citgo, and PDV USA are (or at some point have previously) registered as foreign agents for the PDVSA Ad Hoc Board.[990]

688.    In its February 2022 FARA filing, and as part of its activities rendered for the PDVSA Ad Hoc Board, PDVH disclosed that it had "interacted with U.S. Government officials to advocate for a resolution to various creditor claims against the Government of Venezuela and/or its subsidiaries in which PDVH is either a party or in which the value of PDVH and its subsidiaries is implicated by the claim."[991]  PDVH also disclosed that "PDVH's preparation for those meetings on occasion involved discussion with Venezuelan government officials within the Government of Juan Gerardo Guaido."[992]

689.    In its September 2022 FARA filing, PDVH noted that Mr. Jordá:

Acting on behalf of PDVH, . . . ha[d] participated in meetings with representatives of the U.S. Government . . . to discuss the importance and means of protecting the assets of PDVH and its subsidiaries, or the value of said assets, from claims brought by creditors of the Maduro regime.[993]

690.    Between June 11, 2019, and January 31, 2020, alone, Mr. Jordá had 32 reportable government contacts, including meetings or calls with representatives of the Department of

---

[988] Ex. 292 at 44-45.

[989] Ex. 21.

[990] Ex. 144 at G_000000534; Ex. 441; Ex. 442; Ex. 443.

[991] Ex. 499 at PDVH_Girard Street_000007688.

[992] Ex. 499 at PDVH_Girard Street_000007688.

[993] Ex. 487 at G_000000026.

Treasury, the U.S. Chamber of Commerce, the House Foreign Affairs Committee, and U.S. Senators, Congressmen, and/or their staff regarding Citgo's governance, operations, and "concerns"; General License 5; the *Crystallex* lawsuit; "detainees" (*i.e.*, the Citgo Six); and "Venezuela/2020 Bonds."[994]

691.    Contemporaneous with its April 30, 2021, FARA filing, Citgo submitted a memorandum entitled "Memo on CITGO Petroleum Corporation and 2020 PDVSA Bond Interest Payment Challenges," describing the impact of the forthcoming interest payments on its "operations and viability."[995]    For example, the memorandum foreshadows the risks and consequences that could result if "the Maduro government fail[s] to make the payment" of $913 million in interest on the 2020 PDVSA Bonds, which would "allow the foreign bondholders to take possession of CITGO" and "benefit [the Maduro government] politically."[996]

692.    In light of these risks, Citgo advocates in the memorandum for "a careful regulatory and policy approach, particularly support from lawmakers" that "not only support[s] [Citgo] through this complicated process but allow[s] time to navigate through this challenge."[997]

693.    In its March 2023 FARA filing, PDVH reported that it had "participated in meetings with representatives of the U.S. Government and prepared materials for those meetings, in an effort to protect PDVH's assets from seizure or diminution in value by creditors of the Maduro regime."[998]

---

[994] Ex. 500 at G_000319387-389.

[995] Ex. 501 at G_000319980.

[996] Ex. 501 at G_000319981.

[997] Ex. 501 at G_000319981.

[998] Ex. 502 at G_000001911.

694. PDVH also reported its "understand[ing] that under the DOJ's interpretation of FARA, PDVSA's indirect ownership of PDVH may, in itself, render PDVH an agent of the PDVSA Ad Hoc Board."[999]

695. In May 2023, the 2015 National Assembly issued a statement that was intended to inform the Venezuelan people about the circumstances surrounding Citgo.[1000]

696. The 2015 National Assembly noted that since 2019, Citgo had been under the control of Juan Guaidó's Interim Government, and that government and the Special Attorney General's Office had proposed a strategy in the U.S. courts that favored litigation over negotiation with creditors.[1001]

697. The 2015 National Assembly also called on the PDVSA Ad Hoc Board to act swiftly to preserve Citgo's property and to seek solutions that avoid jeopardizing its integrity.[1002]

698. In November 2021, a lobbying firm, the Klein/Johnson Group LLC ("**Klein/Johnson**") entered into a consulting agreement with PDVH, as amended on March 20, 2022, to support, among other things, "the durability of PDVH's relationship with its shareholder."[1003]

699. In a March 30, 2022 FARA filing, PDVH reported that it paid $80,000 in fees and $3,114 for travel, meals, and lodging to Klein-Johnson on behalf of the PDVSA Ad Hoc Board.[1004]

---

[999] Ex. 502 at G_000001911.

[1000] Ex. 503.

[1001] Ex. 503 at ¶ 4.

[1002] Ex. 503 at ¶ 4.

[1003] Ex. 73 at G_000319346.

[1004] Ex. 499 at PDVH_Girard Street_000007704.

700.     In December 2023 and June 2024, Klein/Johnson reported in FARA filings that it received $80,000 per month in exchange for lobbying activities performed on behalf of the PDVSA Ad Hoc Board "through PDV Holding, Inc."[1005]

701.     Similarly, in December 2023, Mr. Medina submitted FARA filings stating that on behalf of the PDVSA Ad Hoc Board, he had engaged in contacts with the U.S. Government regarding "the status of litigation commenced by creditors, other matters related to those proceedings and Citgo."[1006]

702.     The Venezuelan authorities also exerted control over the PDVSA Ad Hoc Board to compel it to engage in systemic pro-opposition statements.  Thus, in 2024 the PDVSA Ad Hoc Board repeatedly promoted on X the recognition of opposition candidate Edmundo González Urrutia as Venezuelan President, including through an X post that included video of statements by opposition candidates.[1007]

### 2.     CAPA Letter

703.     On June 28, 2023, CAPA sent a letter to U.S. Department of State Secretary Antony Blinken following up on a June 7, 2023, meeting and setting out CAPA's "proposal by which [PDVH] and its indirect subsidiary [Citgo] could resolve via settlement, the bulk of the creditor claims currently pending against" PDVSA and Venezuela.[1008]

---

[1005] Ex. 272 at G_000000307-15; Ex. 505 at G_000020095; *see also* Ex. 387 at G_000320166 (Willkie Farr & Gallagher LLP also filed a FARA for providing legal services to the Ad Hoc Board.).

[1006] Ex. 506 at 11.

[1007] Ex. 508; Ex. 507; Ex. 447.

[1008] Ex. 452.

704.    The letter stated that between 2019 and 2022, "CITGO has lacked the financial ability to dividend cash to its parent companies to fund a settlement with creditors," and that by the end of Q1 2023, "CITGO generated meaningful financial capacity to fund a settlement with creditors."[1009]

705.    The letter goes on to note that "following the 2023 Transition Statute's creation of [CAPA], the company [Citgo] began working in earnest with Crystallex, the PDVSA bondholders and ConocoPhillips with the intent of settling with all those creditors listed in the table below under Group 1 [Crystallex, PDVSA 2020s, ConocoPhillips, Dresser Rand, Red Tree]" and that "PDVSA and PDVH began settlement discussions with Crystallex in December of last year" and "have had more than a dozen settlement related calls and meetings."[1010]

706.    Finally, the CAPA letter proposes that "CITGO will continue negotiations to satisfy via consensual settlements the claims of Crystallex, the PDVSA 2020 bondholders, and PDVSA creditors with existing writs of attachment" and asks the U.S. government to bar enforcement against Venezuela and PDVSA by their remaining creditors.[1011]

707.    In July 2023, Klein/Johnson filed the CAPA letter with OFAC "on behalf of PDV Holding, Inc., for . . . the PDVSA Ad Hoc Board."[1012]

708.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[1009] Ex. 452 at G_000000290.

[1010] Ex. 452 at G_000000290-091.

[1011] Ex. 452 at G_000000294.

[1012] Ex. 452.



709.

710.

711.

---

[1013] Ex. 454.

[1014] Ex. 454.

[1015] Ex. 454 at PDVSA_0005656.

[1016] Ex. 454 at PDVSA_0005656.

[1017] Ex. 454 at PDVSA_0005656.

███████████████████████████████████████████████████

██████████████████████████████ [1018]

712.    ████████████████████████████████

███████████████████████████████ [1019] ███████████

██████████████████████████ [1020]

713.    ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ [1021]

714.    ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ [1022] ██████████████

█████████████████████ [1023]

---

[1018] Ex. 292 at 192:17-19, 193:4-15.

[1019] Ex. 166 at 127:5-8; *see* Ex. 292 at 170:14-22, 198:2-202:22.

[1020] Ex. 455 at PDVSA_0005661.

[1021] Ex. 455 at PDVSA_0005661.

[1022] Ex. 455 at PDVSA_0005661.

[1023] Ex. 455 at PDVSA_0005670.

715. 

[1024]

716. On the same day, and as part of the meeting between PDVSA Ad Hoc Board, 2015 National Assembly, and CAPA officials, Mr. Gustavo Marcano, Head of CAPA, [1025] gave a presentation on the "Importance of preserving CITGO for Venezuela and the US."

717. 

[1026]

Mr. Marcano further stressed, "Given the situation of the oil and gas industry in Venezuela, CITGO's organization may prove critical in supporting PDVSA and Venezuela during the transition phase."[1027]

718. In an interview with newspaper "Petrogui@" on January 19, 2024, Mr. Medina stated it would be most appropriate for Citgo to pay PDVSA's debts and restructure the sovereign debt, but noted "I think there's a very high risk that Citgo will definitely be lost."[1028] He also said Citgo is "an asset of all Venezuelans . . . ."[1029]

---

[1024] Ex. 292 at 206:3-10.

[1025] Ex. 452 at G_000000295.

[1026] Ex. 455 st PDVSA_0005662.

[1027] Ex. 455 at PDVSA_0005662.

[1028] Ex. 401 at p. 1, 3.

[1029] Ex. 401 at p. 2.

719.    As recently as March 28, 2024, PDVH reported in its FARA filing that "PDVH has worked to advocate for a resolution to various creditor claims against the Government of Venezuela and/or its subsidiaries in which PDVH is either a party or in which the value of PDVH and its subsidiaries is implicated by the claim."[1030]  In recent FARA filings, Citgo Holding has made similar statements.



---

[1030] Ex. 489 at G_000000004; Ex. 509 at G_000002540-54; Ex. 511 at G_000096569-80.

[1031] Ex. 292 at 52:14-21.

[1032] Ex. 292 at 52:14-21.

[1033] Ex. 270 at Schedules 1.1, 1.2.

Dated: March 19, 2025

Respectfully submitted,

/s/ Evan Glassman
Evan Glassman
**STEPTOE LLP**
1114 Avenue of the Americas, 35th Floor
New York, NY 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
eglassman@steptoe.com

Mark W. Friedman
William H. Taft V
Carl Micarelli
Juan Fandiño
Jaime M. Fried
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909-6000
mwfriedman@debevoise.com
whtaft@debevoise.com
cmicarelli@debevoise.com
jfandino@debevoise.com
jmfried@debevoise.com

Michael J. Baratz (*pro hac vice*)
Molly Bruder Fox (*pro hac vice*)
Emma Marshak (*pro hac vice*)
**STEPTOE LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 429-3000
mbaratz@steptoe.com
mbfox@steptoe.com
emarshak@steptoe.com

Robert Drain
Jay B. Kasner
Scott D. Musoff
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
robert.drain@skadden.com
jay.kasner@skadden.com
scott.musoff@skadden.com

*Counsel to Plaintiffs G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, G&A Strategic Investments VII LLC, and Girard Street Investment Holdings LLC*

194